1 | JEROME C. ROTH (State Bar No. 159483)
ROSEMARIE T. RING (State Bar No. 220769)
2 | JONATHAN H. BLAVIN (State Bar No. 230269)
WILLIAM J. EDELMAN (State Bar No. 285177)
3 | MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
4 | San Francisco, California 94105
Tel:    (415) 512-4000
5 | Fax:   (415) 512-4077
Email:  jerome.roth@mto.com
6 |
*Attorneys for Defendant*
7 | LINKEDIN CORPORATION

8 | **UNITED STATES DISTRICT COURT**

9 | **NORTHERN DISTRICT OF CALIFORNIA**

10 | **SAN JOSE DIVISION**

11 |

12 | PAUL PERKINS, PENNIE SEMPELL, ANN | CASE NO.  13-cv-04303-LHK
BRANDWEIN, ERIN EGGERS, CLARE
13 | CONNAUGHTON, JAKE KUSHNER,
NATALIE RICHSTONE, NICOLE CROSBY,
14 | and LESLIE WALL; individually and on | **DEFENDANT'S NOTICE OF MOTION**
behalf of all others similarly situated, | **AND MOTION TO DISMISS FIRST**
15 | | **AMENDED CLASS ACTION**
Plaintiffs, | **COMPLAINT AND TO STRIKE CLASS**
16 | | **ALLEGATIONS; MEMORANDUM OF**
| **POINTS AND AUTHORITIES IN**
17 | v. | **SUPPORT THEREOF**

18 |

19 | LINKEDIN CORPORATION, | Judge:     Hon. Lucy H. Koh
Date:      April 10, 2014
20 | Defendant. | Time:      1:30 p.m.
Location: Courtroom 8 – 4th Floor

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**TABLE OF CONTENTS**

Page

I.     BACKGROUND AND SUMMARY OF ALLEGATIONS ................................................. 4

      A.    The Add Connections Networking Tool ................................................. 4

      B.    Accessing Email Contacts ................................................. 4

      C.    Sending Connection Invitations ................................................. 6

      D.    Plaintiffs' Claims ................................................. 8

II.    LEGAL STANDARDS ................................................. 9

III.   ARGUMENT ................................................. 10

      A.    All Of Plaintiffs' Claims Fail Because Members Consent To Allowing
            Access To Email Contacts and Sending Connection Invitations ................................................. 10

      B.    Plaintiffs Lack Article III Standing To Bring Right Of Publicity, UCL, And
            Section 502 Claims ................................................. 15

      C.    Plaintiffs Fail To State A Claim For Violations Of California's Common
            Law Right Of Publicity ................................................. 21

      D.    Plaintiffs Fail To State A Claim For Violations Of California's Unfair
            Competition Law ................................................. 21

            1.    Plaintiffs Do Not Satisfy Rule 9(b) ................................................. 22

            2.    The Alleged Misrepresentations Are Not "Likely To Deceive"
                  Reasonable Consumers As A Matter Of Law ................................................. 23

            3.    Plaintiffs Do Not Allege Reliance ................................................. 24

            4.    Plaintiffs' Claims Under the Unlawful Prong Fail ................................................. 24

            5.    All Of Plaintiffs' UCL Claims Fail For Lack Of Standing ................................................. 25

      E.    Plaintiffs Fail To State A Claim Under The SCA ................................................. 25

            1.    Plaintiffs Do Not Allege Access To "Electronic Communications" ................................................. 26

            2.    Plaintiffs Do Not Allege That Any "Electronic Communications"
                  Were In "Electronic Storage" ................................................. 27

            3.    Plaintiffs' Allegations Establish That Google Authorized Access To
                  Its Users' Accounts ................................................. 27

      F.    Plaintiffs Fail To State A Claim Under The Wiretap Act ................................................. 28

            1.    Plaintiffs Do Not Allege That The "Contents" Of Any "Electronic
                  Communications" Were Intercepted ................................................. 29

**TABLE OF CONTENTS**

2. Plaintiffs Do Not Allege Any Interception ................................................. 29

G. Plaintiffs Fail To State A Claim Under California Penal Code Section 502 .......... 30

1. Plaintiffs Do Not Allege Circumvention Of Any "Technical" Or "Code-Based" Barriers ........................................................... 30

2. Plaintiffs Do Not Allege Any Cognizable Injury Under Section 502(c)(8) ........................................................................... 32

IV. IN THE ALTERNATIVE, THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS IN THE FAC ................................................................ 33

A. If Held To Be An Issue of Fact, Consent Is Inherently Individualized .................. 33

B. Plaintiffs' Claims Based on Emotional Harm are Inherently Individualized .......... 35

V. CONCLUSION .................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998)...........................................................................35

*Alvarado-Moralez v. Digital Equip. Corp.*,
843 F.2d 613 (1st Cir. 1988) ...........................................................................32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................9, 26

*Be In, Inc. v. Google Inc.*,
2013 WL 5568706 (N.D. Cal. Oct. 9, 2013)................................................10, 11, 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................9

*Chamberlain v. Ford Motor Co.*,
369 F. Supp. 2d 1138 (N.D. Cal. 2005) ................................................................13

*Chudner v. TransUnion Interactive, Inc.*,
626 F. Supp. 2d 1084 (D. Or. 2009)....................................................................12

*Cohen v. Facebook, Inc.*,
798 F. Supp. 2d 1090 (N.D. Cal. 2011),
2011 WL 5117164 (N.D. Cal. Oct. 27, 2011) ......................................................passim

*Cornerstone Consultants, Inc. v. Prod. Input Solutions, L.L.C.*,
789 F. Supp. 2d 1029 (N.D. Iowa 2011) ...............................................................28

*Crowley v. CyberSource Corp.*,
166 F. Supp. 2d 1263 (N.D. Cal. 2001) ................................................................29

*Cruz Lopez v. Pena*,
2013 WL 819373 (N.D. Tex. Mar. 5, 2013) ............................................................27

*Daimlerchrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......................................................................................9

*Facebook, Inc. v. Power Ventures, Inc.*,
2010 WL 3291750 (N.D. Cal. July 20, 2010) ..........................................................31

*Fantasy, Inc. v. Fogerty*,
984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) ......................32

*Faulkner v. ADT Sec. Servs., Inc.*,
706 F.3d 1017 (9th Cir. 2013)............................................................................9

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

*Feldman v. Google*,
    513 F. Supp. 2d 229 (E.D. Pa. 2007) ................................................................. 13

*Fields v. Mobile Messengers Am., Inc.*,
    2013 WL 6073426 (N.D. Cal. Nov. 18, 2013) ..................................................... 34

*Fraley v. Facebook, Inc.*,
    830 F. Supp. 2d 785 (N.D. Cal. 2011) (Koh, J.) ........................................... passim

*Freeman v. Time, Inc.*,
    68 F.3d 285 (9th Cir. 1995) ................................................................................. 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...................................................................................... 15, 21

*Garback v. Lossing*,
    2010 WL 3733971 (E.D. Mich. Sept. 20, 2010) ................................................. 30

*Garcia v. Haskett*,
    2006 WL 1821232 (N.D. Cal. June 30, 2006) ..................................................... 28

*Gibson v. Chrysler Corp.*,
    261 F.3d 927 (9th Cir. 2001) ............................................................................... 14

*Global Policy Partners, LLC v. Yessin*,
    686 F. Supp. 2d 631 (E.D. Va. 2009) .................................................................. 30

*Hernandez v. Path, Inc.*,
    2012 WL 5194120 (N.D. Cal. Oct. 19, 2012) ................................................ 26, 29

*Ibey v. Taco Bell Corp.*,
    2012 WL 2401972 (S.D. Cal. June 12, 2012) ..................................................... 10

*In re Am. Airlines, Inc., Privacy Litig.*,
    370 F. Supp. 2d 552 (N.D. Tex. 2005) ................................................................ 32

*In re Doubleclick Inc. Privacy Litig.*,
    154 F. Supp. 2d 497 (S.D.N.Y. 2001) ............................................................ 16, 27

*In re Facebook Privacy Litig.*,
    2011 WL 6176208 (N.D. Cal. Nov. 22, 2011) ..................................................... 32

*In re Google Android Consumer Privacy Litig.*,
    2013 WL 1283236 (N.D. Cal. Mar. 26, 2013) ..................................................... 30

*In re iPhone Application Litig.*,
    2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) (Koh, J.) ...................... 15, 20, 30, 32

*In re JetBlue Airways Corp. Privacy Litig.*,
    379 F. Supp. 2d 299 (E.D.N.Y. 2005) ................................................................. 16

*In re LinkedIn User Privacy Litig.*,
    932 F. Supp. 2d 1089 (N.D. Cal. 2013) ............................................................... 24

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ............................................................... 14, 22, 23

*Incorp Servs. Inc. v. Incsmart.Biz Inc.*,
    2012 WL 3685994 (N.D. Cal. Aug. 24, 2012) ................................................ 31, 32

*Jones v. Corbis Corp.*,
    815 F. Supp. 2d 1108 (C.D. Cal. 2011)
    *aff'd*, 489 F. App'x 155, 156 (9th Cir. 2012) ........................................ 10, 12, 34

*Konop v. Hawaiian Airlines, Inc.*,
    302 F.3d 868 (9th Cir. 2002) .............................................................................. 29

*La Court v. Specific Media, Inc.*,
    2011 WL 1661532 (C.D. Cal. Apr. 28, 2011) ................................................ 15, 16

*Lapidus v. Hecht*,
    232 F.3d 679 (9th Cir. 2000) ................................................................................ 9

*Legge v. Nextel Commc'ns, Inc.*,
    2004 WL 5235587 (C.D. Cal. June 25, 2004) ..................................................... 35

*Low v. LinkedIn Corp.*,
    2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) (Koh, J.) ..................................... 15

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................. 9

*Lyons v. Bank of Am., NA*,
    2011 WL 6303390 (N.D. Cal. Dec. 16, 2011) ................................................ 33, 35

*Mazur v. eBay Inc.*,
    2008 WL 618988 (N.D. Cal. Mar. 4, 2008) ........................................................ 24

*Mazza v. Am. Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir. 2012) .............................................................................. 33

*Mintz v. Mark Bartelstein & Assocs. Inc.*,
    906 F. Supp. 2d 1017 (C.D. Cal. 2012) .............................................................. 29

*Moreno v. USG Corp.*,
2007 WL 951301 (S.D. Cal. Mar. 19, 2007)........................................................................ 32

*Mortensen v. Bresnan Commc'ns, L.L.C.*,
2010 WL 5140454 (D. Mont. Dec. 13, 2010) ..................................................................... 10

*Murray v. Fin. Visions, Inc.*,
2008 WL 4850328 (D. Ariz. Nov. 7, 2008) ........................................................................ 34

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001)................................................................................................ 9

*Newcombe v. Adolf Coors Co.*,
157 F.3d 686 (9th Cir. 1998)........................................................................................ 10, 21

*Nexsales Corp. v. Salebuild, Inc.*,
2012 WL 216260 (N.D. Cal. Jan. 24, 2012) .................................................................. 26, 27

*O'Donovan v. Cashcall, Inc.*,
278 F.R.D. 479 (N.D. Cal. 2011) ........................................................................................ 34

*Sanders v. Apple, Inc.*,
672 F. Supp. 2d 978 (N.D. Cal. 2009) ........................................................................... 33, 35

*Scherillo v. Dun & Bradstreet, Inc.*,
684 F. Supp. 2d 313 (E.D.N.Y. 2010) ................................................................................ 12

*Shefts v. Petrakis*,
2011 WL 5930469 (C.D. Ill. Nov. 29, 2011) ..................................................................... 10

*Stearns v. Select Comfort Retail Corp.*,
2009 WL 1635931 (N.D. Cal. June 5, 2009) ...................................................................... 33

*Talbot v. Robert Matthews Distrib. Co.*,
961 F.2d 654 (7th Cir. 1992) ............................................................................................... 32

*Theofel v. Farey–Jones*,
359 F.3d 1066 (9th Cir. 2004)............................................................................................. 27

*Tietsworth v. Sears*,
720 F. Supp. 2d 1123 (N.D. Cal. 2010) .............................................................................. 33

*Torres v. Nutrisystem, Inc.*,
289 F.R.D. 587 (C.D. Cal. 2013) ........................................................................................ 34

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008).............................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Nosal,*
676 F.3d 854 (9th Cir. 2012)...................................................................................... 31

*United States v. Reed,*
575 F.3d 900 (9th Cir. 2009)...................................................................................... 29

*United States v. Weaver,*
636 F. Supp. 2d 769 (C.D. Ill. 2009)......................................................................... 27

*Vess v. Ciba-Geigy Corp. USA,*
317 F.3d 1097 (9th Cir. 2003)............................................................................ 14, 22

*Yunker v. Pandora Media, Inc.,*
2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) .......................................................... 26

## STATE CASES

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*
20 Cal. 4th 163 (1999)............................................................................................... 25

*Chrisman v. City of Los Angeles,*
155 Cal. App. 4th 29 (2007)...................................................................................... 30

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.,*
35 Cal. 3d 197 (1983)................................................................................................ 23

*In re Tobacco II Cases,*
46 Cal. 4th 298 (2009)............................................................................................... 24

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (2003)............................................................................................. 25

*Lugosi v. Universal Pictures,*
25 Cal. 3d 813 (1979)................................................................................................ 20

*Miller v. Collectors Universe, Inc.,*
159 Cal. App. 4th 988 (2008).................................................................................... 20

*Slivinsky v. Watkins–Johnson Co.,*
221 Cal. App. 3d 799 (1990)..................................................................................... 21

## FEDERAL STATUTES

18 U.S.C. § 2510 ......................................................................................................... 9

18 U.S.C. § 2510(4) ................................................................................................... 28

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

**Page(s)**

18 U.S.C. § 2510(8) ........................................................................................................ 29

18 U.S.C. § 2510(17) ............................................................................................ 25, 26, 27

18 U.S.C. § 2511(1)(a) .................................................................................................... 28

18 U.S.C. § 2511(2)(d) .................................................................................................... 10

18 U.S.C. § 2701 .............................................................................................................. 9

18 U.S.C. § 2701(a)(1) ............................................................................................... 25, 26

18 U.S.C. § 2701(c)(1) ............................................................................................... 27, 28

18 U.S.C. § 2701(c)(2) .................................................................................................... 10

## STATE STATUTES

Cal. Bus. & Prof. Code § 17200, *et seq.* ......................................................................... 21

Cal. Bus. & Prof. Code § 17204 ...................................................................................... 25

Cal. Civ. Code § 3344 ..................................................................................................... 17

Cal. Penal Code § 502 (Wiretap Act ) .................................................................... passim

Cal. Penal Code § 502(b)(10) .................................................................................. 10, 30

Cal. Penal Code § 502(c) ............................................................................................... 30

Cal. Penal Code § 502(c)(1) .................................................................................... 10, 30

Cal. Penal Code § 502(c)(6)-(8) .............................................................................. 10, 30

Cal. Penal Code § 502(c)(7) ........................................................................................... 30

Cal. Penal Code § 502(c)(8) ........................................................................................... 32

Cal. Penal Code § 637 .................................................................................................... 34

## FEDERAL RULES

Fed. R. Civ. P. 9(b) .............................................................................................. passim

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 3, 9, 15

Fed. R. Civ. P. 12(b)(6) ....................................................................................... passim

**Page(s)**

Fed. R. Civ. P. 12(f) ................................................................................... 3, 32, 33

Fed. R. Civ. P. 23 ............................................................................................... 33

Fed. R. Civ. P. 23(b)(3) ...................................................................................... 33

Fed. R. Civ. P. 23(c)(1)(A) ............................................................................ 4, 33

Fed. R. Civ. P. 23(d)(1)(D) ........................................................................ 4, 5, 33

Fed. R. Civ. P. Rules 12(f) .................................................................................. 4

**CONSTITUTIONAL PROVISIONS**

U.S. Const., art. III ...................................................................................... passim

**TREATISES**

Restatement (Second) of Torts § 892 ............................................................... 10

## NOTICE OF MOTION AND MOTION TO DISMISS AND TO STRIKE

PLEASE TAKE NOTICE that on April 10, 2014 at 1:30 p.m. before the Honorable Lucy H. Koh in Courtroom 8 on the Fourth Floor of the above-entitled Court located at 280 South 1st Street, San Jose, California, Defendant LinkedIn Corporation ("LinkedIn") will move to dismiss Plaintiffs' First Amended Class Action Complaint ("First Amended Complaint" or "FAC"), and in the alternative, to strike the class allegations therefrom. LinkedIn's motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), 9(b), 12(f), 23(c)(1)(A), and 23(d)(1)(D), and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice filed herewith, the Declaration of William J. Edelman (and exhibits thereto) filed herewith, all pleadings and papers on file in this matter, and such other matters as may be presented to this Court at the hearing or otherwise.

## STATEMENT OF RELIEF SOUGHT

LinkedIn seeks an order, pursuant to Rules 12(b)(1), 12(b)(6), and 9(b), dismissing with prejudice the FAC and each of its causes of action for lack of standing and failure to state a claim upon which relief can be granted, or, in the alternative, an order pursuant to Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) striking the class allegations as immaterial and impertinent.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Whether Plaintiffs have standing under Article III of the U.S. Constitution.

2.    Whether the FAC states a claim upon which relief can be granted.

3.    Whether the FAC's class allegations should be stricken.

## MEMORANDUM OF POINTS AND AUTHORITIES

LinkedIn is the world's largest professional network, with more than 259 million members. In contrast to social networks used to share personal information among friends and family, LinkedIn allows members to connect with, find, and be found by current and potential business contacts to create professional networks online. As with traditional business networking, the more connections a member has, the larger and more effective the member's professional network

becomes, and the more exposure and opportunities the member enjoys. LinkedIn provides members with a variety of tools to expand their networks, including one called Add Connections, which allows members to import email addresses from their external email accounts and send emails inviting those contacts to join their networks.

In this putative class action, Plaintiffs bring a series of meritless claims based on their contention that Add Connections is a "deceptive advertising scheme" used by LinkedIn to expand its member base. According to Plaintiffs, permission screens presented to members when they use Add Connections deceive them into allowing access to their email contacts and sending connection invitations to those contacts in violation of California's common law right to publicity, California's Unfair Competition Law ("UCL"), the Stored Communications Act ("SCA"), the Wiretap Act, and California Penal Code section 502. As shown below, every one of these claims is groundless as a matter of law and should be dismissed.

*First*, all of Plaintiffs' claims fail because Plaintiffs' allegations establish, as a matter of law, that members consent to Add Connections accessing their email contacts and sending connection invitations. Plaintiffs acknowledge that LinkedIn members must click through a series of permission screens when using Add Connections. Any reasonably prudent Internet user who reviewed these screens would understand that, by clicking buttons labeled "Allow" and "Add Connections," they were consenting to the challenged actions. At a minimum, Plaintiffs have not adequately pled their own lack of consent as required to state a claim under any of the asserted causes of action. Because all of Plaintiffs' claims are based on their contention that Add Connections permission screens are deceptive, their claims are "grounded in fraud" and thus subject to the heightened pleading standard of Rule 9(b). Plaintiffs do not come close to meeting this standard because they do not allege what screens *they* saw, how *they* were supposedly deceived by the screens, and what actions *they* took in reliance on them. Without such allegations, Plaintiffs also fail to satisfy even the more lenient notice pleading standard of *Twombly/Iqbal*. There are no facts alleged from which a plausible inference may be drawn that, despite clicking though permission screens requiring members to consent *before* email contacts are accessed or connection invitations are sent, they did not consent to such actions.

*Second*, Plaintiffs' right of publicity, UCL, and California Penal Code Section 502 claims fail on the additional ground that Plaintiffs do not allege a cognizable injury sufficient to establish Article III standing or to state a claim. Plaintiffs fail in their attempt to make this case "fit" this Court's opinion in *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 800 (N.D. Cal. 2011) (Koh, J.), because they do not allege facts showing that connection invitations have "concrete, measureable, and provable" economic value. In *Fraley*, the plaintiffs challenged Facebook's "Sponsored Stories" program, by which paid advertisements were displayed stating that members "Like" the third-party advertiser. The plaintiffs alleged that these "endorsements" were two to three times more valuable than regular advertisements, and that they were injured because Facebook should have compensated them for this increased value. *Id.* at 797-99. Here, by contrast, Add Connections allows members to expand their professional networks—the very reason they join LinkedIn—not to advertise on behalf of third parties. Plaintiffs' contention that each connection invitation has economic value because, if accepted, it grows LinkedIn's member base is precisely the type of indirect and undefined economic value rejected as insufficient to show injury by this Court in *Fraley* and by *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090 (N.D. Cal. 2011), 2011 WL 5117164 (N.D. Cal. Oct. 27, 2011). Nor do Plaintiffs allege that they suffered any emotional harm in support of their claims.

*Third*, Plaintiffs' claims under the SCA, the Wiretap Act, and Section 502 also fail because Plaintiffs do not allege facts showing that the importation of *email addresses*, or the manner in which they were imported, violates any of these statutes. Instead, Plaintiffs falsely accuse LinkedIn of "hacking into" the contents of email communications. These conclusory and baseless allegations are not only insufficient to state a claim, but are highly prejudicial to LinkedIn and should be stricken under Rule 12(f).

Plaintiffs' claims should be dismissed under Rule 12(b)(1), Rule 12(b)(6), and Rule 9(b). To the extent any of Plaintiffs' claims survive dismissal because the Court concludes that consent is not established as a matter of law, or that injury in the form of emotional harm is sufficiently alleged, Plaintiffs' class allegations should be stricken. Whether class members misunderstood Add Connections permission screens, or were embarrassed by a connection invitation, are

1   individualized issues that preclude class treatment of Plaintiffs' claims.  Thus, the class allegations

2   should be stricken under Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) to avoid a waste of time and

3   resources by the Court and the parties on a futile class certification motion.

4   **I.       BACKGROUND AND SUMMARY OF ALLEGATIONS**

5           **A.      The Add Connections Networking Tool**

6           Add Connections allows LinkedIn members to expand their professional networks quickly

7   and efficiently by importing contacts from their external email accounts and sending emails

8   inviting their contacts to join the members' LinkedIn networks.  As Plaintiffs' allegations show,

9   members using Add Connections are guided through a multi-step process by a series of permission

10  screens that explain each step and require members to affirmatively consent *before* email contacts

11  are accessed and *before* connection invitations are sent. [1]  Because all of the permission screens

12  presented to members, and the order in which they are presented, are relevant to Plaintiffs'

13  contention that members are deceived into allowing Add Connections to access their email

14  contacts and send connection invitations, a screen omitted by Plaintiffs is properly subject to

15  judicial notice, *see* Request for Judicial Notice ("RJN") at 4-5, and set forth below as it was

16  presented to members.

17          **B.      Accessing Email Contacts**

18          Members must click through two permission screens affirmatively demonstrating consent

19  *before* email contacts are accessed.  The first screen is from LinkedIn and invites members to

20  "Grow your network on LinkedIn" and "Get started by adding your email address":

21

22

23

24

25

26  _____

    [1] Plaintiffs allege that Add Connections accesses email contacts from "Yahoo! Mail, Microsoft
27  Mail, Google Gmail, and any number of other email service providers," FAC ¶ 24, but only allege
    facts relating to Google Gmail.  Accordingly, Plaintiffs' claims are limited to accessing and
28  sending emails to contacts from Google Gmail.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                                            CASE NO. 13-CV-04303-LHK



FAC ¶ 29 & Figure 3, at 15. Members have the choice to "Continue" or "Skip this step." Members who click "Continue" are connected to Google Gmail in one of two ways, depending on whether they are logged into their Google accounts. If they are not logged in, they have to enter their passwords. *Id*. ¶ 30. Once they enter their passwords, or if they are logged into their Google accounts, members are presented with a second permission screen from Google notifying them that "LinkedIn is asking for some information from your Google Account," including "Google Contacts," which Google describes elsewhere to Gmail users as follows: "[e]mail addresses are automatically added to your Contacts list each time you use the Reply, Reply to all, or Forward functions to send mail to addresses that don't already exist in your Contacts list." Declaration of William J. Edelman in Support of RJN ("Edelman Decl."), Ex. D.

FAC Figure 4. Members have the choice to "Allow" access to their Google accounts, including their Google Contacts, or to deny access by clicking "No thanks."

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

### C. Sending Connection Invitations

For members who "Allow" access to their Google accounts and Google Contacts, email addresses are imported and presented to the members using two permission screens, one for contacts who are members of LinkedIn and one for contacts who are not. Both screens require members to affirmatively demonstrate their consent *before* connection invitations are sent. The first screen invites members to "Connect with people you know on LinkedIn":



Edelman Decl., Ex. F. The LinkedIn profiles of these contacts are presented in a screen with a vertical scroll bar along the right side. The screen invites members to select contacts they want to connect to ("Select the people you'd like to connect to"), and indicates that all contacts are currently selected by displaying a checked "Select All" checkbox and stating the total number selected ("218 Selected"). Members may consent or decline to send connection invitation emails by taking one of the following actions: (1) click "Add Connection(s)" to send connection invitation emails to all contacts; (2) uncheck the "Select All" box, select individual contacts, and click "Add Connection(s)" to send connection invitation emails to selected contacts; or (3) click "Skip this step" to decline to send connection invitations and proceed to the next screen. If members choose (1) or (2), emails are sent to selected contacts.

The second permission screen invites members to "Stay in touch with your contacts who aren't on LinkedIn yet" and "Invite them to connect with you":



FAC Figure 5. The names and email addresses of these contacts are presented in a screen with a vertical scroll bar along the right side. *Id.* ¶ 44. The screen allows members to "[i]nvite them to connect with you," and indicates that all contacts are selected by displaying a checked "Select All" checkbox and stating the total number of contacts selected ("1132 Selected). *Id.* Figure 5. Members may consent or decline to send connection invitations by taking one of the following actions: (1) click "Add to Network" to send connection invitation emails to all contacts; (2) uncheck the "Select All" box, select specific contacts, and click "Add to Network" to send connection invitation emails to selected contacts; or (3) click "Skip this step" to decline to send invitations. For members who choose (1) or (2), emails are sent to selected contacts. Because the vast majority of LinkedIn members have public profiles, including all of the Plaintiffs with current LinkedIn accounts, *see* Edelman Decl., Exs. B1-B9, these connection invitations convey no more information than what Plaintiffs made publicly available on LinkedIn. As with all connection invitations, if there is no response, reminder emails are sent. FAC ¶ 6.

### D.     Plaintiffs' Claims

Plaintiffs contend that Add Connections is a "deceptive advertising scheme to improperly use the names, photographs, likenesses, and identities of Plaintiffs for the purpose of generating substantial profits for LinkedIn." FAC ¶ 10.  Plaintiffs do not challenge connection invitations sent to contacts who are LinkedIn members, presumably because it contradicts their theory that the purpose of Add Connections is to expand LinkedIn's member base.  They also do not allege any facts about their own experiences with the Add Connections permission screens.  They do not allege what screens they saw, what they understood them to mean, or whether they sent invitations to LinkedIn members or clicked "Skip this Step" to proceed directly to the screen used to send invitations to contacts who are not on LinkedIn.  In short, Plaintiffs do not allege that they actually read or were deceived by any of the permission screens upon which their claims are based.

Plaintiffs also contend, without factual support, that connection invitations and "additional spam emails" containing their names were sent to their email contacts "endorsing and advertising" LinkedIn.  *Id.* ¶¶ 13-21.  Plaintiffs allege that they were "deprived [of the] monetary value" of these so-called "endorsements," *id.* ¶¶ 72-73, but they do not point to anything in the emails that endorses LinkedIn.  They contend that invitations have "monetary value" because they increase the size of LinkedIn's member base.  *See, e.g., id.* ¶¶ 52, 58.  Plaintiffs misquote LinkedIn founder and Chairman Reid Hoffman as crediting Add Connections with LinkedIn's growth, *id.* ¶ 52 (quoting Mr. Hoffman as saying "it's that connection with the individual that I think leads to growth rate"), when in fact Mr. Hoffman was referring to *LinkedIn's* connection with its members. *See* Edelman Decl., Ex. A.  Plaintiffs also selectively quote discussion board posts by anonymous LinkedIn members expressing frustration and embarrassment supposedly caused by invitations, *see, e.g.,* FAC ¶ 31, though they allege no such supposed injury as to themselves.

With respect to accessing email contacts, Plaintiffs falsely accuse LinkedIn of "guessing [email account] passwords" and of "hacking into," "breaking into," and "tunneling" into their email accounts and the "contents" of their emails, *id.* ¶¶ 2, 3, 32, 43, 114, 115, 119, all without any factual support whatsoever; they do not allege a single instance where a password was "guessed" or the contents of emails were accessed.

Plaintiffs' claims challenging Add Connections fall into three categories. *First*, Plaintiffs contend that Add Connections accessed their email contacts without consent in violation of the SCA, 18 U.S.C. § 2701 *et seq.*, the Wiretap Act, 18 U.S.C. § 2510 *et seq.*, and California Penal Code Section 502. *See* FAC ¶¶ 110-138. *Second*, Plaintiffs contend that Add Connections, also without consent, sent emails inviting these contacts to join LinkedIn members' networks in violation of California's common law right of publicity. *Id.* ¶¶ 88-99. *Third*, Plaintiffs contend that Add Connections violates all three prongs of the UCL, California Business & Professions Code § 17200 *et seq.*, based on alleged violations of other state laws ("unlawful" prong) and alleged misrepresentations in permission screens and on LinkedIn's blog ("unfair" and "fraudulent" prongs). *Id.* ¶¶ 100-109. Plaintiffs seek to represent a class of "All natural persons in the United States who had an account registered on www.linkedin.com as of May 15, 2013, and had their names, photographs, likenesses, or identities associated with their accounts used in an endorsement email sent to third parties by LinkedIn." *Id.* ¶ 75.

## II.     LEGAL STANDARDS

Federal courts have subject matter jurisdiction only over "cases" or "controversies" under Article III of the U.S. Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). To invoke that jurisdiction, a plaintiff must allege "standing for each claim he seeks to press" or face dismissal under Rule 12(b)(1). *Daimlerchrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint "must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Though the court accepts all allegations of material fact as true and construes the pleadings in the light most favorable to the plaintiffs, *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013), it should not accept mere "labels and conclusions," nor a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). In addition to a plaintiff's allegations, the court may consider documents referenced in the complaint and relevant matters subject to judicial notice. *E.g.*, *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000).

III. **ARGUMENT**

A. **All Of Plaintiffs' Claims Fail Because Members Consent To Allowing Access To Email Contacts and Sending Connection Invitations**

Plaintiffs must show lack of consent to state a claim under each of the asserted causes of action.[2] Because any reasonably prudent Internet user who reviewed the Add Connections permission screens would understand that they were consenting to Add Connections accessing their email contacts and sending connection invitations on their behalf, Plaintiffs' own allegations establish consent as a matter of law. This is fatal to Plaintiffs' claims. At a minimum, Plaintiffs do not adequately allege lack of consent under Rule 9(b) or even the more lenient notice pleading standard of *Twombly/Iqbal*.

Claims based on lack of consent can be dismissed on the pleadings where the allegations establish consent to the challenged conduct. *See, e.g., Ibey v. Taco Bell Corp.*, 2012 WL 2401972, at *3 (S.D. Cal. June 12, 2012) (dismissing claim where "Plaintiff expressly consented to contact by Defendant"); *Mortensen v. Bresnan Commc'ns, L.L.C.*, 2010 WL 5140454, at *4-5 (D. Mont. Dec. 13, 2010) (finding consent for Wiretap Act claim where consent "evident" based on ISP privacy notice and user agreement). "Consent is determined from the reasonable viewpoint of another person, not from Plaintiff's unexpressed subjective beliefs." *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1112 n.2 (C.D. Cal. 2011) (*citing* Restatement (Second) of Torts § 892)), *aff'd*, 489 F. App'x 155, 156 (9th Cir. 2012); *see also Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *9 (N.D. Cal. Oct. 9, 2013) (Koh, J.) (applying "reasonably prudent internet user" standard to determine whether users had notice of website's terms of service so as to be bound by them).

---

[2] *See Cohen*, 798 F. Supp. 2d at 1093-94 (plaintiff must establish "lack of consent" under California common law right of publicity (citing *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998)); 18 U.S.C. § 2701(c)(2) (under SCA, person may "authorize[]" access to electronic communications if he or she is a "user" of the "service"); *Shefts v. Petrakis*, 2011 WL 5930469, at *7 n.10 (C.D. Ill. Nov. 29, 2011) ("under the SCA, it would be Plaintiff's burden to prove that the access was unauthorized"); 18 U.S.C. § 2511(2)(d) (under Wiretap Act, interception not unlawful where "one of the parties to the communication has given prior consent to such interception"); Cal. Penal Code §§ 502(c)(1) and (6)-(8), 502(b)(10) (requiring defendant to be acting "without permission"). Plaintiffs' UCL claim also relies upon the absence of consent because the alleged misrepresentations Plaintiffs contend negate consent (deceptive screens) are not "likely to deceive" a reasonable consumer, *see infra* Part III.D.2.

Plaintiffs' allegations establish that, as a matter of law, they consented to Add Connections accessing their email contacts by clicking through two permission screens. In the first screen, members are invited to "Grow your network on LinkedIn" and "Get started by adding your email address," and are given the choice to "Continue" or "Skip this step." FAC Figure 3. Only members who click "Continue" are taken to the second screen, which informs all first-time users of the tool that "LinkedIn is asking for some information from your Google Account," including "Google Contacts." *Id.* Figure 4. They are again given the choice to "Allow" access to their Google accounts and Google Contacts or to deny access by clicking "No Thanks." *Id.* ¶ 32 & Figure 4. Google Contacts are accessed *only* if members click "Allow." Members who read these permission screens and clicked buttons labeled "Continue" and "Allow" would reasonably understand that they were consenting to Add Connections accessing their Google Contacts.

Plaintiffs concede that members provide "authority and consent" to access "external email accounts" and "contact lists" from those accounts. *Id.* ¶ 33. But they contend that the term "Google Contacts" is deceptive because it does not mean email addresses "of every person emailed by the users and every person who has received an email from LinkedIn's users." *Id.* ¶ 33. Plaintiffs are wrong. As Plaintiffs acknowledge, "it is Google that provides this screen," *id.* ¶ 32, not LinkedIn, and Google describes Google Contacts to Gmail users as follows: "Email addresses are automatically added to your Contacts list each time you use the Reply, Reply to all, or Forward functions to send mail to addresses that don't already exist in your Contacts list." Edelman Decl., Ex. D (Google description of "Google Contacts"). Accordingly, by clicking "Continue" and then "Allow," in response to screens stating that LinkedIn was requesting information, including "Google Contacts," from their Google accounts, Plaintiffs consented to Add Connections accessing all email addresses contained in their Google Contacts.

Plaintiffs' allegations also establish that, as a matter of law, they consented to Add Connections sending connection invitations by clicking through a permission screen. A reasonably prudent user who read the permission screen used by members to send invitations to contacts who are not on LinkedIn would understand that clicking "Add to Network" on a screen that asks them to "Stay in touch with your contacts who aren't on LinkedIn yet" and "Invite them

to connect with you," and that provides a list of email addresses with a check-box indicating that all of them are selected along with the total number selected, will result in connection invitations being sent to the selected email addresses. *See* FAC Figure 5. In the context of a professional network, in which names are part of public profiles available for viewing by any Internet user, a reasonably prudent Internet user would understand that a connection invitation will include their names. Consent to sending reminder emails may also be determined as a matter of law because, under California's common law right of publicity, consent "may be implied from the consenting party's conduct and the circumstances of the case." *Jones*, 815 F. Supp. 2d at 1113. Reminder emails are no different than connection requests. They contain the same information and are sent to the same contacts. As LinkedIn explains to members, in a document the FAC cites to and relies upon, the "intention behind sending reminders is to jog the receiver's memory in case they overlooked the original message. No more than two reminders are ever sent," and the reminders stop once a member replies. Edelman Decl., Ex. E & FAC ¶ 8. In light of these circumstances, consent to reminder emails is implied from a member's consent to send the initial invitation.

Plaintiffs acknowledge that members are "provided a screen that allows [them] to scroll down and view the total list of email addresses downloaded," FAC ¶ 44, but contend that "the screen greys out this scroll bar," *id*. ¶ 34. However, the screen shot in the FAC shows the scroll bar and the total number of contacts available to be viewed. *Id*. Figure 5. Scroll bars are a common means to display a large amount of information on a website. Courts routinely hold, for example, that information is "'reasonably communicated' to a webpage user" where the user "simply has to scroll down a page to read the clause." *Scherillo v. Dun & Bradstreet, Inc.*, 684 F. Supp. 2d 313, 322 (E.D.N.Y. 2010) ("A person who checks the box agreeing to the terms and conditions of a purchase on an internet site without scrolling down to read all of the terms and conditions is in the same position as a person who turns to the last page of a paper contract and signs it without reading the terms.").[3]

---

[3] *See also, e.g.*, *Chudner v. TransUnion Interactive, Inc.*, 626 F. Supp. 2d 1084, 1090 (D. Or. 2009) ("[Plaintiff] argues that the TrueCredit forum selection clause was a surprise to consumers, because it was contained in a small text-box that required the consumer to scroll down repeatedly

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

Anecdotal allegations of complaints by a *de minimis* fraction of LinkedIn's more than 259 million members do nothing to change the conclusion that a reasonably prudent Internet user who viewed and clicked through the Add Connection permission screens consented as a matter of law. *See Chamberlain v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1145 (N.D. Cal. 2005) (where a "reasonable consumer" standard is used, "[a]necdotal evidence alone is insufficient" to show that a reasonable consumer is likely to be misled). While some members may conceivably have clicked on buttons labeled "Allow" and "Add Connections" without paying attention to the accompanying permission screens, that does not mean that they did not objectively consent, much like someone who inadvertently clicks on "Reply to All" in Outlook and sends an email to a broader audience than intended.

The Add Connections permission screens distinguish this case from this Court's decision in *Fraley* and from *Cohen*, 798 F. Supp. 2d 1090, which both held that consent could not be found as a matter of law where the defendant relied on provisions in a website's terms and conditions agreed to at registration. *See, e.g.*, *Fraley*, 830 F. Supp. 2d at 805-06 (consent premised on Facebook's "Terms of Use" presented to users during initial account registration process prior to initiation of "Sponsored Stories" program); *Cohen*, 798 F. Supp. 2d at 1094-96 (consent argument premised on Facebook's "Statement of Rights and Responsibilities," "Principles," and "Privacy Policy"). The *Fraley* plaintiffs argued that they "were never asked to review or renew their Terms of Use subsequent to Facebook's introduction of the Sponsored Stories feature, which operates on an opt-out basis." *Fraley*, 830 F. Supp. 2d at 805. Here, in contrast, Plaintiffs acknowledge that members using Add Connections must click through the permission screens that establish consent, and thus cannot claim they did not have the opportunity to review them before consenting. The screen used to send connection invitations (FAC Figure 5) alone precludes Plaintiffs' right of

to read it in full.... Although [plaintiff] contends that this renders the forum selection clause hidden and, thus, unenforceable, that fact is simply insufficient to render the forum selection clause invalid due to surprise."); *Feldman v. Google*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007) ("That the user would have to scroll through the text box of the Agreement to read it in its entirety does not defeat notice because there was sufficient notice of the Agreement itself and clicking 'Yes' constituted assent to all of the terms.").

publicity and UCL claims since those claims relate solely to the supposed "endorsement" of LinkedIn in those invitations. The preceding two screens authorizing access to email contacts (FAC Figures 3 & 4) dispose of Plaintiffs' remaining claims based on the SCA, the Wiretap Act, and Section 502.

At a minimum, Plaintiffs do not adequately allege their own lack of consent to Add Connections accessing email contacts and sending connection invitations. Plaintiffs speculate about what LinkedIn members might not understand about the Add Connections permission screens, but a "class action, when filed, includes only the claims of the named plaintiff or plaintiffs." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 940 (9th Cir. 2001). Plaintiffs allege nothing about their *own* experiences with the Add Connections permission screens, aside from conclusory statements that Add Connections accessed their email contacts "without [their] authorization," *e.g.*, FAC ¶ 13, and sent connection invitations "without prior consent," *e.g.*, *id.* In addition, because the alleged lack of consent is based entirely on the contention that LinkedIn intentionally misled members into using Add Connections through deceptive permission screens — in other words, obtained consent through fraud — all of Plaintiffs' claims are grounded in fraud and thus subject to the particularity requirements of Rule 9(b).[4] In "cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct," and "allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-05 (9th Cir. 2003). Under Rule 9(b), Plaintiffs must plead with particularity "'the who, what, when, where, and how' of the misconduct charged," *Vess*, 317 F.3d at 1106, and "set forth an explanation as to why the statement or omission complained of was false or misleading," *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996). Plaintiffs' failure to

---

[4] *E.g.,* FAC ¶ 1 (LinkedIn engaged in "deceptive business practices") ¶ 33 ("LinkedIn's disclosures on its website are designed to deceive"), ¶ 32 (screen "misleadingly states" information), ¶ 34 ("design, layout, and format of the page is aimed to deceive"), ¶ 35 ("LinkedIn is deceiving its users"), ¶ 36 ("LinkedIn is aware that its web pages are deceptive"), ¶ 37 (screen "misleads" users), ¶ 38 ("LinkedIn misleads its users with respect to the implications of [permission] screen"), ¶ 47 ("LinkedIn makes numerous deceptive and misleading statements").

provide *any* facts about what permission screens *they* saw or how *they* were supposedly deceived falls far short of Rule 9(b)'s heightened pleading standard.

All of Plaintiffs' claims rise or fall on the contention that members do not consent to Add Connections accessing their email contacts and sending connection invitations. Because any reasonably prudent Internet user who read the Add Connections permission screens would understand that by clicking through them they were agreeing to both, consent is established as a matter of law. At a minimum, Plaintiffs do not adequately allege lack of consent as to themselves because they do not allege any facts showing that they were deceived by the permission screens and therefore did not consent to the challenged actions.

## B.    Plaintiffs Lack Article III Standing To Bring Right Of Publicity, UCL, And Section 502 Claims

Plaintiffs fail to allege a cognizable injury to satisfy the standing requirements of Article III, and thus their right of publicity, UCL, and Section 502 claims should be dismissed under Rule 12(b)(1).

To establish Article III standing, a plaintiff "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). For the injury-in-fact requirement, Plaintiffs must allege a "coherent and factually supported theory of what that injury might be," which means a "particularized example of economic injury or harm," not simply "abstract concepts" such as "value-for-value exchanges." *In re iPhone Application Litig.*, 2011 WL 4403963, at *5-6 (N.D. Cal. Sept. 20, 2011) (Koh, J.) (internal citations and quotations omitted) (quoting *La Court v. Specific Media, Inc.*, 2011 WL 1661532, at *6 (C.D. Cal. Apr. 28, 2011); *see also Low v. LinkedIn Corp.*, 2011 WL 5509848, at *3-4 (N.D. Cal. Nov. 11, 2011) (Koh, J.) (plaintiff's allegation that "[p]ersonal information has an independent economic

value, and that he was not justly compensated for LinkedIn's transfer of his personal data" was "too abstract and hypothetical to support Article III standing").[5]

Here, Plaintiffs do not allege any "coherent and factually supported" theory of economic or non-economic harm to show injury in fact. Two recent cases, *Cohen* (Seeborg, J.) and *Fraley* (Koh, J.), addressed "what kind of facts must be alleged to show the existence of economic damages" for right of publicity and UCL claims. *Cohen*, 2011 WL 5117164, at *2. In *Cohen*, the plaintiffs challenged Facebook's "Friend Finder" program, which allegedly was

> designed to encourage Facebook users to create larger networks of 'friends,' and, at least allegedly, to give Facebook access to email addresses for non-users who can then be solicited to join Facebook. As such, the service facilitates Facebook's ability to increase both its user base and the amount of time individual users spend on the site . . . . [I]t is beyond dispute that its ability to earn advertising revenues and its valuation as a company are dependent on the size and involvement of its user base.

*Cohen*, 798 F. Supp. 2d at 1096. The plaintiffs argued that their names and likenesses were used by Facebook to promote the Friend Finder program, which "had an economic value to Facebook" because their use "can be seen as serving a commercial purpose, undertaken with at least the intent of achieving growth in Facebook's user base, thereby ultimately resulting in monetary gain for Facebook." *Cohen*, 2011 WL 5117164, at *2. The court held that such allegations, even if true, did not identify a cognizable economic injury, and dismissed the claim in both the original and amended complaints. *Id.* at *3; 798 F. Supp. 2d at 1097.

In contrast, this Court in *Fraley* held that the plaintiffs had "articulated a coherent theory of how they were economically injured by the misappropriation of their names, photographs, and likenesses." 830 F. Supp. 2d at 799. In *Fraley*, the plaintiffs alleged that when they clicked the

---

[5] *See also, e.g., In re Doubleclick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) (unauthorized collection of personal information not "economic loss to the subject"); *LaCourt*, 2011 WL 1661532, at *5 (plaintiffs failed to adequately allege injury in fact because they provided no facts showing that they "ascribed an economic value" to their personal information, attempted a value-for-value exchange of information, or were deprived of its value); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) ("there is [] no support for the proposition that an individual passenger's personal information has or had any compensable value in the economy at large").

"Like" button on Facebook pages of certain companies, they were subsequently featured in "Sponsored Stories" displayed to their Facebook Friends advertising that they "Like" the company's products, services, or brand. *Id.* at 797-99.

In holding that the *Fraley* plaintiffs adequately pled injury in fact under Article III, this Court emphasized that they "allege[d] that their individual, personalized endorsement of products, services, and brands to their friends and acquaintances has *concrete, provable value* in the economy at large, which can be measured by the additional profit Facebook earns from selling Sponsored Stories compared to its sale of regular advertisements." *Id.* at 799 (emphasis added). The Court noted that "Plaintiffs do not merely cite abstract economic concepts in support of their theory of economic injury, but rather point to specific examples of how their personal endorsement is valued by advertisers," *id.* at 799, including statements by Facebook executives that these endorsements were "worth two to three times more than traditional advertisements on Facebook," and that "Facebook presumably profits from exploitation of this *calculable commercial value*." *Id.* at 809 (emphasis added); *see also id.* at 799 (same). The *Fraley* plaintiffs thus "identified a direct, linear relationship between the value of their endorsement of third-party products, companies, and brands to their Facebook friends, and the alleged commercial profit gained by Facebook." *Id.* at 800.[6]

As this Court explained, *Cohen* was distinguishable from *Fraley* because the *Cohen* plaintiffs "were unable to show that their names and likenesses had any general commercial value" to Facebook. *Id.* at 800. In contrast to the *Cohen* plaintiffs who alleged that the Friend Finder service was used by Facebook "to attract a larger user base result[ing] in monetary gain for Facebook," *id.* at 809, the *Fraley* plaintiffs alleged that Sponsored Stories were "two to three times more valuable than generic advertisements sold to Facebook Advertisers, *id.* at 800. In addition, the *Fraley* plaintiffs "identified a direct, linear relationship between the value of their endorsement

---

[6] The Court in *Fraley* also noted that the plaintiffs there alleged "a violation of their individual statutory rights under California Civil Code § 3344, and therefore, an invasion of a legally protected interest for Article III purposes." F. Supp. 2d at 797. By contrast, Plaintiffs here only assert a common law misappropriation claim, and do not assert a claim under Civil Code Section 3344.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

of third-party products, companies, and brands to their Facebook friends, and the alleged commercial profit gained by Facebook." *Id.* Thus, this Court concluded that, unlike the *Cohen* plaintiffs, the *Fraley* plaintiffs "alleged facts showing that their personal endorsement [had] concrete, measureable, and provable value in the economy at large." *Id.*

Here, as in *Cohen*, Plaintiffs have not alleged facts showing that the alleged use of their names and likenesses in connection invitations have any general commercial value in the economy at large beyond allegedly growing LinkedIn's member base. Plaintiffs do not allege that connection invitations contain "endorsements" of LinkedIn or any third party—a connection invitation is simply a request from a member to join his or her professional network. Nor do Plaintiffs allege any basis for calculating a "concrete, measureable, and provable" value of connection invitations, in contrast to the facts alleged by the *Fraley* plaintiffs showing a "direct, linear" relationship between the alleged profits to Facebook and the value of their "endorsements" in Sponsored Stories. Although Plaintiffs attempt to parrot this Court's ruling in *Fraley* by asserting the conclusory allegation that their "[i]ndividualized personalized endorsement of LinkedIn to Plaintiffs' friends and acquaintances has concrete provable value," FAC ¶ 53, the sole alleged basis for this claim is that connection invitations grow LinkedIn's member base, which leads to increased business for LinkedIn. *See id.* ¶ 51 ("[h]aving a growing number of members is central to LinkedIn's business"; "[m]ember growth is directly correlated to the success of LinkedIn's business"); *id.* ¶ 58 ("LinkedIn is growing its network by having its members endorse LinkedIn multiple times without their consent"; "[t]his growth of LinkedIn's network is leading to increased direct revenue through sales of products directly to new members, and indirect revenue through sales to increasing numbers of recruiters and large corporations"). Not only do Plaintiffs misquote LinkedIn founder and Chairman Reid Hoffman in making this allegation, as discussed *supra* at 8, but even accepting this claim as true, any such indirect, undefined benefit is *precisely* what *Cohen* and this Court in *Fraley* found to be insufficient.

Because Plaintiffs allege no facts that could provide the necessary baseline for a "calculable commercial value," such as the value of generic advertisements in *Fraley*, they resort to alternative "calculations" based on other networking tools that have nothing to do with the

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

purported monetary value of connection invitations. For example, Plaintiffs suggest that because LinkedIn charges $10 to use its InMail networking tool, connection invitations must have the same value because InMail and connection invitations both involve sending emails and reminders. *See* FAC ¶ 55. That is specious, because the two services are completely different. InMail allows members to contact LinkedIn members with whom they have had no previous communication (and thus do not have their email addresses), and to customize the content of the message without space or other limitations applicable to connection invitations. In contrast, connection invitations sent through Add Connections use a standardized message and may be sent only to existing email contacts. *See* Edelman Decl., Ex. C. Indeed, if they were comparable services, no consumer would pay $10 for InMails when connection invitations are free of charge.

Plaintiffs also suggest that connection invitations may have the same value as the price of premium LinkedIn services that might be purchased by some recipients of those requests, FAC ¶ 56, a theory that, again, was soundly rejected by *Cohen* and *Fraley*—that "attract[ing] a larger user base resulted in monetary gain for [the defendant]." *Fraley*, 830 F. Supp. 2d at 809 (citing *Cohen*, 2011 WL 5117164, at *2). Moreover, the vast majority of connection invitations have no conceivable relationship to any premium account revenue for LinkedIn, as only a tiny percentage of LinkedIn members (less than 1%) have premium accounts. Plaintiffs' allegation that LinkedIn "would be forced to pay for email addresses to advertise and promote its services," FAC ¶ 57, is likewise off-base, because their right of publicity and UCL claims concern the alleged misappropriation of *their names or likenesses*, not of third-party email addresses.

Plaintiffs' failure to allege any injury in fact is not surprising because the Add Connections tool is designed to, and does, benefit members. Add Connections enables members to do just what they joined LinkedIn to do: expand their professional networks. While each Sponsored Story in *Fraley* provided a direct, calculable benefit to Facebook and its advertisers, with no such benefit to the plaintiffs, the situation here is reversed: Add Connections provides a direct benefit to members in the form of larger networks, no benefit to third parties, and, even as alleged, only an indirect, undefined benefit to LinkedIn.

As for non-economic harm, Plaintiffs provide anecdotes from online discussion board users expressing frustration with the Add Connections tool. *See, e.g.*, FAC ¶¶ 31, 33, 41, 49, 50, 58. But *none* of those anecdotes are from Plaintiffs themselves. Though Plaintiffs identify certain relationships they had with people they emailed through the Add Connections tool, *id.* ¶¶ 17, 18, 19, 21, no Plaintiff has alleged that they suffered *emotional* harm as a result. *See id.* ¶¶ 72-73 (alleging that Plaintiffs were "deprived of *money*" and that "[e]ach plaintiff has been personally injured by this loss of *money*") (emphases added), ¶¶ 93-94 (alleging that "Plaintiffs were harmed by LinkedIn's actions" and that "Plaintiffs were deprived of the *earnings* they would otherwise be entitled to") (emphasis added). Accordingly, Plaintiffs have not even attempted to state a right of publicity claim based on emotional injury. *See, e.g.*, *In re iPhone*, 2011 WL 4403963, at *4 (dismissing claim where "Plaintiffs do not allege injury in fact to *themselves*").

In any event, the anecdotes do not identify any cognizable non-economic injury because the emotional harm they describe was not caused by LinkedIn allegedly misappropriating their name or likeness for commercial advantage; rather, it was caused by LinkedIn contacting people that the members did not intend to communicate with at all. To state a right of publicity claim for emotional harm, a plaintiff must establish that the harm flows from a *commercial* misappropriation. *See, e.g., Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988, 1006 (2008) ("mental anguish resulting from commercial misappropriation"); *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 835-36 & n.11 (1979) (noting that "[c]ommercial misappropriations may injure a person's feelings" such as the "person may find any commercial exploitation undesirable and offensive" or others "may disparage one who would sell their identity" for commercial purposes). The mental harm described in the anecdotes, however, has nothing to do with any commercial exploitation of individuals' names or likenesses. Rather, it flows entirely from Add Connections sending emails on behalf of members to people whom they would have preferred not to contact. Thus, the alleged embarrassment would have been the same if the connection invitations did not mention LinkedIn at all. And, as noted, all Plaintiffs with active LinkedIn accounts have created public LinkedIn profiles which can be viewed by all Internet users, precluding any claim that the association of their identities with LinkedIn was personally

-20-

offensive. Accordingly, Plaintiffs have not alleged any cognizable emotional harm "fairly traceable" to a violation of the right of publicity. *Laidlaw*, 528 U.S. at 180-81.

## C. Plaintiffs Fail To State A Claim For Violations Of California's Common Law Right Of Publicity

California's common law right of publicity has four elements: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Cohen*, 798 F. Supp. 2d at 1093-94 (citing *Newcombe*, 157 F.3d at 692). As demonstrated above, Plaintiffs fail to adequately allege lack of consent or any resulting injury, which is "the *sine qua non* of a cause of action for misappropriation of name." *Id.* at 1097 (quoting *Slivinsky v. Watkins–Johnson Co.,* 221 Cal. App. 3d 799, 807 (1990)). Accordingly, Plaintiffs' right of publicity claim should be dismissed under Rule 12(b)(6) for failure to state a claim.

## D. Plaintiffs Fail To State A Claim For Violations Of California's Unfair Competition Law

California's Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, *et seq*. Plaintiffs attempt to assert claims under the "unfair" and "fraudulent" prongs based on alleged misrepresentations in Add Connections permission screens and on LinkedIn's blog. Claims asserted under the "unlawful" prong are based on alleged violations of other state laws. All of Plaintiffs' UCL claims fail.

Plaintiffs allege that LinkedIn misrepresented that members "have full control to prevent their name and appearance in LinkedIn advertisements, including endorsement emails sent by LinkedIn to third parties," and that "repeated emails would not be sent to third parties containing their names and likenesses without their permission," but then "encourage[ed] [members] to utilize LinkedIn in such a way that allowed LinkedIn to access [their] external email accounts and send endorsement emails to email addresses contained therein." FAC ¶¶ 103-04. Plaintiffs do not identify any statement by LinkedIn making any such representations. Instead, they rely on words and phrases plucked from Add Connections permission screens and LinkedIn's blog. None of these statements support a misrepresentation claim.

### 1. Plaintiffs Do Not Satisfy Rule 9(b)

Plaintiffs' claims are subject to Federal Rule of Civil Procedure 9(b) but do not satisfy its heightened pleading standard. Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b) applies to state law claims "sound[ing] in fraud," regardless of whether they are labeled "fraud" claims. *See Vess*, 317 F.3d at 1105. Plaintiffs allege that LinkedIn "intentionally and knowingly" made misrepresentations regarding Add Connections, which members "justifiably relied upon …when deciding to join and utilize LinkedIn." FAC ¶ 103. Plainly, these claims "sound in fraud" and thus are subject to Rule 9(b)'s particularity requirement that Plaintiffs plead the "'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106. Plaintiffs do not satisfy this standard because they do not allege *how* any of the selected words or phrases are false or misleading.

Plaintiffs allege that permission screens for accessing Google accounts use the terms "some information" and "Google Contacts" and therefore are "designed to deceive" members into believing that only their "contact lists" will be imported." *Id*. ¶ 32-33. As explained above, members are invited to "Grow your network" by "adding your email address" and given the option to "Continue" or "Skip this step." Members who choose to "Continue" are taken to a Google permission screen, stating that "LinkedIn is asking for some information from your Google Account," including "Google Contacts," which Google describes as including exactly the email addresses Plaintiffs contend are not included in "contact lists." Plaintiffs do not explain *how* the challenged terms are false or misleading in light of these statements on the LinkedIn and Google permission screens.

With respect to the permission screen used to send connection invitations to contacts who are not LinkedIn members, Plaintiffs allege that the "Add to Network" button is deceptive because, "[a]lthough LinkedIn provides a list of the email addresses it has downloaded," it displays the emails in a scroll down format in which only the first ten are visible and it does not state that those email addresses will receive connection invitations or that reminder emails will be sent. FAC ¶¶ 38-41. Plaintiffs again ignore other statements on this screen. As explained above, the screen offers members the opportunity to "Stay in touch with your contacts who aren't on

LinkedIn yet" and "Invite them to connect with you." Directly after these statements, the names and email addresses of all contacts not on LinkedIn are presented to members using a scroll-down list with checkboxes indicating that all of them have been selected ("Select All") as well as the total number selected ("1132 Selected"). Members have the option to "Add to Network" or "Skip this step." If Plaintiffs contend that, notwithstanding this context, they did not know that email addresses in addition to the ones visible were selected, and that by clicking on "Add to Network" the listed addresses would receive connection invitations, they must include those allegations to explain *how* the "Add to Network" button is false or misleading.

Finally, Plaintiffs allege that selected statements from LinkedIn's blog are misleading. *See Id.* ¶ 47. None of these alleged statements support any misrepresentation claim under the UCL because Plaintiffs do not allege *how* they are false or misleading in light of the Add Connections permission screens described above. Indeed, it is unclear whether and how they relate to Add Connections at all, *e.g.*, references to "spam" and "abusive behavior" by members spamming other members. *Id.* ("We take spam very seriously").

### 2. The Alleged Misrepresentations Are Not "Likely To Deceive" Reasonable Consumers As A Matter Of Law

Misrepresentation claims under the UCL require a showing that "members of the public are likely to be deceived." *See Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995); *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983) (same). Therefore, to state a claim, Plaintiffs must allege facts showing that the selected statements from Add Connections permission screens and LinkedIn's blog are "likely to deceive" reasonable consumers. As demonstrated above, the Add Connections permission screens are not "likely to deceive" a reasonable consumer who actually reads them. To the contrary, these screens not only explain each step in the process—from accessing and importing Google Contacts, to selecting and sending connection invitations to contacts on LinkedIn, to selecting and sending connection invitations to contacts not yet on LinkedIn—but require members to consent to each step by clicking buttons labeled "Continue," "Allow," "Add Connection(s)," and "Add to Network" *before* any action is taken. Any reasonably prudent Internet user clicking these buttons to move

from one screen to the next would understand that they were consenting to allowing access to their email contacts and to sending connection invitations.  Indeed, Plaintiffs do not allege that they read the permission screens, which, as set forth below, alone requires dismissal of their claims.

### 3.    Plaintiffs Do Not Allege Reliance

Plaintiffs do not allege that they actually and reasonably relied upon any of the alleged misrepresentations.  *See In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (actual reliance required for UCL claim).  Rule 9(b) requires "the same level of specificity [] with respect to [pleading] reliance' as with respect to misrepresentations."  *Mazur v. eBay Inc.*, 2008 WL 618988, at *13 (N.D. Cal. Mar. 4, 2008)).  This standard has not been met.  Plaintiffs' allegations of reliance are conclusory and do not allege facts specific to any named Plaintiff, such as what screens they saw, what they understood them to mean, and whether they imported email contacts and sent connection invitations to contacts who were LinkedIn members and those who were not, or only to contacts who were not LinkedIn members by clicking "Skip this Step" in the permission screen for contacts who were LinkedIn members.  Plaintiffs simply allege that they "justifiably relied upon" alleged misrepresentations.  *See* FAC ¶ 103.  Accordingly, Plaintiffs have not adequately alleged actual and reasonable reliance on any misrepresentation.  *Cf. In re LinkedIn User Privacy Litig.*, 932 F. Supp. 2d 1089, 1093 (N.D. Cal. 2013) (plaintiffs "[did] not even allege that they actually read the alleged misrepresentation[] which would be necessary to support a claim of misrepresentation").

### 4.    Plaintiffs' Claims Under The Unlawful Prong Fail

The "unlawful" prong of the UCL "embrac[es] 'anything that can properly be called a business practice and that at the same time is forbidden by law.'"  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Plaintiffs' claims under the UCL's "unlawful" prong are predicated on alleged violations of California's common law right of publicity, the California Computer Fraud and Abuse Act, the California Comprehensive Data Access and Fraud Act, the California Invasion of Privacy Act, and the California Consumer Remedies Act.  FAC ¶ 101.  For the reasons stated above, Plaintiffs fail to state any claim for violations of California's common law right of publicity or California's Comprehensive Data Access and Fraud Act.  With

respect to California's Computer Fraud and Abuse Act (which is not actually a law), Invasion of Privacy Act, and Consumer Remedies Act, Plaintiffs do not even attempt to state claims under these laws. Accordingly, Plaintiffs fail to state a claim under the "unlawful" prong of the UCL.

### 5. All Of Plaintiffs' UCL Claims Fail For Lack Of Standing

To have standing to sue under the UCL, Plaintiffs must show that they "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. As set forth above, Plaintiffs have not alleged sufficient facts to show injury in fact based on connection invitations sent using Add Connections. Nor have they adequately alleged that connection invitations resulted in the loss of money or property recoverable as restitution under the UCL. Indeed, Plaintiffs do not allege that they have ever paid any money to LinkedIn. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) (Under the UCL, "prevailing plaintiffs are generally limited to injunctive relief and restitution.").

### E. Plaintiffs Fail To State A Claim Under The SCA

The SCA prohibits "(1) intentionally access[ing] without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceed[ing] an authorization to access that facility ... *and thereby obtain[ing] ... access to a wire or electronic communication while it is in electronic storage in such system.*" 18 U.S.C. § 2701(a)(1) (emphasis added). "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication *incidental to the electronic transmission thereof*; and (B) any storage of such communication by an electronic communication service for purposes of *backup protection* of such communication." 18 U.S.C. § 2510(17) (emphases added). In addition to failing to adequately allege that any access occurred without authorization, Plaintiffs' SCA claim should be dismissed under Rule 12(b)(6) for several additional reasons.

### 1. Plaintiffs Do Not Allege Access To "Electronic Communications"

There is no plausible allegation in the FAC that LinkedIn gained access to any "electronic communications." As the FAC states, the "subject of this complaint" involves LinkedIn's alleged

practice of "downloading *email addresses*."  FAC ¶ 2 (emphasis added).  Indeed, the FAC alleges repeatedly that LinkedIn gained access only to email addresses.[7]

Email addresses are not "electronic communications" within the meaning of 18 U.S.C. § 2701(a)(1).  In *Hernandez v. Path, Inc.*, 2012 WL 5194120 (N.D. Cal. Oct. 19, 2012), the plaintiffs similarly alleged that the defendant "accessed, uploaded and stored data from the users' Contact Address Books," which consisted of users' "contacts" including their "e-mail addresses." *Id.* at *1 & n.1.  The court dismissed the SCA claim because "as defined by and used in the SCA, the term 'electronic storage' refers to the temporary, intermediate storage of the *electronic communication* that is incidental to the *electronic transmission of the communication*," and thus plaintiffs' "Contact Address Books are not a communication to which the SCA applies."  *Id.* at *4 (quoting 18 U.S.C. § 2510(17)) (emphases added).

Plaintiffs allege that LinkedIn "accessed members' email communications," FAC ¶¶ 114-15, but those allegations are wholly conclusory, without any supporting factual detail, and are inconsistent with the other allegations in the FAC that allege only access to email *addresses*. These conclusory allegations fail as a matter of law.  *See Iqbal*, 556 U.S. at 678; *Nexsales Corp. v. Salebuild, Inc.*, 2012 WL 216260, at *3 (N.D. Cal. Jan. 24, 2012) ("conclusory statements that repeat the statutory definitions of the terms" do "not support a claim under the [SCA]"); *Yunker v. Pandora Media, Inc.*, 2013 WL 1282980, at *9 (N.D. Cal. Mar. 26, 2013) (dismissing "conclusory allegations that parrot the text of the [SCA]").

### 2. Plaintiffs Do Not Allege That Any "Electronic Communications" Were In "Electronic Storage"

Plaintiffs also have not alleged *any* facts showing that electronic communications were obtained while they were in "electronic storage."  *See, e.g., Cruz Lopez v. Pena*, 2013 WL 819373, at *3 (N.D. Tex. Mar. 5, 2013) (complaint failed "to adequately allege facts showing that the emails were in 'electronic storage.'").  As noted, "electronic storage" is defined under the SCA as

---

[7] *See, e.g.*, FAC ¶ 3 ("extract email addresses"), ¶ 7 ("appropriation of email addresses"), ¶¶ 16-21, 24 ("harvesting email addresses"), ¶ 30 ("downloads the email addresses"), ¶ 33 ("accessing of email addresses"), ¶ 44 (same), ¶ 55 ("email addresses that LinkedIn takes"), ¶ 57 ("email addresses appropriated").

either (1) "temporary, intermediate storage" or (2) storage for purposes of "backup protection." 18 U.S.C. § 2510(17). Plaintiffs, however, "fail[] to provide specific facts demonstrating that [their] data was 'in electronic storage,' instead relying on conclusory statements that repeat the statutory definitions of the terms." *Nexsales*, 2012 WL 216260, at *4. Indeed, there is no allegation that LinkedIn accessed any communications that were in "temporary, intermediate storage," which courts have limited to "messages *not yet delivered* to their intended recipient." *Theofel v. Farey–Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004) (emphasis added); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001) (dismissing SCA claim which failed to allege defendant obtained "communications temporarily stored . . . incident to their transmission-for example, when an email service stores a message until the addressee downloads it"). Moreover, the FAC does not allege that any communications were in storage for purposes of "backup protection," which courts have found inapplicable to web-based email services — such as the "Yahoo! Mail, Microsoft Mail," and "Google Gmail" services referenced in the FAC. FAC ¶ 24. As the Ninth Circuit has held, where the service "might be the only place a user stores his messages," as is the case with web-based email, the "messages are not stored for backup purposes." *Theofel*, 359 F.3d at 1070; *United States v. Weaver*, 636 F. Supp. 2d 769, 772 (C.D. Ill. 2009) (in "case of web-based email systems," service "is not storing that user's opened messages for backup purposes").

### 3. Plaintiffs' Allegations Establish That Google Authorized Access To Its Users' Accounts

Regardless of whether Plaintiffs consented to access, the SCA exempts from liability "conduct authorized ... by the person or entity providing a wire or electronic communications service." 18 U.S.C. § 2701(c)(1). Plaintiffs' allegations plainly establish that Google, the provider of the electronic communications services at issue, was authorized to access its users' accounts. Thus Plaintiffs' SCA claim falls squarely within this exemption and fails as a matter of law.

As Plaintiffs allege, *Google*, not LinkedIn, provides a permission screen in which Google states that "LinkedIn is asking for some information from your Google Account," including "Google Contacts." FAC ¶ 32 & Figure 4 ("it is Google that provides this screen"). "LinkedIn

users provide" consent to such access, *id.* ¶ 33, by clicking "Allow" on the screen, *id.* Figure 4. Plaintiffs' allegations thus clearly demonstrate that Google directly authorized access to its users' accounts. Moreover, Plaintiffs nowhere allege that Google did *not* provide such authorization. This pleading deficiency alone is fatal to Plaintiffs' SCA claim. *See Cornerstone Consultants, Inc. v. Prod. Input Solutions, L.L.C.*, 789 F. Supp. 2d 1029, 1051 (N.D. Iowa 2011) ("[T]o allege the lack of authorization, *as required*, the plaintiffs would have to allege sufficient facts to make it plausible that none of the entities identified in § 2701(c) authorized the access. The plaintiffs have not done so, here.") (emphasis added); *Garcia v. Haskett*, 2006 WL 1821232, at *5 (N.D. Cal. June 30, 2006) (although defendant may have accessed facility of third-party ISP by accessing plaintiff's email account, plaintiff failed to state SCA claim because did not allege that such access "was conduct unauthorized by" ISP). "This glaring omission is not cured by the plaintiffs' allegations that they 'did not authorize'" access to their accounts—which, as discussed *supra* at Part III.A separately fails—"because a 'provider's' authorization would make a 'user's' lack of authorization of no consequence" under the SCA. *Cornerstone,* 789 F. Supp. 2d at 1051.

### F.     Plaintiffs Fail To State A Claim Under The Wiretap Act

The Wiretap Act creates a right of action against anyone who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Act defines "intercept" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). In addition to failing to adequately allege the absence of consent, Plaintiffs' Wiretap Act claim should be dismissed under Rule 12(b)(6) for several additional reasons.

#### 1.     Plaintiffs Do Not Allege That The "Contents" Of Any "Electronic Communications" Were Intercepted

Under the Wiretap Act, email addresses are not "contents" of "electronic communications." The Wiretap Act defines "contents" to mean "information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added). "Contents" thus includes the substantive text of an email or text message; it does not encompass

address information.  *See, e.g., United States v. Reed*, 575 F.3d 900, 914-15 (9th Cir. 2009)

(identities of parties to a communication are not "contents"); *United States v. Forrester*, 512 F.3d

500, 509-10 (9th Cir. 2008) (address information, such as email addresses and IP addresses, are

not "contents" of communications).  As the *Hernandez* court held in also dismissing the plaintiff's

Wiretap Act claim, "[a]lthough [the defendant] allegedly transmitted the Class Members' Contact

Address Books from the Class Members' mobile devices to Path's servers," which included email

addresses, it "did not 'intercept' a 'communication' to do so."  *Hernandez,* 2012 WL 5194120, at

\*3.  The same is true here.  And as noted, Plaintiffs' conclusory allegations that they accessed

"electronic communications" and the "contents" thereof, *see, e.g.*, FAC ¶¶ 119-20, simply parrot

the language of the statute, are unsupported by any factual allegations, and fail as a matter of law.

### 2.    Plaintiffs Do Not Allege Any Interception

Plaintiffs do not—and cannot—allege that electronic communications were acquired

"contemporaneous *with transmission*," a requirement of any "interception" under the statute.

*Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 877-78 (9th Cir. 2002) (emphasis added).  At

best, Plaintiffs have alleged only access to data located in Google accounts, not communications

that were in transmission at the time of any alleged acquisition.  Thus, Plaintiffs fail to allege an

"interception" under the statute.  *See id.*; *Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp.

2d 1017, 1031 (C.D. Cal. 2012) (dismissing Wiretap Act claim where "Defendants did not access,

disclose, or use any emails that had been acquired during transmission.  Rather, the emails

Defendants viewed were stored on Gmail").  Finally, Plaintiffs' wholly conclusory assertions that

an "interception" occurred, FAC ¶¶ 119-20, simply repeat the language of the statute and are

legally insufficient.  *See Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1268 (N.D. Cal.

2001) (courts should "not accept a conclusory allegation that conduct alleged in the complaint

constituted an interception under the Wiretap Act"); *Garback v. Lossing*, 2010 WL 3733971, at \*4

(E.D. Mich. Sept. 20, 2010) ("no allegation that any emails were 'intercepted' contemporaneously

with transmission" and rejecting "conclusory allegation" of "intercept"); *Global Policy Partners,*

*LLC v. Yessin*, 686 F. Supp. 2d 631, 639 (E.D. Va. 2009) (same).

### G. Plaintiffs Fail To State A Claim Under California Penal Code Section 502

California Penal Code Section 502(c) prohibits, among other things, a person from "[k]nowingly and without permission access[ing] or caus[ing] to be accessed any computer, computer system, or computer network." Cal. Penal Code § 502(c)(7). Plaintiffs allege that Add Connections violates this and similar subsections of Section 502(c). FAC ¶¶ 129-133 (alleging violations of Cal. Penal Code §§ 502(c)(1) and (6)-(8)). In addition to failing to adequately allege injury in fact and lack of consent, *i.e.*, that LinkedIn acted "without permission," Plaintiffs' Section 502 claim should be dismissed under Rule 12(b)(6) on the additional grounds below.

#### 1. Plaintiffs Do Not Allege Circumvention Of Any "Technical" Or "Code-Based" Barriers

"Courts within this District have interpreted 'without permission'"— which is an element of each of the Section 502 subsections at issue (Cal. Penal Code §§ 502(c)(1) and (6)-(8), and 502(b)(10))—"to require that a defendant access a network 'in a manner that *circumvents technical or code based barriers* in place to restrict or bar a user's access.'" *In re Google Android Consumer Privacy Litig.*, 2013 WL 1283236, at *11-12 (N.D. Cal. Mar. 26, 2013) (emphasis added); *In re iPhone Application Litig.*, 2011 WL 4403963, at *4 (citing authorities and stating that "individuals may only be subjected to liability for acting 'without permission' under Section 502 if they 'access[ ] or us[e] a computer, computer network, or website in a manner that overcomes technical or code-based barriers'") (alterations original). "Section 502 defines 'access' in terms redolent of 'hacking' or breaking into a computer." *Chrisman v. City of Los Angeles*, 155 Cal. App. 4th 29, 34 (2007). Plaintiffs do not allege any circumvention of technical or code-based barriers; at best, they allege that Add Connections, *with permission*, accessed their email accounts, but then acted *in excess* of that authorization. Plaintiffs allege that Add Connections communicates with external email accounts in one of two ways: first, for email accounts that are not already open, LinkedIn "requests the username and password of an external email account," and second, "[i]f a LinkedIn user leaves an external email account open," LinkedIn can directly communicate with that account. FAC ¶ 30. Either way, members are notified that Add Connections is requesting access to their Google accounts and certain information, including

Google Contacts.  *Id.* ¶ 32 & Figure 4 ("Google screen pops up stating, 'LinkedIn is asking for some information from your Google Account,'" specifically identifying "Google Contacts").  As noted, Plaintiffs concede that members provide "authority and consent" to access their "external email accounts," but assert that LinkedIn "exceeds" such authorization.  *Id*. ¶ 33.

Plaintiffs do not allege, however, that Add Connections circumvented any technical or code-based barriers to exceed such authorization.  As the Ninth Circuit held in *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) with respect to the Computer Fraud and Abuse Act, the federal corollary to Section 502,[8] a claim that a party "exceeds authorized access" would "apply to *inside hackers*," *id*. at 858 (emphasis added), as opposed to those who exceed contractual use restrictions, with "hacking" being defined as the "circumvention of technological access barriers," *id*. at 863.  Thus, as here, a party fails to state a claim that defendants "exceeded their authorized access" where "there are no direct or clear allegations of 'hacking,'" being "broadly, the 'circumvention of technological access barriers.'"  *Incorp Servs. Inc. v. Incsmart.Biz Inc.*, 2012 WL 3685994, at *3 (N.D. Cal. Aug. 24, 2012) (quoting *Nosal*, 676 F.3d at 863).

Although the FAC is replete with conclusory allegations of "hacking" or "tunneling," *e.g.*, FAC ¶¶ 3, 32, 43, 114, 119, there are no factual allegations detailing *how* technical or code-based barriers are circumvented.  Indeed, as shown above, the FAC's allegations demonstrate the opposite.  The FAC's threadbare assertions of "hacking" fail to establish a violation of Section 502.  *See Incorp*, 2012 WL 3685994, at *3 (dismissing complaint where "factual allegations fail to 'flesh out' what the Ninth Circuit has described as hacking"); *In re Am. Airlines, Inc., Privacy Litig.*, 370 F. Supp. 2d 552, 559 n.14 (N.D. Tex. 2005) ("Although plaintiffs allege that AAI 'hacked' into American's electronic communication service or remote computing service . . . , this is a conclusory assertion that the court need not accept" under "Rule 12(b)(6)").[9]

---

[8] Courts routinely "consider[] cases interpreting the Computer Fraud and Abuse Act ('CFAA'), the federal corollary to Section 502, in evaluating how broad an application Section 502 should properly be given."  *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *7 (N.D. Cal. July 20, 2010).

[9] Plaintiffs' "hacking" allegations should be stricken under Rule 12(f), which empowers district courts to strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                   CASE NO. 13-CV-04303-LHK

## 2. Plaintiffs Do Not Allege Any Cognizable Injury Under Section 502(c)(8)

With respect to Plaintiffs' claim under Section 502(c)(8), Plaintiffs nowhere allege that LinkedIn has "introduce[d] any computer contaminant into any computer, computer system, or computer network." Cal. Penal Code § 502(c)(8). As this Court has held, the phrase "computer contaminants" is "aimed at 'viruses or worms,' and other malware that usurps the normal operation of the computer or computer system." *In re iPhone App. Litig.*, 2011 WL 4403963, at *13. There is no allegation that LinkedIn has introduced any computer contaminants, like viruses or worms, that have usurped the normal operation of any computer system. Thus, Plaintiffs fail to state a claim under Section 502(c)(8). *See In re Facebook Privacy Litig.*, 2011 WL 6176208, at *4 (N.D. Cal. Nov. 22, 2011) (dismissing Section 502(c)(8) claim for failing to allege "'contaminant' introduced to 'usurp' the 'normal operations' of the subject computers").

## IV. IN THE ALTERNATIVE, THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS IN THE FAC

"Under Rules 23(c)(1)(A) and 23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained." *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1146 (N.D. Cal. 2010) (granting motion to strike). Accordingly, district courts regularly strike class allegations at the pleading stage "to avoid the expenditures of time and money that must arise from litigating

---

District courts enjoy considerable discretion in exercising that authority. *E.g.*, *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527-28 (9th Cir. 1993) (review for abuse of discretion), *rev'd on other grounds*, 510 U.S. 517 (1994). Scandalous allegations include allegations that "improperly cast[] a derogatory light on someone, most typically a party to the action," *Moreno v. USG Corp.*, 2007 WL 951301, at *1 (S.D. Cal. Mar. 19, 2007), or allegations that "are superfluous descriptions and not substantive elements of the cause of action," *Alvarado-Moralez v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988) (allegations that company conducted layoff in a cruel manner were properly stricken as scandalous). *See also Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 665 (7th Cir. 1992) (allegations that food distribution company intentionally caused salmonella outbreak were properly stricken as scandalous). Here, Plaintiffs' outrageous allegations that LinkedIn gained access to users' external email accounts by "hacking into," "breaking into," "tunneling" into, and "guessing [email account] passwords" for those accounts, FAC ¶¶ 2, 3, 32, 43, 114, 115, 119, should all be stricken. Plaintiffs allege no factual support for these "superfluous descriptions" that "improperly cast a derogatory light" on LinkedIn; nor could they, as Plaintiffs' own screen shots make plain that LinkedIn accesses external email accounts only after users consent to access by clicking "Allow" on a permission screen.

spurious issues." *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 990–91 (N.D. Cal. 2009); *see also Lyons v. Bank of Am., NA*, 2011 WL 6303390, at *7 (N.D. Cal. Dec. 16, 2011); *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *19 (N.D. Cal. June 5, 2009).

Under Rule 23(b)(3), Plaintiffs must show that common factual issues "present a significant aspect of the case and . . . can be resolved for all members of the class in a single adjudication." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012). It is clear from the allegations of the FAC that Plaintiffs' claims are not suitable for class treatment. Allowing this case to proceed to the class certification stage would be a waste of both the Court's and the parties' time and resources through months of class certification discovery and briefing, while only postponing the inevitable conclusion that no class can be certified under Rule 23.

### A.    If Held To Be An Issue Of Fact, Consent Is Inherently Individualized

As demonstrated above, Plaintiffs' consent is established as a matter of law based upon the Add Connections permission screens requiring users to consent affirmatively to the challenged conduct. If, however, the Court were to conclude that consent is an issue of fact, allegations that consent may be determined on a classwide basis should be stricken. *See* FAC ¶ 78 ("Common questions of law and fact affecting the Class predominate over any individual issues," including "Whether Plaintiffs and the Class consented to the use of their names, photographs, likenesses, or identities in multiple endorsement emails sent to third parties by LinkedIn"); *id.* ¶ 61 (same). Whether class members misunderstood Add Connections permission screens is an individualized inquiry that predominates with respect to each of Plaintiffs' claims, precluding class certification.

Consent depends on numerous subjective factors concerning an individual's knowledge and state of mind, including whether he or she understands disclosures seeking consent, and is familiar with a company's practices based upon his or her experience or general awareness of industry practices. *See, e.g., Jones*, 815 F. Supp. 2d at 1114-17 (resolving consent issue based on evidence of the plaintiff's "past industry experience" and various "custom[s] and practice[s] in the entertainment industry"). Thus, it is not surprising that courts repeatedly have denied class certification in cases where consent is an element of the claims. *See, e.g., Murray v. Fin. Visions, Inc.*, 2008 WL 4850328, at *4-5 (D. Ariz. Nov. 7, 2008) (denying certification of Wiretap Act

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

claim, noting that "question of consent, either express or implied," is a "fact intensive inquiry and may vary with the circumstances of the parties" and "will require an individualized showing of each class member's knowledge and consent with respect to each intercepted email"); *Torres v. Nutrisystem, Inc*., 289 F.R.D. 587, 594 (C.D. Cal. 2013) (denying certification of California Penal Code Section 637 claims, noting that "issue of whether class members consented to the recordings would also require a detailed factual inquiry for each class member, likely resulting in varying responses to the consent issue," including whether users "actually expected the calls to be recorded"); *Fields v. Mobile Messengers Am., Inc*., 2013 WL 6073426, at *4 (N.D. Cal. Nov. 18, 2013) (holding that plaintiffs "failed to meet their burden to prove that the issue of consent can be addressed with class-wide proof" and finding "individualized inquiries regarding consent"); *O'Donovan v. Cashcall, Inc*., 278 F.R.D. 479, 495 (N.D. Cal. 2011) (denying certification in action alleging uniform wrongful conduct by initiating unauthorized electronic fund transfers ("EFTs"), given need to assess whether "a specific borrower authorized or consented to [an] EFT").

Here, if the Court here were to determine that consent is an issue of fact, the class allegations should be stricken because determining whether class members consented will require individualized inquiries that predominate over common issues and preclude class certification. Consent will turn on each class member's subjective mental state, including, *e.g.,* whether, how, and to what extent each class member read and understood Add Connections permission screens. In addition, each class member's personal experiences, prior knowledge, and expectations about how LinkedIn operates, including how connection invitations and reminders are used, will have to be considered in determining whether there is consent. As the court held in *Sanders*, 672 F. Supp. 2d 978, in striking class allegations where reliance was an element of the plaintiffs' claims, "if the proposed class were to be certified, the Court would be forced to engage in individual inquiries of each class member with respect to materiality of the statement, whether the member saw Apple's advertisements or visited Apple's website, and what caused the member to make the purchase." *Id*. at 991. The same is true here with respect to consent, thus precluding class certification.

**B.      Plaintiffs' Claims Based On Emotional Harm Are Inherently Individualized**

Plaintiffs' claims based on emotional harm not only fail as a matter of law, but they are also individualized and preclude class certification.  As noted, Plaintiffs point to various highly personal statements of LinkedIn members describing embarrassment and other types of non-economic harm allegedly resulting from invitations being sent to individuals that they did not wish to contact.  *See, e.g.,* FAC ¶¶ 31, 41, 49-50.  These examples, which include contacting people who are mentally ill and acquaintances from the distant past whose spouses recently died, show the highly individualized and idiosyncratic nature of these harms.  *See, e.g., id.* ¶¶ 31, 41.

Determining whether and to what extent class members suffered such non-economic harm would be an inherently individualized inquiry for each class member that would revolve around highly unique and personal circumstances.  Courts repeatedly have held that class certification is improper for claims based on emotional harm.  *See, e.g., Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 417 (5th Cir. 1998) (the "very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy"); *Legge v. Nextel Commc'ns, Inc.*, 2004 WL 5235587, at *7 (C.D. Cal. June 25, 2004) ("mental distress, humiliation, embarrassment" damages always vary by consumer).  The Court should do the same here and strike all allegations of classwide injury based on non-economic harm.  *See, e.g., Lyons*, 2011 WL 6303390, at *8.

**V.      CONCLUSION**

For these reasons, the Court should dismiss Plaintiffs' FAC, or alternatively, strike Plaintiffs' class allegations.

DATED: December 6, 2013    MUNGER, TOLLES & OLSON LLP
                               JEROME C. ROTH
                               ROSEMARIE T. RING
                               JONATHAN H. BLAVIN
                               WILLIAM J. EDELMAN


                           By: _____/s/ Jerome C. Roth_____
                               JEROME C. ROTH
                           Attorneys for Defendant
                           LINKEDIN CORPORATION