1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT

**RUSS AUGUST & KABAT**
Larry C. Russ, State Bar No. 82760
Dorian S. Berger, State Bar No. 264424
Daniel P. Hipskind, State Bar No. 266763
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Tel:  (310) 826-7474
Fax:  (310) 826-6991
Email:  lruss@raklaw.com
Email:  dberger@raklaw.com
Email:  dhipskind@raklaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

Paul Perkins, Pennie Sempell, Ann Brandwein, Erin Eggers, Clare Connaughton, Jake Kushner, Natalie Richstone, Nicole Crosby, and Leslie Wall; individually and on behalf of all others similarly situated,

        Plaintiffs

v.

LinkedIn Corporation,

        Defendant.

**Case No. 13-CV-04303-HRL**

**PLAINTIFFS' OPPOSITION TO LINKEDIN'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT AND TO STRIKE CLASS ALLEGATIONS**

Judge:    Hon. Lucy H. Koh
Date:     April 10, 2014
Time:     1:30p.m.
Location: Courtroom 8 - 4th Floor

RUSS, AUGUST & KABAT

**TABLE OF CONTENTS**

I.   STATEMENT OF ISSUES ................................................................................. 1

II.  INTRODUCTION ............................................................................................ 1

III. BACKGROUND .............................................................................................. 4

   A)   ABOUT THE PLAINTIFFS ............................................................................ 4

   B)   ABOUT LINKEDIN. ..................................................................................... 5

      1)   LinkedIn's Accessing Of Users Third-Party Email Accounts .................... 5

      2)   LinkedIn's Repeated Spamming Of Harvested Email Addresses. ............... 6

      3)   LinkedIn Profits From Using Member Names In Endorsement Emails. ...... 7

   C)   PLAINTIFFS' CAUSES OF ACTION. ............................................................. 7

   D)   LINKEDIN IGNORES AND MISREPRESENTS FACTUAL ALLEGATIONS IN THE COMPLAINT.... 8

IV.  LEGAL STANDARDS ..................................................................................... 9

V.   ARGUMENT AND ANALYSIS ....................................................................... 9

   A)   PLAINTIFFS ESTABLISH LINKEDIN DID NOT OBTAIN THEIR CONSENT TO HARVEST EMAIL ADDRESS AND SEND REPEATED ENDORSEMENT EMAILS. ................. 9

      1)   The Proper Standard For Consent, The Objective Reasonable Person. ...... 10

      2)   Plaintiffs Did Not Consent To LinkedIn Accessing, Downloading, and Indefinitely Storing Every Email Address And Related Data. ...................... 11

      3)   Plaintiffs Did Not Consent To LinkedIn Sending Repeated Endorsement Emails. ..... 13

      4)   Cases Have Found No Consent Where Far Broader Disclosures Were At Issue......... 15

      5)   LinkedIn Cannot Establish It Had The Implied Consent Of Its Users. ....... 16

      6)   LinkedIn's Failure To Obtain Its Members' Consent Is Pled Sufficiently.......... 17

   B)   PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS FOR VIOLATIONS OF THEIR RIGHT OF PUBLICITY AND UCL. ................................................. 18

      1)   Misappropriation Of An Individual's Name, Resulting In Economic Gain To Another Establishes Injury In Fact. .................................................. 19

      2)   Plaintiffs Have Suffered An Injury In Fact. .............................................. 20

      3)   Cases Cited By LinkedIn Are Readily Distinguishable. ............................. 23

   C)   COMMON LAW RIGHT OF PUBLICITY IS PLEAD SUFFICIENTLY. .................. 24

   D)   THE COMPLAINT PLEADS UCL CLAIMS BASED ON LINKEDIN'S UNLAWFUL, UNFAIR, AND FRAUDULENT ACTIVITIES. .................................................. 24

1)   The Complaint Pleads UCL Claims Pursuant To Rule 9(b)........................................ 25

2)   LinkedIn's Misrepresentations Are Likely to Deceive................................................ 26

3)   Plaintiffs Allege Reliance. ........................................................................................ 27

4)   Plaintiffs' Claims Under The Unlawful Prong. ......................................................... 28

5)   Plaintiffs Have Adequately Alleged Standing For Their UCL Claims. ...................... 28

E)   PLAINTIFFS HAVE STATED A CLAIM UNDER THE STORED COMMUNICATIONS ACT. ......... 28

1)   LinkedIn Accesses Users Third Party Email Accounts And Obtains Electronic Communications................................................................................................ 28

2)   Plaintiffs Establish For Purposes Of A 12(b)(6) Motion That The Data Accessed By LinkedIn Is In Electronic Storage. ....................................................................... 29

3)   Google's Granting Access Does Not Shield LinkedIn From Liability. ....................... 30

F)   LINKEDIN'S INTERCEPTION OF DATA ASSOCIATED WITH EMAILS VIOLATES THE WIRETAP ACT.......................................................................................................................... 31

1)   Plaintiffs Allege That LinkedIn Intercepted Electronic Communications. .................. 31

2)   LinkedIn Intercepts Data Contemporaneous To Transmission. ................................. 32

G)   LINKEDIN VIOLATES THE CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT ........................................................................................................................... 32

**VI.  THE COURT SHOULD DENY LINKEDIN'S MOTION TO STRIKE THE CLASS ALLEGATIONS................................................................................................. 33**

A)   LINKEDIN'S MOTION IS PREMATURE. ............................................................................ 33

B)   THE COURT SHOULD DENY LINKEDIN'S MOTION TO STRIKE PLAINTIFFS' ALLEGATIONS REGARDING CONSENT. ...................................................................................... 34

**VII. CONCLUSION ........................................................................................................ 35**

RUSS, AUGUST & KABAT

1

## Table Of Authorities

2

3

**FEDERAL CASES**

4
*A&M Records v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. Cal. 2001) ............................................................... 20

5
*Alberghetti v. Corbis Corp.,*
263 F.R.D. 571 (C.D. Cal. 2010) ................................................................... 20

6

7
*Be In, Inc. v. Google Inc.,*
2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ................................................. 11

8
*Berry v. Funk,*
146 F.3d 1003 (D.C. Cir. 1998) .................................................................... 11

9

10
*Blumofe v. Pharmatrak, Inc.,*
329 F.3d 9 (1st Cir. 2003) ................................................................. 11, 16, 31

11

12
*Brazil v. Dell Inc.,*
2008 WL 4912050 (N.D. Cal. Nov. 14, 2008) .............................................. 33

13
*Brooks v. ComUnity Lending, Inc.,*
2010 WL 2680265 (N.D. Cal. Jul. 6, 2010) .................................................. 25

14

15
*Chamberlain v. Ford Motor Co.,*
369 F. Supp. 2d 1138 (N.D. Cal. 2005) ........................................................ 17

16
*Cohen v. Facebook,*
2011 U.S. Dist. LEXIS 1245606 (N.D. Cal. Oct. 27, 2011) ........................ 22

17
*Cohen v. Facebook, Inc.,*
798 F. Supp. 2d 1090 (N.D. Cal. 2011) ................................................. passim

18

19
*Cooper v. Pickett,*
137 F.3d 616 (9th Cir. 1997) ........................................................................ 25

20
*Del Amo v. Baccash,*
2008 WL 4414514 (C.D. Cal. Sept. 16, 2008) ....................................... 21, 24

21

22
*Desnick v. American Broadcasting Cos., Inc.,*
44 F.3d 1345 (7th Cir. 1995) ........................................................................ 16

23
*Doe v. City and County of San Francisco,*
2012 WL 2132398 (N.D. Cal. Jun. 12, 2012) .............................................. 29

24

25
*Ellison v. Robertson,*
357 F.3d 1072, 1079 (9th Cir. Cal. 2004) ..................................................... 20

26
*Fields v. Mobile Messengers Am., Inc.,*
2013 U.S. Dist. LEXIS 163950, at *3 (N.D. Cal. Nov. 18, 2013) ............... 35

27

28
*Fraley v. Facebook, Inc.,*
830 F. Supp. 2d 785, 806 (N.D. Cal. 2011) .......................................... passim

RUSS, AUGUST & KABAT

*General Telephone Co. of Southwest v. Falcon*,
457 U.S. 147 (1982) ........................................................................................... 34

*Gibson v. Chrysler Corp.*,
261 F.3d 927 (9th Cir. 2001) ............................................................................ 17

*Gilday v. DuBois*,
124 F.3d 277 (1st Cir. 1997) ............................................................................. 11

*Harris v. comScore, Inc.*,
292 F.R.D. 579 (N.D. Ill 2013) ......................................................................... 35

*Hepting v. AT&T Corp.*,
439 F. Supp. 2d 974(N.D. Cal. 2006) ............................................................... 17

*Hernandez v. Path, Inc.*,
2012 U.S. Dist. LEXIS 151035 (N.D. Cal. Oct. 17, 2012) ............................... 29

*Hibbs-Rines v. Seagate Technologies, LLC.*,
2009 WL 513496 (N.D. Cal. Mar. 2, 2009) ...................................................... 33

*In Re Apple and AT&T iPad Unlimited Data Plan Litig.*,
C.A. No. 10-02553-RMW (N.D. Cal. Aug. 26, 2012) ....................................... 34

*In re Doubleclick, Inc. Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ............................................................... 24

*In re Google Android Consumer Privacy Litig.*,
2013 WL 1283236 (N.D. Cal. Mar. 26, 2013) .................................................. 32

*In re Google Inc. Gmail Litig.*,
2013 U.S. Dist. LEXIS 172784 (N.D. Cal. Sept. 26, 2013) ....................... 10, 11, 16

*In re Jet Blue Airways Corp. Privacy Litig.*,
379 F.Supp.2d 299 (E.D.N.Y. 2005) ................................................................. 24

*In re Linkedin User Privacy Litig.*,
932 F. Supp. 2d 1089 (N.D. Cal. 2013) ............................................................ 27

*In re Mason*,
16 F.2d 384 (7th Cir. 1990) ............................................................................... 11

*In re Wal-Mart Stores, Inc. Wage & Hour Litig.*,
505 F. Supp. 2d 609 (N.D. Cal. 2007) .............................................................. 33

*Johnson v. Riverside Healthcare Sys.*,
534 F.3d 1116 (9th Cir. 2008) ............................................................................ 9

*Jones v. Corbis Corp.*,
489 Fed. Appx. 155 (9th Cir. 2012) .................................................................. 10

*Jones v. Corbis Corp.*,
815 F. Supp. 2d 1108 (C.D. Cal. 2011) ........................................................ 16, 35

*Kowalsky v. Hewlett-Packard Co.*,
2010 WL 5141869 (N.D. Cal. Dec. 13, 2010) .................................................. 26

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Low v. LinkedIn Corporation*,
   2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) ............................................... 24

*Mass. v. E.P.A.*,
   549 U.S. 497 (2007) .......................................................................................... 19

*Mintz v. Mark Bartelstein & Assocs.*,
   906 F. Supp. 2d 1017 (C.D. Cal. 2012) ......................................................... 32

*Mohamed v. Jeppesen Dataplan, Inc.*,
   614 F.3d 1070 (9th Cir. 2010) ............................................................................ 9

*Motschenbacher v. R.J. Reynolds Tobacco Co.*,
   498 F.2d 821 (9th Cir. 1974) .......................................................................... 19

*Murray v. Fin. Visions, Inc.*,
   2008 U.S. Dist. LEXIS 93419 (D. Ariz. Nov. 6, 2008) ............................... 35

*New Mexico State Investment Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ........................................................................ 18

*O'Donovan v. Cashcall, Inc.*,
   278 F.R.D. 479 (N.D. Cal. 2011) .................................................................... 35

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010) ........................................................................ 11

*Sanders v. Apple Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) ........................................................... 33

*Scherillo v. Dun & Bradstreet, Inc.*,
   684 F. Supp. 2d 313 (E.D.N.Y. 2010) ........................................................... 14

*Semegen v. Weidner*,
   780 F.2d 727 (9th Cir. 1985) .......................................................................... 25

*Solano v. Playgirl, Inc.*,
   292 F.3d 1078 (9th Cir. 2002) ........................................................................ 21

*Specht v. Netscape Communications Corp.*,
   306 F.3d 17 (2d Cir. 2002) ............................................................................. 11

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) .......................................................................... 25

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
   2000 WL 525390 (C.D. Cal. March 27, 2000) ............................................. 14

*Ticketmaster L.L.C. v. RMG Techs.*,
   2007 WL 2989504 (C.D. Cal. Oct. 12, 2007) ............................................... 26

*Torres v. Nutrisystem, Inc.*,
   289 F.R.D. 587 (C.D. Cal. 2013) .................................................................... 35

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.*,
   245 F.3d 1048 (9th Cir. 2001) ........................................................................ 26

RUSS, AUGUST & KABAT

*United States v. Holland,*
    519 F.3d 909 (9th Cir. 2008) ........................................................................ 11

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ...................................................................... 18

*Vinole v. Countrywide Home Loans, Inc.,*
    571 F.3d 935 (9th Cir. 2009) ........................................................................ 34

*Watkins v. L.M. Berry & Co.,*
    704 F.2d 577 (11th Cir. 1983) ......................................................... 10, 11, 16

*Williams v. Gerber Products Co.,*
    552 F.3d 934 (9th Cir. 2008) ........................................................................ 26

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) .......................................................................... 9

**STATE CASES**

*Berman v. Bromberg,*
    56 Cal.App.4th 936 (1997) ............................................................................ 35

*Dora v. Frontline Video, Inc.,*
    15 Cal.App.4th 536 (1993) ............................................................................ 19

*Eastwood v. Superior Court*
    149 Cal. App. 3d 409 (1986) ......................................................................... 24

*Hill v. Roll International Corp.,*
    195 Cal. App. 4th 1295 (2011) ..................................................................... 28

*KNB Enterprises v. Matthews,*
    78 Cal.App.4th 362 (2000) ........................................................................... 20

*Kwikset Corp. v. Superior Court,*
    51 Cal. 4th 310, 327 (2011) .......................................................................... 27

*Morgan v. AT & T Wireless Serv., Inc.,*
    177 Cal.App.4th 1235 (2009) ....................................................................... 26

*Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.,*
    164 Cal.App.3d 1122 (1985) ........................................................................ 35

**STATUTES**

18 U.S.C. § 2701 .......................................................................................... 7, 28, 29

18 U.S.C. § 2510 ..................................................................................................... 7

Cal. Bus. & Prof. Code § 17200 ................................................................... passim

**RULES**

Fed. R. Civ. P. 23 ............................................................................................ 33, 34

Fed. R. Civ. P. 9(b) ................................................................................... 9, 18, 25

RUSS, AUGUST & KABAT

Fed. R. Civ . P. 12(b)(6) ................................................................................................... 9

Rule R. Civ. P. 12(f) ...................................................................................................... 33

**TREATISES**

Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure Civil §
    1785.3 (3d. ed. 2005) ............................................................................................... 34

McCarthy Thomas, The Rights of Publicity and Privacy § 4:15 (2d ed. 2002) ......................... 19

McCarthy Thomas, The Rights of Publicity and Privacy § 10:24 (2d ed. 2002) ....................... 11

Restatement (Second) of Torts § 892 .......................................................................... 11

**CONSTITUTIONAL PROVISIONS**

Article III .................................................................................................... passim

RUSS, AUGUST & KABAT

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

## I.   STATEMENT OF ISSUES

To drive member growth and sell costly premium memberships LinkedIn Corporation ("LinkedIn") harvests email addresses from users' third-party email accounts and misappropriates its members' names. LinkedIn's practices violate the California Common Law Right of Publicity, California Unfair Competition Law, Federal Stored Communications Act, Federal Wiretap Act, and California Comprehensive Data Access and Fraud Act. The primary issues raised in LinkedIn's motion to dismiss and strike class allegations are:

- Consent. Do users consent to have email addresses and related data harvested from their third-party accounts, copied to LinkedIn's servers, stored indefinitely by LinkedIn, and used by LinkedIn to send multiple endorsement emails to individuals, purportedly on behalf of the user?
- Standing. Does LinkedIn's sending of repeated solicitation emails advertising its service, carrying the purported endorsement and name of a user, constitute a provable injury or enrichment to LinkedIn, conferring Article III standing?
- Class Allegations. Is consent an objective determination such that a class can be ascertained?

## II.   INTRODUCTION

LinkedIn operates a social network. The value and profitability of its business derives from the number of members who use its service and particularly from those to whom it can sell "premium" memberships. In a relentless effort to enroll new users and sell premium memberships, LinkedIn harvests email addresses and data stored in LinkedIn users' third-party email accounts. After copying and permanently storing the data on its servers, LinkedIn repeatedly spams the harvested email addresses. LinkedIn's messages advertise LinkedIn and bear the supposed endorsement of the user from whom the email address was harvested. Instead of obtaining the consent of users to advertise its services using their names and likenesses, LinkedIn tells its users LinkedIn will never "email anyone without your permission." Compl. ¶ 35. LinkedIn's practices enrich LinkedIn at the expense of LinkedIn's users, enabling LinkedIn to grow its user base, sell premium memberships, and increase profitability by avoiding expensive member acquisition costs.

Plaintiff, Jake Kushner, an Associate Professor of Pediatrics and Section Head of Pediatric Diabetes at Baylor College of Medicine discovered LinkedIn emailed hundreds of Dr. Kushner's colleagues and students. The emails requested Dr. Kushner's colleagues and students join

LinkedIn and provided links to LinkedIn's website where the recipients were asked to pay 400 dollars a year for a "premium" LinkedIn membership. *Id*. ¶ 19.

Plaintiff, Clair Connaughton, a consulting attorney for the United States Agency for International Development ("USAID") and member of the mediation panel for the Eastern District of New York Federal Court found LinkedIn sent emails ostensibly on her behalf to hundreds of people including opposing counsel in active litigation and the clients of opposing counsel. *Id*. ¶ 19.

Plaintiff, Nicole Crosby, co-owner of a small business that manufactures fire grates learned LinkedIn had sent hundreds of emails to her customer list. Instead of advertising Ms. Crosby's business, Texas Fireframe Company, the emails advertised LinkedIn. *Id*. ¶ 18.

These and six additional putative class members filed this case to stop LinkedIn's practice of downloading and indefinitely storing email addresses and related data gathered from its members and sending repeated endorsement emails advertising its service to the harvested email addresses. Under California law, all persons are entitled to compensation for the use of their likeness and name in connection with advertisements to which they have not given consent.

In an attempt to evade responsibility for its email harvesting and advertising practices, LinkedIn's motion advances multiple contradictory positions.

First, LinkedIn blames its users. Def. Br. at 4-8 & 10-15. LinkedIn contends (as a matter of law), it received the consent of its users, but that is false based on the allegations in the Complaint. LinkedIn alleges users should have known, based on cryptic language on LinkedIn's sign-up screens (*e.g.*, "add to network"), that LinkedIn would download email addresses from users' third-party emails accounts, indefinitely store the email addresses, and send multiple solicitation emails advertising LinkedIn. Tellingly, LinkedIn does not and cannot argue its terms of service (which until this case was filed, were hidden from users) disclosed LinkedIn's email and data harvesting and endorsement advertising practices. Compl. ¶ 26. Unable to shield itself behind its terms of service, LinkedIn relies on its user sign-up screens, rebranded in LinkedIn's motion as "permission screens." The Complaint pleads that the language on LinkedIn's sign-up screens is false, incomplete, and designed to deceive. *See infra* Part V(A). Nowhere on these sign-up screens does LinkedIn tell users that LinkedIn downloads external email addresses, stores these

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

1   email addresses, and sends these email addresses solicitation emails to join LinkedIn.  LinkedIn is

2   left arguing that it received the *implied* consent of its users.  Implied consent, however, is an

3   affirmative defense requiring the consenting party to knowingly agree.  The cryptic phrases on

4   LinkedIn's site fall far short of establishing actual or implied consent.

5       Second, LinkedIn incorrectly alleges Plaintiffs lack standing as LinkedIn's sending of

6   promotional endorsement emails to addresses harvested from users' accounts does not injure or

7   enrich anyone.  Def. Br. at 15-21 & 25.  Contrary to LinkedIn's claim, Plaintiffs alleged LinkedIn

8   failed to compensate Plaintiffs for the use of their identities to sell "premium" memberships, grow

9   LinkedIn's membership base, and save on new member acquisition costs.  *See infra* Part V(B).

10  Moreover, LinkedIn places a value of ten dollars for each email sent to a recipient containing an

11  endorsement.  LinkedIn's InMail program charges LinkedIn members ten dollars per email to send

12  a message to another member they are not directly linked to.  Compl. ¶ 9.  The Complaint

13  identifies numerous statements from LinkedIn's management and financial reports ascribing

14  LinkedIn's profits to its practice of using endorsement emails to promote and sell its services.  *Id*.

15  ¶¶ 7, 12, 23, 51-54, 56, 58.  Reid Hoffman, LinkedIn's co-founder and executive chairman,

16  described the use of users' own contacts to promote LinkedIn as the single most important decision

17  LinkedIn ever made: "[W]hen we launched, we had hoped . . . that the growth would pick up by

18  itself. . . I sat down with the team.  And I said, look *if we don't solve this we're dead* . . . I have one

19  good idea . . . *we'll allow people to essentially upload their address book*."[1]

20      Third, LinkedIn sets forth contradictory standards for determining how the Plaintiffs' class

21  was deceived.  Def. Br. at 10-15 & 33-35.  LinkedIn states that even though the individual

22  Plaintiffs are representatives of a class, Plaintiffs must each individually allege their understanding

---

[1] LinkedIn's brief claims the Complaint misquotes LinkedIn co-founder and executive chairman Reid Hoffman as crediting "Add Connections" with LinkedIn's growth.  Def. Br. at 8.  Plaintiffs request the Court take judicial notice of a transcript of a May 9, 2013 interview of Reid Hoffman on Bloomberg Television, available at: http://www.bloomberg.com/video/reid-hoffman-discusses-founding-linkedin-P6pT1HPQQaSQqcRZ7SPeZA.html (last visited January 13, 2013); *see* Declaration of Dorian S. Berger in Support of RJN ("Berger Dec."), Ex. A.  Reid Hoffman's statements in the Bloomberg interview show the "Add Connections" function is vital to LinkedIn's growth and profit.  LinkedIn's request for judicial notice asks the Court consider materials outside the pleadings "information available on the Internet repeatedly have been held to constitute matters of public record subject to judicial notice. Dkt. No. 18 at 5:1-6.  Plaintiffs welcome the opportunity to provide additional context to the statements of LinkedIn's co-founder.

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

of how they were deceived by LinkedIn.  Yet, mere pages later, LinkedIn argues that determining whether someone consented is an objective question rather than a subjective determination.  Ten pages later on, LinkedIn reverses itself again and alleges that consent is subjective and the Court must strike Defendants' class allegations.  The law is clear: consent is to be determined using an objective, reasonable person standard. *See infra* Part VI.

## III.    BACKGROUND

LinkedIn's Motion to Dismiss ignores the facts as pleaded in the Complaint and introduces a multitude of information well outside the pleadings.  To correct the distorted picture LinkedIn attempted to create, we set forth the actual facts pleaded in the Complaint.

### A) About The Plaintiffs.

Plaintiffs are professionals from across the United States who brought this action after LinkedIn sent hundreds of emails advertising LinkedIn to email addresses harvested from Plaintiffs' third-party email accounts.  Compl. ¶¶ 13-21.  The plaintiffs include a former manager of international advertising sales for the New York Times, a published author, professors at Baylor Medical School and Baruch College, a film executive, a medical doctor, a small business owner, a creative director at an international advertising company, and an attorney who sits on the mediation panel for the Eastern District of New York Federal Court.  Plaintiffs range from their mid-30's to mid-60's.[2] *Id.*

Plaintiffs are precisely the type of individuals who are LinkedIn's target market.  Each plaintiff has alleged that LinkedIn harvested email addresses from his or her external email account and proceeded to send multiple emails to the appropriated addresses advertising LinkedIn, all without his or her consent. *Id*. ¶¶ 13-21.  Instead of alerting them to the intrusion and repeated emailing, LinkedIn falsely represented to all of its users including the named Plaintiffs, that LinkedIn "will never send emails without your permission." *Id*. ¶¶ 35, 40.  LinkedIn does not dispute that each LinkedIn user was shown the sign-up screens identified in the Complaint.

---

[2] Plaintiffs incorporate by reference Exhibits B-1 to B-8 of Defendant's request for judicial notice (the LinkedIn profiles of the named Plaintiffs).  The named Plaintiffs are graduates of Harvard, Brown, Berkley, Northwestern, the University of Texas of Austin, and hold advanced degrees in law, medicine, public health, and mathematics.   The varied occupations of the named Plaintiffs provide further indicia that a reasonable person would not view LinkedIn's sign-up screens as providing consent to LinkedIn's data harvesting and endorsement email practices.

RUSS, AUGUST & KABAT

**B) About LinkedIn.**

LinkedIn is a social networking company that directs its products and services to people whom it describes as "people in professional occupations." *Id*. at 23. Growing its membership has been central to LinkedIn's success. Reid Hoffman, LinkedIn's co-founder, stated that the most important factor in LinkedIn's success was using members' external contacts to grow. Berger Decl. Ex. A. Jeff Weiner, LinkedIn's CEO, stated changing the way LinkedIn sends invitations led to strong member growth, directly contributing to the bottom line. "[LinkedIn] grew its member base to 218 million, and witnessed strong member growth through the quarter *due to optimization initiatives*. As a result, new sign ups increased to greater than two per second." Compl. ¶ 7.

**1) LinkedIn's Accessing Of Users Third-Party Email Accounts.**

When a new member signs up for LinkedIn, LinkedIn asks a user to use an external email address as their username. *Id*. ¶ 25. This request is made without any warning as to what the username will be used for. *Id*. ¶ 30 & Fig. 3. After a user enters his or her external email address, the user is asked to create a professional profile. *Id*. After the professional information is provided and clicking "Create My Profile," instead of being greeted by a draft profile, users are greeted with a screen prepopulated with their own email address. *Id*.

This "Grow your network" page uses the setup information provided to LinkedIn to harvest email addresses from users' external email accounts. The screen lists the LinkedIn user's external email account, requested by LinkedIn. *Id*.



Without consent or notice, LinkedIn checks to see if the user has an open email account on his or her computer. *Id*. ¶¶ 3, 30, 43. For example, LinkedIn attempts to access a user's Gmail

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

1    account if the user has Gmail open in another browser window or has not logged out of Gmail.[3] If

2    an email account is open, LinkedIn accesses the account by using the open email session.  *Id*.

3    LinkedIn does not prompt members for a password.  *Id*. ¶ 3.  Instead, LinkedIn sweeps the external

4    email account for every email address a user has been emailed by, CCed, or emailed.  *Id*. ¶¶ 30, 33,

5    37.  For many users this is thousands of addresses.  *Id*. ¶¶ 32, 34, 44.

6         Once LinkedIn copies and stores a member's third party email addresses on LinkedIn

7    servers, LinkedIn asks users if they want to "[s]tay in touch with your contacts who aren't on

8    LinkedIn yet.  Invite them to connect to you."  *Id*. ¶ 34.  The box to accept is already checked.  A

9    mere click of the enter button leads to each appropriated email address receiving ***three*** emails

10   requesting they join LinkedIn with the name of the LinkedIn user from whom the addresses were

11   harvested.  These solicitation emails are a clear endorsement of LinkedIn, using the name of the

12   person from whom the email address was appropriated, and are worded so that they appear to be

13   coming from the LinkedIn members.  *Id*. ¶¶ 45, 46, Fig. 7.  Each email displays the LinkedIn logo.

14        When users click on the LinkedIn endorsement email they are taken to a webpage and

15   asked to sign up for LinkedIn's premium service.  Unlike the accused Facebook feature in *Cohen*,

16   LinkedIn seeks to sell services to members.  *Id*. ¶ 56.

17        **2)   LinkedIn's Repeated Spamming Of Harvested Email Addresses.**

18        A week after LinkedIn sends emails to the email addresses it has appropriated, LinkedIn

19   sends another email advertising its service.  *Id*. ¶¶ 2, 6, 8, 18, 55.  A week later, this process is

20   repeated with a ***third*** endorsement email requesting the recipient to sign up for LinkedIn.  *Id.*  This

21   process is engaged in by LinkedIn with the appropriated email addresses.  *Id*. ¶¶ 32, 34, 44.

22        When a user discovers that thousands of endorsement emails have been sent to addresses

23   harvested from his or her external email account, there is no functional way to stop further emails

24   from being sent to the harvested email addresses.  *Id*. ¶¶ 2, 25 50.  The "Help Forums" on

25   LinkedIn.com are filled with thousands of complaints from users asking LinkedIn to stop sending

26   emails.  *Id*. 35.  LinkedIn members have found LinkedIn sent emails on their behalf to former

27

28   _____

[3] The third-party email accounts that LinkedIn attempts to access include Yahoo Mail, Microsoft
Hotmail, Gmail and other email services.  LinkedIn argues in a footnote that the allegations in
the Complaint are limited to Google Gmail accounts.  This is not the case.  Compl. ¶ 24.

spouses, opposing counsel, professors, clients, students of professors, etc.  *Id.* ¶¶ 5, 15, 17-19.

**3)  LinkedIn Profits From Using Member Names In Endorsement Emails.**

LinkedIn directly profits in several ways from advertising its service to non-members by using the names and likenesses of its members.  First, LinkedIn is able to sell premium memberships to non-members by sending promotional emails (bearing users' purported endorsement of LinkedIn) to the email addresses harvested from its members' third party email accounts.  *Id.* ¶ 56.  In 2012, Premium Subscriptions accounted for $190 million dollars in LinkedIn revenue.  *Id.*  Second, endorsement emails sent to appropriated email addresses are the single most important way that LinkedIn grows its membership base.  LinkedIn sells services that are directly attributable to LinkedIn's membership size.[4]  *Id.* ¶ 53.  LinkedIn's CEO (Jeff Weiner) has stated, "by virtue of the size of the network, we were able to do something that's really never been possible before, and that's passive candidate recruiting at scale."  *Id.*  Third, LinkedIn is able to save money by using appropriated email addresses to send "endorsement" emails.  LinkedIn's 2012 10-K states, "our member base has grown virally . . . we have been able to build our brand with relatively low marketing costs."  *Id.* ¶ 54.  Fourth, LinkedIn's InMail Program values each email address at $10.  *Id.* ¶ 55.

**C)  Plaintiffs' Causes Of Action.**

Plaintiffs' Class Action Complaint asserts LinkedIn is accountable for (1) misrepresentation through its own website and sign-up screens that LinkedIn would access users' external email accounts, harvest email addresses and related data, and indefinitely store the harvested data on LinkedIn's servers and (2) fails to attain the consent of its members to send multiple solicitation emails advertising LinkedIn by using the name of a LinkedIn user.

LinkedIn's harvesting and storage of email addresses violates the Stored Communications Act ("SCA") 18 U.S.C. §§ 2701, *et seq.*; Electronic Communications Privacy Act ("Wiretap Act") 18 U.S.C. §§ 2510, *et seq.*; California's Unfair Competition Law ("UCL") § 17200, *et. seq.*; California's Comprehensive Data Access and Fraud Act ("§ 502") Penal Code § 502.  LinkedIn's

---

[4] LinkedIn's co-founder Reid Hoffman, stated uploading users' external email accounts was the biggest decision made by LinkedIn "If we didn't fix this it was game over, jump of a cliff, dead. . . . So we said we would allow people to essentially upload their address book."  Berger. Decl. Ex. A.

RUSS, AUGUST & KABAT

sending of multiple emails advertising LinkedIn, bearing the name of a LinkedIn user, violates

California's Common Law Right of Publicity and UCL statute.

### D) LinkedIn Ignores And Misrepresents Factual Allegations In The Complaint.

LinkedIn misstates Plaintiffs' Complaint.  Plaintiffs allege material omissions by LinkedIn

and affirmative misrepresentations.  By way of example, LinkedIn claims the Complaint does "not

allege how any of the selected words or phrases are false or misleading."  Def. Br. at 22. Yet, the

Complaint identifies numerous examples of misleading statements on LinkedIn's sign-up screens.

For example, the Complaint cites the following misleading statements:

> The 'Why not invite some users' screen misleads LinkedIn users because it states,
> "Stay in touch with your contacts who aren't on LinkedIn yet. Invite them to connect
> with you." By using the phrase, "your contacts," LinkedIn is intentionally misleading
> its users regarding the volume of email addresses it is collecting.

Compl. ¶ 37.

> LinkedIn misleads its users with respect to the implications of the "Why not invite
> some users?" screen by captioning a large button on the screen, "Add to Network."
> The LinkedIn user is not told that by clicking "Add to Network," LinkedIn will send
> emails (into the thousands) containing the user's endorsement to each of the email
> addresses harvested from that user's external email account.

Compl. ¶ 38.

> LinkedIn expressly states that they will not email any recipients without their
> permission. "We will not store your password or email anyone without your
> permission." (LinkedIn Login Screen Step 2). Never does LinkedIn state that they will
> be sending multiple emails on a user's behalf.

Compl. ¶ 47.

Again, ignoring the Complaint, LinkedIn attempts to have the Court believe "Plaintiffs do

not allege that they actually read or were deceived by any of the permission screens."  Def. Br. at 8.

Yet, the Complaint spells out:

> LinkedIn intentionally misrepresented a Member's ability to prevent his or her
> appearance and name in advertisements so LinkedIn could enjoy substantial profits
> by having users unwittingly endorse LinkedIn to third parties through such
> advertisement emails.  ***Plaintiffs justifiably relied upon those misrepresentations
> when deciding to join and utilize LinkedIn.***

Compl. ¶ 103 (emphasis added).

> Plaintiffs reasonably had no expectation that by signing up for a LinkedIn account,
> their names, photographs, or likenesses would be used to endorse products, services,
> or brands.

Compl. ¶ 62.

Begging credulity, LinkedIn declares [referring to spamming appropriated email

RUSS, AUGUST & KABAT

addresses], "Plaintiffs do not point to anything in the emails that endorses LinkedIn." Def. Br. at 8. However, the Complaint states LinkedIn's solicitation emails, "Request[]the recipients to join LinkedIn." Compl. ¶¶ 13-21, 35, 41. When a prospective user clicks on the endorsement email they are taken to a sign-up page where LinkedIn "attempts to sell them premium services" at $39.95 to $49.95 a month. *Id.* ¶ 56. "LinkedIn is not only advertising joining its network, but also directly selling a product." *Id.*

LinkedIn contends that allegations in the Complaint do not identify LinkedIn's fraudulent conduct or Plaintiffs' reliance thereon with sufficient particularity to satisfy Fed. R. Civ. P. 9(b). Def. Br. at 8. To the contrary, Plaintiffs' allegations regarding the misconduct at issue — which include both false and misleading affirmative representations and material omissions — clearly notify LinkedIn of the conduct it is charged with, and why it misled Plaintiffs and other customers, so that LinkedIn can prepare its defense, as required by Rule 9(b) and Ninth Circuit law. LinkedIn's purported confusion regarding its role in the fraud is wholly manufactured. Plaintiffs' allegations are more than sufficient under Rule 9(b), and any further details are within LinkedIn's control and will be revealed through discovery.

## IV.   LEGAL STANDARDS

LinkedIn's motion tests the legal sufficiency of the claims asserted in the complaint. *See* Fed. R. Civ. P. 12(b)(6). A complaint should not be dismissed "unless the plaintiffs' complaint fails to state a claim to relief that is plausible on its face." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (quotations omitted). The issue is not whether the non-moving party will ultimately prevail but whether plaintiffs are entitled to offer evidence to support the claims asserted. *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1100 (9th Cir. 2010). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in light most favorable to the non-moving party. *See Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008).

## V.   ARGUMENT AND ANALYSIS

### A)  Plaintiffs Establish LinkedIn Did Not Obtain Their Consent To Harvest Email Address And Send Repeated Endorsement Emails.

LinkedIn did not obtain the consent of its users to (1) access their third-party email

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

1  accounts, (2) harvest email addresses stored in those accounts, (3) store the harvested email

2  addresses indefinitely for LinkedIn's use, and (4) send multiple endorsement emails.  LinkedIn

3  concedes that consent is determined using an objective standard and that LinkedIn users were

4  greeted by the same series of sign-up screens. Def. Br. at 4-7, 10 ("Consent is determined from the

5  reasonable viewpoint of another person, not from Plaintiff's unexpressed subjective beliefs.").

6      LinkedIn must establish its sign-up screens, construed in the light most favorable for the

7  Plaintiffs, allow a reasonable person to understand and consent to LinkedIn accessing a user's third

8  party email account, harvest the email addresses, indefinitely store the email addresses on

9  LinkedIn's servers, and send multiple endorsement emails advertising LinkedIn products and

10  services.  In numerous cases, this Court and others have found a lack of consent despite a user

11  agreeing to the terms of use on a website with much broader disclosers than LinkedIn's sign-up

12  screens. *See In re Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *10 (N.D. Cal.

13  Sept. 26, 2013) (Koh, J.) (finding no consent despite Google's terms of service containing broad

14  releases); *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090, 1096 (N.D. Cal. 2011) (finding

15  Facebook users did not consent to appropriation of their identities although "plaintiffs may indeed

16  have consented to the disclosure of their names and profile pictures to their Facebook friends").

17      Accepting LinkedIn's theory of consent — that a few cryptic disclosures on a web site

18  provide LinkedIn the right to harvest users' email addresses and broadcast users' persona to

19  hundreds of people - offends the principles enunciated in privacy laws.  *See Watkins v. L.M. Berry

20  & Co.*, 704 F.2d 577, 582 (11th Cir. 1983) ("It would thwart th[e] policy [of protecting privacy] if

21  consent could routinely be implied from circumstances.").

22  **1)  The Proper Standard For Consent, The Objective Reasonable Person.**

23      Consent can be express or implied.  Both express and implied consent are determined

24  "***objectively from the perspective of a reasonable person***." *Jones v. Corbis Corp.*, 489 Fed. Appx.

25  155, 156 (9th Cir. 2012) (emphasis added); Restatement (Second) of Torts, § 892 (no consent

26  where "a reasonable person would not understand from the words or conduct that consent is

27  given").  The "reasonable person" is not someone who is "hypersensitive or unduly suspicious."

28  *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (*quoting In re Mason,* 916 F.2d 384,

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

1    386 (7th Cir. 1990).[5]  Further, "consent is not an all-or-nothing proposition . . . '[a] party may

2    consent to the interception of only part of a communication or to only a subset of its

3    communications.'"  *In re Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *47 (*quoting Blumofe v.*

4    *Pharmatrak, Inc.* 329 F.3d 9, 18 (1st Cir. 2003); *Cohen,* 798 F. Supp. 2d at 1096.  (consent to

5    broad terms of use does not "establish[] that [Facebook users] consented to the particular uses in

6    dispute.").

7            When consent is implied, it should be "construed narrowly."  McCarthy Thomas, The

8    Rights of Publicity and Privacy § 10:24 (2d ed. 2002) (*citing* Restatement (Second) of Torts §

9    892).  "Without actual notice, consent can only be implied when the surrounding circumstances

10   convincingly show that the party knew about and consented to the interception." *Berry v. Funk*,

11   146 F.3d 1003, 1011 (D.C. Cir. 1998) (analyzing the "prior consent" exception of the Wiretap

12   Act).  Further, "courts have cautioned that implied consent applies only in a narrow set of cases."

13   *In re Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *47 (*citing Watkins*, 704 F.2d at 581).

14   Rather, a court "must inquire into the dimensions of the consent and then ascertain whether the

15   interception exceeded those boundaries." *Pharmatrack, Inc.,* 329 F.3d at 19 (*quoting Gilday v.*

16   *DuBois*, 124 F.3d 277, 297 (1st Cir. 1997)).

17       **2)  Plaintiffs Did Not Consent To LinkedIn Accessing, Downloading, and
             Indefinitely Storing Every Email Address And Related Data.**
18
19           When users sign up for LinkedIn, they are asked to use a third-party email address as their

20   username.  On the second sign-up screen a user is prompted with the message "grow your network

21   on LinkedIn."  Compl. ¶ 30.  There is no indication on these pages that LinkedIn will be

22   downloading the email addresses of every email ever sent or received by the user.  *Id.*  In fact, the

---

23   [5] LinkedIn states that the proper standard for evaluating consent is the "reasonably prudent

24   person."  Def. Br. at 10.  For this standard they cite this Court's decision in *Be In, Inc. v. Google
     Inc.*, 2013 WL 5568706, at *9 (N.D. Cal. Oct. 9, 2013) (Koh, J.).  However, in *Be In,* the parties

25   did not dispute the standard to be applied and adopted the standard set forth in *Specht v.*
     *Netscape Communications Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (Sotomayor, J.).  Although

26   *Specht*, was applying California law, it was applied to determine if a website's terms of use were
     made reasonably conspicuous so as to compel arbitration.  The vast majority of cases cited by

27   LinkedIn apply the reasonable person standard, and that is the standard applied in recent 9th
     Circuit decisions.  *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010)

28   (applying the "reasonable members of the public" standard).  Further, LinkedIn has not
     explained, what if any, difference exists between the "reasonable person" and "reasonably
     prudent person" standard.

RUSS, AUGUST & KABAT

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

text on the page is deceptive and gives users a false reassurance by stating that, "[w]e will not store your password or email anyone without your permission."  *Id*. ¶ 47 & Fig 3.  If an email account is open, LinkedIn accesses that account.  Again, there is no notification on LinkedIn's sign-up pages that it will be using an open session to access an external email account.  *Id*. ¶ 32.  A user is then prompted by a pop screen stating, "LinkedIn states that it wants some information from one's Google Contacts."  *Id*. ¶ 33.  When a user hits "allow" LinkedIn sweeps a user's account and downloads every email address a user has ever been emailed by or sent email to.  *Id*. ¶ 30.

LinkedIn claims that reasonable persons would understand that they "consent to [LinkedIn] accessing all email addresses contained in their Google contacts."  Def. Br. at 11.  Yet, LinkedIn offers no analysis why a reasonable person would understand they consented to LinkedIn assessing "all email addresses contained" in their third-party email account.  LinkedIn's "permission screens" fail to provide consent for five reasons.  ***First***, the screens do not indicate LinkedIn will download thousands of contacts to LinkedIn's servers.  LinkedIn copies not only the contacts in users' address book, but also the email addresses of everyone that user emailed, been emailed by or copied on an email.  Compl. ¶ 33.  ***Second***, LinkedIn provides no notice LinkedIn will indefinitely store the data on LinkedIn's servers.  *Id*. ¶¶ 30, 32.

***Third***, LinkedIn is aware its messages do not provide actual notice to users, and are, at best, deceptive.  Thousands of complaints have been posted on LinkedIn's help boards (managed, moderated, and hosted by LinkedIn).  *Id*. ¶¶ 31, 33, 36, 41, 50, 58.  ***Fourth***, LinkedIn's disclosures on its website deceive its users.  *Id*. ¶¶ 33-35.  Prior to LinkedIn harvesting data from a third party email account, the only disclosures from LinkedIn are "grow your network," "get started by adding your email address," "we will not store your password or email anyone without your permission," and "LinkedIn.com is asking for some information from your Google Contacts."  *Id*. ¶ 30 & Fig. 3.  There is nothing in these disclosures that would lead a reasonable person to conclude LinkedIn uses an open email session to tunnel into a user's account and indefinitely store the harvested data.

***Fifth***, a reasonable person would not find LinkedIn's welcome screens evidence consent for LinkedIn to download data on everyone a user has ever emailed or been emailed by.  LinkedIn claims that a Gmail user would know Google is downloading and storing email addresses, phone

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

numbers, and other data from their Gmail account.  However, LinkedIn is not downloading "contacts" as they would be understood by a reasonable person.  LinkedIn requests this Court take judicial notice of an exhibit where Google states that it stores many email addresses in its contacts database.  However, this is deceptive, as Google stores contact data in three primary categories: "my contacts," "most contacted," and "other contacts."  Berger Decl. Exs. B & C.  A reasonable person would understand "my contacts" and "most contacted" as one's contacts in the "context of a professional network."  Def. Br. at 12.  "My Contacts" are described by Google as the "addresses you care about."  Berger Decl. Ex. C.  However, LinkedIn downloads, copies and stores data from Google's "other contacts" repository.  Other contacts contain everyone who has been emailed by, the user, been CC'ed on an email, sent by the other or to the user, or sent an email to the user.  As the complaint makes clear, this numbers in the thousands of email addresses for a typical user.  Compl. ¶¶ 32, 44.  A reasonable person would not understand the sign-up screens as granting LinkedIn permission to download and store data from "other contacts."  *Id.* ¶¶ 32, 34, 50.

LinkedIn does not identify any language that would lead a reasonable person to conclude LinkedIn downloads every email address a user had emailed or been emailed by.

**3)  Plaintiffs Did Not Consent To LinkedIn Sending Repeated Endorsement Emails.**

Without the consent of its members, LinkedIn advertises its service to non-members by sending repeated messages.  *Id.* ¶¶ 34, 36, 60.  The endorsement emails purport to endorse LinkedIn, using the name of the person from whom the email address was appropriated.  When a user clicks on the link in the endorsement email, they are taken to a webpage where the prospective user is asked to join LinkedIn's premium service.  *Id.* ¶ 56.  Unlike Facebook in *Cohen*, LinkedIn seeks to sell prospective members costly memberships.  LinkedIn claims its users consent to LinkedIn sending repeated endorsement emails on their behalf based on sign-up screens, "as LinkedIn explains to members . . . No more than two reminders are ever sent."  Def. Br. at 12.  However, LinkedIn's sign-up screens fail to provide consent as understood by a reasonable person.

***First***, LinkedIn's sign-up screens do not inform users that each email address will be sent three emails.  LinkedIn claims a reasonable person would understand LinkedIn will be sending repeated endorsement emails based on the following cryptic language: "[s]tay in touch with your

contacts who aren't on LinkedIn yet" and "[I]nvite them to connect with you." The Complaint

makes clear, these statements do not provide implied or actual consent to a reasonable person.

**Second**, LinkedIn represents that it is only inviting a user's contacts. This is not the case.

LinkedIn sends emails to every address that it has harvested.[6] Compl. ¶¶ 30, 33, 37. **Third**, no

language on the sign-up screens indicates emails will be sent from LinkedIn with a member's

endorsement of LinkedIn. The button merely reads, "add to network." **Fourth**, sign-up screens

are designed to deceive users. *Id.* ¶¶ 38, 39. Only the first ten names are shown on the screen,

even if there are thousands of email addresses. *Id.* ¶ 44. A user might be able to see that additional

names are selected, but users would need to scroll down using a greyed out bar on the side.[7]

**Fifth**, LinkedIn is aware its webpages are deceptive and users have not consented to

sending multiple endorsement emails to each appropriated email address. *Id.* ¶¶ 35, 36, 38, 45, 57,

58. Thousands of users have complained to LinkedIn about its unethical harvesting of email

addresses and repeated spamming of those addresses. *Id.* ¶¶ 33, 36, 41, 48-50, 58.

**Sixth**, statements on the LinkedIn site would lead a reasonable person to conclude that

LinkedIn would not send multiple spam messages. *Id.* ¶¶ 5, 25, 35, 40. LinkedIn states in its

publicity materials and terms of use that one should only invite close business contacts to join and

that LinkedIn never sends emails "without your permission." *Id.*

**Seventh**, technology experts who have evaluated LinkedIn's sign-up process have found it

misleading. Following the filing of the Complaint, the New York Time's technology reporter,

Vindu Goal, signed up for LinkedIn to test the allegations in the Complaint. Vindu Goal's

---

[6] LinkedIn could make disclosures clear by saying "LinkedIn Will Be Sending 1134 Emails Using Your Name Endorsing LinkedIn."

[7] LinkedIn contends that where information is accessible via a scroll bar, it is reasonably communicated. However, the case on which LinkedIn relies reveals the deficiency of the notice provided on LinkedIn's sign-up screens – such notice must be clear and conspicuous. In *Scherillo v. Dun & Bradstreet, Inc.,* 684 F. Supp. 2d 313, 322 (E.D.N.Y. 2010), a website had its terms and conditions embedded in a web page. The Court found a user put on notice because of multiple conspicuous warnings that LinkedIn has never provided. The warnings include "I have read and AGREE to the terms and conditions shown above." "adjacent to this text is a much smaller, empty box ("the terms and conditions check box")," and "at the bottom of the page is another box containing the phrase "Complete Registration." California Courts have held that placing information such that a user has to scroll does not provide adequate notice. *See Ticketmaster Corp. v. Tickets.Com, Inc.,* 2000 WL 525390, at *2 (C.D. Cal. March 27, 2000) (finding no consent where "the terms and conditions are set forth so that the customer needs to scroll down the home page to find and read them").

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

qualifications make him far savvier than the "objective reasonable person." Goal's testing found LinkedIn stores email addresses and associated data "even if you don't invite some or all of those imported names to connect with you, LinkedIn saves the information for various purposes, including prompting you later to add the people as connections." Berger Decl. Ex. D. The New York Times article continued, "I aborted the import process to avoid spamming all of those people, ***but it's not hard to see how someone new to the service could accidentally send an invitation to everyone they know***, including casual acquaintances and people they would rather not connect with ever again." *Id.* Far from, "explain[ing] each step and requir[ing] members to affirmatively consent" (Def. Br. at 4), LinkedIn's sign-up screens evince LinkedIn failing to provide clear notice required for LinkedIn to establish consent.

### 4)   Cases Have Found No Consent Where Far Broader Disclosures Were At Issue.

Because LinkedIn's terms of service were hidden from users and did not put its members on notice, LinkedIn relies on its sign-up screens. LinkedIn claims their signup screens distinguish this case from decisions in *Fraley* and *Cohen*. In *Cohen,* the Court found plaintiffs had not consented to the use of their names and likenesses by Facebook. The terms of service relied on by Facebook, were significantly more detailed and clear than the cryptic language on LinkedIn's sign-up screens. *See Cohen*, 798 F. Supp. 2d at 1096 ("Plaintiffs may indeed have consented to the disclosure of their names and profile pictures to their Facebook friends and even to Facebook users at large, but Facebook has not established that they consented to the particular uses in dispute.").[8]

Recently, this Court found that although Google's terms gave Google the right to "prescreen, flag, filter, modify, refuse or remove any or all Content from any Service" and "advertisement[s] may be targeted to the content of the information stored on the services," Google users' acceptance of these statements "does not establish explicit consent." *In re Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *49-50. LinkedIn's sign-up screens provide far less of a disclosure than the terms of use as issue in *Cohen*, *Fraley* and *In re Gmail Litig.*

---

[8] In *Fraley*, this Court found that, even if Facebook's terms of service provided it with the right to use Plaintiffs' names, such a determination was "a disputed question of fact and is not proper grounds for dismissal at this time."). *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 806 (N.D. Cal. 2011).

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

**5)  LinkedIn Cannot Establish It Had The Implied Consent Of Its Users.**

LinkedIn alleges that even if there is no actual consent for sending multiple endorsement emails, consent may be implied.  As with actual consent, the standard for implied consent is that of an objective reasonable person.  LinkedIn provides no basis for why the sign-up screens would provide implied consent to send multiple emails.  In support of its position, LinkedIn identifies a help file buried within the LinkedIn website (and not shown on the sign-up screens), to show the supposed implied consent for sending multiple emails.[9]  Def. Br. at 12.  A "help file" that is not visible to members when they are signing up does not establish implied consent to send multiple emails where implied consent is to be "narrowly construed."  *Watkins*, 704 F.2d at 581 (finding consent should be narrowly found); *Desnick v. American Broadcasting Cos., Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995) (Posner, J.) ("there can be no implied consent in any non-fictitious sense of the term when express consent is procured by a misrepresentation or a misleading omission").  Further, when determining implied consent the scope of the consent is a primary concern.  *In re Pharmatrak, Inc*., 329 F.3d at 9 ("In evaluating a Wiretap Act claim finding "a reviewing court must inquire into the dimensions of the consent.").  LinkedIn's attempt to broaden the scope of implied consent to include sending multiple emails is precisely the sort of broadening in scope disfavored when evaluating claims of implied consent.

The only case LinkedIn cites in support of finding implied consent illustrates why implied consent is inapplicable here.  In *Jones v. Corbis Corp.*, a court granted summary judgment to the defendant, finding a celebrity had given implied consent to use of her photographs where the plaintiff had walked at various red carpets, posed for photographers on the red carpet, understood it was industry practice to have her photo used, and been given notice her image would be exploited "by any and all means in connection with the events without limitation."  *Jones v. Corbis Corp*., 815 F. Supp. 2d 1108, 1114 (C.D. Cal. 2011).  In contrast, LinkedIn users are not provided notice their names will be used to promote LinkedIn.  There is no industry practice that when a user sends

---

[9] The fact that LinkedIn has a page that provides adequate notice but does not post it when a user joins indicates that LinkedIn despite having the ability to does not obtain the consent of its members.

an email, multiple repeated emails are sent.  Statements on LinkedIn's site show industry practice is inapposite "[w]e will not . . . email anyone without your permission."  Compl. ¶ 47.

### 6)   LinkedIn's Failure To Obtain Its Members' Consent Is Pled Sufficiently.

LinkedIn advances various arguments relating to whether consent was sufficiently pled.  LinkedIn alleges the Complaint insufficiently pleads Plaintiffs' lack of consent.  The complaint pleads LinkedIn harvested email addresses and sent endorsement emails without the consent of each Plaintiff.  *Id*. ¶¶ 13-21.  LinkedIn claims that anecdotal allegations in a complaint do not establish lack of consent.  Def. Br. at 13.  Yet, the Complaint allegations are not anecdotal.  The Complaint explains why a reasonable person would not consent to LinkedIn's actions based on the sign-up screens.  *Id*. ¶¶ 30, 33-35.  LinkedIn's citation of *Chamberlain v. Ford Motor Co*., for the proposition that "anecdotal evidence alone is insufficient," is misplaced.  Def. Br. at 13.  In *Chamberlain*, the Court evaluated consent on a motion for summary judgment.  369 F. Supp. 2d 1138, (N.D. Cal. 2005).  Here, consent is not alleged anecdotally.  This case is not at summary judgment, discovery has yet to open, and additional evidence will prove these allegations.

After contending that anecdotal allegations are insufficient, LinkedIn states, "[p]laintiffs do not adequately allege their own lack of consent." as "Plaintiffs alleging nothing about their own experiences."  Def. Br. at 14.  Not only does this argument contradict LinkedIn's objection to anecdotal statements, it is unsupported by law.  LinkedIn cites *Gibson v. Chrysler Corp*., 261 F.3d 927 (9th Cir. 2001), for the proposition that Plaintiffs must plead their own experiences.  However, *Gibson*, relates to whether "claims of unnamed class members can serve as a basis for [federal] diversity jurisdiction."  *Id*. at 941.  Each Plaintiff pled they did not consent to LinkedIn's actions.  Compl. ¶¶ 13-21.  There is no requirement, for a class action complaint, that each plaintiff must allege their own experiences where the consent was obtained through the same web-screens,

1  contacts or statements.[10]  Indeed, securities class actions evidence that a plaintiff need only identify

2  which statements were deceptive based on a reasonable person's objective understanding.[11]

3        LinkedIn objects to the Complaints' allegations of a lack of consent as the Complaint

4  purportedly fails to "provide any facts about what permission screens they say or how they were

5  supposedly deceived."  Def. Brief. at 15.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir.

6  2003), is cited for the proposition that because the lack of consent "is based entirely on the

7  contention that LinkedIn intentionally mislead members [sic]. . . all of Plaintiffs' claims are

8  grounded in fraud and thus subject to the particularity requirements of Rule 9(b)."  Def. Br. at 14.

9  However, the complaint alleges that LinkedIn failed to get the consent of its members through

10  various avenues – including averments not sounding in fraud.  Compl. ¶ 35 (failure to inform

11  "LinkedIn does not inform its users"); *Id.* ¶ 38 (confusing disclosures "LinkedIn does not

12  disclose"); *Id.* ¶ 39 (incomplete notice "page does not indicate that an email will be sent.").  Where

13  fraud is not an essential element of a claim (*e.g.*, right of publicity, two of the UCL prongs and the

14  Wiretap and SCA claim) a court will "disregard averments of fraud not meeting Rule 9(b)'s

15  standard and then ask whether a claim has been stated."  *Vess*, 317 F.3d at 1105.

16        Where averments of fraud are made, the Complaint adequately identifies the who, what,

17  when, where and how of LinkedIn's actions.  For example, in alleging the sign-up screens are

18  deceptive the Complaint identifies the deceptive statements on the sign-up screens (*e.g.*, Compl.¶

19  37), identifies that they are LinkedIn's screens and the location of the website containing the

20  misleading statements (*e.g.*, *Id.*¶ 36) and identifies why and how they are deceptive (*e.g.*, *Id.* ¶ 37).

21  **B)  Plaintiffs Have Standing To Bring Their Claims For Violations Of Their Right Of Publicity And UCL.**

22        LinkedIn's endorsement emails have a direct relationship to commercial profit gained by

23  LinkedIn.[12]  The endorsement emails advertise LinkedIn's premium service to non-members at

RUSS, AUGUST & KABAT

[10] Courts have rejected the position put forward by LinkedIn.  *See Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974, 1000 (N.D. Cal. 2006) (Rejecting the need for pleading each Plaintiffs individual experience "The court cannot see how any *one* plaintiff will have failed to demonstrate injury-in-fact if that plaintiff effectively demonstrates that *all* class members have so suffered.")(emphasis added).
[11] *See New Mexico State Investment Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (holding scienter can be established holistically).
[12] LinkedIn has not challenged the sufficiency of standing as to Plaintiffs' claims for violation of the Wiretap and Stored Communications Act.

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

$39.95 to $49.95 a month.  Compl. ¶ 56.  There are four independent ways LinkedIn profits from sending endorsement emails: (1) the endorsement emails advertise LinkedIn's premium service, which is attributable to roughly $200 million a year in revenue for LinkedIn (*Id*. ¶¶ 23, 56); (2) LinkedIn's InMail program sells member email addresses for $10 each (*Id*. ¶¶ 8, 9 55); (3) endorsement emails are directly tied to membership size, which is "key to LinkedIn's survival" (*Id*. ¶¶ 7, 12, 51-54, 58); and (4) endorsement emails increase LinkedIn's profitability by reducing marketing and member acquisitions costs (*Id*. ¶¶ 7, 54).

### 1)   Misappropriation Of An Individual's Name, Resulting In Economic Gain To Another Establishes Injury In Fact.

To establish standing, a plaintiff must show that "it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Mass. v. E.P.A.*, 549 U.S. 497, 517 (2007).  In this case, Plaintiffs alleged Article III standing on the basis of LinkedIn's deprivation of money owed to Plaintiffs by virtue of LinkedIn's misappropriation of their likenesses for its own commercial gain.

Courts have concluded that any person, whether or not such person has the elusive and undefined status of "celebrity," may have their day in court based upon averments of misappropriation of the right of publicity, resulting in economic gain to another. *See* McCarthy Thomas, The Rights of Publicity and Privacy (West 2011) § 4:15 ("Noncelebrities –Majority view: noncelebrities have a right of publicity.").

The Ninth Circuit, noting the views of a number of commentators, held that the "non-celebrity" could claim misappropriation of his/her right of publicity, resulting in economic gain to another, in *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 824 n.11 (9th Cir. 1974):

> [I]t is quite possible that the appropriation of the identity of a celebrity may induce humiliation, embarrassment and mental distress, while the appropriation of the identity of a relatively unknown person may result in economic injury or may itself create economic value in what was previously valueless.

The ability of the non-celebrity to plead violation of rights of publicity, resulting in economic loss, was addressed in *Dora v. Frontline Video, Inc.*, 15 Cal.App.4th 536 (1993), involving plaintiff's likeness in a surf video.  Plaintiff did not plead a lack of consent and non-

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

1   payment based on defendants profiting from the use of the name or likeness. The Court of Appeal

2   concluded it need not resolve the plaintiff's "celebrity" status – he claimed notoriety among

3   Malibu surfing aficionados in his era – because whether or not plaintiff was a celebrity he could

4   plead loss of the economic value of the use taken. 15 Cal.App.4th at 542 n.2.

5       *KNB Enterprises v. Matthews*, 78 Cal.App.4th 362 (2000) directly refutes LinkedIn's

6   erroneous contention. KNB claimed to own non-celebrity models' rights of publicity. KNB

7   claimed the defendant had infringed this right, resulting in profit to the Defendant. The court of

8   appeal agreed, observing that the right of publicity "has become a tool to control the commercial

9   use and, thus, protect the economic value of one's name, voice, signature, photograph or likeness."

10  78 Cal.App.4th at 366; *see also Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 576 (C.D. Cal. 2010)

11  (in suit including non-celebrities for use of likenesses without consent, with no claim of mental

12  anguish, "California rights of publicity clearly extend to celebrities and non-celebrities alike.").

13  This Court, in *Fraley v. Facebook*, found Article III standing and a violation of California's right

14  of publicity law. Plaintiffs alleged Facebook was enriched through the use of their likenesses.

15  "[T]hey allege that their individual, personalized endorsement of products, services, and brands to

16  their friends and acquaintances has concrete, provable value in the economy at large, which can be

17  measured by the additional profit Facebook earns from selling Sponsored Stories compared to its

18  sale of regular advertisements." 830 F. Supp. 2d at 799.[13]

19      **2)  Plaintiffs Have Suffered An Injury In Fact.**

20      Plaintiffs plead four concrete ways that LinkedIn profits from the unconsented use of its

21  members' names and data in endorsement emails.[14]  **First**, LinkedIn's endorsement emails

---

[13] Case law relating to economic benefit under the Copyright Act is applicable here, where
LinkedIn has drawn users to its website through misappropriation of members' data and
endorsements. The Court of Appeals has held the misappropriation of data to draw website
traffic is a commercial use under the Copyright Act conferring a benefit on a defendant. *See
Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. Cal. 2004) (Holding drawing website traffic
using copyrighted material is a commercial use conferring financial benefit on the Defendant.
"There is no requirement that the draw be 'substantial.'"); *A&M Records v. Napster, Inc.,* 239
F.3d 1004, 1015 (9th Cir. Cal. 2001) ("Direct economic benefit is not required to demonstrate a
commercial use.").

[14] On January 6, 2014, while this motion was pending, LinkedIn filed suit against various
companies that scrape data from LinkedIn's website. This suit underscores the value \ LinkedIn
places on the personal information it has obtained from members and belies LinkedIn's claim
that it garners no benefit from its own harvesting of data. *See LinkedIn Corporation v. Does 1
through 10 inclusive*, CV-14-0028-HRL, Dkt. No. 1 (N.D. Cal. 2013) (LinkedIn's Complaint

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

advertise a commercial service and solicit recipients of the endorsement emails to purchase a

LinkedIn Premium Membership. LinkedIn earned $190 million from sales of Premium

Subscriptions.[15] Compl. ¶ 56. Plaintiffs suffer an injury in fact through LinkedIn's failure to

compensate Plaintiffs for use of their identities in commercial endorsements targeted not at

themselves, but at other consumers, without their consent. Plaintiffs' endorsements are valued by

LinkedIn because "[i]n essence, Plaintiffs are celebrities—to their friends." *Fraley,* 830 F. Supp.

2d at 800. The use of members' names in endorsement emails establishes an injury in fact even

though the identity of a Plaintiff might not have had preexisting value. *Del Amo v. Baccash*, 2008

WL 4414514, at *6 (C.D. Cal. Sept. 16, 2008) ("courts generally presume that the fourth element

[injury-in-fact] of the applicable test has been established if there is sufficient evidence to prove the

first three elements"); *Solano v. Playgirl, Inc*., 292 F.3d 1078, 1090 (9th Cir. 2002) (holding that

the mere allegation that the plaintiff was not compensated was sufficient to satisfy the injury

prong). The additional profit earned by LinkedIn is directly cognizable as LinkedIn will be able to

track which endorsement emails converted into premium memberships. The benefit conferred on

LinkedIn through use of endorsement emails to sell premium memberships is thus at least as

measurable and concrete as in *Fraley*. *Fraley*, 830 F. Supp. 2d at 800. In *Fraley*, the use of

sponsored stories allowed for Facebook to raise ad prices. Here, individual endorsements by

members can be traced to the purchase of premium memberships – a "direct linear relationship"

between profit made by LinkedIn and the value of member "endorsements."

    ***Second***, LinkedIn places a value of $10 on each LinkedIn email address and stresses the

importance of sending reminder emails as key to signing people up. Compl. ¶ 55. Under

LinkedIn's InMail program, LinkedIn charges its own members $10 to send up to three emails to a

fellow LinkedIn members not directly linked to that user. LinkedIn states that these emails are

---

alleges "by pilfering member data from the LinkedIn site, the Doe Defendants misconduct
threatens to degrade the value of LinkedIn's Recruiting product" and "by pilfering data from the
LinkedIn site, the Doe Defendants threaten to degrade the value of LinkedIn's Recruiter
product"). Berger Decl. Ex. F.
[15] Defendants state that because only 1% of LinkedIn members have premium accounts "the vast
majority of connection invitations have no conceivable relationship to any premium revenue."
Def. Br. at 19. However, LinkedIn sends out hundreds endorsement emails for each member.
Compl. ¶ 18 ("hundreds of Ms. Crosby's contacts"); *Id*. ¶ 19 ("hundreds of Dr. Kushner's
colleagues, students and casual acquaintances"); *Id*. ¶ 21 ("LinkedIn sent emails purportedly on
Ms. Wall's behalf to over eight hundred email addresses.).

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

worth $10 each because they carry an "endorsement and ***the ability to send up to two reminder emails***" and are thus "better than an email or cold call." The ability to send reminder emails is a key part of the $10-per-email-address that LinkedIn charges. "Our intention behind sending reminders is to jog the receiver's memory in case they overlooked the original message." *Id*. LinkedIn goes onto brag, "Does it work? Absolutely." *Id*. LinkedIn's assignment of $10 per email address in its internal sales program shows LinkedIn's use of members email addresses and names has cognizable value. *See Fraley*, 830 F. Supp. 2d at 799. (Holding standing was established because plaintiffs alleged "individual, personalized endorsement of products, services, and brands to their friends and acquaintances has concrete, provable value in the economy at large.").

***Third***, LinkedIn uses endorsement emails to grow its membership base and thus accrue profits. The specific allegations in the complaint, statements from LinkedIn management, and disclosures in LinkedIn's 10-K make the connection between member endorsement emails and LinkedIn's profit concrete and differentiate it from the allegations made in *Cohen*. Compl. ¶¶ 7, 12, 51-54, 58. In *Cohen*, the Plaintiffs alleged that their names and likenesses were used to promote Facebook's friend finder service to existing Facebook members. *Cohen*, 798 F. Supp. 2d at 1092. Plaintiffs' first complaint failed to allege any injury or unjust enrichment of Facebook. *Id*. ("Plaintiffs have not even alleged that they suffered injury to their feelings"). Plaintiffs' second complaint alleged Facebook used their name or likeness to promote the Friend Finder service to existing Facebook users.[16] Here, in contrast to *Cohen*, Plaintiffs' names are used in endorsement emails to nonmembers. Further, the complaint contains numerous statements from LinkedIn's financial statements. *See, e.g.,* Cmpl. ¶ 51 ("in order to grow our business, we must continually attract new customers"); *Id*. ¶ 53 ("with one new member joining every second, LinkedIn's membership grows larger and more valuable by the day"); *Id*. (LinkedIn's CEO Jeff Weiner stated growing LinkedIn's membership allows LinkedIn to make sales to large companies "specifically by the virtue of the size of the Network"). LinkedIn contends that "'Add Connections'

---

[16] One feature of Friend Finder was to send out invitations to non-Facebook members. Accordingly, it was alleged that the increased use of Friend Finder would lead people using this feature and inviting people to Facebook which would then lead to profit for Facebook. The Court found this causal chain to attenuate to confer standing. *Cohen v. Facebook*, 2011 U.S. Dist. LEXIS 1245606, *10 (N.D. Cal. Oct. 27, 2011) (dismissing based on failure to establish "any such injury.").

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

provides a direct benefit to members in the form of larger networks, no benefit to third parties, and, even as alleged, ***only an indirect, undefined benefit to LinkedIn***." Def. Br. at 19 (emphasis added).  LinkedIn claims that the Plaintiffs have taken LinkedIn founder Reed Hoffman's statements out of context.  To provide additional context we ask the Court take judicial notice of a recent interview with Reid Hoffman where he stated:

> When we launched LinkedIn we thought the growth would pick up by itself.  Once we launched, we had a small trickle but not an explosion of growth.  If we didn't fix this it was game over, jump of a cliff, dead.  And so I said, I have one good idea and were going to try it and see if it works.  The good idea was that people were most curious about people who were here.  So we said we would allow people to essentially upload there address book.  And that caused our growth curve to go from this to this [showing his hand going up].

Unlike in *Cohen*, sending connection emails is directly attributed to LinkedIn's growth.  Statements from LinkedIn's executives emphasize the tie between sending endorsement emails and the survival of LinkedIn.  *Fraley*, 830 F. Supp. 2d at 801 (comparing facts in *Fraley* to *Cohen*, finding plaintiffs in *Fraley* quote statements from Facebook's executives regarding the value of endorsements).

  ***Fourth***, LinkedIn profits from endorsement emails by saving LinkedIn on new member acquisition costs.  LinkedIn states they do not profit from the use of endorsement emails.  Def. Br. at 19.  LinkedIn ignores statements in the Complaint from LinkedIn's financial statements where LinkedIn's use of viral endorsement emails is identified as a key strategy that reduces costs and increases profits.  Compl. ¶ 51 (Identifying LinkedIn's key strategy is to "foster viral growth of our member base"); *Id*. ¶ 54 ("[O]ur member base has grown virally . . . we have been able to build out brand with relatively low marketing costs."); *Id*. ¶ 7 (LinkedIn CEO Jeff Weiner describing the importance of viral growth).  The statements from LinkedIn's management connecting the use of endorsement emails to LinkedIn saving marketing costs differentiates this case from *Cohen* where no connection was made.  Here, LinkedIn's management is on the record as providing the connection necessary to establish Article III standing.

  **3)  Cases Cited By LinkedIn Are Readily Distinguishable.**

  LinkedIn tries to analogize this case to *In re Doubleclick, Inc. Privacy Litig.*, 154 F. Supp.

2d 497 (S.D.N.Y. 2001), and its progeny, Def. Br. at 5-7, but the analogy fails.[17] Unlike the plaintiffs in *Doubleclick*, Plaintiffs here have not alleged that LinkedIn has misappropriated its members' identities and data to promote its service. *Id.* at 524. Instead, Plaintiffs allege that their personal information, including without limitation, their electronic communications (*e.g.*, messages in Gmail) and their likenesses (*e.g.*, name), has been accessed and misused. Moreover, the statutes and common law, including California's common law right of publicity law, were not at issue in *Doubleclick*. In the recent privacy cases cited by LinkedIn, each plaintiff's allegation of injury was grounded in the economic value of their personal information itself, under the theory that personal information has inherent value. LinkedIn's attempt to shoehorn Plaintiffs' allegations of injury into this common form misses the mark because Plaintiffs plainly do not solely rely on the economic value of their personal information to establish injury.

**C) Common Law Right Of Publicity Is Plead Sufficiently.**

Plaintiffs' have established the four elements required for pleading a violation of California's common law right of publicity. The elements are: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. *Eastwood v. Superior Court* (1983), 149 Cal. App. 3d 409. Plaintiffs have alleged that LinkedIn used members' names to promote its service, the use was for commercial advantage, and LinkedIn did not have the consent of Plaintiffs. *Del Amo v. Baccash*, 2008 WL 4414514, at *6 ("courts generally presume that the fourth element [injury-in-fact] of the applicable test has been established if there is sufficient evidence to prove the first three elements".) Accordingly, LinkedIn's motion to dismiss Plaintiffs' right of publicity claim should be denied.

**D) The Complaint Pleads UCL Claims Based On LinkedIn's Unlawful, Unfair, And Fraudulent Activities.**

Plaintiffs allege that LinkedIn violated § 17200 because its conduct, in addition to violating

---

[17] Defendants' cited cases are distinguishable. *In re Jet Blue Airways Corp. Privacy Litig.*, 379 F.Supp.2d 299 (E.D.N.Y. 2005) (mere harvesting and sale of personal information through airline's online reservation system did not violate the federal or state theories alleged); *Low v. LinkedIn Corporation*, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) (Koh, J.) (Denying Article III standing arising from the theft of personal data where LinkedIn did not profit from the theft and Plaintiffs had failed to show how "his personal information was disclosed or transferred to third parties, and how it has harmed him.").

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

federal and state wiretap acts, was unlawful, unfair, and fraudulent. *See* Compl. ¶¶ 100-109. Plaintiffs further allege that LinkedIn violated § 17200 because it invaded class members' legally protected right to publicity and privacy under the California Constitution and other applicable law. *Id.* ¶¶ 88-98.  Plaintiffs allege not just that LinkedIn, used email addresses and the name and likeness of its members to advertise its service.  It did so surreptitiously and misled the public and Class Members about its misdeeds.  LinkedIn makes the audacious claim, in contravention of the Complaint that "Plaintiffs do not identify any statement by LinkedIn making any such [mis]representations" by LinkedIn.  Def. Br. at 21.

### 1)  The Complaint Pleads UCL Claims Pursuant To Rule 9(b).

The Ninth Circuit long construed Rule 9(b) to require only that "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge." *Brooks v. ComUnity Lending, Inc*., 2010 WL 2680265, at *9 (N.D. Cal. Jul. 6, 2010) (*quoting Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)); *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).  Thus, while Rule 9(b) imposes a heightened standard, it does not require a plaintiff allege each and every detail about the alleged conduct.  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) ("we cannot make Rule 9(b) carry more weight than it was meant to bear").

Plaintiffs allege LinkedIn misrepresented to members that LinkedIn would harvest email addresses from third party email accounts and store the data indefinitely.  Further, LinkedIn deceived its members so that it could send out endorsement emails.  The Complaint identifies numerous statements where LinkedIn misrepresented what it was doing.  *See e.g*., Compl. ¶¶ 37, 38, 47.  The Complaint explains how these statements are false or misleading.  *Id*. ¶ 34 ("Instead of clearly stating that LinkedIn will be emailing thousands of users repeatedly, LinkedIn states that it will allow you to "stay in touch with your contacts who aren't on LinkedIn yet."); *Id*. ¶ 47 ("LinkedIn expressly states . . . "We will not store your password or email anyone without your permission." . . .  Never does LinkedIn state that they will be sending multiple emails on a user's behalf.).  The Complaint identifies deceptive statements from LinkedIn's blog.  *Id*. ¶ 47 (identifying the statement "we are committed to putting our members first. This means being open

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

1    about how we use and protect the data that you entrust with us as a LinkedIn member" as deceptive

2    and misleading).  This statement is false as LinkedIn does not disclose it will be downloading and

3    storing indefinitely data harvested from third party email accounts.  *Id.* ¶ 18 ("When LinkedIn

4    harvested email accounts from Ms. Crosby, it was able to gather not only the addresses of users but

5    also additional information contained in the addressees themselves.").

6         Where, as here, a defendant made consistent misrepresentations over an extended period of

7    time, the plaintiff need not list each and every instance of such misrepresentations.  *Ticketmaster*

8    *L.L.C. v. RMG Techs.*, 2007 WL 2989504, at *2 (C.D. Cal. Oct. 12, 2007) (*citing U.S. ex rel. Lee*

9    *v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001)); *accord Morgan v. AT & T*

10   *Wireless Serv., Inc.*, 177 Cal.App.4th 1235, 1262 (2009) ("[W]here a fraud claim is based upon

11   numerous misrepresentations, such as an advertising campaign that is alleged to be misleading . . .

12   it is sufficient for the plaintiff to provide a representative selection of the advertisements or other

13   statements to indicate the language upon which the implied misrepresentations are based.").  The

14   examples in Plaintiffs' Complaint, coupled with allegations describing LinkedIn's

15   misrepresentations, notify LinkedIn of the circumstances of the alleged fraud.

16        **2)   LinkedIn's Misrepresentations Are Likely to Deceive.**

17        LinkedIn incorrectly argues that Plaintiffs fail to plead falsity with particularity. With

18   respect to their claims under the UCL, Plaintiffs need only allege a "plausible claim" that the

19   representations at issue were likely to deceive a reasonable consumer.  *Williams v. Gerber*

20   *Products Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008); *Kowalsky v. Hewlett-Packard Co.*, 2010 WL

21   5141869, at *8 (N.D. Cal. Dec. 13, 2010) ("Where a defendant's representations generate

22   reasonable expectations that a product will have qualities or capabilities it does not have, courts

23   have found that those representations may be likely to deceive."); *accord Morgan*, 177

24   Cal.App.4th at 1255-56.  Plaintiffs' allegations readily meet these standards.

25        Contrary to LinkedIn's suggestion, LinkedIn's sign-up screens would not lead a reasonable

26   user to understand they were consenting to allowing LinkedIn to access, copy and store indefinitely

27   every email address a user had ever emailed or been emailed by.  LinkedIn's brief inaccurately

28   describes the consent that LinkedIn sought from its users as limited to "allowing access to their

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

email contacts and to sending connection invites." Def. Br. at 24. LinkedIn does far more than access users email contacts and send invites. Compl. ¶¶ 33, 34. LinkedIn's misleading and false statements also included promises, both implicit and explicit, regarding how LinkedIn would handle users' data and send emails. *See e.g., Id.* ¶ 5, 32, 47. As explained in the Complaint, these statements were false (certainly misleading) when they were made.

### 3) Plaintiffs Allege Reliance.

In arguing that Plaintiffs fail to plead reliance, LinkedIn mischaracterizes both Plaintiffs' allegations and the law. Plaintiffs specifically alleged they relied on LinkedIn's representations when joining and utilizing LinkedIn. *Id.* ¶ 103 ("LinkedIn intentionally misrepresented a Member's ability to prevent his or her appearance and name in advertisements so LinkedIn could enjoy substantial profits by having users unwittingly endorse LinkedIn to third parties through such advertisement emails. Plaintiffs justifiably relied upon those misrepresentations when deciding to join and utilize LinkedIn."). Plaintiffs have all alleged they were members of LinkedIn (Compl. ¶¶ 13- 21), and it is uncontested that when a user signs up for LinkedIn they are shown signup screens containing the misleading statements (*Id.* ¶ 25). The Plaintiffs in addition to stating they justifiably relied on the representations contained on the signup screens also signed up for LinkedIn and clicked through the signup screens containing the fraudulent statements. Defendants cite this Court's decision in *In re Linkedin User Privacy Litig.*, 932 F. Supp. 2d 1089, 1093 (N.D. Cal. 2013), for the proposition that Plaintiffs have not adequately alleged actual reliance as they did not plead they "actually read on the alleged misrepresentation.") However, in *In re LinkedIn User Privacy*, there was a question as to whether the Plaintiff had even seen the privacy policy on which the users' reliance was based. Here, Plaintiffs joined LinkedIn and viewed the statements on LinkedIn's signup screens. Courts have found that viewing a misleading statement is sufficient for establishing reliance under the UCL. *See, e.g., Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 327 (Cal. 2011) (finding reliance established where plaintiffs "saw and relied on.").[18]

---

[18] Defendants state, without support, that Defendants must allege facts specific to each named Plaintiff. Although not required, each Plaintiff alleged they joined LinkedIn. Compl. ¶¶ 13-21. Where they saw the signup screens identified in the Complaint. *Id.* ¶¶ 30-39. LinkedIn states that Plaintiffs allegations are faulty as they fail to allege "what each [Plaintiff] understood [the statements] to mean." Def. Br. at 24. However, the law is clear, whether a statement is

RUSS, AUGUST & KABAT

### 4)  Plaintiffs' Claims Under The Unlawful Prong.

Plaintiffs agree with LinkedIn that the claims under the UCL's "unlawful" prong arise from violations of California's common law right of publicity.

### 5)  Plaintiffs Have Adequately Alleged Standing For Their UCL Claims.

Plaintiffs have plead that LinkedIn's unfair, unlawful and fraudulent practices have deprived them of compensation they are due.  This Court has held a party has standing to bring a claim under the UCL where the defendant profited from the misappropriation of the plaintiff's name. *See Fraley*, 830 F. Supp. 2d. at 812 (finding standing for a UCL claim from "failure to compensate them for their valuable endorsement of third-party products and services to their Facebook Friends").  Plaintiffs have a vested interest in the monies that should have been paid to them by LinkedIn for use of their endorsements of LinkedIn.  "To the extent Plaintiffs allege they have a right to be paid for their endorsements . . . the Court finds that they have alleged a loss of money or property sufficient to state a claim under the UCL." *Id.*

### E)  Plaintiffs Have Stated A Claim Under The Stored Communications Act.

The Stored Communications Act ("SCA"), 18 U.S.C. 2701-2712, provides a private right of action against any person who "intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system."  18 U.S.C. § 2701(a).  LinkedIn intentionally exceeds its authority when it accesses users' third-party email accounts.  Compl. ¶¶ 110-16.  Specifically, LinkedIn states it wants to "grow your network" and asks for a third-party email address.  *Id.* ¶¶ 30, 43, 47.  LinkedIn then attempts to access that email account by using an existing email session that has not been logged out.  *Id.*  Only after LinkedIn has attempted to access a user's third-party email account is there any warning to the user.  LinkedIn alleges Plaintiffs' allegations are deficient.  Def. Br. at 25-28.  Dismissal of Plaintiffs SCA claim is premature where issues of fact are in dispute.

### 1)  LinkedIn Accesses Users Third Party Email Accounts And Obtains Electronic Communications.

LinkedIn contends they cannot be liable for violating the SCA as LinkedIn merely

---

deceptive or misleading is based on an "objective reasonable consumer standard."  *Hill v. Roll International Corp.*, 195 Cal. App. 4th 1295, 1298 (2011).

downloaded "email addresses" which are not "electronic communications." This argument fails for two reasons. First, LinkedIn downloads more than email addresses from the third-party email accounts of its users, as the Complaint states. Compl. ¶ 43 ("LinkedIn will use an open connection to an email service to download a user's data"); *Id.* ¶ 114 ("obtaining the contents of email communications in electronic storage"). The data harvested by LinkedIn includes information about the senders and receivers of emails (*e.g.*, company, job title, physical address). Second, LinkedIn's reliance on *Hernandez v. Path, Inc.*, 2012 U.S. Dist. LEXIS 151035, at *3 (N.D. Cal. Oct. 17, 2012), is misplaced. In *Hernandez*, a user's address book was stored on the user's mobile device and uploaded by the defendant. In contrast, here, Google stores contact information iteratively and is constantly updating the information based on the receiving and sending of emails and other communications. *See* LinkedIn RFJN Ex. D. *Hernandez*, did not hold that all "address books" are per-se not "electronic communications" under the SCA. Instead, the address book in *Hernandez* was not an electronic communication because it was not stored in temporary or intermediate storage as required by the SCA. Here, Plaintiffs allege that the contact information accessed by LinkedIn is stored in electronic storage. When LinkedIn copies data from a third-party email account the data it is copying is information that is constantly being changed and updated as emails are received and sent. It is not a static file as contemplated in *Hernandez*. Such electronic storage as the SCA contemplates includes retaining an email or information contained in an email, on a server after delivery to the recipient. *Doe v. City and County of San Francisco*, 2012 WL 2132398, at *2 (N.D. Cal. Jun. 12, 2012). Thus, turning temporary information (iteratively updated contact information maintained by Google) into a permanent record at LinkedIn's facility is exactly the type of privacy invasion the SCA seeks to prohibit. On a motion to dismiss, this allegation is more than sufficient.

### 2) Plaintiffs Establish For Purposes Of A 12(b)(6) Motion That The Data Accessed By LinkedIn Is In Electronic Storage.

LinkedIn argues that Plaintiffs failed to allege that they accessed data while it was in "electronic storage." Def. Br. at 26. This is not correct. Plaintiffs allege that LinkedIn violated section 2701(a)(1) by "hacking into LinkedIn members' external email accounts and, once obtaining access without the consent of members, obtaining the contents of email communications

RUSS, AUGUST & KABAT

1    in electronic storage and storing the contents of those emails on LinkedIn servers."  LinkedIn has

2    requested this Court take judicial notice of a document from Google outlining how address and

3    contact data is stored.  The document identified by LinkedIn provides further basis for concluding

4    that the data is in temporary storage.  LinkedIn RFJN Ex. D. ("email addresses are automatically

5    added to your Contacts list each time you use the Reply, Reply to all or Forward function.").  The

6    constant and dynamic updating of Google Contacts information is indicative of intermediate or

7    temporary storage of the data.

8           Courts have upheld the sufficiency of far less detailed allegations regarding "electronic

9    storage."  In *In re Intuit*, the court rejected a similar defense argument holding that plaintiff's

10   allegation that defendant "accessed data contained in 'cookies' that it placed in Plaintiffs

11   computers' electronic storage" was sufficient to satisfy the requirements of Fed. R. Civ. P. 8.  *In re*

12   *Intuit Privacy Litig.*, 138 F. Supp. 2d 1272, 1277 (C.D. Cal. 2001).  Notably, plaintiff in that case

13   simply alleged "electronic storage" as here."  *See also, In re Toys R Us Inc. Privacy Litigation*,

14   2001 WL 34517252, at *3 (N.D. Cal. Oct. 9, 2001) (data accessed is "incidentally stored in

15   plaintiff's computers while awaiting final transmission to another location" was sufficient").

16          **3)   Google's Granting Access Does Not Shield LinkedIn From Liability.**

17          LinkedIn's final argument is that Google "authorized" LinkedIn "to access Plaintiffs'

18   communications."  Def. Br. at 27.  LinkedIn bases this argument on Section 2701(c)(1), which

19   provides that the SCA exempts from liability "conduct authorized … by the person or entity

20   providing the wire or electronic communications service."  This exception to liability does not

21   apply here because Plaintiffs never authorized LinkedIn to access this particular data.  An entry

22   ostensibly authorized by a "communications facility" can still constitute an unauthorized entry

23   because "assent or willingness would not be effective" if the LinkedIn knew, or should have

24   known, that Google "was mistaken as to the nature and quality of the invasion intended."  *Theofel*

25   *v. Farey-Jones*. 959 F.3d 1066, 1073 (9th Cir. 2003).  Accordingly, there is "no refuge for a

26   defendant who procures consent by exploiting a known mistake that relates to the essential nature

27   of his access."  *Id*.  Here, Plaintiffs have alleged ample facts (*supra* V(A), that vitiate any consent.

28

RUSS, AUGUST & KABAT

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

**F) LinkedIn's Interception Of Data Associated With Emails Violates The Wiretap Act.**

The Wiretap Act, 18 U.S.C. §§ 2510–2522, provides a private right of action against one who "a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). LinkedIn intentionally intercepts content relating to email communications.

**1) Plaintiffs Allege That LinkedIn Intercepted Electronic Communications.**

LinkedIn contends "address information, such as email addresses and IP addresses, are not contents of communications." Def. Br. at 29. However, Plaintiffs allege LinkedIn intercepts "information contained in that member's email account and stores it on LinkedIn's servers." Compl. ¶ 119. The data intercepted is data associated with emails and other communications. *Id*. ¶ 43. This intercepted information is not limited to email addresses and includes information transmitted with a communication such as the location of email recipient and the employer and job title of the email sender. The information is compiled by email providers (*e.g.*, Google) in real-time as communications are sent. *See* LinkedIn RFJN Ex. D. ("Also if you use Google+ adding a person to your circle will also add them to your Contact list.").

LinkedIn's citation to cases, holding "the identities" of a party to a communication are not "contents" subject to the Wiretap Act is distinguishable from the facts here where information accessed by LinkedIn goes beyond email addresses. *See United States v. Reed,* 575 F.3d 900 (9th Cir. Cal. 2009) ("'contents' when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication."). Further, "federal wiretap statutes broadly define 'contents.'" *Nix v. O'Malley*, 160 F.3d 343, 346 n.3 (6th Cir. 1998). The "definition encompasses personally identifiable information." *In re Pharmatrak*, 329 F.3d at 18. Here, LinkedIn accesses information associated with a communication includes the employer of the individual and their job title. Further, email addresses provide information to LinkedIn that make the email addresses themselves a communication.[19]

---

[19] Compl. ¶ 18 ("When LinkedIn harvested email accounts from Ms. Crosby, it was able to gather not only the addresses of users but also additional information contained in the addresses themselves. Many addresses contained the company or institution that the user was associated with. Harvesting email addresses allowed LinkedIn to find out information relating to many of the email addresses that were harvested and the employers of people that had emailed or been emailed by Ms. Crosby.").

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

**2) LinkedIn Intercepts Data Contemporaneous To Transmission.**

LinkedIn states Plaintiffs fail to allege an interception of data "contemporaneous with transmission" of the communication. Def. Br. at 29. However, the "contact data" LinkedIn accesses is generated contemporaneous to transmissions. Additional discovery will help to uncover additional information. Already, LinkedIn identified to the Court through its Request for Judicial Notice that contact data is "automatically updated," "each time you use the Reply, Reply to All or Forward functions to send mail," information associated with the message is "automatically updated to your Contacts List." LinkedIn RFJN Ex. D. Google's real-time updating of information available for interception by LinkedIn distinguishes Plaintiffs' claim from the cases cited by LinkedIn. *See Mintz v. Mark Bartelstein & Assocs.*, 906 F. Supp. 2d 1017, 1030 (C.D. Cal. 2012) (where during an employment dispute the Defendant hacked into a parties email account and downloaded salary data). In contrast, here LinkedIn accesses data generated contemporaneously to the transmission of emails and other communications.

**G) LinkedIn Violates The California Comprehensive Data Access And Fraud Act**

California Penal Code section 502 Section, proscribes civil and criminal liability to, "[k]nowingly and without permission access[ing] . . . any computer, computer system, or computer network." *Id.* § Cal. 502(c)(7). LinkedIn's argument that Plaintiffs have not sufficiently pled LinkedIn's accessing of email addresses in users' third-party email accounts as "without permission" is unpersuasive. As LinkedIn points out, the "without permission" element is satisfied if a defendant accesses a network "'in a manner that *circumvents technical or code based barriers* in place to restrict or bar a user's access.'" Def. Br. at 30 (*quoting In re Google Android Consumer Privacy Litig.*, 2013 WL 1283236, at *11-12 (N.D. Cal. Mar. 26, 2013)) (emphasis in Def. Br.).

Plaintiffs plead LinkedIn is able to circumvent the username and password authentication features of third-party email accounts by "pretend[ing] to be [the] user and download[ing] the email addresses contained anywhere in that account to LinkedIn servers." Compl. ¶ 30. LinkedIn's Motion mischaracterizes Plaintiffs' complaint in an effort to analogize this case with cases where defendants merely violated a defendants' terms of use. Def. Br. at 30. The Complaint pleads LinkedIn uses a technological surreptitious method for accessing users third-party accounts. *Id.* ¶ 3

RUSS, AUGUST & KABAT

1    (describing LinkedIn using an open email session to access); *Id.* ¶ 43 (describing use of cookies to

2    "tunnel through any open email program" and gain access to a users third-party email account).

3         LinkedIn alleges Plaintiffs lack standing as they fail to allege a monetary loss.  This

4    argument is identical to the argument previously addressed as to Plaintiffs standing to bring a UCL

5    claim and is incorporated herein.  *See supra* Part V(D)(5).

6    **VI.    THE COURT SHOULD DENY LINKEDIN'S MOTION TO STRIKE THE CLASS
         ALLEGATIONS**

7         In an attempt to preclude consideration of Plaintiffs' claims, LinkedIn asks the Court to

8    preemptively deny class certification of such claims at the pleading stage, by essentially having the

9    Court interpret the allegations instead of accepting them as true.[20]

10        **A)  LinkedIn's Motion Is Premature.**

11        LinkedIn's motion not only lacks merit, it is premature.  As the Ninth Circuit and other

12   Courts have held, class certification should only be denied prior to discovery in the rare

13   circumstance that it is clear from the face of the pleadings that the requirements of

14   Fed. R. Civ. P. 23 cannot possibly be satisfied.  That is far from the case here.

15        Rule 12(f) is used to eliminate "spurious issues by dispensing with those prior to trial."

16   *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009) (citation omitted).  *In re Wal-*

17   *Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 614-16 (N.D. Cal. 2007) ("plaintiffs

18   should at least be given the opportunity to make the case for certification based on appropriate

19   discovery"); *Hibbs-Rines v. Seagate Technologies, LLC.*, 2009 WL 513496, at *3 (N.D. Cal. Mar.

20   2, 2009) (same); *see also Brazil v. Dell Inc.*, 2008 WL 4912050, at *3 (N.D. Cal. Nov. 14, 2008)

21   (Whyte, J.) ("[T]he class determination generally involves considerations that are 'enmeshed in the

RUSS, AUGUST & KABAT

---

[20] LinkedIn's motion to strike "Plaintiffs' claims based on emotional harm" should be denied as moot.  Although LinkedIn's marketing practices result in significant emotional harm to many individuals, Plaintiffs' class action does not arise from such emotional harm.  Rather, the harm giving rise to Plaintiffs' class actions are the economic harm each Plaintiff has suffered as a result of LinkedIn.  The Complaint makes clear that it is Plaintiffs' economic injuries giving rise to the class action claims at issue.  *See* Compl. ¶¶ 72-73 (pleading that "[e]ach Plaintiff was deprived the ***monetary value*** of having his or her endorsement appear in the endorsement emails . . ." and that "[e]ach Plaintiff has been personally injured by this ***loss of money*** . . . ." in the "Facts Common to Plaintiffs' Actions" section of the FAC) (emphasis added); *Id.* ¶ 78 (listing the following "[c]ommon questions of law and fact affecting the Class:" "Whether LinkedIn gained a ***commercial benefit***," "Whether LinkedIn was unjustly enriched," and "What the ***value of an endorsement*** by a non-celebrity is" ") (emphasis added).

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

factual and legal issues comprising the plaintiff's cause of action.'") (*quoting General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)).  "However, motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle for arguments pertaining to class allegations."  *In Re Apple and AT&T iPad Unlimited Data Plan Litig.*, C.A. No. 10-02553-RMW, slip op. at 4 (N.D. Cal. Aug. 26, 2012) (opinion attached at Ex. F) (citations omitted).

> The Ninth Circuit has stated that "[a]lthough a party seeking class certification is not always entitled to discovery on the class certification issue, . . . the propriety of a class action cannot be determined in some cases without discovery, and . . . ***the better and more advisable practice*** for a District Court to follow is to afford litigants an opportunity to present evidence as to whether a class action was maintainable."

*Id.* (citing *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939-40 (9th Cir. 2009)) (emphasis added).

Likewise, the denial of class certification at the pleading stage, before the plaintiff has an opportunity to take discovery, is highly unusual and is generally not appropriate.  *See* 7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure Civil § 1785.3 (3d. ed. 2005) ("As a practical matter, the court's [class certification] determination…usually should be predicated on more information than the complaint itself affords.").

Here, Plaintiffs' allegations are more than sufficient to make a prima facie showing of the Rule 23 requirements, and this is far from the "rare case" where certification should be denied without even affording Plaintiff the opportunity to take discovery.  Indeed, Plaintiffs' claims here challenge a course of conduct, involving common disclosures ("LinkedIn's signup screens").

As set forth below, in arguing why a class could not be certified here, LinkedIn mischaracterizes Plaintiffs' allegations and the applicable legal standards.  Discovery will allow Plaintiffs the opportunity to demonstrate, at the proper stage of this litigation, that the elements of Plaintiffs' claims are predominately subject to common proof and that the requirements of Rule 23 are satisfied.  The Court should deny LinkedIn's motion, permit Plaintiffs to take class discovery, and rule on class certification at the appropriate stage of this litigation.

**B)  The Court Should Deny LinkedIn's Motion To Strike Plaintiffs' Allegations Regarding Consent.**

LinkedIn's claims "[w]hether class members misunderstood Add Connections permission

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

1   screens is an individualized inquiry that predominates with respect to each of Plaintiffs' claims" is

2   peculiar.  Def. Brief at 33.  Yet, earlier in the same motion, LinkedIn argued "[c]onsent is

3   determined from the reasonable viewpoint of another person, ***not from Plaintiff's unexpressed***

4   ***subjective beliefs***."  Def. Motion at 10 (quoting *Jones*, 815 F. Supp. 2d at 1112 n.2) (emphasis

5   added).  LinkedIn directly contradicts its earlier acknowledgement that the relevant standard as to

6   whether consent is prevalent is an object reasonable person.[21]

7        Consent is an issue common to all the class as consent is determined objectively based on

8   the reasonable person standard.  California recognizes the objective theory of contracts (*Berman v.*

9   *Bromberg*, (1997) 56 Cal.App.4th 936, 948), under which "[i]t is the objective intent, as evidenced

10  by the words of the contract, rather than the subjective intent of one of the parties, that controls

11  interpretation"  *Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.*, (1985) 164

12  Cal.App.3d 1122, 1127.  LinkedIn correctly notes in its quotation of *Jones v. Corbis*, Plaintiffs'

13  "unexpressed subjective beliefs" are irrelevant.  *Jones*, 815 F. Supp. 2d at 1112 n.2.  Because

14  consent is evaluated using an objective standard rather than Plaintiffs' individualized, subjective

15  intent, common questions of law and fact affecting the Class predominate over individual issues.

16       The decision in *Harris v. comScore, Inc.*, is instructive.  292 F.R.D. 579 (N.D. Ill 2013).

17  The Northern District of Illinois opinion was based on the same "objective intent" standard that

18  governs here.  In *comScore*, the Court certified a class "into the hundreds of thousands" finding

19  that "each Class member engaged in a substantively identical process to download [the product]. . .

20  . The scope of the plaintiffs' consent here is determined by that identical process, the ULA, and the

21  Downloading Statement, and is therefore common across the Class and Subclass, respectively."

22  *Id.* at 585.  Here, the proposed class of LinkedIn users was provided identical signup screens.

**VII.    CONCLUSION**

24       For the forgoing reasons, this Court should deny LinkedIn's motions.[22]

---

[21] Cases cited by LinkedIn involve proposed classes exposed to different facts (making consent difficult to ascertain).  All the cases involved denial of class certification not motions to strike allegations.  *Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 594 (C.D. Cal. 2013) (where consent could not be determined on a class wide basis because members were exposed to different disclosures); *Fields v. Mobile Messengers Am., Inc.*, 2013 U.S. Dist. LEXIS 163950, at *3 (N.D. Cal. Nov. 18, 2013) (consent was not common as class interfaced with different companies).
[22] Alternatively, if the motion is granted in any respect, Plaintiffs should be given leave to amend.

OPP. TO MOTION TO DISMISS FAC
CASE NO. 13-CV-04303-LHK

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

1

2    Dated: January 13, 2014              Respectfully submitted,

3                                         **RUSS AUGUST & KABAT**

4

5                                         By:  /s/ Larry C. Russ
                                               Larry C. Russ
6

7                                         Larry C. Russ, Cal. Bar No. 82760
                                          lruss@raklaw.com
8                                         Dorian S. Berger, Cal. Bar No. 264424
                                          dberger@raklaw.com
9                                         Daniel P. Hipskind, Cal. Bar No. 266763
                                          dhipskind@raklaw.com
10                                        12424 Wilshire Boulevard, 12th Floor
                                          Los Angeles, California 90025
11                                        Tel:  (310) 826-7474
                                          Fax:  (310) 826-699112424 Wilshire
12
                                          *Attorneys for Plaintiffs*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28