1  JEROME C. ROTH (State Bar No. 159483)
   ROSEMARIE T. RING (State Bar No. 220769)
2  JONATHAN H. BLAVIN (State Bar No. 230269)
   WILLIAM J. EDELMAN (State Bar No. 285177)
3  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, 27th Floor
4  San Francisco, California 94105
   Tel:   (415) 512-4000
5  Fax:  (415) 512-4077
   Email:  jerome.roth@mto.com
6
   *Attorneys for Defendant*
7  LINKEDIN CORPORATION

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10                        **SAN JOSE DIVISION**

11

12  PAUL PERKINS, PENNIE SEMPELL, ANN          CASE NO.  13-cv-04303-LHK
    BRANDWEIN, ERIN EGGERS, CLARE
13  CONNAUGHTON, JAKE KUSHNER,
    NATALIE RICHSTONE, NICOLE CROSBY,
14  and LESLIE WALL; individually and on       **DEFENDANT'S REPLY IN SUPPORT OF**
    behalf of all others similarly situated,   **MOTION TO DISMISS FIRST AMENDED**
15                                             **CLASS ACTION COMPLAINT AND TO**
                   Plaintiffs,                 **STRIKE CLASS ALLEGATIONS**
16

17          v.

18  LINKEDIN CORPORATION,                      Judge:      Hon. Lucy H. Koh
                                               Date:       April 10, 2014
19                 Defendant.                  Time:       1:30 p.m.
                                               Location: Courtroom 8 – 4th Floor
20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. ARGUMENT ....................................................................................................... 3

    A.  All Of Plaintiffs' Claims Fail Because Members Consent Through Add Connections Permission Screens ................................................................. 3

        1.  Plaintiffs' Arguments Challenging Consent For Importing Email Addresses Have No Merit ............................................................... 6

        2.  Plaintiffs' Arguments Challenging Consent To Sending Connection Invitations Have No Merit ............................................................... 7

        3.  Plaintiffs Have Not Adequately Pled Their Own Lack Of Consent ............. 8

    B.  Plaintiffs Lack Article III Standing To Bring Right Of Publicity, UCL, And Section 502 Claims ................................................................................. 9

    C.  Plaintiffs Fail To State A Claim Under The UCL ...................................... 11

    D.  Plaintiffs Fail To State A Claim Under The SCA ...................................... 12

        1.  Plaintiffs Do Not Allege Access To "Electronic Communications" ........... 12

        2.  Plaintiffs Do Not Allege That Any "Electronic Communications" Were In "Electronic Storage" ......................................................... 14

        3.  Plaintiffs' Allegations Establish That Google Authorized Access To Its Users' Accounts ..................................................................... 15

    E.  Plaintiffs Fail To State A Claim Under The Wiretap Act ........................... 15

        1.  Plaintiffs Do Not Allege That The "Contents" Of Any "Electronic Communications" Were Intercepted ............................................... 15

        2.  Plaintiffs Do Not Allege Any "Interception" .................................... 16

    F.  Plaintiffs Fail To State A Claim Under California Penal Code Section 502 .......... 17

III. IN THE ALTERNATIVE, THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS IN THE FAC ....................................................................... 19

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Baxter v. Intelius, Inc.*,
2010 WL 3791487 (C.D. Cal. Sept. 16, 2010) ........................................................ 3

*Blumofe v. Pharmatrak, Inc.*
329 F.3d 9 (1st Cir. 2003) ........................................................ 16

*Chudner v. TransUnion Interactive, Inc.*,
626 F. Supp. 2d 1084 (D. Or. 2009) ........................................................ 7

*Chung v. Johnston*,
2009 WL 3400658 (N.D. Cal. Oct. 20, 2009) ........................................................ 13

*Corbis v. Jones*,
815 F. Supp. 2d 1108 (C.D. Cal. 2011) ........................................................ 20

*Cornerstone Consultants, Inc. v. Prod. Input Solutions, L.L.C.*,
789 F. Supp. 2d 1029 (N.D. Iowa 2011) ........................................................ 15

*Drobnak v. Andersen Corp.*,
561 F.3d 778 (8th Cir. 2009) ........................................................ 8

*Feldman v. Google*,
513 F. Supp. 2d 229 (E.D. Pa. 2007) ........................................................ 7

*Fields v. Mobile Messengers Am., Inc.*,
2013 WL 6073426 (N.D. Cal. Nov. 18, 2013) ........................................................ 20

*Fraley v. Facebook, Inc.*,
830 F. Supp. 2d 785 (N.D. Cal. 2011) ........................................................ passim

*Gene & Gene LLC v. BioPay LLC*,
541 F.3d 318 (5th Cir. 2008) ........................................................ 20

*Gregurek v. United Omaha Life Ins. Co.*,
2009 WL 4723137 (C.D. Cal. Nov.10, 2009) ........................................................ 20

*Ground Zero Museum Workshop v. Wilson*,
813 F. Supp. 2d 678 (D. Md. 2011) ........................................................ 18

*Hager v. Vertrue, Inc.*,
2011 WL 4501046 (D. Mass. Sept. 28, 2011) ........................................................ 3

*Harris v. comScore, Inc.*,
292 F.R.D. 579 (N.D. Ill. 2013) ........................................................ 20

*Harris v. Las Vegas Sands L.L.C.*,
2013 WL 5291142 (C.D. Cal. Aug. 16, 2013) ........................................................ 3

*Hernandez v. Path, Inc.*,
   2012 WL 5194120 (N.D. Cal. Oct. 19, 2012) ......................................................... 13, 14, 16

*In re Facebook Privacy Litigation*,
   791 F. Supp. 2d 705 (N.D. Cal. 2011) ................................................................. 18

*In re Flonase Antitrust Litig.*,
   610 F. Supp. 2d 409 (E.D. Pa. 2009) ................................................................... 8

*In re Google Android Consumer Privacy Litig.*,
   2013 WL 1283236 (N.D. Cal. Mar. 26, 2013) .............................................. 18, 19

*In re Google, Inc. Privacy Policy Litig.*,
   2012 WL 6738343 (N.D. Cal. Dec. 28, 2012) .......................................................... 11

*In re Google, Inc. Privacy Policy Litig.*,
   2013 WL 6248499 (N.D. Cal. Dec. 3, 2013) ...................................................... 3, 15

*In re Intuit Privacy Litig.*,
   138 F. Supp. 2d 1272 (C.D. Cal. 2001) ............................................................. 14, 15

*In re iPhone Application Litig.*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012) (Koh, J.) ...................................... 14, 15, 16

*In re iPhone Application Litig.*,
   2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ....................................................... 11

*In re Toys R Us, Inc. Privacy Litig.*,
   2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) ......................................................... 14

*In re Vistaprint Corp. Mktg. & Sales Practices Litig.*,
   2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) ........................................................ 3

*In re: Google Inc. Gmail Litig.*,
   2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ........................................................ 4

*Incorp Servs. Inc. v. Incsmart.Biz Inc.*,
   2012 WL 3685994 (N.D. Cal. Aug. 24, 2012) ....................................................... 17

*Konop v. Hawaiian Airlines, Inc.*,
   302 F.3d 868 (9th Cir. 2002) ............................................................................... 16

*Mazur v. eBay, Inc.*,
   2008 WL 618988 (N.D. Cal. Mar. 4, 2008) ........................................................... 12

*Mintz v. Mark Bartelstein & Assocs. Inc.*,
   906 F. Supp. 2d 1017 (C.D. Cal. 2012) .................................................................. 17

*Monaco v. Bear Stearns Cos., Inc.*,
   2012 WL 10006987 (C.D. Cal. Dec. 10, 2012) ...................................................... 20

*Nexsales Corp. v. Salebuild, Inc.*,
   2012 WL 216260 (N.D. Cal. Jan. 24, 2012) .................................................. 13, 14

*Ramirez v. Ghilotti Bros. Inc.*,
   941 F. Supp. 2d 1197 (N.D. Cal. 2013) ........................................................ 6

*Route v. Mead Johnson Nutrition Co.*,
   2013 WL 658251 (C.D. Cal. Feb. 21, 2013) ................................................ 19

*Sanders v. Apple Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) ........................................................ 19

*Scherillo v. Dun & Bradstreet, Inc.*,
   684 F. Supp. 2d 313 (E.D.N.Y. 2010) ........................................................ 7

*Steve Jackson Games, Inc. v. U.S. Secret Service*,
   36 F.3d 457 (5th Cir. 1994) ........................................................................ 17

*Thompson v. Thompson*,
   2002 WL 1072342 (D.N.H. May 30, 2002) .................................................. 17

*Ticketmaster Corp. v. Tickets.com, Inc.*,
   2000 WL 525390 (C.D. Cal. Mar. 27, 2000) .............................................. 7

*United States v. Forrester*,
   512 F.3d 500 (9th Cir. 2008) ...................................................................... 16

*Zimmerman v. HBO Affiliate Group*,
   834 F.2d 1163 (3d Cir. 1987) ...................................................................... 8

### STATUTES AND RULES

18 U.S.C. § 2510(8) ................................................................................................ 16

18 U.S.C. § 2510(12) .............................................................................................. 13

18 U.S.C. § 2511(2)(d) ............................................................................................ 15

18 U.S.C. § 2701(a) ................................................................................................ 12

18 U.S.C. § 2701(c)(1) ............................................................................................ 15

18 U.S.C. § 2701(c)(2) ............................................................................................ 12

Cal. Penal Code § 502(c) ........................................................................................ 17

Fed. R. Evid. 201(b) ............................................................................................ 3, 9

Rule 9(b) .......................................................................................................... 2, 11, 12

## I.      INTRODUCTION

Plaintiffs' Opposition confirms that their claims challenging LinkedIn's Add Connections networking tool are baseless as a matter of law and that the First Amended Complaint ("FAC") should be dismissed.  Their arguments, which consistently omit and mischaracterize facts alleged in the FAC or subject to judicial notice, are all based on a false premise—that Add Connections expands LinkedIn's member base "at the expense" of LinkedIn members.  LinkedIn members join LinkedIn to leverage and expand their existing network of contacts, which is exactly what Add Connections allows them to do.  Members import email addresses which they use to connect with people who are already on LinkedIn (one of many facts Plaintiffs ignore because it conflicts with their theory that the only point of Add Connections is to grow LinkedIn's member base), as well as with people who are not on LinkedIn but with whom they have been in email contact. Plaintiffs' contention that Add Connections does this "at the expense" of members is a transparent attempt to misuse this Court's ruling in *Fraley* by conjuring up some injury to LinkedIn members where none exists.  As shown below, all of Plaintiffs' claims fail as a matter of law.

*First*, Plaintiffs offer a scattershot array of arguments as to why Add Connections permission screens do not establish consent.  None have merit.  As in the FAC, Plaintiffs selectively cite words and phrases they claim are deceptive, while ignoring all other aspects of the screens that undermine their claims because they show that reasonable Internet users clicking through the screens chose to import email addresses and send connection invitations.  At bottom, their arguments assume that members do not read information presented on the screens before clicking on buttons indicating consent and do not understand basic operations like using a scroll bar, even though well-settled case law establishes that reasonable Internet users do both.

*Second*, faced with clear precedent in *Cohen* and *Fraley* establishing that they lack Article III standing to pursue their right of publicity, UCL, and Section 502 claims, Plaintiffs essentially put all of their eggs in the "premium account" basket in a failed attempt to analogize this case to *Fraley*.  In *Fraley*, this Court held that Article III standing required a "direct, linear" relationship between Sponsored Stories and profits to Facebook to show that member endorsements in Sponsored Stories had "concrete, measurable, and provable" value.  The *Fraley* plaintiffs met this standard by alleging that advertisers paid Facebook two to three times more for Sponsored Stories than for a generic advertisements.

There simply is no comparison between Sponsored Stories and Add Connections. Sponsored Stories were advertisements stating that members "liked" certain products, whereas Add Connections is a service provided to members. Sponsored Stories were sold to advertisers with no benefit to members, whereas members use Add Connections to build their online networks—exactly the reason they join LinkedIn. And the plaintiffs in *Fraley* alleged facts showing that *all* Sponsored Stories resulted in two to three times more profit to Facebook, whereas Plaintiffs allege that *some* members who receive connection invitations *might* purchase premium accounts, without any basis for concluding that there is a relationship between the two, let alone one showing that connection invitations have "concrete, measurable, and provable" value. In fact, only 1% of members have premium accounts, which are not even mentioned in connection invitations. In short, Add Connections is a service that benefits members and does not come close to establishing the type of "direct, linear" relationship required for Article III standing.

*Third*, Plaintiffs cannot avoid Rule 9(b) on their UCL claims by disclaiming repeated allegations characterizing Add Connections as a "deceptive advertising scheme." These claims are based on alleged fraudulent misrepresentations and thus are subject to the heightened pleading standard of Rule 9(b). Plaintiffs do not allege with the particularity required by Rule 9(b) any misrepresentation that is "likely to deceive" reasonable consumers, nor facts showing how they were deceived or that they relied upon any such misrepresentation.

*Fourth*, Plaintiffs continue to rely on baseless allegations of "hacking" to support their Stored Communications Act ("SCA"), Wiretap Act, and Section 502 claims. Plaintiffs not only ignore LinkedIn's motion to strike these allegations, but contort allegations in the FAC beyond recognition in a failed attempt to show that the statutory elements of these claims are met.

*Finally*, Plaintiffs oppose LinkedIn's alternative motion to strike class allegations by trying to rewrite class action law. They insist that, because they seek to represent a class, they do not have to allege facts showing their own experiences with Add Connections. That is not the law. Plaintiffs seeking to represent a class must be able to state a claim under the asserted causes of actions as to themselves. They also argue that LinkedIn has taken inconsistent positions on the applicable standards for determining consent. But there is no inconsistency between (1) the requirement that Plaintiffs allege facts showing their own supposed lack of consent, and (2) the objective standard by which courts determine if consent has been established as a matter of law. If the Court determines that consent cannot be decided as a matter of law, the issue of consent will require individualized inquiries, making it clear now that no class can be certified.

## II.    ARGUMENT

### A.    All Of Plaintiffs' Claims Fail Because Members Consent Through Add Connections Permission Screens

Plaintiffs throw out a dozen arguments as to why Add Connections permission screens do not establish consent, all of which ignore facts and law establishing that reasonable Internet users presented with these screens would understand that, by clicking buttons labeled "Allow" and "Add to Network," they are agreeing to import email addresses and send connection invitations.

All of Plaintiffs' arguments assume that members do not read the screens, individually or in context, before clicking buttons indicating agreement with them.  This ignores the substantial body of case law establishing that reasonable Internet users do just that and are bound by those actions.  *See, e.g.*, *In re Google, Inc. Privacy Policy Litig.*, 2013 WL 6248499, at *13 (N.D. Cal. Dec. 3, 2013) (finding consent as a matter of law and dismissing right of publicity claims where website "clearly disclosed how the [challenged] feature worked" and user "voluntarily clicked on the . . . feature"); *Hager v. Vertrue, Inc.*, 2011 WL 4501046, at *5 (D. Mass. Sept. 28, 2011) ("[A] consumer cannot decline to read clear and easily understandable terms that are provided on the same webpage in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the webpage, which the consumer has failed to read, is deceptive."); *Baxter v. Intelius, Inc.*, 2010 WL 3791487, at *4 (C.D. Cal. Sept. 16, 2010) (same); *In re Vistaprint Corp. Mktg. & Sales Practices Litig.*, 2009 WL 2884727, at *6 (S.D. Tex. Aug. 31, 2009) (same); *Harris v. Las Vegas Sands L.L.C.*, 2013 WL 5291142, at *2, 5-6 (C.D. Cal. Aug. 16, 2013).[1]

---

[1] A newspaper article about this lawsuit cited by Plaintiffs is not to the contrary.  As a threshold matter, Plaintiffs' request for judicial notice of this article should be denied because the FAC neither relies upon nor incorporates it by reference, and the author's opinions are hearsay and not matters "whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  In any event, that author states that the screens requested his permission to import email addresses and disclosed the number of email addresses imported and to whom connection invitations would be sent. Although noting that he could see how members who do not read the screens (as he obviously did) could "accidentally" send connection invitations, consistent with the case law above holding that reasonable Internet users do not click on buttons indicating agreement with information presented to them without reading it, the writer acknowledged that his article made no attempt to opine on the legal concept of consent.  Pls.' RJN, Ex. D at 2 ("The legal process will sort out whether LinkedIn is getting adequate consent.").

1    Moreover, Plaintiffs' assertion that LinkedIn is relying on the screens because it is

2    "[u]nable to shield itself behind its terms of service," which they claim "were hidden from users"

3    before this lawsuit, is not only false, but misses the point.  *See* Pls.' Opp. to LinkedIn's Mot. to

4    Dismiss FAC ("Opp.") at 2.  LinkedIn's terms of service have never been hidden from members,

5    though they were hidden from this Court by Plaintiffs' manipulation of Figure 1 in the FAC.[2]

6    More to the point, LinkedIn does not need to rely on its terms of service here.  Plaintiffs get it

7    backwards when they point to this Court's ruling in *In re: Google Inc. Gmail Litigation* and other

8    cases holding that terms of service did not establish consent as a matter of law.  In those cases, the

9    terms of service were general and presented to members before the challenged actions occurred so

10   that it was unclear whether they even contemplated those actions.  *See In re: Google Inc. Gmail*

11   *Litig.*, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013) (terms of service granting Google the

12   right "to pre-screen, review, flag, filter, modify, refuse or remove any or all Content from any

13   Service" did not constitute consent to Google's "reading of email for the purposes of creating user

14   profiles or providing targeted advertising" ); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 806

15   (N.D. Cal. 2011) (terms of service stating, "[y]ou give us permission to use your name and

16   [Facebook] profile picture in connection with [certain] content" did not constitute consent to

17   Sponsored Stories launched after the plaintiffs agreed to terms of service).  Here, the permission

18   screens are *specific* to Add Connections and presented to members *at the time* of use.  Thus, there

19   is no question that they apply to Add Connections and establish consent as a matter of law.

20        As alleged in the FAC, members using Add Connections are guided through a multi-step

21   process by permission screens that explain each step and require express consent *before* email

22   addresses are imported and *before* connection invitations are sent.  Following is a summary of the

23   contents of these screens and the order in which they are presented to members:

24

25

---

26   [2] Plaintiffs allege that users must scroll down to see the hyperlink to LinkedIn's terms of service
     on the screen where they enter their information and click "Join LinkedIn" to complete the
27   registration process.  That is simply not true.  Plaintiffs truncated Figure 1 of the FAC directly
     above the hyperlink to LinkedIn's terms of service.
28

| ADD CONNECTIONS PERMISSION SCREENS | | | |
|---|---|---|---|
| | *Heading* | *Contents* | *Actions* |
| 1 | **Grow your network on LinkedIn** | • **Get started by adding your email address**<br>• We will not store your password or email anyone without your permission | **Continue**<br>*or*<br>**Skip this step** |
| 2 | **Google Accounts** | **LinkedIn.com is asking for some information from your Google Account simonshamatest@gmail.com**<br>• Email address: simonshamatest@gmail.com<br>• Google Contacts | **Allow**<br>*or*<br>**No thanks** |
| 3 | **Connect with people you know on LinkedIn** | • **We found 218 people you know on LinkedIn. Select the people you'd like to connect to.**<br>• Text box with scroll bar. *Imported contacts who are LinkedIn members displayed in a text box with a scroll bar that identifies the total number of contacts imported and selected* | **Add Connections**<br>*or*<br>**Skip this step** |
| 4 | **Why not invite some people?** | • **Stay in touch with your contacts who aren't on LinkedIn yet.  Invite them to connect with you.**<br>• Text box with scroll bar. *Imported contacts who are not LinkedIn members displayed in a text box with a scroll bar that identifies the total number of contacts imported and selected* | **Add to Network**<br>*or*<br>**Skip this step** |

Reasonable Internet users would understand that the invitation on Screen 1 to "Grow your network on LinkedIn" and "Get started by adding your email address," followed by the notification from Google on Screen 2 that LinkedIn "is asking for some information from your Google Account," including "Google Contacts," is part of a process for importing email addresses, to which they are agreeing by clicking "Allow" on Screen 2.  Likewise, reasonable Internet users would understand that, when presented with those imported email addresses on Screen 3, inviting them to "Select the people you'd like to connect to," they have a choice.  They can click "Add Connections" to connect to those email addresses, or click "Skip this Step" to proceed to Screen 4 if they do not wish to connect.  On Screen 4, they would understand that they have the same choice because they are presented with email addresses in the same format as in Screen 3 and asked to "Stay in touch with [their] contacts who aren't on LinkedIn yet" by "Invit[ing] them to connect with you."  They click "Add to Network" if they wish to connect to those email addresses, or click "Skip this Step" if they do not wish to connect.

### 1.  Plaintiffs' Arguments Challenging Consent For Importing Email Addresses Have No Merit

Plaintiffs concede that members who click "Allow" on Screen 2 consent to provide their Google Contacts to LinkedIn, but argue that this consent does not cover all of the email addresses in Google's definition of that term: "[e]mail addresses are automatically added to your Contacts list each time you use the Reply, Reply to all, or Forward functions to send mail to addresses that don't already exist in your Contacts list." Def.'s RJN, Ex. D. Plaintiffs insist that only email addresses that are saved by users in an "address book" qualify as "contacts." *See* Opp. at 12.

There is nothing deceptive about Google's use of the term Google Contacts on Screen 2 to notify their customers that LinkedIn is requesting that information. A person with whom one communicates by email is a contact. If there is any question about that, the definition of Google Contacts, which is capitalized and therefore clearly a defined term, is readily available on Google's website. Plaintiffs' reliance on the sub-categories of "Google Contacts" defined by Google—(a) "my contacts," (b) "most contacted," and (c) "other contacts"—to argue that a reasonable person would understand that they were consenting to provide LinkedIn with (a) and (b), but not (c) is nonsensical. *See* Opp. at 13. If members understand such fine distinctions, there can be no question that members who click "Allow" in response to a request for "Google Contacts" understand the scope of their consent. In any event, Screen 2 states that LinkedIn is requesting "Google Contacts," and that is exactly what is provided when members click "Allow."

Plaintiffs also argue that a reasonable person would not understand that Add Connections "uses an open email session to tunnel into a user's account and indefinitely store the harvested data." Opp. at 12. Plaintiffs' allegations of "hacking" and "tunneling" are false and the subject of a pending motion to strike to which Plaintiffs failed to respond, thus requiring that the allegations be stricken. *See Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 & n.7 (N.D. Cal. 2013). Plaintiffs suggest, without any support whatsoever, that members who consent to provide LinkedIn with their Google Contacts somehow condition that consent on a particular type of access. There is no such condition. And, as exhibits to Plaintiffs' own request for judicial notice show, once a member consents, Google provides LinkedIn access using an industry standard

1  application programming interface ("API").  Pls.' RJN, Ex. B.[3]

2        **2.**      **Plaintiffs' Arguments Challenging Consent To Sending Connection Invitations Have No Merit**

3        Plaintiffs argue that displaying contacts in a text box with a scroll bar is deceptive because

4  it does not display all email addresses to which connection invitations will be sent when members

5  click "Add to Network."  There is nothing deceptive about using scroll bars, which are a common

6  and accepted means of presenting information that does not fit on one screen.  Courts consistently

7  have held that reasonable Internet users are bound by information presented using a scroll bar

8  whether or not they actually scroll down and read it.  *See, e.g., Scherillo v. Dun & Bradstreet, Inc.*,

9  684 F. Supp. 2d 313, 322 (E.D.N.Y. 2010); *Chudner v. TransUnion Interactive, Inc.*, 626 F. Supp.

10  2d 1084, 1090 (D. Or. 2009); *Feldman v. Google*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007).[4]

11  This rule applies with particular force here because the text box informs members that there are

12  more email addresses than are visible by identifying the total number in the header of the box.

13        Next, Plaintiffs contend that the term "Add to Network" is deceptive because it does not

14  explain that emails will be sent and that they will "endorse" LinkedIn.  Reasonable Internet users

15  would read Screen 4—which displays a list of imported email addresses and offers the option to

16  "Invite them to connect with you"—and understand that, by clicking "Add to Network," they were

17  consenting to send emails to those email addresses inviting them to join their networks.  How else

18  would Plaintiffs expect to "invite" people who "aren't on LinkedIn yet" to join their networks?

19  As for the alleged "endorsement" of LinkedIn, connection invitations do not say anything about

20

21  _____

22  [3] Plaintiffs' remaining arguments are either repetitive or merit little discussion.  The alleged postings on LinkedIn's message board have no bearing on whether Add Connections permission screens establish consent as a matter of law.  *See* Opp. at 11-12.  Likewise, the alleged storage of

23  imported email addresses is not an element of any claim alleged and thus is irrelevant.  *See, id.*

24  [4] Plaintiffs' reliance on an old "browsewrap" case, *Ticketmaster Corp. v. Tickets.com, Inc.*, 2000 WL 525390, at *3 (C.D. Cal. Mar. 27, 2000) is misplaced.  That case concerned the enforceability

25  of terms and conditions referenced in small font at the bottom of a website screen.  Unlike here, the user never had to click any button indicating agreement with information on the screen.  *See*

26  *id.* ("Many web sites make you click on 'agree' to the terms and conditions before going on, but Ticketmaster does not.").  Nor did the screen indicate that users would have to scroll down to

27  reach the terms, which were linked at the bottom of the screen.  *See id.*  By contrast, Screens 3 and 4 identify the total number of email addresses imported at the top of the text box in which they are

28  displayed.

1    LinkedIn.  They invite the recipient to join the member's professional network.  *See* FAC, Fig. 7

2    ("I'd like to add you to my professional network").

3          Finally, Plaintiffs argue that, even assuming members consent to sending a connection

4    invitation, they do not consent to sending reminders.  Opp. at 13-15.  But Plaintiffs do not dispute

5    that reminder emails are no different in form and content than connection invitations, and

6    Plaintiffs concede that consent may be express or implied.  *See* Opp. at 10.  Moreover, they do not

7    articulate any theory of injury for reminder emails independent of the supposed injury for

8    connection invitations.

9         **3.**      **Plaintiffs Have Not Adequately Pled Their Own Lack Of Consent**

10          Plaintiffs allege nothing about their own experiences with Add Connections.  They do not

11    allege what screens they saw or how they were allegedly deceived by them so as to show that,

12    despite clicking through the screens, they did not consent to importing email addresses or sending

13    connection invitations.  Instead, they rely on the conclusory assertion that LinkedIn acted "without

14    . . . authorization" and "without . . . consent."  *See* FAC ¶¶ 13-21.[5]  In their opposition, Plaintiffs

15    first insist that, because they seek to represent a class, they do not have to allege facts specific to

16    themselves.  *See* Opp. at 27 n.18 ("Defendants state, without support, that Plaintiffs must allege

17    facts specific to each named Plaintiff").  That is not the law.  "It is well settled that to be a class

18    representative on a particular claim, the plaintiff must himself have a cause of action on that

19    claim." *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1169 (3d Cir. 1987); *see also, e.g.*,

20    *Drobnak v. Andersen Corp.*, 561 F.3d 778, 784 (8th Cir. 2009); *In re Flonase Antitrust Litig.*, 610

21    F. Supp. 2d 409, 413 (E.D. Pa. 2009).  Plaintiffs then argue that, "[a]lthough not required, each

22    Plaintiff alleged they joined LinkedIn…[w]here they saw the signup screens identified in the

23    Complaint."  Opp. at 27 n.18.  But Plaintiffs *do not allege* anywhere in the FAC that they saw the

24    screens, let alone how they were deceived by them so as to invalidate the consent they gave by

25    clicking through them.  Because Plaintiffs do not allege facts establishing the absence of consent

26
27
28

---

[5] Plaintiffs are required both to (1) plausibly plead lack of consent, which is not supported by anecdotal allegations of confusion, and to (2) plead a claim for relief as to themselves, which requires allegations establishing their own lack of consent.  It is not "contradict[ory]" for LinkedIn to hold Plaintiffs to both of those legal obligations.  *See* Opp. at 17.

as to themselves, they cannot state a claim under any of the asserted causes of action.

**B.     Plaintiffs Lack Article III Standing To Bring Right Of Publicity, UCL, And Section 502 Claims**

Plaintiffs concede that they have no claims based on emotional injury, Opp. at 33 n.20, leaving their flawed theory of economic injury as the only potential basis for Article III standing in support of their right of publicity, UCL, and Section 502 claims, and the injury element of their right of publicity and UCL claims.  They argue that they have been injured by connection invitations because they allegedly contributed to the growth of LinkedIn's member base and greater profits for LinkedIn, which Plaintiffs claim they are entitled to share.  This theory of injury was squarely rejected in *Cohen* and *Fraley*.

*Cohen* and *Fraley* establish that in cases challenging an online network's alleged use of member names and/or likenesses to grow the member base, Article III's standing requirement is not satisfied unless there is a "direct, linear" relationship between "the value of [the] endorsement …and the alleged commercial profit gained by" the online network.  830 F. Supp. 2d at 800.  As Plaintiffs acknowledge, in *Cohen*, the court held that the alleged "causal chain" from "increased use of [Facebook's] Friend Finder" to "people using this feature…[to]…invit[e] people to Facebook" to "profit for Facebook" was too "attenuate[d] to confer standing."  Opp. at 22 n.16.  Plaintiffs also acknowledge that, in *Fraley*, this Court held that there must be a "direct, linear relationship" between the alleged member "endorsement" and the alleged profits of the online network, and distinguished *Cohen* based on specific factual allegations showing that members' endorsements of third-party products, which Facebook sold to advertisers on Facebook, were "two or three times more valuable than generic advertisements."  830 F. Supp. 2d at 800; Opp. at 21.  Based on these allegations, the *Fraley* plaintiffs were able to show that the value for their alleged endorsements was "concrete, measureable, and provable."  *Fraley*, 830 F. Supp. 2d at 800.  While Plaintiffs desperately try to analogize this case to *Fraley*—going so far as to blatantly misquote LinkedIn executives, not once but twice[6]—they allege no facts establishing the type of "direct, linear" relationship required by this Court in *Fraley* for Article III standing.

---

[6] Plaintiffs ignore LinkedIn's demonstration in its opening brief that Plaintiffs misquoted Reid Hoffman in the FAC.  *See* Motion at 8.  Plaintiffs compound the problem in their opposition by requesting judicial notice of a purported transcript of a different interview with Mr. Hoffman and misquote him *again*.  Plaintiffs' request for judicial notice of this purported transcript should be denied because, not only is it not cited in the FAC or incorporated by reference, it does not even appear to be an "official" transcript and therefore is "subject to reasonable dispute."  Fed. R. Evid.

Plaintiffs attempt to get around *Cohen* and *Fraley* by focusing on the availability of premium accounts. They assert that this case is different from *Cohen* because the recipients of connection invitations might purchase a premium account, which Plaintiffs say represents a "direct, linear" relationship between a connection invitation and profit to LinkedIn with "measurable and concrete" value because connection invitations "can be traced to the purchase of premium memberships." Opp. at 21; *see also id.* ("LinkedIn will be able to track which endorsement emails converted into premium memberships"). Plaintiffs are wrong.

As a threshold matter, Plaintiffs do not allege that any of *their* connection invitations "can be traced" to the purchase of a premium account, and do not propose a class limited to members who can. In any event, rather than identifying a "direct, linear" relationship, Plaintiffs' premium account theory actually underscores the indirect, attenuated nature of the relationship between connection invitations and any benefit to LinkedIn. Connection invitations do not even mention premium accounts. Plaintiffs do not and cannot allege that every connection invitation results in the purchase of a premium account. Indeed, only 1% of members have premium accounts, which Plaintiffs do not dispute. *See* Opp. at 21 n.15.[7]

Even for the miniscule number of LinkedIn members who purchase a premium account after receiving a connection invitation, there is no "direct, linear" relationship between the two. People who receive a connection invitation may purchase a premium account months or even years after receiving it for any number of reasons. They may purchase a premium account based on an article they read a month before or a month after receiving a connection invitation describing the high quality of LinkedIn's premium account services, or because of a friend's positive experience. At bottom, Plaintiffs offer no basis upon which to assume that connection invitations result in the purchase of premium accounts so as to satisfy *Fraley's* "direct, linear relationship" test.

Plaintiffs' theory that LinkedIn saves "new member acquisition costs" by using connection

---

201(b). This time, Plaintiffs quote Mr. Hoffman as saying that "sending connection emails is directly attributed to LinkedIn's growth," Opp. at 23, when Mr. Hoffman actually said that telling people which of their email contacts were already on LinkedIn helped kick-start growth. *See* Pls.' RJN, Ex. A. In other words, this quote refers to Screen 3, not Screen 4. Plaintiffs' claims do not challenge Screen 3; indeed, Plaintiffs omitted it altogether from the FAC. *See* Motion at 6.

[7] According to the figures alleged by Plaintiffs—and using the alleged monthly subscription price that would yield the highest number of premium memberships—only 0.2% of LinkedIn members have premium subscriptions. *See* FAC ¶¶ 23, 56 ($190 million in annual premium subscription revenue at a $39.95 monthly rate would require 396,329 premium subscriptions, which is only 0.2% of LinkedIn's 225 million members as alleged in the FAC).

1   invitations is equally baseless.  Opp. at 23.  First, it simply repackages the growing member base

2   theory, focusing on the costs instead of the revenue side of the profit equation.  Opp. at 22.  These

3   so-called "saved acquisition costs" does not distinguish this case from *Cohen*—indeed this

4   allegation would apply to any online network, all of which rely on some form of connection

5   requests to grow in size.  Second, Plaintiffs do not allege any "*concrete, measureable, and*

6   *provable*" value associated with the alleged "saved acquisition costs."  Instead, they rely on

7   conclusory and vague assertions of "viral growth" and "relatively low marketing costs."  FAC

8   ¶¶51, 54; Opp. at 23.  Finally, Plaintiffs' allegation that "LinkedIn would be forced to pay for

9   email addresses to advertise and promote its service," FAC ¶ 57, which is the only "cost saving"

10  actually identified, is no different than the abstract theories of "value-for-value exchanges" that

11  courts, including this one, have found insufficient to support Article III standing.  *See In re*

12  *Google, Inc. Privacy Policy Litig.*, 2012 WL 6738343, at *5 (N.D. Cal. Dec. 28, 2012); *In re*

13  *iPhone Application Litig.*, 2011 WL 4403963, at *4–6 (N.D. Cal. Sept. 20, 2011) (holding that

14  hypothetically foreclosed "value-for-value exchanges" resulting from collection of personal

15  information were not cognizable injuries in fact); Motion at 15-16.  Plaintiffs posit that they "have

16  not alleged that LinkedIn has misappropriated its members' identifies and data to promote its

17  service," Opp. at 24, which is an extraordinary statement because that is exactly what they allege

18  in the first paragraph of the FAC.  *See* FAC ¶ 1 (LinkedIn "appropriat[es] the . . . identities of

19  Plaintiffs to advertise its products and services for a commercial purpose").[8]

20          **C.      Plaintiffs Fail To State A Claim Under The UCL**

21          While Plaintiffs concede that their UCL claims are subject to Rule 9(b), they assert that the

22  FAC satisfies Rule 9(b) because it "notif[ies] LinkedIn of the circumstances of the alleged fraud."

23  Opp. at 26.  According to Plaintiffs, it is enough that they identify supposed misrepresentations on

24  the permission screens and LinkedIn's blog which deceived unidentified members about Add

25  ───────────────────

    [8] In their opposition, Plaintiffs continue to rely on the growth in LinkedIn's member base as a

26  cognizable Article III injury, despite *Cohen* and *Fraley*, as well as the flawed comparison between
    connection invitations and InMail.  As set forth in the Motion, neither of these establish Article III

27  standing.  Nothing in the opposition changes that fact or warrants an additional response.

28

REPLY ISO MOT. TO DISMISS FAC
                                                        CASE NO. 13-CV-04303-LHK

1    Connections.  But allegations selectively citing certain words and phrases from these screens as

2    "misrepresentations," without any allegations explaining how they are deceptive in context, do not

3    satisfy the heightened pleading standard of Rule 9(b).  Plaintiffs' conclusory allegation that they

4    "justifiably relied upon" misrepresentations without any allegations regarding what screens *they*

5    saw or how *they* were deceived by them also does not satisfy Rule 9(b), which requires "[t]he

6    same level of specificity . . . with respect to [pleading] reliance."  *Mazur v. eBay, Inc*., 2008 WL

7    618988, at *13 (N.D. Cal. Mar. 4, 2008) (internal quotation marks omitted); FAC ¶ 103.

8           Plaintiffs insist that they do not have to allege any facts regarding their experiences with

9    Add Connections permission screens because it is "uncontested" that they saw the screens and,

10   therefore, reliance can be assumed.  *See* Opp. at 26-27.  Plaintiffs are wrong.  As explained above,

11   Plaintiffs cannot avoid applicable pleading requirements just because they purport to bring their

12   claims on behalf of a class.  They do not allege that they have Gmail accounts, so there is no basis

13   to "assume" that they saw Screen 2 presented by Google, let alone were deceived by it.  The same

14   is true for Screens 1, 4, and 5.  And there are no allegations whatsoever that Plaintiffs saw or were

15   deceived by any of the alleged statements on LinkedIn's blog.  Plaintiffs' reliance on Rule 9(b)

16   cases holding that a plaintiff "need not list each and every instance of misrepresentations" made

17   by a defendant over an "extended period of time" is misplaced.  Opp. at 26.  The FAC is subject to

18   dismissal under Rule 9(b), not because it fails to allege *all* misrepresentations, but because it does

19   not identify *any* misrepresentation or reliance thereon with the requisite particularity.

20          Finally, the alleged misrepresentations are not "likely to deceive" a reasonable consumer

21   as a matter of law, for the same reasons they establish consent as a matter of law.  A reasonable

22   Internet user would understand that, by clicking on buttons labeled "Allow" and "Add to

23   Network," they were choosing to import email addresses and send connection invitations.

24          **D.     Plaintiffs Fail To State A Claim Under The SCA**

25          In addition to failing to adequately allege that any access occurred without authorization,

26   18 U.S.C. § 2701(c)(2), Plaintiffs' SCA claims should be dismissed on the following grounds.

27                 **1.     Plaintiffs Do Not Allege Access To "Electronic Communications"**

28          Plaintiffs fail to point to any plausible allegation in the FAC that LinkedIn "obtain[s] . . .

-12-

access" to "electronic communications," 18 U.S.C. § 2701(a).  The FAC repeatedly alleges that

LinkedIn gained access only to *email addresses*.  *See* Motion at 26 n.7.  As the Google permission

screen in the FAC states, LinkedIn obtains access to a user's "Google Contacts," FAC Figure 4,

which Plaintiffs acknowledge (and the Google documents attached to Plaintiffs' RJN confirm)

refers to a "list" of "addresses."  Opp. at 13; FAC ¶ 60 ("lists of email addresses"); Pls.' RJN, Ex.

C.  The conclusory and contradictory allegation that LinkedIn accesses "email communications,"

FAC ¶¶ 114-15, should be ignored.  *See Nexsales Corp. v. Salebuild, Inc*., 2012 WL 216260, at *3

(N.D. Cal. Jan. 24, 2012) ("conclusory statements" do "not support a claim under [SCA]"); *Chung*

*v. Johnston*, 2009 WL 3400658, at *3 (N.D. Cal. Oct. 20, 2009) ("court may disregard" allegations

"contradicted" by documents on which complaint "necessarily relies").

Plaintiffs now purport to rely upon other "contact data" LinkedIn purportedly accesses,

such as "company, job title, [and] physical address."  Opp. at 29.  The FAC nowhere mentions

such "data" independent of the email addresses themselves.  In any event, neither email addresses

nor such "contact data" constitute "electronic communications," which the statute specifically

limits to data "*transmitted* in whole or in part by a . . .  system that affects interstate or foreign

commerce." 18 U.S.C. § 2510(12) (emphasis added).  Indeed, the "address books" at issue in

*Hernandez v. Path, Inc*., 2012 WL 5194120 (N.D. Cal. Oct. 19, 2012), which the court held were

"not a communication to which the SCA applies," *id*. at *4, included not only email addresses, but

also "mailing addresses," "job title," and "employer," *id*. at *1 n.1.  Plaintiffs attempt to

distinguish *Hernandez* by arguing that Google "is constantly updating the information" in Google

Contacts, whereas the address books in *Hernandez* were "static."  Opp. at 29.  That Google may

update Google Contacts does not convert them into "*transmitted*" "communications."  If that were

the case, then virtually any list of data capable of being updated would constitute an "electronic

communication."  And the *Hernandez* plaintiff made the same failed argument, claiming (contrary

to Plaintiffs' account of the case) that the "contact address book *is not a static file* that simply sits

in electronic storage, but is a file that is *constantly being updated*."  Pl.'s Opp. to Mot. to Dismiss

at 5, *Hernandez v. Path*, No. 12-CV-01515 YGR, (N.D. Cal. June 26, 2012), 2012 WL 5884013

(emphasis added).  The *Hernandez* court rejected this argument, as this Court should here.

## 2.     Plaintiffs Do Not Allege That Any "Electronic Communications" Were In "Electronic Storage"

Even accepting that a list of email addresses constitutes "electronic communications," Plaintiffs have not alleged *any* facts showing that the addresses were obtained while they were in "electronic storage."  Plaintiffs do not even attempt to argue that the addresses were stored for "backup protection," and instead limit their arguments to the "temporary, intermediate storage" prong of § 2510(17).  Opp. at 29-30.  The FAC nowhere mentions "temporary, intermediate storage," much less alleges the requisite "specific facts demonstrating that [the] data was 'in electronic storage.'"  *Nexsales*, 2012 WL 216260, at *4.  As the cases Plaintiffs rely upon hold, where plaintiffs "do not allege that [communications] are incidentally stored . . . while awaiting final transmission to another location," they "fail[] to allege that defendants accessed electronic communications in 'temporary, intermediate storage.'"  *In re Toys R Us, Inc. Privacy Litig.*, 2001 WL 34517252, at *3 (N.D. Cal. Oct. 9, 2001); Opp. at 30.

Plaintiffs attempt to make up for this fatal omission by again pointing to the "constant and dynamic updating of Google Contacts information." Opp. at 30.  Even accepting this as true, it does not establish that any data is accessed while it is in "temporary, intermediate storage."  As Plaintiffs' own allegations make clear, LinkedIn accesses data from Google Contacts *after* any such "dynamic updating."  *Id.*; FAC ¶¶ 114-15.  Such data does not plausibly reside *temporarily* in the Contacts list as it awaits final transmission to *another* location.  *In re Toys R Us*, 2001 WL 34517252, at *3; *In re iPhone*, 844 F. Supp. 2d 1040, 1059 (N.D. Cal. 2012) (Koh, J.) (data residing "for up to a one-year period" not in "'temporary, intermediate storage'").  Indeed, notwithstanding the "updating" and "dynamic" nature of the address book in *Hernandez*, the court there likewise held that the plaintiff failed to allege that such data was in "temporary, intermediate storage," as Plaintiffs acknowledge.  *See* 2012 WL 5194120, at *4; Opp. at 29 ("address book in *Hernandez* . . . was not stored in temporary or intermediate storage").[9]

---

[9] Plaintiffs rely upon *In re Intuit Privacy Litig.,* 138 F. Supp. 2d 1272 (C.D. Cal. 2001); Opp. at 30, where the court found sufficient the plaintiff's allegation that the defendant "accessed data contained in 'cookies' that it placed in Plaintiffs computers' electronic storage," 138 F. Supp. 2d at 1277.  Not only is this case irrelevant, as the FAC alleges access to email addresses, not

-14-

### 3. Plaintiffs' Allegations Establish That Google Authorized Access To Its Users' Accounts

Plaintiffs effectively concede that their allegations establish that Google, as the "entity providing the wire or electronic communications service," authorized access to its users' accounts, which constitutes an absolute defense under 18 U.S.C. § 2701(c)(1). *See* Opp. at 30 (noting "Google's Granting Access"). Plaintiffs' only response is that this "exception to liability does not apply here because *Plaintiffs* never authorized LinkedIn to access this particular data." *Id.* (emphasis added). But as courts have made clear, a "provider's authorization would make a 'user's' lack of authorization *of no consequence*" under the SCA. *Cornerstone Consultants, Inc. v. Prod. Input Solutions, L.L.C.*, 789 F. Supp. 2d 1029, 1051 (N.D. Iowa 2011) (emphasis added). Thus, even if information is obtained "without [members'] consent," Section 2701(c)(1) "exempts conduct authorized" by the service provider, and thus, "[w]hatever the propriety of Google's actions, it plainly authorized actions that it took itself." *In re Google, Inc. Privacy Policy Litigation*, 2013 WL 6248499, at *12. Plaintiffs' claim that Google might have been "mistaken as to the nature and quality" of access is nonsensical and legally irrelevant. *See* Opp. at 30. As Plaintiffs allege, it is *Google* that provides the permission screen authorizing LinkedIn to access its users' accounts and "Google Contacts." FAC ¶¶ 32-33 & Figure 4. As the source of that disclosure, Google could not plausibly have been mistaken as to the "nature and quality" of the access given and disclosed; it clearly knows the meaning of "Google Contacts."

### E. Plaintiffs Fail To State A Claim Under The Wiretap Act

In addition to failing to adequately allege the absence of consent, 18 U.S.C. § 2511(2)(d), Plaintiffs' SCA claim is subject to dismissal on the following bases.

### 1. Plaintiffs Do Not Allege That The "Contents" Of Any "Electronic Communications" Were Intercepted

Under the Wiretap Act, email addresses are not "contents" of "electronic

---

"cookies," but Plaintiffs ignore that this Court has expressly declined to follow *Intuit*, describing it as a "non-binding decision[]" that provided "little analysis on this point of law," and concluding that more "persuasive" cases held that "cookies' long-term residence on plaintiffs' hard drives places them outside of § 2510(17)'s definition of 'electronic storage.'" *In re iPhone*, 844 F. Supp. 2d at 1057-59.

communications."  The Wiretap Act defines "contents" to mean "information concerning the

substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

As this Court has held, "'content' is limited to information the user intended to communicate, such

as the words spoken in a phone call." *In re iPhone*, 844 F. Supp. 2d at 1061.  Likewise, the Ninth

Circuit has made clear that email addresses are not "contents" of communications, even though, as

Plaintiffs claim, they may include the employer or job title of an individual in the address itself.

*United States v. Forrester*, 512 F.3d 500, 509-10 (9th Cir. 2008); *see also Hernandez,* 2012 WL

5194120, at *3.  Relying on the First Circuit's decision in *Blumofe v. Pharmatrak, Inc.* 329 F.3d 9

(1st Cir. 2003), and again pointing to the "contact data" nowhere referenced in the FAC, Plaintiffs

argue that "contents" "encompasses personally identifiable information," Opp. at 32.  They ignore,

however, that this Court has held that it "does not find *In re Pharmatrak* persuasive because *In re*

*Pharmatrak* cites to a footnote of a 1972 Supreme Court case discussing an outdated version of

the Wiretap Act," and that "personally identifiable information that is automatically generated by

the communication but that does not comprise the substance, purport, or meaning of that

communication is not covered by the Wiretap Act." *In re iPhone*, 844 F. Supp. 2d at 1062.  No

different here, "Google Contacts" data does not comprise the substance or meaning of any

communication and is "automatically updated" "each time" a user uses "the Reply, Reply to All or

Forward functions to send mail," as Plaintiffs concede.  Opp. at 32.  It does not constitute

"contents" of "communications."

### 2.       Plaintiffs Do Not Allege Any "Interception"

Even if the email addresses at issue constitute the "contents" of "communications,"

Plaintiffs do not allege that they were acquired contemporaneously *with transmission.*  Indeed, in

contradiction, Plaintiffs allege in the SCA cause of action that such data was acquired while it was

in "electronic storage," not transmission—though as established above, that fails to satisfy the

specific statutory definitions in the SCA.  FAC ¶¶ 114-15.  As the Ninth Circuit has held, for a

communication to "be 'intercepted' in violation of the Wiretap Act, it must be acquired during

transmission, not while it is in electronic storage." *Konop v. Hawaiian Airlines, Inc*., 302 F.3d

868, 878 (9th Cir. 2002).  Obtaining access to data stored in email accounts does not constitute an

1   interception under the statute.  *See Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp. 2d

2   1017, 1031 (C.D. Cal. 2012) (dismissing claim where no emails "had been acquired during

3   transmission.  Rather, the emails Defendants viewed were stored on Gmail").

4          Despite the fact that the FAC nowhere alleges any acquisition during transmission,

5   Plaintiffs now claim that "Google's real-time updating of information . . .  distinguishes Plaintiffs'

6   claim from" such decisions.  Opp. at 32.  But irrespective of whether such data is updated by

7   Google, Google "Contacts *are stored* in the user's Google Account," as the Google documentation

8   attached to Plaintiffs' RJN provides.  Pls.' RJN, Ex. B at 1 (emphasis added).  Even accepting the

9   implausible theory that the "updating" of Google Contacts constitutes a "transmission" of a

10  "communication," under Plaintiffs' own allegations LinkedIn only accessed such data while it was

11  being stored and *after* any transmission.  *See Thompson v. Thompson*, 2002 WL 1072342, at *3

12  (D.N.H. May 30, 2002) ("the acquisition of stored e-mail—electronic data that are no longer in the

13  process of being transferred—does not qualify as the interception of electronic communications")

14  (citing *Steve Jackson Games, Inc. v. U.S. Secret Service*, 36 F.3d 457 (5th Cir. 1994)).

15          **F.      Plaintiffs Fail To State A Claim Under California Penal Code Section 502**

16          In addition to failing to adequately allege injury in fact and lack of consent, Plaintiffs'

17  Section 502 claim should be dismissed on the following grounds.

18          As Plaintiffs acknowledge, Section 502 requires Plaintiffs to allege that LinkedIn

19  "circumvents technical or code based barriers in place to restrict or a bar a user's access."  Opp. at

20  32.  Beyond threadbare (and false) assertions of "hacking" and "tunneling"—the subject of

21  LinkedIn's motion to strike, which Plaintiffs entirely ignore—there are no factual allegations of

22  technical circumvention at all in the FAC.  This alone subjects the claim to dismissal.  *See Incorp*

23  *Servs. Inc. v. Incsmart.Biz Inc.*, 2012 WL 3685994, at *3 (N.D. Cal. Aug. 24, 2012) (dismissing

24  claim where "factual allegations fail to 'flesh out' what the Ninth Circuit has described as

25  hacking").

26          Relying upon revisionist history, Plaintiffs now assert that because they allege that

27  LinkedIn "'pretends to be [the] user and downloads the email addresses,'" FAC ¶ 30, it uses a

28  "technological surreptitious method for accessing users third-party accounts" and therefore

engages in circumvention.  Opp. at 32.  This is implausible and contradicted by the allegations of the FAC.  Whether members' Google accounts are opened or closed, members are notified *by Google* (who presumably would be implementing any such technical barriers) that "'LinkedIn is asking for some information from your Google Account,'" specifically identifying "Google Contacts," and the member has the option of clicking "No thanks."  FAC ¶ 32 & Figure 4.  Given that Google plainly authorizes LinkedIn to access members' accounts, which Plaintiffs concede, *supra* Part II.D.3, any claim that LinkedIn is engaging in a "technological surreptitious method" of circumvention is nonsensical.  *See, e.g., Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 692 (D. Md. 2011) ( "no circumvention" where "access" to site "was authorized").

All the FAC alleges is that its *members* do not consent to the *scope* of access LinkedIn obtains to their Google accounts.  Plaintiffs acknowledge that members "provide authority and consent" to LinkedIn to access their Google accounts, though claim that it "exceeds" such authorization given the alleged ambiguity of "[G]oogle [C]ontacts."  FAC ¶ 33.  This, however, does not rise to the level of technical circumvention.  As the court held in *In re Facebook Privacy Litigation*, 791 F. Supp. 2d 705, 716 (N.D. Cal. 2011), in dismissing the plaintiffs' Section 502 claim, the "Plaintiffs do not allege that Defendant circumvented technical barriers," but, "[t]o the contrary," only "allege that Defendant caused 'nonconsensual transmissions' of their personal information."  Notwithstanding Plaintiffs' conclusory "hacking" and "tunneling" claims, the FAC does not allege any *facts* showing technical circumvention by LinkedIn in accessing members' Google accounts or their Google Contacts.  The court in *In re Google Android Consumer Privacy Litig.*, 2013 WL 1283236 (N.D. Cal. Mar. 26, 2013), rejected similarly deficient allegations where plaintiffs had "not included *any facts* that show – or lead to a reasonable inference – that the tracking codes have been designed in such a way to render ineffective any barriers."  *Id.* at 12.  The omission of any such facts here similarly subjects Plaintiffs' Section 502 claim to dismissal.[10]

---

[10] Although the failings detailed above are more than sufficient to dismiss Plaintiffs' claim, the "Google Contacts API" document attached to Plaintiffs' RJN, Ex. B, confirms that Plaintiffs *cannot* allege any technical circumvention.  The document details the manner in which third parties, such as LinkedIn, are able to access their users' Google accounts using a publicly-available application programming interface (API) provided by Google called "OAuth," without

**III.    IN THE ALTERNATIVE, THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS IN THE FAC**

As Plaintiffs acknowledge, a motion to strike class allegations should be granted where "it is clear from the face of the pleadings" that class treatment is improper.  Opp. at 33.  Their argument "that the Court should defer ruling on this issue until the class certification stage . . . fails to acknowledge that where the matter is sufficiently obvious from the pleadings, a court may strike class allegations."  *Route v. Mead Johnson Nutrition Co.*, 2013 WL 658251, at *8 (C.D. Cal. Feb. 21, 2013); *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990–91 (N.D. Cal. 2009) (finding defendant's motion to strike "not premature").  In their opposition, Plaintiffs contend that the motion should be denied because LinkedIn is asserting "contradictory" arguments as to whether consent is determined using an "objective or "subjective" standard.  Opp. at 3-4, 35.  Not so.

In its motion to dismiss, LinkedIn argues that Add Connections permission screens establish consent as a matter of law and that Plaintiffs must allege facts showing that they can state a claim under this objective standard.  To the extent the Court disagrees with this view, and holds that consent cannot be established as a matter of law, the issue of consent splinters into individual issues requiring determination of what each member did and understood with respect to the permission screens.  For example, Plaintiffs repeatedly allege that Screen 2 is deceptive because Google refers to "Google Contacts."  *See, e.g.,* FAC ¶ 33 (Google permission screen does not "clearly notify[] the user"); Opp. at 2 (describing screen as "cryptic").  Although LinkedIn believes that Screen 2 establishes consent as a matter of law, if the Court concludes otherwise, the issue of consent would require individualized inquiries into whether each member understood the meaning of "Google Contacts," which turns on their exposure to Google's service documents defining that term and personal experiences using Gmail.  *See Corbis v. Jones*, 815 F. Supp. 2d

---

any technical circumvention. As the document notes, "When your application needs access to user data, it asks Google for a particular scope of access," Google then "displays an OAuth dialog to the user, asking them to authorize your application to request some of their data"—the Google permission screen provided in this case, FAC, Figure 4—and "[i]f the user approves, then Google gives your application a short-lived access token." *Id.* at 2. The "application requests user data, attaching the access token to the request," and if "Google determines that your request and the token are valid, it returns the requested data." *Id.* at 2. As this document shows, Plaintiffs' "hacking" and "tunneling" claims are plainly frivolous and harassing, and should be stricken.

1108, 1114-17 (C.D. Cal. 2011) (consent was "highly individualized and depended on," *inter alia*, "Plaintiff's knowledge of the circumstances" and "past industry experience and conduct").

Contrary to Plaintiffs' assertion, the mere existence of an "identical process" for obtaining consent is not sufficient to certify a class.  Opp. at 35.  Courts consistently deny class certification in cases where there are uniform representations, but ambiguities in their terms (as Plaintiffs allege here), necessitating individualized inquiries into each putative class member's understanding.  *See e.g., Gregurek v. United Omaha Life Ins. Co.*, 2009 WL 4723137, at *9 (C.D. Cal. Nov.10, 2009) ("resolution of the ambiguity cannot be made on a class-wide basis"); *Monaco v. Bear Stearns Cos., Inc.,* 2012 WL 10006987, at *7 (C.D. Cal. Dec. 10, 2012) (class certification "not appropriate" where terms were "facially ambiguous" and "extrinsic and parol evidence is needed to determine the intent of each" class member).  Moreover, contrary to Plaintiffs' contention, several of these cases involve uniform disclosures where courts nonetheless have held that individualized issues concerning consent preclude class certification.[11]  Accordingly, if the Court concludes that Add Connections permission screens do not establish consent as a matter of law, Plaintiffs' class allegations should be stricken because individual issues on consent that will predominate and preclude class certification.

---

[11] *See, e.g., Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008) (holding that plaintiffs failed to provide a "sensible method of establishing consent or the lack thereof via class-wide proof" and "that [defendant] sent its fax advertisements in accordance with the same procedure is not necessarily determinative of whether class-wide proof is available to establish consent"); *Fields v. Mobile Messengers Am., Inc.*, 2013 WL 6073426, at *2, 4-5 (N.D. Cal. Nov. 18, 2013) (putative class subject to common "software platform" but holding that "individualized inquiries regarding consent" precluded certification); *Fraley*, 2013 WL 4516819, at *3 (N.D. Cal. Aug. 26, 2013) (Seeborg, J.) (in approving class settlement, noting "significant risk" that "class certification would prove unwarranted in light of consent issues" notwithstanding uniform Facebook policies).  Plaintiffs rely on *Harris v. comScore, Inc.*, 292 F.R.D. 579 (N.D. Ill. 2013); Opp. at 35, but there was no allegation in that case that the terms of the "form contract" at issue were ambiguous or unclear, necessitating the introduction of individualized extrinsic evidence. Indeed, the court there even noted that if it "finds it necessary to evaluate whether individual plaintiffs engaged in behavior subjecting them to [defendant's] unauthorized collection of their information, the court may reevaluate its class certification decision."  *Id.* at 586 n.4.

DATED:  January 31, 2014                      MUNGER, TOLLES & OLSON LLP
                                                            JEROME C. ROTH
                                                            ROSEMARIE T. RING
                                                            JONATHAN H. BLAVIN
                                                            WILLIAM J. EDELMAN


                                              By:        _/s/ Jerome C. Roth_____
                                                            JEROME C. ROTH
                                              Attorney for Defendant
                                              LINKEDIN CORPORATION

-21-