UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PAUL PERKINS et al., | Case No.: 13-CV-04303-LHK |
| Plaintiffs, | ORDER GRANTING IN PART AND |
| v. | DENYING IN PART DEFENDANT'S |
| LINKEDIN CORPORATION, | MOTION TO DISMISS |
| Defendant. | |

Paul Perkins ("Perkins"), Pennie Sempell ("Sempell"), Ann Brandwein ("Brandwein"), Erin Eggers ("Eggers"), Clare Connaughton ("Connaughton"), Nicole Crosby ("Crosby"), Jake Kushner ("Kushner"), Natalie Richstone ("Richstone"), and Leslie Wall ("Wall"), on behalf of themselves and a putative class (collectively, "Plaintiffs"), bring the instant action against LinkedIn Corporation ("Defendant" or "LinkedIn").  *See* ECF No. 55, Second Amended Class Action Complaint ("SAC").  Plaintiffs allege that Defendant, the operator of a popular social networking website, harvested email addresses from Plaintiffs' contact lists and email history, including the email addresses of every person that has ever emailed Plaintiffs, been emailed by Plaintiffs, or been carbon copied on emails to or from Plaintiffs.  *Id.* ¶ 1.  According to Plaintiffs, Defendant violated several California laws by sending, without Plaintiffs' knowledge or consent, up to two messages to those harvested email addresses reminding the recipients to join LinkedIn.  *Id.* ¶¶ 6, 9-11, 92-93.  These reminder emails, Plaintiffs allege, used Plaintiffs' names and likenesses to personally endorse LinkedIn's services for the commercial benefit of LinkedIn and to the detriment of Plaintiffs.  *Id.* ¶¶ 83-86, 92-93, 104-05.

1

United States District Court
For the Northern District of California

1    Before the Court is Defendant's Motion to Dismiss the SAC.  ECF No. 60 ("Mot.").

2   Plaintiffs opposed the motion, ECF No. 65 ("Opp."), and Defendant replied, ECF No. 66

3   ("Reply").  Having considered the submissions of the parties, the applicable law, and the record in

4   this case, the Court GRANTS in part and DENIES in part Defendant's Motion to Dismiss.

5   **I.      BACKGROUND**

6          **A.      Factual Allegations**

7          LinkedIn is a social networking website geared toward professional networking with more

8   than 200 million users.  SAC ¶ 42.  LinkedIn members, who maintain résumé-like online profiles,

9   utilize the website to view each other's profiles and to exchange messages.  LinkedIn is a for-profit

10  entity, generating revenue primarily through three avenues: "Talent Solutions," "Marketing

11  Solutions," and the sale of "Premium Subscriptions."  *Id.*  Talent Solutions refer to the variety of

12  products LinkedIn offers that allow employers and recruiters to quickly search for and contact

13  prospective employees.  *Id.*  Marketing Solutions consist of advertising to LinkedIn users by

14  placing advertisements on the website.  *Id.*  Premium Subscriptions are sold directly to individuals

15  or businesses that want to conduct advanced searching on LinkedIn's website, enhance their

16  professional identities, and contact other members.  *Id.*  LinkedIn seeks to grow its membership

17  because the success of these three revenue streams is directly related to the number of registered

18  LinkedIn users.  *See id.*

19         At this stage, the instant case centers on LinkedIn's practice of sending reminder messages

20  to email addresses that have been harvested from LinkedIn members.  SAC ¶¶ 1, 9.  LinkedIn

21  collects these email addresses in two ways: during the sign up process for new users and through

22  the "Add Connections" feature for existing users.  *Id.* ¶¶ 44-59, 68-70.  Plaintiffs are nine

23  professionals who seek to represent a nationwide class of LinkedIn users.  *Id.* ¶ 22.  Plaintiffs

24  allege that during the sign up process LinkedIn harvested the email addresses of Plaintiffs' contacts

25  as well as the email addresses of every person who has either emailed Plaintiffs, been emailed by

26  Plaintiffs, or who has been carbon copied on an email to or from Plaintiffs.  *Id.* ¶¶ 1, 63.  LinkedIn

27  then sent an initial message (the "initial invitation email") to those harvested email addresses,

28  purportedly on behalf of the LinkedIn user, inviting the recipient to join LinkedIn.  *Id.* ¶ 71.  If

United States District Court

For the Northern District of California

1  after one week the invitee had not joined, LinkedIn would send a second email (the "first reminder

2  email") reminding the invitee of the outstanding invitation. *Id.* ¶ 72.  If after another week the

3  invitee still had not joined, LinkedIn would send a third and final email (the "second reminder

4  email") encouraging the invitee to do so.  *Id.*[1]  LinkedIn sent these reminder emails, Plaintiffs

5  allege, without Plaintiffs' knowledge or consent.  *Id.* ¶¶ 10-11, 92-93.  Against that backdrop, the

6  Court now details the sign up, invitation, and reminder processes more fully.

7  **1.      LinkedIn Sign Up Process**

8       When a new user signs up for LinkedIn, the website prompts her to provide her first name,

9  last name, email address, and a password.  SAC ¶ 45 fig.1 (pictured below).  Underneath the

10  prompts for this information is a button titled "Join LinkedIn," adjacent to which is a small

11  asterisk.  *Id.*  The asterisk directs the user to a line at the bottom of a page that states: "By joining

12  LinkedIn, you agree to LinkedIn's User Agreement, Privacy Policy, and Cookie Policy."  *Id.* ¶ 45.

13  A new user can only view the terms of service by scrolling down the page and clicking on a link

14  beneath the "Join LinkedIn" button, which then takes the user to a separate screen.  *Id.*

26  [1] To be clear, the "first reminder email" is the second overall email sent by LinkedIn to the invitee—the "initial invitation email" being the first.  Likewise, the "second reminder email" is the third and final email the invitee receives from LinkedIn.  Per the Court's prior ruling, only the two "reminder emails" remain at issue in this case.  ECF No. 47, Order Granting in Part and Denying in Part Defendant's Motion to Dismiss with Leave to Amend ("First MTD Order") at 30-32.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**Figure 1**



Once a new user enters the prompted information and clicks the "Join LinkedIn" button, she is directed to a second page, which states "let's start creating your professional profile."  SAC ¶ 48 fig.2 (pictured below).  This page asks the user to provide LinkedIn with her country of residence, ZIP code, employment status, job title, and industry.  *Id.*  Below these fields is a button titled "Create my profile."  *Id.*

**Figure 2**

A new user who clicks the "Create my profile" button is next directed to a page that states "Grow your network on LinkedIn." SAC ¶ 50 fig.3 (pictured below).  On this page, the user is told to "Get started by adding your email address," under which the field for "Your email" is pre-populated with the user's email address, *id.*, which the user already provided to LinkedIn on the

4

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

first screen, *see supra* Figure 1.  The "Grow your network on LinkedIn" page contains a button titled "Continue" under the pre-populated email field.  SAC ¶ 50 fig.3.  Importantly, under the "Continue" button is a statement that reads: "We will not store your password or email anyone without your permission."  *Id.*  According to the SAC, each of the nine named Plaintiffs "read and relied on" this representation, believing as a result that they "did not grant LinkedIn the right to send multiple follow-up emails" on their behalf.  *Id.* ¶¶ 24, 26, 28, 30, 32, 34, 36, 38, 40.  Further, under that statement is an option for new users to "Skip this step."  *Id.* ¶ 50 fig.3.

**Figure 3**



A new user who clicks "Continue" and who signed up with LinkedIn using an email address from Google's Gmail system is led to a screen from Google Accounts.[2]  SAC ¶ 51 fig.4 (pictured below).  This page states that "Linkedin.com is asking for some information from your Google Account" and then lists the user's email address.  *Id.*  The page also displays two bullet points.  The first bullet point states "Email address" and contains the email address of the user.  *Id.* The second bullet point states "Google Contacts."  *Id.*  The user then has the option of selecting the "Allow" or "No thanks" button.  *Id.*

---

[2] Plaintiffs Perkins, Sempell, Brandwein, and Eggers claim to have registered with LinkedIn using Gmail accounts.  SAC ¶¶ 23, 25, 27, 29.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**Figure 4**



A new user who clicks "Continue" on the "Grow your network on LinkedIn" page and who signed up with LinkedIn using a Yahoo! email address is led to a screen from Yahoo! Mail.[3]  SAC ¶ 52 fig.5 (pictured below).  This page prompts the user to "Click 'Agree' to sign in to www.linkedin.com using your Yahoo ID and allow sharing of Yahoo info."  *Id.*  The page also tells the user that she is "sharing" her Yahoo! email address and "authorizing access to: Yahoo! Contacts."  *Id.*  The user may then click on the "Agree" button to grant LinkedIn access.  *Id.*

**Figure 5**



---

[3] Plaintiff Wall claims to have registered with LinkedIn using a Yahoo! email account. SAC ¶ 39.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

1    A new user who clicks "Continue" on the "Grow your network on LinkedIn" page and who

2 signed up with LinkedIn using a Microsoft email address is led to a Microsoft accounts screen.[4]

3 SAC ¶ 53 fig.6 (pictured below).  This page asks the user, "Let this app access your info?"  *Id.*  The

4 page states that "LinkedIn needs your permission to: View your profile info and contact list,"

5 informing the user that "LinkedIn will be able to see your profile info, including your name,

6 gender, display picture, contacts, and friends."  *Id.*  The page also says that LinkedIn needs the

7 user's permission to "Access email addresses," meaning that "LinkedIn will have access to your

8 and your contacts' email addresses."  *Id.*  The user then has the option of selecting the "Yes" or

9 "No" button.  *Id.*

**Figure 6**



21    A new user who clicks "Continue" on the "Grow your network on LinkedIn" page and who

22 signed up with LinkedIn using an AOL email address is led to an AOL Sign In screen.[5]  SAC ¶ 54

23 fig.7 (pictured below).  This page prompts the user to "Sign In," informing her that she is

24 "currently signed in as [Member Name]."  *Id.*  Unlike the previous email provider screens, the

---

[4] None of the named Plaintiffs claim to have registered with LinkedIn using a Microsoft
email account, but the putative class covers LinkedIn users who signed up using any email address,
including Microsoft accounts.  SAC ¶ 43.

[5] Plaintiffs Connaughton, Crosby, and Richstone claim to have registered with LinkedIn
using AOL email accounts.  SAC ¶¶ 31, 33, 37.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

1   AOL screen provides no explicit indication that LinkedIn will be accessing the user's email address

2   or contacts.[6]  The user may then click the "Continue" button to proceed.  *Id.*

**Figure 7**



16   Once LinkedIn has obtained access to a new user's email address and contacts, the user is

17   led to a screen titled "Connect with people you know on LinkedIn."  ECF No. 18-2, Ex. F (pictured

18   below as Figure 8).[7]  This page contains a list of the user's contacts who are already on LinkedIn

19   described as "people you know on LinkedIn."  *Id.*  LinkedIn provides this list by matching the

20   user's contacts' email addresses, which LinkedIn has harvested from the user's email account,

21   against LinkedIn's own membership database, which contains email addresses of existing LinkedIn

22   members.  The page contains images and job titles of email contacts of the user who have a

23   LinkedIn account, with check boxes next to their names.  *Id.*  The boxes are all checked by default.

24   *Id.*  The user may then choose between two options: "Add Connection(s)" or "Skip this step."  *Id.*

---

[6] Further, a new user who clicks "Continue" on the "Grow your network on LinkedIn" page and who signed up with LinkedIn using an Apple Mail account, such as Plaintiff Kushner, will not be led to a popup screen at all.  SAC ¶¶ 35, 55.

[7] A screenshot of this page does not appear in the SAC.  In its prior motion to dismiss order, however, the Court took judicial notice of a screenshot showing the page.  First MTD Order at 15 (citing *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)).

8

**Figure 8**



Next, the new user is directed to a page titled "Why not invite some people?"[8]  SAC ¶ 59

fig.8 (pictured below as Figure 9).  Beneath the heading on this page is the following statement:

"Stay in touch with your contacts who aren't on LinkedIn yet.  Invite them to connect with you."

*Id.*  Below that statement is a list of the user's email contacts (names and email addresses) who are

not already registered on LinkedIn.  *Id.*  There is a checkbox next to each, and the "Select All" box

is checked by default.  *Id.*  While only the first ten contacts appear, there is a scroll bar to the right,

signifying that additional entries can be found by scrolling down.  *Id.*  Furthermore, next to the

"Select All" box is a statement indicating the total number of contacts that have been selected.  *Id.*

The screenshot in the SAC, for example, reads "1132 Selected."  *Id.*  At the bottom of the page, the

user may choose between two options: "Add to Network" or "Skip this step."  *Id.*

---

[8] In the SAC, Plaintiffs allege that signing up for LinkedIn in the first instance is not the only way that users are led to this page.  Indeed, *existing* LinkedIn users are greeted on the LinkedIn homepage by a link that states "See Who You Already Know on LinkedIn."  SAC ¶ 68 fig.9.  Under that title is a screen that allows the current user to input her email address.  Like for new registrants, this field is pre-populated with the email address affiliated with the existing user's LinkedIn account.  If the user clicks the "Continue" button under the email address, she is directed to the "Why not invite some people?" page.  *Id.* ¶ 70.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

United States District Court
For the Northern District of California

**Figure 9**



If a user chooses the "Add to Network" option, LinkedIn sends the initial invitation email to all of the email addresses affiliated with the checked boxes.  SAC ¶ 71.  These emails, which Plaintiffs label "endorsement emails,"[9] come from the user's name via LinkedIn and contain the following text: "I'd like to add you to my professional network."  *See* ECF No. 63-2, Ex. A (pictured below as Figure 10).[10]  This text is followed by a signature line that contains the LinkedIn user's name.  *Id.*  Beneath the signature line is a button that says "Confirm that you know [LinkedIn user]," which the recipient can click to accept the user's invitation and begin the process of joining LinkedIn.  *Id.*

---

[9] The Court has already ruled that "the terms 'invitation emails' and 'endorsement emails'" are "synonymous" for purposes of this case, and that the Court will use them "interchangeably." First MTD Order at 29.  The Court will also use "reminder emails" interchangeably because these emails endorse LinkedIn as much as the initial invitation email.

[10] Figure 10 does not appear in the SAC.  However, Plaintiffs request judicial notice of a screenshot showing the initial invitation email, which the Court grants for the reasons stated in Part III, *infra.*

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

1

**Figure 10**

2



10

11

**2.      LinkedIn Reminder Emails**

12

If one week after receiving the initial invitation email, the recipient has not joined LinkedIn,

13

LinkedIn sends the first reminder email encouraging the recipient to join.  SAC ¶ 72.  At the top,

14

the first reminder email is titled "Reminder about your invitation from [LinkedIn user]."  *See* ECF

15

No. 63-2, Ex. A (pictured below as Figure 11).[11]  Under the LinkedIn logo, the email continues:

16

"This is a reminder that on [date of initial email], [LinkedIn user] sent you an invitation to become

17

part of their professional network at LinkedIn."  *Id.*  If the recipient, after receiving this reminder,

18

desires to accept the user's invitation and join LinkedIn, he may do so by clicking the button titled

19

"Accept [LinkedIn user's] invitation."  *Id.*  Beneath that button, LinkedIn republishes the initial

20

invitation email.  *Id.*  According to Plaintiffs, these first reminder emails were sent by Defendant

21

without Plaintiffs' consent.  SAC ¶¶ 61, 67, 71, 92.

22

23

24

25

26

27

_____

[11] Figure 11 does not appear in the SAC.  However, Plaintiffs request judicial notice of a
screenshot showing the first reminder email, which the Court grants for the reasons stated in Part
III, *infra*.

28

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**United States District Court**
For the Northern District of California

**Figure 11**



If after a second week, the recipient of the prior endorsement emails still has not joined LinkedIn, LinkedIn sends the second reminder email encouraging the recipient to do so.  SAC ¶ 72.  At the top, the second reminder email is titled "[LinkedIn user's] invitation is awaiting your response."  *See* ECF No. 63-2, Ex. A (pictured below as Figure 12).[12]  Under the LinkedIn logo, the email continues: "[LinkedIn user] would like to connect on LinkedIn.  How would you like to respond?"  *Id.*  Unlike the initial invitation email or the first reminder email, the second reminder email may include a photograph of the LinkedIn user—namely, her LinkedIn profile picture if she has uploaded one—to the left of the user's name.  *Id.* (empty box in Figure 12).  If the recipient, after receiving this final reminder, desires to accept the user's invitation and join LinkedIn, he may do so by clicking the button titled "Confirm you know [LinkedIn user]."  *Id.*  This time, LinkedIn does not republish the initial invitation email below the button.  According to Plaintiffs, these second reminder emails were sent by Defendant without Plaintiffs' consent.  SAC ¶¶ 61, 67, 71, 92.

---

[12] Figure 12 does not appear in the SAC.  However, Plaintiffs request judicial notice of a screenshot showing the second reminder email, which the Court grants for the reasons stated in Part III, *infra*.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

1
2
3
4
5
6
7
8
9
10

**United States District Court**
For the Northern District of California

**Figure 12**



11     Plaintiffs allege that "[e]ach of the reminder emails contain the LinkedIn member's name

12 and likeness so as to give the recipient the impression that the LinkedIn member is endorsing

13 LinkedIn and asking the recipient to join LinkedIn's social network." SAC ¶ 67. As indicated

14 above, however, the judicially noticed screenshots reveal that only a user's name—not her

15 likeness—appears in the first reminder email. *See supra* Figure 11. By contrast, in the second

16 reminder email, a user's name appears along with her likeness, so long as the user has previously

17 uploaded a profile picture to her LinkedIn account. *See supra* Figure 12.

18     Plaintiffs allege further that once the invitation process has been set into motion, it is

19 virtually impossible for users to stop Defendant from sending the reminder emails. SAC ¶¶ 61, 75-

20 77. Specifically, Plaintiffs claim: "The only way LinkedIn users could stop the two follow-up

21 endorsement emails (assuming the user found out about the initial emails in the first place) from

22 going out would be to individually open up each invitation from within his or her LinkedIn account

23 (which LinkedIn has intentionally made difficult to find within the user's account) and click a

24 button that allows the user to withdraw that single invitation." *Id.* ¶ 76. LinkedIn offers no

25 mechanism, Plaintiffs allege, by which users can withdraw all reminder emails at once. *Id.* ¶ 77.

26 Plaintiffs claim that it would take hours to prevent LinkedIn from sending the reminder emails to

27 the hundreds or thousands of contacts a user may have. *Id.* ¶ 76. Plaintiffs allege further that

28

13

LinkedIn does not take prompt remedial action when users have contacted LinkedIn to try and stop the reminder emails from being sent.  *Id.* ¶ 77.

In addition, plaintiffs allege that Defendant's sending of reminder emails to addresses harvested from LinkedIn users is contrary to several of Defendant's own policies.  SAC ¶¶ 46, 73-74.  In particular, Plaintiffs highlight the following:

- LinkedIn's statement on the "Grow your network on LinkedIn" screen: "We will not store your password *or email anyone without your permission*."  *See supra* Figure 3 (emphasis added).

- LinkedIn's statements on official blog postings:
  - "Ensuring more privacy and control over your personal data remains our highest priority."  *Id.* ¶ 73.
  - "Ensuring you more clarity, consistency and control over your personal data continues to be our highest priority."  *Id.*
  - "We take spam very seriously."  *Id.*

- An official LinkedIn blog post titled "How to report abusive behavior on LinkedIn," in which LinkedIn states that examples of abusive behavior in violation of LinkedIn's terms of service include "not using a real name/person as the profile owner, falsifying info, creating fake profiles, trying to use someone else's account, *massively inviting people they don't know*, and using the data in a way not authorized or intended by LinkedIn's Terms of Service.  This behavior, though infrequent, strikes at the very root of a trusted professional network.  We take these violations very seriously and will not tolerate this behavior."  *Id.* (emphasis added).[13]

- Three sentences from LinkedIn's Privacy Policy:
  - "[T]he amount and type of information you decide to share, and with whom you share it, is up to you."  *Id.* ¶ 46.
  - "You decide how much or how little you wish to communicate to individuals or groups."  *Id.*
  - "We do not rent, sell, or otherwise provide your personally identifiable information to third parties without your consent unless compelled by law."  *Id.* ¶ 74.

Plaintiffs also point to a number of user postings on LinkedIn's Help Center pages complaining about Defendant sending reminder emails.  SAC ¶¶ 50, 57, 62, 67, 75, 77, 90.  These postings, Plaintiffs contend, prove that LinkedIn knew about the harm caused by its practice of sending reminder emails to prospective users but nevertheless took no action.  *Id.* ¶¶ 57-58.  For example, on one message board thread an upset user wrote: "at this point I'm finding LinkedIn

---

[13] Plaintiffs selectively quote this blog post in the SAC, but the Court took judicial notice of the entire document, which is available at http://blog.linkedin.com/2009/03/27/how-to-report-abusive-behavior-on-linkedin/, in its prior motion to dismiss order.  *See* First MTD Order at 9 & n.5.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

1    more of a problem in terms of hurting my reputation rather than helping it.  What's more the

2    invitations are NOT people in my address book.  They are people I don't know.  I find this entire

3    issue extremely unprofessional on LI's part.  You would think with all these members with the

4    same problem LI would respond with a fix."  *Id.* ¶ 77.  Another angry user wrote: "There is a

5    specific group of people whom I absolutely must avoid for ethical reasons.  This feature has sent

6    out invitations on its own initiative twice, and my first notice each time was that one of these

7    people 'accepted' my invitations.  Terrible."  *Id.* ¶ 62.

8         Finally, Plaintiffs advance a number of theories regarding how LinkedIn's sending of

9    reminder emails injured Plaintiffs.  First, Plaintiffs allege that the reminder emails are valuable to

10   LinkedIn.  SAC ¶ 85.  Specifically, Plaintiffs note that attracting new members is integral to the

11   business model of LinkedIn, which actively advertises its size, and that reminder emails containing

12   personalized endorsements of LinkedIn are a critical component of attracting these new members.

13   *Id.* ¶¶ 83-85.  Plaintiffs quote Josh Elman ("Elman"), LinkedIn's former head of growth, who has

14   said: "[I]t took several emails to a person before they would actually sign up for LinkedIn.  It

15   would average about 3.2 in the early days."  *Id.* ¶ 16.  According to Elman, "That number 3.2 was

16   actually really really important that's how many emails you need to get before you sign up and so

17   we kept the email importer and it still works."  *Id.* ¶ 17.  Absent these reminder emails, Plaintiffs

18   suggest, LinkedIn would have to pay for email addresses to advertise and promote LinkedIn's

19   services.  *Id.* ¶¶ 86, 89.  Second, Plaintiffs allege that, in certain instances, LinkedIn charges its

20   existing users a $10.00 fee to send reminders via LinkedIn's internal messaging system (known as

21   "InMail") to other LinkedIn users to whom the sender wants to connect but is not already

22   connected.  *Id.* ¶ 87.  Relying on this fact, Plaintiffs claim that "LinkedIn acknowledges the value

23   of sending multiple reminder emails."  *Id.*  Third, Plaintiffs note that the increased membership

24   resulting from the reminder emails further benefits LinkedIn by expanding the audience to which

25   LinkedIn can market its Premium Subscriptions, which cost between $39.95 and $49.95 per month.

26   *Id.* ¶ 88.

27        **B.    Procedural History**

28

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

On September 17, 2013, Plaintiffs filed a class action complaint, *see* ECF No. 1, which Plaintiffs amended on October 2, 2013, *see* ECF No. 7, First Amended Complaint ("FAC"). The FAC contained five causes of action: (1) violation of California's common law right of publicity; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; (3) violation of the federal Stored Communications Act ("SCA"), 18 U.S.C. § 2701; (4) violation of the federal Wiretap Act, 18 U.S.C. § 2511; and (5) violation of California's Comprehensive Data Access and Fraud Act ("section 502"), Cal. Penal Code § 502. FAC ¶¶ 88-138.

On December 6, 2013, Defendant moved to dismiss the FAC. ECF No. 17. Plaintiffs opposed the motion on January 13, 2014, ECF No. 24, and Defendant replied on January 31, 2014, ECF No. 30. The Court held a motion hearing on April 10, 2014. *See* ECF No. 39.

On June 12, 2014, the Court granted in part and denied in part Defendant's motion to dismiss with leave to amend. First MTD Order at 39. The Court began by denying Defendant's motion to dismiss for want of Article III standing, finding that Plaintiffs had "adequately alleged" injury-in-fact, causation, and redressability "with respect to all of their causes of action." *Id.* at 23. As to Plaintiffs' federal claims, the Court granted Defendant's motion, dismissing Plaintiffs' claims under the SCA and the Wiretap Act. *Id.* at 23-27. The Court granted in part and denied in part Defendant's motion as to Plaintiffs' state law claims. Concerning the common law right of publicity cause of action, the Court held that Plaintiffs had consented to Defendant's sending of the initial invitation email, but that Plaintiffs plausibly alleged that they had not consented to the first and second reminder emails. *Id.* at 28-32. Accordingly, the Court granted Defendant's motion as to the initial invitation email but denied the motion as to the subsequent reminder emails. *Id.* at 32. Next, the Court granted Defendant's motion on the section 502 claim, concluding that "Plaintiffs have not adequately alleged that Defendant breaches a technical or code-based barrier." *Id.* at 35. Concerning Plaintiffs' UCL claims, the Court granted Defendant's motion as to Plaintiffs' "misrepresentation-based UCL claims" because "Plaintiffs have not alleged that they read any of LinkedIn's purported misrepresentations." *Id.* at 36-37. However, the Court denied Defendant's motion as to Plaintiffs' "unlawful prong [UCL] claim to the extent that the claim is premised on

16

1    LinkedIn's invasion of Plaintiffs' common law right of publicity when LinkedIn sends the

2    [reminder] emails." *Id.* at 37.

3         Plaintiffs filed another amended complaint on August 28, 2014. *See* SAC. In the SAC,

4    Plaintiffs now allege just three state law causes of action: (1) violation of California's common law

5    right of publicity; (2) violation of California's statutory right of publicity ("section 3344"), Cal.

6    Civ. Code § 3344; and (3) violation of California's UCL. As required by the Court, *see* First MTD

7    Order at 39, Plaintiffs obtained Defendant's consent to add the section 3344 cause of action, ECF

8    No. 56 at 2-3. With Plaintiffs electing not to renew any of their federal claims, the Court's basis

9    for jurisdiction is the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). SAC ¶ 20.[14]

10   Unlike in their FAC, Plaintiffs now allege that they each "read and relied on" some of Defendant's

11   alleged misrepresentations. *Id.* ¶¶ 24, 26, 28, 30, 32, 34, 36, 38, 40.

12        In response to the SAC, Defendant filed the instant Motion to Dismiss on September 18,

13   2014. Mot. at 26. In its motion, Defendant asks the Court to dismiss the entire SAC with prejudice

14   or, in the alternative, to dismiss Plaintiffs' request for minimum statutory damages under section

15   3344. *Id.* at 1. At the same time, Defendant also filed a request for judicial notice. ECF No. 61.

16   Plaintiffs opposed the Motion to Dismiss on October 9, 2014. ECF No. 63. That same day,

17   Plaintiffs filed their own request for judicial notice, ECF No. 64, and an objection to Defendant's

18   judicial notice request, ECF No. 62. On October 13, 2014, Plaintiffs filed a corrected Opposition.

19   Opp. at 26.[15] Defendant replied on October 23, 2014, Reply at 16, and filed a supplemental

20   judicial notice request that same day, ECF No. 67.

21   **II.    LEGAL STANDARDS**

22   _____

23        [14] In addition to relying on CAFA as a basis for this Court's subject matter jurisdiction,
     Plaintiffs erroneously assert jurisdiction under "28 U.S.C. § 1331," the federal question statute.
24   SAC ¶ 20. The Court assumes this assertion is a typographical error because Plaintiffs no longer
     allege any claims arising under federal law. Accordingly, the Court sua sponte STRIKES reference
25   to § 1331 in the SAC. *See* Fed. R. Civ. P. 12(f)(1) (permitting the Court "on its own" to "strike
     from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter").
26        [15] In its Reply, Defendant protests that Plaintiffs' corrected Opposition "contains several
     substantive additions." Reply at 2 n.1; *see also* ECF No. 66-1, Declaration of Rosemarie T. Ring
27   ¶¶ 3-5. Defendant, however, has not moved to strike Plaintiffs' corrected Opposition or otherwise
     requested that the Court take any action to address this matter. The Court declines to do so sua
28   sponte.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

*United States District Court*
For the Northern District of California

### A.    Motion to Dismiss under Rule 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Supreme Court has held that Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995).  Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### B.    Requests for Judicial Notice

The Court generally may not look beyond the four corners of a complaint in ruling on a Rule 12(b)(6) motion, with the exception of documents incorporated into the complaint by reference, and any relevant matters subject to judicial notice.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001).  Under the

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

doctrine of incorporation by reference, the Court may consider on a Rule 12(b)(6) motion not only documents attached to the complaint, but also documents whose contents are alleged therein, provided the complaint "necessarily relies" on the documents or contents thereof, the document's authenticity is uncontested, and the document's relevance is uncontested. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *accord Lee*, 250 F.3d at 688-89. The purpose of this rule is to "prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting documents upon which their claims are based." *Swartz*, 476 F.3d at 763 (alterations and internal quotation marks omitted).

The Court also may take judicial notice of matters that are either (1) generally known within the trial court's territorial jurisdiction or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Proper subjects of judicial notice when ruling on a motion to dismiss include legislative history reports, *see Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012); court documents already in the public record and documents filed in other courts, *see Holder v. Holder*, 305 F.3d 854, 866 (9th Cir. 2002); and publicly accessible websites, *see Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).

## C.      Leave to Amend

If the Court determines that the complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the

United States District Court
For the Northern District of California

1    moving party has acted in bad faith.  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532

2    (9th Cir. 2008).

3    **III.      REQUESTS FOR JUDICIAL NOTICE**

4            In connection with the instant Motion to Dismiss, Defendant requests that the Court take

5    judicial notice of a screenshot of a first reminder email sent by LinkedIn.  ECF No. 61 at 1.

6    Plaintiffs opposed Defendant's request, arguing that the screenshot Defendant provided was

7    "inauthentic."  ECF No. 62 at 2.  Plaintiffs also filed their own request for the Court to take judicial

8    notice of the following: (1) a California Assembly Committee on Judiciary document analyzing

9    Assembly Bill 826 ("AB 826"), enacted later as section 3344; (2) a California Senate Committee

10   on Judiciary document describing AB 826; (3) an official press release from Assemblyman John

11   Vasconcellos ("Vasconcellos") regarding AB 826; (4) a letter from Vasconcellos to Governor

12   Ronald Reagan regarding AB 826; and (5) screenshots of an initial invitation email, first reminder

13   email, and second reminder email.  ECF No. 64 at 1.  Defendant filed a supplemental request

14   asking the Court to take judicial notice of the legislative drafting history of AB 826.  ECF No. 67 at

15   1.

16           The Court DENIES Defendant's request for judicial notice of the screenshot of the first

17   reminder email.  Plaintiffs dispute the screenshot's authenticity, ECF No. 62 at 1-2, so the Court

18   cannot conclude that the screenshot is a document "whose accuracy cannot reasonably be

19   questioned," Fed. R. Evid. 201(b).  The Court GRANTS Plaintiffs' unopposed request for judicial

20   notice of the screenshots of an initial invitation email, first reminder email, and second reminder

21   email.  Defendant does not dispute the accuracy or relevancy of these screenshots, *see* Reply at 8

22   n.8, and the SAC "necessarily relies" on them, *Coto*, 593 F.3d at 1038.  The Court GRANTS

23   Defendant's supplemental request for judicial notice of AB 826's drafting history and GRANTS

24   Plaintiffs' request for judicial notice of the California Assembly and Senate Judiciary Committees'

25   documents analyzing AB 826, as well as Vasconcellos' official press release and letter to Governor

26   Reagan.  *See Anderson*, 673 F.3d at 1094 n.1 ("Legislative history is properly a subject of judicial

27   notice."); *Montantes v. Inventure Foods*, No. CV-14-1128-MWF RZX, 2014 WL 3305578, at *1

28

20

1    (C.D. Cal. July 2, 2014) (taking judicial notice of California assemblyman's press release and letter

2    to Governor Reagan).

3    **IV.    MOTION TO DISMISS**

4            Defendant moves to dismiss the SAC on several bases.  First, Defendant argues that the

5    Court should dismiss Plaintiffs' request for minimum statutory damages under section 3344,

6    California's right of publicity statute, because Plaintiffs have failed to allege any "mental harm"

7    arising out of Defendant's alleged conduct.  Mot. at 6-10.  Second, Defendant contends that all of

8    Plaintiffs' claims are barred by the Communications Decency Act ("CDA"), 47 U.S.C. § 230,

9    which provides immunity to "interactive computer services" from tort liability arising out of their

10   publishing third-party content.  Mot. at 10-19.  Third, Defendant argues that the First Amendment

11   bars all of Plaintiffs' claims because the reminder emails implicate the public interest and are thus

12   noncommercial in nature, or, if they are commercial, because the emails publicize protected

13   speech.  Mot. at 19-24.  Finally, Defendant argues that all of Plaintiffs' claims should be dismissed

14   because any use of Plaintiffs' names and likenesses in the reminder emails was "incidental" and

15   therefore not actionable under California law.  Mot. at 24-25.  The Court addresses each argument

16   in turn.

17       **A.    Minimum Statutory Damages Under Section 3344**

18           California's statutory right of publicity "complement[s]" the common law right of publicity

19   but "neither replaces nor codifies the common law cause of action."  *Newcombe v. Adolf Coors*

20   *Co.*, 157 F.3d 686, 691-92 (9th Cir. 1998).  The statute provides, in relevant part: "Any person who

21   knowingly uses another's name, voice, signature, photograph, or likeness, in any manner . . . for

22   purposes of advertising or selling . . . , without such person's prior consent, . . . shall be liable for

23   any damages sustained by the person."  Cal. Civ. Code § 3344(a).  To state a claim under section

24   3344, a plaintiff must first allege the elements of the common law right: "(1) the defendant's use of

25   the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's

26   advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury."  *Downing v.*

27   *Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001).  In addition, section 3344 requires a

28   plaintiff to allege (5) "a knowing use by the defendant"; and (6) "a direct connection between the

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**United States District Court**
For the Northern District of California

1    alleged use and the commercial purpose." *Id.* When section 3344 has been violated, a plaintiff

2    may recover "in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual

3    damages suffered by him or her as a result of the unauthorized use." Cal. Civ. Code § 3344(a).

4        Plaintiffs here do not claim "actual damages" under section 3344; Plaintiffs assert only that

5    they are entitled to minimum statutory damages "in the amount of $750 per LinkedIn member."

6    SAC ¶ 143. Defendant argues that Plaintiffs seek this remedy solely on the basis of economic

7    injury. Mot. at 9-10. As a result, Defendant contends, "Plaintiffs' claim for minimum statutory

8    damages should be dismissed because Section 3344's statutory damages provision applies only to

9    claims for mental harm, which Plaintiffs do not allege." *Id.* at 6.

10       The Court agrees. The text of section 3344, it is true, contains no express requirement that

11   a plaintiff plead mental harm in order to claim the minimum statutory damages figure. A

12   California Court of Appeal, however, has inferred such a requirement from section 3344's

13   legislative history. *See Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988 (2008). This

14   Court should follow *Miller*'s interpretation of a California statute absent convincing evidence "that

15   the California Supreme Court would reject it." *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214,

16   219 (9th Cir. 2013); *see also In re Watts*, 298 F.3d 1077, 1082 (9th Cir. 2002) (explaining that

17   federal courts "are bound to follow [California intermediate appellate courts] absent convincing

18   evidence that the California Supreme Court would reject the[ir] interpretation of [a state statute]").

19       In *Miller*, an authenticator of memorabilia sued his former employer for knowingly issuing,

20   without his consent, certificates of authenticity bearing his name. *See* 159 Cal. App. 4th at 991.

21   As a result, Miller sought minimum statutory damages under section 3344. *Id.* After reviewing the

22   statute's legislative history, the court in *Miller* concluded that by enacting section 3344's provision

23   for minimum statutory damages, "the Legislature provided a practical remedy for a non-celebrity

24   plaintiff whose damages are difficult to prove and who suffers primarily mental harm from the

25   commercial misappropriation of his or her name." 159 Cal. App. 4th at 1002. "To the extent

26   Miller suffered commercial loss," the court explained, "his recourse was to prove actual damages

27   like any other plaintiff whose name has commercial value." *Id.* at 1006. Relying on these

28   findings, the court held that "statutory minimum damages were meant to compensate non-celebrity

22

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

plaintiffs who suffer . . . mental anguish yet no discernible commercial loss." *Id.*  Contrary to

Plaintiffs' assertion, Opp. at 11, this holding was not dicta, *see, e.g.*, J. Thomas McCarthy, *1 Rights*

*of Publicity and Privacy* § 6:46 (2d ed.) (explaining that *Miller* "held that the statutory minimum

damages could not be recovered by a person as a measure of damages for injury to the commercial

value of his or her identity" because "the statutory minimum could be used only when a plaintiff

seeks damages for injury to mental feeling and peace of mind").[16]

In holding that minimum statutory damages under section 3344 were meant to compensate

for mental anguish, the court in *Miller* distinguished "injury to the character or reputation" from

"injury to the feelings" resulting from harm to one's reputation.  159 Cal. App. 4th at 1002.

Quoting from the statute's legislative history, the *Miller* court explained that section 3344's

minimum statutory damages remedy only compensates the latter injury:

> Unlike [an] action for defamation, "The gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community.  The right of privacy concerns one's own peace of mind, while the right of freedom from defamation concerns primarily one's reputation.  The injury is mental and subjective.  It impairs the mental peace and comfort of the person and may cause suffering much more acute than that caused by a bodily injury."

*Id.* (ellipses omitted) (quoting ECF No. 64-1, Assemb. Comm. on Judiciary Analysis of A.B. 826

("Assemb. Comm. Analysis"), Reg. Sess., at 1 (Cal. May 3, 1971)).  Minimum statutory damages,

thus, do not recompense mere reputational harm; rather, this remedy compensates for the effect any

such reputational harm might have on one's feelings or peace of mind.  *See id.* at 1008 (concluding

that the real injury to Miller was not to his reputation per se, but "*the worry and uncertainty*

*regarding his reputation*" (emphasis added)).

Plaintiffs have not provided convincing evidence that the California Supreme Court would

reject *Miller*'s interpretation of section 3344's minimum statutory damages provision.  *See Muniz*,

738 F.3d at 219.  Plaintiffs argue first that, as a textual matter, "[r]eading a mental harm

---

[16] *Miller* also held that the plaintiff was entitled to only $750 in statutory damages, rather than $750 for each certificate of authenticity bearing his name.  *Miller*, 159 Cal. App. 4th at 1008.  That holding is not at issue here, and the Court expresses no view on its correctness.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**United States District Court**
For the Northern District of California

1    requirement into Section 3344 would impermissibly import a limitation where none exists." Opp.

2    at 7. Nothing in the text, however, precludes *Miller*'s interpretation, and other courts have found

3    *Miller*'s statutory analysis to be perfectly proper. *See, e.g.*, *Starbucks Corp. v. Super. Ct.*, 168 Cal.

4    App. 4th 1436, 1450 (2008) (explaining that the court in *Miller*, "[a]pplying basic precepts of

5    statutory construction," determined that section 3344's "minimum statutory damages intended to

6    remedy the alleged injury to [a plaintiff's] mental feelings and peace of mind").

7          Plaintiffs assert next that section 3344's legislative history "directly contradicts LinkedIn's

8    argument that damages must be tied to mental anguish." Opp. at 9. The Court disagrees for two

9    reasons. First, Plaintiffs appear to have confused the availability of minimum statutory damages

10   under section 3344 with the availability of damages more generally under the statute. Defendant

11   does not argue, and *Miller* did not hold, that "damages must be tied to mental anguish." *Id.*

12   Instead, *Miller* concluded that the *minimum statutory damages* award of $750 must be tied to

13   mental anguish. *See* 159 Cal. App. 4th at 1006. A plaintiff alleging economic injury has every

14   right to seek "actual damages" under section 3344. *Id.*; *see* Cal. Civ. Code § 3344(a) (allowing

15   recovery for "actual damages").

16         Second, the legislative history of section 3344, on which *Miller* relied heavily, supports the

17   conclusion that minimum statutory damages were meant to compensate only for mental anguish.

18   *See* Assemb. Comm. Analysis at 1 (explaining that section 3344's minimum statutory damages

19   provision was intended to remedy "injury to the feelings" and to one's "peace of mind and

20   comfort" (quoting *Fairfield v. Am. Photocopy Equip. Co.*, 138 Cal. App. 2d 82, 86-87 (1955))).

21   Plaintiffs, in contrast, identify no piece of legislative history suggesting that section 3344's

22   minimum statutory damages remedy was aimed at compensating anything other than mental harm.

23   The documents Plaintiffs cite indicate only that section 3344 contemplates class action lawsuits,

24   *see* Opp. at 8 n.8, a proposition that Defendant does not dispute. The other authorities Plaintiffs

25   cite suggest that section 3344's minimum statutory damages remedy was in fact meant to solve the

26   "proof problems" associated with non-celebrity claims of "mental suffering." *Id.* at 8 n.9 (quoting

27   John R. Braatz, Note, White v. Samsung Electronics America*: The Ninth Circuit Turns A New*

28

1    *Letter in California Right of Publicity Law*, 15 Pace L. Rev. 161, 180 n.134 (1994)); *see Stilson v.*

2    *Reader's Digest Assn., Inc.*, 28 Cal. App. 3d 270, 274 (1972).[17]

3         Plaintiffs argue next that this Court in *Fraley v. Facebook* already "rejected LinkedIn's

4    argument that pleading economic injury is insufficient to sustain a claim for statutory damages

5    under Section 3344."  Opp. at 9 (citing *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal.

6    2011)).  Plaintiffs are mistaken.  In *Fraley*, the plaintiffs, as here, "allege[d] not that they suffered

7    mental anguish as a result of Defendant's actions, but rather that they suffered economic injury

8    because they were not compensated for Facebook's commercial use of their names and likenesses

9    in targeted advertisements to their Facebook Friends."  830 F. Supp. 2d at 806.  In holding that the

10   non-celebrity plaintiffs had sufficiently alleged that their names had "provable commercial value,"

11   *id.* at 810, this Court concluded: "Of course, at summary judgment or at trial, Plaintiffs may not

12   simply demand $750 in statutory damages in reliance on a bare allegation that their commercial

13   endorsement has provable value, but rather must 'prove actual damages like any other plaintiff

14   whose name has commercial value.'"  *Id.* at 809 (quoting *Miller*, 159 Cal. App. 4th at 1006).

15   Critically, the plaintiffs in *Fraley* had claimed *both* minimum statutory damages and actual

16   damages in their complaint.  *See* No. 11-1726, ECF No. 22 ¶ 118 (requesting "the greater of $750

17   per incident, or actual damages").[18]  For this reason, the Court, quoting *Miller*, determined that the

18   plaintiffs could not simply "demand $750 in statutory damages"; they would have to "prove actual

19   damages" at trial.  *Fraley*, 830 F. Supp. 2d at 809.  Plaintiffs here, by contrast, claim only the

20   minimum statutory damages award.  *See* SAC ¶ 143.  Without claiming actual damages, Plaintiffs

21   cannot state a claim under section 3344 based on economic harm alone.

22

23

24   [17] Plaintiffs' citations to *Lugosi v. Universal Pictures*, 603 P.2d 425 (Cal. 1979), and
     *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001), are also unavailing.

25   These cases suggest only that the statutory right of publicity is "economic in nature."  Opp. at 9.
     This is unsurprising because to succeed on a section 3344 claim, a plaintiff must prove "a direct

26   connection between the alleged use and the [defendant's] commercial purpose."  *Downing*, 265
     F.3d at 1001.  *Lugosi* and *Comedy III* say nothing, however, about whether section 3344's

27   provision for minimum statutory damages may compensate for economic injury.
          [18] The Court takes judicial notice of the complaint in *Fraley*.  *See Holder*, 305 F.3d at 866

28   (taking judicial notice of court documents in the public record).

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**United States District Court**
For the Northern District of California

Plaintiffs argue further that courts generally presume the injury requirement has been met so long as the other elements of a section 3344 cause of action have been satisfied.  Opp. at 10.  In *Del Amo v. Baccash*, No. CV 07-663-PSG, 2008 WL 4414514, at *6 (C.D. Cal. Sept. 16, 2008), for instance, the court concluded that a plaintiff seeking minimum statutory damages "need not demonstrate injury" so long as she has shown that the defendant, without her consent, knowingly used her identity to the direct commercial benefit of the defendant.  *Id.*  The Court does not read *Del Amo* to suggest that just because mental anguish may be difficult to prove, it need not even be alleged by plaintiffs seeking to recover minimum statutory damages under section 3344.  *See Cohen v. Facebook, Inc.* (*Cohen I*), 798 F. Supp. 2d 1090, 1097 (N.D. Cal. 2011) (concluding that to state a claim for minimum statutory damages under section 3344, "plaintiffs must, at a minimum, plead that they suffered mental anguish as a result of the alleged misappropriation, and a plausible supporting factual basis for any such assertion").  Nor could the Court read *Del Amo* to suggest in any way that a plaintiff alleging solely economic injury may avail herself of section 3344's minimum statutory damages remedy.  That issue was simply not before the *Del Amo* court.  To the extent *Del Amo* might be read to the contrary, the Court finds such a reading inconsistent with *Miller* and declines to adopt it.  *See, e.g.*, *Starbucks*, 168 Cal. App. 4th at 1450 (citing with approval *Miller*'s conclusion that section 3344's "minimum statutory damages intended to remedy the alleged injury to [a plaintiff's] mental feelings and peace of mind"); McCarthy, *supra*, § 6:46.[19]

---

[19] Plaintiffs' additional citations are unpersuasive.  In *Cohen v. Facebook, Inc.* (*Cohen II*), No. C 10-5282 RS, 2011 WL 5117164, at *2 (N.D. Cal. Oct. 27, 2011), Judge Seeborg clarified his prior order interpreting *Miller*: "Nothing in the June 27, 2011 Order, nor in *Miller*, represents a holding that non-celebrity plaintiffs can never pursue claims for economic loss and are instead limited to emotional damages."  True enough.  As indicated above, a non-celebrity plaintiff may very well recover for economic injury under section 3344 if she can prove "actual damages."  Cal. Civ. Code § 3344(a); *see Fraley*, 830 F. Supp. 2d at 809 (quoting *Miller*, 159 Cal. App. 4th at 1006).  *Cohen II*, therefore, is entirely consistent with *Miller*.
    Section 3344 authorizes "profits from unauthorized use" of a plaintiff's name or likeness in addition to either minimum statutory damages or actual damages.  Cal. Civ. Code § 3344.  Plaintiffs' citation to *Orthopedic Systems, Inc. v. Schlein*, 202 Cal. App. 4th 529 (2011), is inapposite.  *Orthopedic Systems*, which cites *Miller* approvingly, merely holds that a plaintiff eligible for minimum statutory damages under section 3344 may also be awarded profits from the unauthorized use of the plaintiff's name or likeness.  *See id.* at 546-47.

26

United States District Court
For the Northern District of California

1    Lastly, Plaintiffs assert that they have in fact alleged "mental anguish."  Opp. at 11-12.  The

2    Court is not convinced.  As Defendant correctly points out, Plaintiffs' allegations of injury under

3    section 3344 focus solely on economic harm.  *See* SAC ¶ 104 ("Each Plaintiff was deprived the

4    monetary value of having his or her endorsement appear in the endorsement emails, and therefore

5    was deprived of money to which he or she was entitled."); *id.* ¶ 136 ("Plaintiffs received no

6    compensation or other consideration for LinkedIn's use thereof."); *id.* ¶ 138 ("Plaintiffs were

7    deprived of the earnings they would otherwise be entitled to.").  Although the Court has already

8    found that Plaintiffs have plausibly alleged "reputational harm" arising out of LinkedIn's sending

9    of reminder emails, First MTD Order at 31, the court in *Miller* made clear that section 3344's

10   minimum statutory damages remedy, unlike a remedy for defamation, was not meant to cover

11   "injury to the character or reputation" but rather an "injury to the feelings," 159 Cal. App. 4th at

12   1002 (internal quotation marks omitted).  As indicated above, the real injury compensated in *Miller*

13   was not the reputational harm itself; it was the effect of that reputational harm on Miller's feelings

14   and mental well-being.  *See id.* at 1008.  This is an injury that Plaintiffs have not alleged.

15   For the reasons stated above, the Court GRANTS Defendant's Motion to Dismiss

16   Plaintiffs' claim for minimum statutory damages under section 3344.  Because Plaintiffs raise the

17   section 3344 claim for the first time in their SAC, and amendment would not necessarily be futile,

18   the Court grants leave to amend.  *See AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637-

19   38 (9th Cir. 2012) ("[A] court abuses its discretion when leave to amend is denied and amendment

20   would not be futile.").

21        **B.        Immunity Under the CDA**

22   As the Ninth Circuit has explained, "Section 230 of the CDA immunizes providers of

23   interactive computer services against liability arising from content created by third parties."  *Fair*

24   *Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir.

25   2008) (en banc).  Section 230 was enacted to "protect[] websites from liability for material posted

26   on the website by someone else."  *Doe No. 14 v. Internet Brands, Inc.*, 767 F.3d 894, 897 (9th Cir.

27   2014).  Specifically, section 230 states: "No provider or user of an interactive computer service

28   shall be treated as the publisher or speaker of any information provided by another information

27

1    content provider." 47 U.S.C. § 230(c)(1).  Importantly, section 230's "grant of immunity applies

2    only if the interactive computer service provider is not also an 'information content provider,'

3    which is defined as someone who is 'responsible, in whole or in part, for the creation or

4    development of' the offending content." *Roommates.Com*, 521 F.3d at 1162 (quoting 47 U.S.C.

5    § 230(f)(3)).  CDA immunity, thus, does not apply to "the *creation* of content" by a website.  *Id.* at

6    1163.  Because a "website operator can be both a service provider and a content provider," it "may

7    be immune from liability for some of the content it displays to the public but be subject to liability

8    for other content." *Id.* at 1162-63.

9         LinkedIn claims immunity under the CDA, arguing that it is an "interactive computer

10   service" but not an "information content provider" because Plaintiffs, not LinkedIn, are responsible

11   for the "substantive content" of the reminder emails.  Mot. at 12-19.  Plaintiffs do not dispute that

12   LinkedIn is an "interactive computer service" under the meaning of the CDA.  *See* Reply at 7 n.6.

13   Instead, Plaintiffs argue that LinkedIn is not entitled to CDA immunity because LinkedIn is an

14   "information content provider" responsible "in whole or in part" for the creation or development of

15   the reminder emails.  Opp. at 12 (quoting *Roommates.Com*, 521 F.3d at 1162).

16        The Court agrees with Plaintiffs.  To start, Plaintiffs allege that LinkedIn, without

17   Plaintiffs' consent and for the commercial benefit of LinkedIn, sent reminder emails to thousands

18   of recipients making use of Plaintiffs' names and likenesses as personalized endorsements for

19   LinkedIn.  SAC ¶¶ 92-93, 122-28.  Plaintiffs allege further that LinkedIn was "solely responsible

20   for the creation and development of each [reminder] email," and that each reminder email "was

21   new, original, and unique content created and developed in whole or in part by LinkedIn." *Id.*

22   ¶¶ 99-100.  LinkedIn, Plaintiffs say, generated the text, layout, and design of the reminder emails

23   and sent them to hundreds if not thousands of recipients.  *Id.* ¶¶ 64, 99-100.  Because, as Plaintiffs

24   allege, LinkedIn sent the reminder emails without Plaintiffs' knowledge or consent, *id.* ¶¶ 92-93,

25   the text and layout of these emails were created by LinkedIn without any input from the user.

26   Significantly, Plaintiffs claim that LinkedIn provided no means by which a user could edit or

27   otherwise select the language included in the reminder emails.  True authorship of the reminder

28   emails, Plaintiffs allege, lay with LinkedIn.  *See* SAC ¶¶ 99-100.

United States District Court
For the Northern District of California

Furthermore, Plaintiffs claim that LinkedIn alone chose to include a user's photograph in the second reminder email, but not in the first reminder email or in the initial invitation email. *Compare supra* Figure 12 (second reminder email with space for photograph if one has been uploaded), *with supra* Figure 10 (initial invitation email with no space for photograph), *and* Figure 11 (first reminder email with no space for photograph).  Likewise, only LinkedIn decided how many reminder emails it would send and how frequently it would do so.  Plaintiffs, who allegedly relied on LinkedIn's statement that it would never "email anyone without [Plaintiffs'] permission," SAC ¶ 50 fig.3, had no idea the reminder emails LinkedIn claims Plaintiffs authored even existed.  Taking all these allegations as true, Plaintiffs have plausibly alleged that LinkedIn was responsible at least "in part" for "the creation or development of" the reminder emails.  *Roommates.Com*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(f)(3)); *see also Fraley*, 830 F. Supp. 2d at 801-02 (holding that Facebook "is not at this stage entitled to CDA immunity" because "Plaintiffs allege that Facebook contributes, at least in part, to the creation or development of the Sponsored Story that ultimately appears on other members' Facebook pages in the form of a product or service endorsement").

LinkedIn argues nevertheless that because *Plaintiffs* provided the substantive content of the initial invitation emails, and consented to those emails being sent, Plaintiffs had already provided the essential content that LinkedIn only republished in the reminder emails.  Mot. at 14-17; Reply at 7-11.  As long as a user "'provides the essential published content,'" Defendant asserts, "the website 'receives full immunity.'"  Reply at 7 (quoting *Carafano v. Metrosplash.com*, Inc., 339 F.3d 1119, 1124 (9th Cir. 2003)).  The Court disagrees for two reasons.  First, "the fact that users are information content providers does not preclude [LinkedIn] from also being an information content provider by helping 'develop' at least 'in part'" the reminder emails.  *Roommates.Com*, 521 F.3d at 1165.  The mere fact that Plaintiffs provided their names, photographs, and email contacts for purposes of the initial invitation email, does not confer blanket CDA immunity on LinkedIn for the alleged harm caused by LinkedIn's unilateral decision to send subsequent reminder emails.  Those emails, Plaintiffs allege, were written, designed, and formatted "in whole or in part by LinkedIn."  SAC ¶ 100.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1      Second, the Court is not convinced that the reminder emails are, as Defendant argues,

2   substantively identical to the initial invitation email.  Mot. at 16-17, 19.  The initial invitation

3   email, written in the first person, reads: "I'd like to add you to my professional network."  Figure

4   10, *supra*.  The first reminder email, written in the third person, states: "This is a reminder that on

5   [date of initial email], [LinkedIn user] sent you an invitation to become part of their professional

6   network at LinkedIn."  Figure 11, *supra*.  The second reminder email, also written in the third

7   person, reads: "[LinkedIn user] would like to connect on LinkedIn.  How would you like to

8   respond?"  Figure 12, *supra*.  Contrary to Defendant's assertions, then, the first reminder email

9   appears to transform the substance of the initial invitation email from "Do you want to connect

10  with me?" to "You never responded to the user's first invitation so let us ask you again, do you

11  want to connect with her?"  The second reminder email is arguably more transformative still, as the

12  substance changes from "Do you want to connect with me?" to "You never responded to the user's

13  first invitation or to our reminder concerning that invitation, so let us ask you for a third time, do

14  you want to connect with her?"[20]  It is precisely this changed character of the reminder emails—

15  from invitation at first to potentially annoying by the end—that the Court found could contribute to

16  the additional harm the reminder emails allegedly caused.  First MTD Order at 31 (noting that

17  "individuals who receive second and third email invitations to join LinkedIn after declining one or

18  two previous email invitations to join LinkedIn from the same sender may become annoyed at the

19  sender"); *see also Fraley*, 830 F. Supp. 2d at 802 (rejecting CDA immunity where Facebook

20  allegedly "transformed the character" of Plaintiffs' submissions).  For these reasons, the Court

21  rejects LinkedIn's claim that the reminder emails are substantively identical to the initial invitation

22  email.

23      Nor is the Court convinced that LinkedIn, in sending the reminder emails, was performing

24  only a "traditional editorial function."  Mot. at 15-16; Reply at 9-11.  As in *Fraley*, Plaintiffs here

---

[20] The Court notes that rather than asking reminder recipients if they want to "accept" the
LinkedIn user's invitation to connect, the second reminder email, like the initial invitation email,
prompts the recipient to "[c]onfirm that you know" the user.  Figures 10, 12, *supra*.  This language,
which Plaintiffs allege was authored solely by LinkedIn, strikes the Court as confusing, at a
minimum, and potentially misleading.

30

"do not allege merely that [LinkedIn] 'edit[ed] user-created content—such as by correcting spelling, removing obscenity or trimming for length.'"  830 F. Supp. 2d at 802 (second alteration in original) (quoting *Roommates.Com*, 521 F.3d at 1169).  Rather, Plaintiffs allege that LinkedIn created and developed the content of the reminder emails, arranged Plaintiffs' names and likenesses in those emails to give the impression that Plaintiffs were endorsing LinkedIn, and offered no opportunity for Plaintiffs to edit those emails.  SAC ¶¶ 99-103.

Additionally, Defendant's citations do not persuade the Court.  LinkedIn's alleged conduct goes well beyond merely adding HTML meta tags to make user-provided text more visible, *see Asia Econ. Inst. v. Xcentric Ventures LLC*, No. CV 10-01360 SVW PJWX, 2011 WL 2469822, at *6-7 (C.D. Cal. May 4, 2011); placing a watermark on photographs and printing the website's address on advertisements created by third parties but published on the website, *see Ramey v. Darkside Prods.*, Inc., No. CIV.A. 02-730 (GK), 2004 WL 5550485, at *6-7 (D.D.C. May 17, 2004); or instructing a search engine to make copies of user-generated reports and authorizing their display so as to maximize the number of page views, *see Small Justice LLC v. Xcentric Ventures LLC,* No. 13-CV-11701, 2014 WL 1214828, at *7-8 (D. Mass. Mar. 24, 2014).  Plaintiffs' allegations suffice at this stage to defeat Defendant's claim of CDA immunity.  *See Fraley*, 830 F. Supp. 2d at 802 (rejecting CDA immunity at the motion to dismiss stage because "Plaintiffs allege not only that Facebook rearranged text and images provided by members, but moreover that by grouping such content in a particular way with third-party logos, Facebook transformed the character of Plaintiffs' words, photographs, and actions into a commercial endorsement to which they did not consent").

The Ninth Circuit's ruling in *Carafano*, which predates the Court of Appeals' en banc decision in *Roommates.Com*, does not counsel otherwise.  In that case, a third party created a fake dating profile of a popular Hollywood actress, which included sexually suggestive comments and the actress's home address and contact information.  *Carafano*, 339 F.3d at 1120-22.  Affirming the district court's grant of summary judgment to Matchmaker.com, the court found CDA immunity because the "critical information about Carafano's home address, movie credits, and the e-mail address that revealed her phone number were transmitted unaltered to profile viewers."  *Id.*

31

United States District Court
For the Northern District of California

at 1125.  "Thus," the court concluded, "Matchmaker did not play a significant role in creating, developing or 'transforming' the relevant information."  *Id.*  Here, by contrast, Plaintiffs have sufficiently alleged that LinkedIn was responsible "at least in part" for creating or developing the reminder emails endorsing LinkedIn.  *Roommates.Com*, 521 F.3d at 1165.  As discussed above, Plaintiffs allege that LinkedIn generated the text, layout, and design of the reminder emails and deprived Plaintiffs any opportunity to edit those emails, which Plaintiffs had no knowledge were being circulated on their behalf.  *Id.* ¶¶ 92-93, 99-100.  *Carafano*, therefore, is distinguishable.

For all these reasons, the Court DENIES Defendant's Motion to Dismiss on grounds of CDA immunity.

### C.    First Amendment Defenses

No right of publicity cause of action "'will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'"  *Downing*, 265 F.3d at 1001 (quoting *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793 (1995)); *accord Hilton v. Hallmark Cards*, 599 F.3d 894, 912 (9th Cir. 2010).  "This First Amendment defense extends to almost all reporting of recent events," but it "is not absolute."  *Downing*, 265 F.3d at 1001 (internal quotation marks omitted).  Courts "must find a proper accommodation between the competing concerns of freedom of speech and the right of publicity."  *Id.* (alteration and internal quotation marks omitted).  Even though the public interest exception to a right of publicity cause of action should be "broadly construed," it "do[es] not apply where a defendant uses a plaintiff's name and likeness in a knowingly false manner to increase sales of the publication."  *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1089 (9th Cir. 2002).  As the Ninth Circuit has explained, "False or misleading commercial speech is not protected."  *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001).

Defendant advances three defenses rooted in the First Amendment.  The Court addresses them one by one.  First, Defendant argues that the reminder emails at issue here "facilitate associations among people and therefore concern matters of public interest."  Mot. at 20.  As the reminder emails "convey[] information that directly relates to . . . matters of public interest," Defendant claims that these emails "constitute[] noncommercial speech subject to the full

United States District Court
For the Northern District of California

protection of the First Amendment." *Id.*  In contrast to the reminder emails, Defendant says, commercial speech "'does no more than propose a commercial transaction.'" *Id.* (quoting *Hoffman*, 255 F.3d at 1184).  Because the reminder emails were not sent "*solely* for advertising purposes," Defendant argues that they cannot be commercial speech under the meaning of the First Amendment.  *Id.* at 22.

The Court is not persuaded.  Although the "core notion of commercial speech" involves "speech which does no more than propose a commercial transaction," speech that "cannot be characterized merely as [a] proposal[] to engage in commercial transactions" may still be deemed commercial for First Amendment purposes.  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal quotation marks omitted).  The mere fact that the reminder emails may implicate the public interest does not, as Defendant suggests, end the inquiry.  In *Bolger*, for instance, the U.S. Supreme Court held that "informational pamphlets" containing "discussions of important public issues such as venereal disease and family planning" were nevertheless commercial speech. *Id.* at 67-68.  The *Bolger* Court so held because the pamphlets (1) were conceded to be advertisements; (2) referred to specific contraceptive products manufactured by Youngs; and (3) were mailed to members of the public with an "economic motivation."  *Id.* at 66-67.  The presence of all three characteristics, the Court concluded, provided "strong support" for a finding that the pamphlets were "properly characterized as commercial speech."  *Id.* at 67; *see also Downing*, 265 F.3d at 1002 (rejecting First Amendment defense to a catalog's use of well-known surfers' photographs even though "the theme of Abercrombie's catalog was surfing and surf culture, a matter of public interest"); *Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089, 1098 (E.D. Cal. 2009) (holding that a wireless provider's emergency preparedness publication was commercial speech even though it "did not directly propose any commercial transactions or offer any products or services").

So too here.  Plaintiffs have plausibly alleged that the reminder emails, just like the initial invitation email, function as advertisements for LinkedIn.  *See* SAC ¶¶ 94, 96, 99, 103.  The Court has already said so, finding that Plaintiffs sufficiently alleged for Article III standing purposes that their names had been "used to endorse or *advertise a product* to [their] friends and contacts."  First

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

1    MTD Order at 22 (emphasis added).  The reminder emails also clearly refer to a product or

2    service—namely, LinkedIn.  The first reminder email tells the recipient, under the official LinkedIn

3    logo, that an existing user has "sent you an invitation to become part of their professional network

4    at LinkedIn."  Figure 11, *supra*.  The second reminder email informs the recipient, under the

5    official LinkedIn logo, that an existing user "would like to connect on LinkedIn," asking the

6    recipient, "How would you like to respond?"  Figure 12, *supra*.  There can be no doubt what

7    product or service is being promoted.

8         Furthermore, Plaintiffs have sufficiently alleged that LinkedIn's motivation for sending the

9    reminder emails is primarily economic.  SAC ¶¶ 12, 15-17, 83-86, 90.  Specifically, Plaintiffs

10   claim that attracting new members is integral to the business model of LinkedIn, which actively

11   advertises its size, and that reminder emails containing personalized endorsements of LinkedIn are

12   a critical component of drawing in these new members.  *See id.* ¶¶ 83-85.  According to the SAC,

13   LinkedIn's 2012 Form 10-K states that "our member base has grown virally based on members

14   inviting other members to join our network" and that because "our member base has grown virally

15   . . . we have been able to build our brand with relatively low marketing costs."  *Id.* ¶¶ 83, 86

16   (ellipsis in original).  As Elman, LinkedIn's former head of growth, has said: "[I]t took several

17   emails to a person before they would actually sign up for LinkedIn.  It would average about 3.2 in

18   the early days."  *Id.* ¶ 16.  According to Elman, "That number 3.2 was actually really really

19   important that's how many emails you need to get before you sign up and so we kept the email

20   importer and it still works."  *Id.* ¶ 17.

21        These acknowledgements come as little surprise to the Court, especially in light of the

22   similar comments uttered by Facebook executives in *Fraley*.  In that case, this Court found

23   particularly persuasive the complaint's quotation of Facebook CEO Mark Zuckerberg, who had

24   stated, "A trusted referral influences people more than the best broadcast message.  A trusted

25   referral is the Holy Grail of advertising."  *Fraley*, 830 F. Supp. 2d at 808.  The *Fraley* complaint's

26   quotation from Facebook COO Sheryl Sandberg was equally convincing: "[m]arketers have always

27   known that the best recommendation comes from a friend. . . .  This, in many ways, is the Holy

28   Grail of advertising."  *Id.* (alterations in original).  As the Court observed in its prior order in this

34

United States District Court
For the Northern District of California

case, "an advertisement bearing the imprimatur of a trusted or familiar source, such as a friend or acquaintance, has concrete value in the marketplace."  First MTD Order at 22-23.  Accordingly, Plaintiffs have sufficiently alleged each of the three characteristics the U.S. Supreme Court in *Bolger* identified as lending "strong support" to a finding of commercial speech.  463 U.S. at 67. Thus, Plaintiffs have sufficiently alleged that LinkedIn's reminder emails constitute commercial speech.

In addition, Plaintiffs have plausibly alleged that LinkedIn's reminder emails are *misleading* commercial speech, for which the First Amendment provides no protection.  *See Hoffman*, 255 F.3d at 1184; *see also Bolger*, 463 U.S. at 68 ("Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.").  In particular, Plaintiffs object to LinkedIn's alleged "unique and misleading advertising practice of sending emails that falsely appeared to be endorsed by Plaintiffs."  SAC ¶ 94.  In addition to claiming that Plaintiffs themselves were misled by, inter alia, LinkedIn's representation that it would never "email anyone without [Plaintiffs'] permission," *id.* ¶ 50 fig.3, Plaintiffs allege that the recipients of the reminder emails were misled into thinking that Plaintiffs were the ones who kept spamming the recipients' inboxes with reminders to join LinkedIn, *id.* ¶ 94.  As the Court previously explained, one of Plaintiffs' "key allegations" is that the reminder emails "have a deleterious effect on users' reputations by making the users' contacts believe that the user is sending the contact multiple endorsement emails."  First MTD Order at 31. One of the many user testimonials is illustrative: "I feel the need to apologize to all the people that Linkedin has been spamming with invites in my name."  SAC ¶ 67.  "This type of reputational harm," uniquely associated with LinkedIn's sending of reminder emails, "is precisely the harm against which the common law right to publicity seeks to protect."  First MTD Order at 31 (citing *Lugosi*, 603 P.2d at 431).  Because Plaintiffs have adequately alleged that LinkedIn's reminder emails are not just commercial speech, but misleading commercial speech that causes them injury, the First Amendment provides LinkedIn no refuge.

None of Defendant's citations compels a contrary conclusion.  In *Hoffman*, L.A. Magazine used a computer-altered picture of Dustin Hoffman, as he appeared in the film *Tootsie*, in a

35

United States District Court
For the Northern District of California

1    contemporary designer dress and heels to illustrate one of its articles.  *Hoffman*, 255 F.3d at 1183.

2    The Ninth Circuit held that the photograph's use was not commercial speech because "the article as

3    a whole is a combination of fashion photography, humor, and visual and verbal editorial comment

4    on classic films and famous actors."  *Id.* at 1185.  Nothing comparable can be said of the reminder

5    emails here, and, unlike the magazine in *Hoffman*, LinkedIn stands to gain financially as a direct

6    result of the personalized endorsements that use Plaintiffs' names and likenesses.  *See Downing*,

7    265 F.3d at 1003 (distinguishing *Hoffman* and explaining that "L.A. Magazine was unconnected to

8    and received no consideration from the designer for the gown depicted in the article").  Further, in

9    *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 546 (1993), the California Court of Appeal

10   held that the use of a well-known surfer's likeness in a "surfing documentary" was exempt from

11   liability under section 3344(d)'s "public affairs" exception.  As the Ninth Circuit explained in

12   *Downing*, however, the *Dora* documentary's chief purpose in using the surfer's likeness was

13   noneconomic: to explain his "contribution to the development of the surf life-style and his

14   influence on the sport."  *Downing*, 265 F.3d at 1002.  Here, by contrast, Plaintiffs plausibly allege

15   that LinkedIn's use of Plaintiffs' names and likenesses in reminder emails is primarily

16   economically motivated.  *See* SAC ¶¶ 83-85.

17        The second argument Defendant advances is that even if the reminder emails amount to

18   commercial speech, Defendant's use of Plaintiffs' names and likenesses "is only actionable 'when

19   the plaintiff's identity is used, without consent, to promote an *unrelated product*.'"  Mot. at 22

20   (quoting *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 413 (2001)).  Defendant,

21   though, provides no authority stating that commercial uses are *only* actionable when a plaintiff's

22   name or likeness is used to promote an unrelated product.  Neither the common law right of

23   publicity cause of action nor its statutory counterpart contains any such requirement.  *See Downing*,

24   265 F.3d at 1001 (listing the elements of each).  In rejecting Abercrombie's First Amendment

25   defense in *Downing*, the Ninth Circuit never even hinted that the appellants, well-known surfers,

26   could not recover because the catalog advertised products related to the surfers' profession: surfer-

27   inspired apparel.  Presumably, it was the surfers' celebrity that would help Abercrombie sell that

28

36

1   apparel.  *See id.* at 1000 (noting that the catalog "advertised for sale" tee-shirts "exactly like those

2   worn by the Appellants").

3        Defendant's argument is premised on an overly broad reading of *Gionfriddo*, which held

4   that the First Amendment protected Major League Baseball's use of "factual data concerning

5   [Major League Baseball] players, their performance statistics, and verbal descriptions and video

6   depictions of their play."  94 Cal. App. 4th at 410-15.  To be sure, the court there stated: "A

7   celebrity's likeness may be used, however, to advertise a *related* product."  *Id.* at 414.  What the

8   court in *Gionfriddo* said next, however, is far more instructive:

> Courts have consistently held that the news media may use celebrity photographs
> from current or prior publications as advertisements for the periodical itself,
> illustrating the quality and content of the periodical without the person's written
> consent.  If a video documentary contains an unconsented, though protected, use of
> a person's likeness, there is little question that an advertisement for the
> documentary, containing a clip of that use would be permissible.  Thus, even if
> Baseball used depictions of players playing the game or recited statistics or
> historical facts about the game to advertise the game and promote attendance, the
> commercial speech cases relied on by plaintiffs would be inapposite.  *The owner of
> a product is entitled to show that product to entice customers to buy it.*

15   *Id.* (emphasis added) (citations omitted).  Confronted with this language, Defendant maintains that

16   its use of Plaintiffs' names and likenesses is not actionable because "such use promotes an

17   invitation the *member requested*."  Reply at 15.  This argument fails.  Plaintiffs' whole case is

18   premised on their allegation that LinkedIn sent the reminder emails without Plaintiffs' knowledge

19   or consent.  SAC ¶¶ 92-93.  In other words, Plaintiffs say they never requested that LinkedIn send

20   these reminder emails.  The Court, moreover, has already held that Plaintiffs' alleged lack of

21   consent as to the reminder emails supported a plausible claim that Plaintiffs' common law right of

22   publicity was violated.  First MTD Order at 31-32.

23        The third and final argument Defendant advances is that even if the reminder emails are

24   commercial speech, "they are protected by the First Amendment because reminders merely refer to

25   and publicize connection invitations which are themselves protected activity under the First

26   Amendment."  Mot. at 23 (citing *Page v. Something Weird Video*, 960 F. Supp. 1438, 1443-44

27   (C.D. Cal. 1996); *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 462 (Cal. 1979) (Bird,

28   C.J., concurring); *Rezec v. Sony Pictures Entm't, Inc.*, 116 Cal. App. 4th 135, 140-44 (2004)).

**United States District Court**
For the Northern District of California

37

These cases, Defendant argues, establish that the First Amendment protects advertisements of protected works because the commercial promotion is "adjunct" or "incidental" to the underlying protected expression.  *Id.*  Because the reminder emails "promote the rights of free speech and association," Defendant claims that the First Amendment shields LinkedIn from liability.  *Id.* at 23-24.

Defendant is mistaken.  The Ninth Circuit recently explained the principle animating the exception for "adjunct" use: "if advertisements for expressive works were not entitled to the same immunity from tort as the underlying work, publishers would be unable to truthfully advertise certain protected works."  *Charles v. City of L.A.*, 697 F.3d 1146, 1155 (9th Cir. 2012).  Citing *Rezec* as one of the "lower courts [to] have occasionally used imprecise, overbroad language in describing" this exception, the court in *Charles* held that "it is only in the narrow context of this principle that we have recognized that the noncommercial First Amendment status of an underlying expressive work extends to advertisements for that work."  *Id.*  In *Page*, for example, the court held that the First Amendment barred liability for a video distributor that had used an actress's likeness to advertise a film in which she had starred.  960 F. Supp. at 1444.  The court so held because "the videos themselves are protected by the First Amendment, and the advertising is incidental to the protected publication of the videos."  *Id.*  In this case, on the other hand, Plaintiffs do not allege that the reminder emails advertise any work protectable under the First Amendment; they allege that the reminder emails advertise LinkedIn, a for-profit corporation.  SAC ¶¶ 94-95.  As there is no underlying protected work to which the advertisements here could be "adjunct" or "incidental," Defendant's argument founders.

Accordingly, the Court DENIES Defendant's Motion to Dismiss on First Amendment grounds.

### D.      Incidental Use

Under California law, the "incidental use of a plaintiff's name or likeness does not give rise to liability under a common law claim of commercial misappropriation or an action under Section 3344."  *Yeager*, 673 F. Supp. 2d at 1100.  Although "[t]he contours of the incidental use doctrine are not well-defined in California," *Aligo v. Time-Life Books, Inc.*, No. C 94-20707 JW, 1994 WL

38

715605, at *2 (N.D. Cal. Dec. 19, 1994), the Second Restatement of Torts offers the Court some

guidance:

> *Incidental use of name or likeness*. The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; *nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity.* No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation.  It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.

Restatement (Second) of Torts § 652C cmt. d (emphasis added).

Defendant contends that "the 'subject' of reminder emails is connection invitations sent by

LinkedIn members themselves, and their 'purpose' is to 'remind' recipients that those invitations

. . . are pending."  Mot. at 24-25.  Citing an Eleventh Circuit case interpreting Florida law,

Defendant argues that the reminder emails are merely "'incidental to, and customary for' the

business of online networking."  Mot. at 25 (quoting *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316,

1326 (11th Cir. 2006)).

The Court cannot agree.  In *Almeida*, the Eleventh Circuit held that Amazon.com was not

liable for using the plaintiff's photograph in furtherance of selling the book on whose cover the

photograph appeared.  456 F.3d at 1324-26.  Crucial to the court's holding was its conclusion that

"Amazon's use of book cover images is not an endorsement or promotion of any product or

service."  *Id.* at 1326.  In contrast, Plaintiffs here have sufficiently alleged that LinkedIn's reminder

emails serve as personalized endorsements for LinkedIn's services.  *See* SAC ¶¶ 94, 96, 99, 103.

The Court has already so held.  *See* First MTD Order at 22, 29, 31-32.  In addition, Plaintiffs

plausibly allege that LinkedIn values the reminder emails precisely because they make use of

Plaintiffs' names and likenesses.  *See* SAC ¶¶ 83-85.  Once again, the Court has already held as

much, *see* First MTD Order at 22-23, and the Court did so for good reason, *see* SAC ¶ 83 (quoting

LinkedIn documents discussing the importance of growing LinkedIn membership "virally"); *see
also Fraley*, 830 F. Supp. 2d at 808 (quoting Facebook executives as saying that "the best

recommendation comes from a friend" and that these personalized referrals are "the Holy Grail of

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

United States District Court
For the Northern District of California

advertising").  LinkedIn's alleged use of Plaintiffs' names and likenesses was critical, not incidental, to Defendant's commercial purpose.

As a result, the Court DENIES Defendant's Motion to Dismiss on grounds of incidental use.

## V.    CONCLUSION

For the foregoing reasons, the Court rules on Defendant's Motion to Dismiss as follows:

- The Court GRANTS Defendant's Motion to Dismiss Plaintiffs' section 3344 claim with leave to amend;
- The Court DENIES Defendant's Motion to Dismiss on grounds of CDA immunity;
- The Court DENIES Defendant's Motion to Dismiss on First Amendment grounds; and
- The Court DENIES Defendant's Motion to Dismiss on grounds of incidental use.

The Court also GRANTS in part and DENIES in part the parties' requests for judicial notice.  The Court sua sponte STRIKES reference to 28 U.S.C. § 1331 in the SAC.

The Court grants Plaintiffs leave to amend the SAC for the limited purpose of correcting the deficiencies to the section 3344 claim because the Court does not find undue delay, bad faith or dilatory motive by Plaintiffs, repeated failure to cure deficiencies, or undue prejudice to LinkedIn. Further, additional allegations may cure the deficiencies identified in this Order, and therefore amendment would not necessarily be futile.  Should Plaintiffs elect to file a Third Amended Complaint curing the deficiencies identified herein, they shall do so within thirty (30) days of the date of this Order.  Failure to meet the 30-day deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal of Plaintiffs' section 3344 claim with prejudice.  Plaintiffs may not add new causes of action or parties without leave of the Court or stipulation of the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED**

Dated: November 13, 2014

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

United States District Court
For the Northern District of California