**RUSS AUGUST & KABAT**
Larry C. Russ, State Bar No. 82760
Dorian S. Berger, State Bar No. 264424
Daniel P. Hipskind, State Bar No. 266763
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Tel:   310.826.7474
Fax:  310.826.6991
Email:  lruss@raklaw.com
Email:  dberger@raklaw.com
Email:  dhipskind@raklaw.com

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Michael W. Sobol, State Bar No. 194857
Nicholas R. Diamand, *Pro Hac Vice*
Melissa Gardner, State Bar No. 289096
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel:   415.956.1000
Fax:  415.956.1008
Email: msobol@lchb.com
Email: ndiamand@lchb.com
Email: mgardner@lchb.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| Paul Perkins, Pennie Sempell, Ann Brandwein, Erin Eggers, Clare Connaughton, Jake Kushner, Natalie Richstone, Nicole Crosby, and Leslie Wall; individually and on behalf of all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>LinkedIn Corporation,<br><br>Defendant. | Case No. 13-CV-04303-HRL<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>1.  **VIOLATION OF COMMON LAW RIGHT OF PUBLICITY**<br>2.  **VIOLATION OF STATUTORY RIGHT OF PUBLICITY**<br>3.  **VIOLATION OF UNFAIR BUSINESS PRACTICES ACT**<br><br>JURY TRIAL DEMANDED |

RUSS, AUGUST & KABAT

Plaintiffs Paul Perkins, Pennie Sempell, Ann Brandwein, Erin Eggers, Clare Connaughton, Jake Kushner, Natalie Richstone, Nicole Crosby, and Leslie Wall (collectively, "Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated, and make the following allegations on information and belief, except as to allegations pertaining to Plaintiffs individually, which are based on their respective personal knowledge.

## INTRODUCTION

1.     In a relentless effort to enroll new users and sell premium memberships, LinkedIn Corporation ("LinkedIn") deceives its users into providing it with their third-party email addresses.  Once obtained, LinkedIn uses the email addresses to harvest additional email addresses and other data stored in unsuspecting users' email accounts.  After copying and permanently storing the harvested data on its servers, LinkedIn repeatedly spams the owners of the email addresses thus harvested with emails that appear to be sent by the unwitting LinkedIn member who initially shared an email address with LinkedIn.  These email messages advertise LinkedIn and bear the ostensible signature and endorsement of the LinkedIn user whose contacts are being spammed.  Instead of obtaining the consent of users to repeatedly barrage everyone they ever emailed with advertisements containing their names and likenesses, LinkedIn deceptively states, when it asks for that first email address, that it will never "email anyone without your permission."

2.     Plaintiff, Jake Kushner, an Associate Professor of Pediatrics and Section Head of Pediatric Diabetes at Baylor College of Medicine, discovered that LinkedIn had repeatedly emailed hundreds of Dr. Kushner's colleagues and students. The emails requested Dr. Kushner's colleagues and students join LinkedIn and provided links to LinkedIn's website where the recipients were asked to pay 400 dollars a year for a "premium" LinkedIn membership.

1

1    3.    Plaintiff, Clare Connaughton, a consulting attorney for the United

2   States Agency for International Development ("USAID") and member of the

3   mediation panel for the Eastern District of New York Federal Court, discovered

4   that LinkedIn had sent repeated endorsement emails ostensibly on her behalf to

5   hundreds of people including opposing counsel in active litigation and the clients

6   of opposing counsel.

7    4.    Plaintiff, Nicole Crosby, co-owner of a small business that

8   manufactures fire grates, learned that LinkedIn had sent hundreds of repeated

9   endorsement emails to her customer list.  Instead of advertising Ms. Crosby's

10   business, Texas Fireframe Company, the emails advertised LinkedIn.

11    5.    These and six additional putative class members filed this case to stop

12   LinkedIn's practice of sending repeated endorsement emails advertising its service

13   to email addresses harvested  from LinkedIn users' external email accounts without

14   obtaining users' consent.

15    6.     LinkedIn's practices violate the California Common Law Right of

16   Publicity, California Statutory Right of Publicity, and California Unfair

17   Competition Law.

18    7.    When a user signs up for LinkedIn, they are required to provide an

19   external email address as their username and to set up a new password for their

20   LinkedIn account.  LinkedIn uses this information to hack into the user's external

21   email account and extract email addresses and data.  If a LinkedIn user leaves an

22   external email account open, LinkedIn pretends to be that user and downloads

23   email addresses and data contained anywhere in that account to LinkedIn's servers.

24   LinkedIn is able to download these addresses and data without requesting the

25   password for the external email accounts even though users never intended to

26   provide consent.

27    8.    LinkedIn intercepts data contained in that member's external email

28   account and stores it on LinkedIn's servers.  The data intercepted is data associated

2

with emails and other communications.  This intercepted data is not limited to email addresses.  This data includes information connected with the harvested email addresses, including the phone numbers, employment information, job titles, birthdays, and nature of the connection to the LinkedIn member.

9.     As a part of its effort to acquire new users, LinkedIn sends second and third reminder endorsement emails endorsing its products, services, and brand to potential new users.  In an effort to optimize the efficiency of this marketing strategy, LinkedIn sends these "reminder endorsement emails" to the lists of email addresses obtained without its existing users' consent and, to further enhance the effectiveness of this particular marketing campaign, these reminder endorsement emails appear to recipients as though they were sent by existing users from whom LinkedIn surreptitiously obtained the list of email addresses, and contain those users' names and likenesses.

10.     These "reminder endorsement emails" are sent to email addresses taken from LinkedIn users' external email accounts including the addresses of former spouses, clients, opposing counsel, etc.  LinkedIn reassures its users "[w]e will not email anyone without your permission."  (LinkedIn Login Step 2, LinkedIn.com).  Yet, LinkedIn downloads and indefinitely stores email addresses gathered from its members' third-party email accounts, regardless of the users' intent in providing their email addresses to LinkedIn.

11.     Not only does LinkedIn send an initial email to the email addresses thus obtained, but LinkedIn sends two additional emails to those email addresses when those email recipients do not sign up for a LinkedIn account.  Each of these reminder emails contains the LinkedIn member's name and likeness so as to appear that the LinkedIn member is sending an email to endorse LinkedIn.  These reminder emails are sent to the email addresses obtained from the member's external email account without notice or consent from the LinkedIn member.

RUSS, AUGUST & KABAT

3

12.     LinkedIn's appropriation of email addresses to send multiple reminder emails promoting its service is motivated by monetary gain.  Brian Guan, formerly a Principal Software Engineer at LinkedIn, posted on LinkedIn's web site that his role is "devising hack schemes to make lots of $$$ with Java, Groovy and cunning at Team Money!"  Brian Guan, LinkedIn Profile, http://www.linkedin.com/in/brianguan (last visited September 13, 2013).  LinkedIn's 2011 10-K identified as its key strategy, "Foster Viral Member Growth."  LinkedIn states, "we will continue to pursue initiatives that promote the viral growth of our member base."  2012 10-K at 3 (Mar 2, 2012).  Jeff Weiner, LinkedIn CEO stated that changing the way it sends invitations to new members (through the appropriation of email addresses) has led to strong member growth directly assisting the bottom line.  "[LinkedIn] [g]rew its member base to 218 million, and witnessed strong member growth through the quarter *due to optimization initiatives*.  As a result, new sign ups increased to greater than two per second."  2013 Q1 Earnings Highlights, May 2, 2013 (emphasis added).  "This strong membership growth is due in large part to new growth optimization efforts."  Jeff Weiner, 2013 Q2 Earnings Call Transcript, August 1, 2013 (emphasis added).

13.     Reid Hoffman, LinkedIn's co-founder, stated that the most important factor in LinkedIn's success was using members' external contacts to grow LinkedIn's business.

> When we launched LinkedIn we thought the growth would pick up by itself.  Once we launched, we had a small trickle but not an explosion of growth. If we didn't fix this it was game over, jump off a cliff, dead. And so I said, I have one good idea and we're going to try it and see if it works. The good idea was that people were most curious about people who were here. So we said we would allow people to essentially upload there address book. And that caused our growth curve to go from this to this [showing his hand going up].

Interview of Reid Hoffman on Bloomberg Television, May 9, 2013, http://www.bloomberg.com/video/reid-hoffman-discusses-founding-linkedinP6pT1HPQQaSQqcRZ7SPeZA.html  (last visited January 13, 2013) (emphasis added).

4

14.    LinkedIn's sending of reminder endorsement emails to harvested email addresses is driven by monetary gain.  LinkedIn never discloses to its users that it will send a second and third reminder endorsement email to each email address that it has harvested.  These follow-up emails are critical to LinkedIn signing up new users.  "Our intention behind sending reminders is to jog the receiver's memory in case they overlooked the original message."  LinkedIn Invitation Reminders, February 7, 2013, http://help.linkedin.com/app/answers/detail/a_id/3882 (last visited July 15, 2013); LinkedIn Community Support, How Do I Stop Invitation Reminders, June 11, 2013, http://community.linkedin.com/questions/16595/how-do-i-stop-sending-invitation-reminders.html (last visited July 15, 2013) ("I even deleted all the sent invitations and still my friends getting the reminders. this is the fourth time in two weeks. so frustrated. after deleting all the sent invitations, i can not withdraw."); LinkedIn InMail, http://www.linkedin.com/static?key=about_inmail (last visited July 15, 2013) ("Does it work?  Absolutely.  InMails are so effective we back them up with a response guarantee. If you don't get a response in 7 days, we'll give you another InMail to send.")

15.    LinkedIn's sending repeated reminder invitations was intentional and purposefully designed to maximize membership growth and LinkedIn's profits. Josh Elman, LinkedIn's 15th employee and the head of LinkedIn's membership growth team, describes the testing and calibration that LinkedIn uses to maximize membership signups: "[p]eople often think on you know stuff like that is kinda throw away or sounds silly but it turned out when we actually had that message in there people were more likely when they signed up for LinkedIn to go and invite other people."  Josh Elman, Growth Hacks: The Secrets to Driving Massive User Growth, August 29, 2013, available at: https://www.youtube.com/watch?v=AaMqCWOfA1o.  Hans van de Bruggen, a user experience designer for LinkedIn during the class period, described the focus

5

RUSS, AUGUST & KABAT

1  LinkedIn placed on its new member acquisition process: "again this is the sort of
2  thing we do on the growth team where we go and just analyze very very closely all
3  the possible ways to get a user to connect another user to the site and identify any
4  friction points in the site. . . . if you can increase the conversion at any point at 2
5  percent that has massive downstream effects."  Growth Hacking with Hans van de
6  Bruggen at LinkedIn, August 25, 2013 (available at:
7  https://www.youtube.com/watch?v=UaHskuZIQCE).

8       16.    Sending a second and third reminder email was critical to LinkedIn
9  growing its user base.  Josh Elman described the necessity of sending out multiple
10  reminder emails: "we have this other interesting data point which is it took several
11  emails to a person before they would actually sign up for LinkedIn.  It would
12  average about 3.2 in the early days."  Josh Elman, Growth Hacks: The Secrets to
13  Driving Massive User Growth, August 29, 2013, available at:
14  https://www.youtube.com/watch?v=AaMqCWOfA1o.

15      17.    Although sending repeated reminder endorsement emails made it
16  appear that LinkedIn users were spamming their contacts, LinkedIn discounted the
17  harm to its existing users and focused on monetary gain to itself.  Josh Elman
18  described LinkedIn's decision to keep spamming non-members as driven by what
19  "works":  "Oh my God, everybody is spamming each other, so should we fix that?
20  That number 3.2 was actually really really important that's how many emails you
21  need to get before you sign up and so we kept the email importer and it still
22  works."  *Id*.

23      18.    At a minimum, LinkedIn places a value of ten dollars for each email
24  sent to a recipient containing an endorsement.  LinkedIn charges its own members
25  ten dollars per email sent by its members to another member not directly linked to
26  that user.  *See e.g.*, Linked InMail Purchasing Page,
27  https://www.linkedin.com/secure/inmail_v4?displayProducts= (last visited May
28  20, 2013).  LinkedIn states that these emails are worth ten dollars each because

they carry an endorsement and ***the ability to send up to two reminder emails*** and are thus "better than an email or cold call."

19. LinkedIn intentionally and knowingly created and developed this deceptive scheme to improperly use the names, photographs, likenesses, and identities of Plaintiffs for the purpose of generating substantial profits for itself. LinkedIn's scheme was initiated without obtaining the consent of, or compensating, Plaintiffs or Class members for their significant roles in promoting LinkedIn's products and services. Plaintiffs and Class members each have a right of publicity under common law and the California Right of Publicity Statute, which entitles them to be compensated for the use of their names, likenesses, and/or photographs in LinkedIn's second and third reminder endorsement emails. LinkedIn has deprived Plaintiffs of such compensation.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. This Court has personal jurisdiction over LinkedIn because (a) a substantial portion of the wrongdoing alleged in this complaint took place in this state, and (b) LinkedIn is authorized to do business here, has sufficient minimum contacts with this state, and/or otherwise intentionally avails itself of the markets in this State through the promotion, marketing, and sale of products and services in this State, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Under the Class Action Fairness Act of 2005 this Court has jurisdiction as the amount of damages sustained by the Class exceeds five million dollars.

21. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1)-(2) because LinkedIn headquarters are located in the Northern District of California. Venue is also proper under California Code of Civil Procedure § 17203 as this is a Court of competent jurisdiction.

7

**PARTIES**

22.     Plaintiffs are nine professionals who filed this case to stop LinkedIn's practice of sending repeated endorsement emails advertising its service to email addresses harvested from LinkedIn users' external email accounts.  Under California law, all persons are entitled to compensation for the use of their likeness and name in connection with advertisements to which they have not given consent.

**Paul Perkins**

23.     Plaintiff Paul Perkins is a United States citizen and resident of New York City, New York in New York County.  Mr. Perkins is the former Manager of International Advertising Sales for the *New York Times* International Sales.  Mr. Perkins was, until 2013, a registered LinkedIn member.  LinkedIn on one or more occasions during the class period gained access to Mr. Perkins' external Gmail account without his authorization.  LinkedIn on one or more occasions during the class period sent invitations to join LinkedIn to email addresses harvested from Mr. Perkins' external email account.  Moreover, without Mr. Perkins' consent, additional second and third reminder endorsement emails were sent by LinkedIn to email addresses harvested from his Gmail account.  These emails were sent without the consent of Mr. Perkins and contained Mr. Perkins' name endorsing and advertising LinkedIn's service.  The reminder endorsement emails requested that the recipients join LinkedIn.  LinkedIn sent these reminder endorsement emails to email recipients within and outside of California.

24.     Mr. Perkins joined LinkedIn because it is a website for professionals. As a professional, Mr. Perkins was concerned about his reputation.  LinkedIn's unconsented-to sending of reminder emails to Mr. Perkins' contacts caused Mr. Perkins worry, concern, embarrassment, frustration and/or injury to the feelings. The sending of repeated reminder emails endorsing LinkedIn caused Mr. Perkins concern about his reputation because, as a professional, he was not the sort of person to send unsolicited commercial emails.  Moreover, Mr. Perkins was

8

1    concerned and his peace of mind disturbed because LinkedIn used his name and/or

2    likeness without his consent to advertise LinkedIn.

3        25.    Mr. Perkins reviewed the statements that LinkedIn made on its signup

4    screens when he joined LinkedIn at the time his external email account address

5    book was imported.  The screens that Mr. Perkins reviewed and relied on included

6    the screens shown below at Figures 1, 2, 3, 4, 8 and 9.  Mr. Perkins was concerned

7    about the privacy of his contacts and did not want them to be repeatedly emailed

8    by LinkedIn.  Based on what was stated within LinkedIn's signup process, Mr.

9    Perkins did not believe that LinkedIn would send repeated follow-up emails

10   endorsing LinkedIn to his contacts.  Having now reviewed LinkedIn's "User

11   Agreement" and "Privacy Policy," Mr. Perkins had no idea that LinkedIn would

12   send repeated follow-up emails to Mr. Perkins' contacts.  Based on the statements

13   made on LinkedIn's signup screens and in its "User Agreement" and "Privacy

14   Policy" Mr. Perkins believed that LinkedIn would request authorization from Mr.

15   Perkins before LinkedIn sent any email to a contact of Mr. Perkins.  Further, Mr.

16   Perkins read and relied on LinkedIn's statement that "[w]e will not store your

17   password or email anyone without your permission."  (LinkedIn Login Screen Step

18   2).  Based on this statement, Mr. Perkins did not believe that he was authorizing

19   LinkedIn to send repeated requests to Mr. Perkins' contacts to join LinkedIn.

20   Based on this statement, Mr. Perkins understood that if he inadvertently agreed to

21   allow an invitation email to be sent, nevertheless, he did not grant LinkedIn the

22   right to send multiple follow-up emails.

23                              **Pennie Sempell**

24       26.    Plaintiff Pennie Sempell is a United States citizen and resident of San

25   Francisco, California in San Francisco County.  Ms. Sempell is a lawyer and an

26   author.  Ms. Sempell has been, and still is, a registered LinkedIn member since

27   before May 13, 2013.  LinkedIn, on one or more occasions during the class period,

28   gained access to Ms. Sempell's external Gmail account without her authorization.

9

RUSS, AUGUST & KABAT

LinkedIn, on one or more occasions during the class period, sent invitations to join LinkedIn to email addresses harvested from Ms. Sempell's external Gmail account. Moreover, without Ms. Sempell's consent, additional second and third reminder endorsement emails were sent by LinkedIn to email addresses harvested from her Gmail account. These emails were sent without the consent of Ms. Sempell and contained Ms. Sempell's name endorsing and advertising LinkedIn's service. The reminder endorsement emails requested that the recipients join LinkedIn. LinkedIn sent these reminder endorsement emails to email recipients within and outside of California.

27.     Ms. Sempell joined LinkedIn because it is a website for professionals. As a professional, Ms. Sempell was concerned about her reputation. LinkedIn's unconsented-to sending of reminder emails to Ms. Sempell's contacts caused Ms. Sempell worry, concern, embarrassment, frustration and/or injury to the feelings. The sending of repeated reminder emails endorsing LinkedIn caused Ms. Sempell concern about her reputation because, as a professional, she was not the sort of person to send unsolicited commercial emails. Moreover, Ms. Sempell was concerned and her peace of mind disturbed because LinkedIn used her name and/or likeness without her consent to advertise LinkedIn.

28.     Ms. Sempell reviewed the statements that LinkedIn made on its signup screens when she joined LinkedIn and at the time her external email account address book was imported. The screens that Ms. Sempell reviewed and relied on included the screens shown below at Figures 1, 2, 3, 4, 8 and 9. Ms. Sempell was concerned about the privacy of her contacts and did not want them to be repeatedly emailed by LinkedIn. Based on what was stated within LinkedIn's signup process, Ms. Sempell did not believe that LinkedIn would send repeated follow-up emails endorsing LinkedIn to her contacts. Having now reviewed LinkedIn's "User Agreement" and "Privacy Policy," Ms. Sempell had no idea that LinkedIn would send repeated follow-up emails to Ms. Sempell's contacts. Based

10

RUSS, AUGUST & KABAT

on the statements made on LinkedIn's signup screens and in its "User Agreement" and "Privacy Policy" Ms. Sempell believed that LinkedIn would request authorization from Ms. Sempell before LinkedIn sent any email to a contact of Ms. Sempell.  Ms. Sempell read and relied on LinkedIn's statement that "[w]e will not store your password or email anyone without your permission."  (LinkedIn Login Screen Step 2).  Based on this statement, Ms. Sempell did not believe that she was authorizing LinkedIn to send repeated requests to Ms. Sempell's contacts to join LinkedIn.  Based on this statement, Ms. Sempell understood that if she inadvertently agreed to allow an invitation email to be sent, nevertheless, she did not grant LinkedIn the right to send multiple follow-up emails.

### Professor Ann Brandwein

29.    Plaintiff Ann Brandwein is a citizen and resident of New Rochelle, New York in Westchester County.  Professor Brandwein is a Professor of Statistics at Baruch College in New York City.  Professor Brandwein has been, and still is, a registered LinkedIn member since before May 13, 2013.  LinkedIn on one or more occasions during the class period gained access to Professor Brandwein's external Gmail account without her authorization.  LinkedIn, on one or more occasions during the class period, sent invitations to join LinkedIn to email addresses harvested from Professor Brandwein's Gmail account.  Moreover, without Professor Brandwein's consent, LinkedIn sent additional second and third reminder emails to those harvested email addresses.  These emails were sent without the consent of Professor Brandwein and contained Professor Brandwein's name endorsing and advertising LinkedIn's service.  The reminder endorsement emails requested that recipients join LinkedIn.  LinkedIn sent these reminder endorsement emails to email recipients within and outside of California.

30.    Professor Brandwein joined LinkedIn because it is a website for professionals.   As a professional, Professor Brandwein was concerned about her

11

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

reputation.  LinkedIn's unconsented-to sending of reminder emails to Professor Brandwein's contacts caused Professor Brandwein worry, concern, embarrassment, frustration and/or injury to the feelings.  The sending of repeated reminder emails endorsing LinkedIn caused Professor Brandwein concern about her reputation because, as a professional, she was not the sort of person to send unsolicited commercial emails.  Moreover, Professor Brandwein was annoyed and her peace of mind disturbed because LinkedIn used her name and/or likeness without her consent to advertise LinkedIn.

31.   Professor Brandwein reviewed the statements that LinkedIn made on its signup screens when she joined LinkedIn and at the time her external email account address book was imported.  The screens that Professor Brandwein reviewed and relied on included the screens shown below at Figures 1, 2, 3, 4, 8 and 9.  Professor Brandwein was concerned about the privacy of her contacts and did not want them to be repeatedly emailed by LinkedIn.  Based on what was stated within LinkedIn's signup process, Professor Brandwein did not believe that LinkedIn would send repeated follow-up emails endorsing LinkedIn to her contacts.  Having now reviewed LinkedIn's "User Agreement" and "Privacy Policy," Professor Brandwein had no idea that LinkedIn would send repeated follow-up emails to Professor Brandwein's contacts.  Based on the statements made on LinkedIn's signup screens and in its "User Agreement" and "Privacy Policy" Professor Brandwein believed that LinkedIn would request authorization from Professor Brandwein before LinkedIn sent any email to a contact of Professor Brandwein.  Professor Brandwein read and relied on LinkedIn's statement that "[w]e will not store your password or email anyone without your permission." (LinkedIn Login Screen Step 2).  Based on this statement, Professor Brandwein did not believe that she was authorizing LinkedIn to send repeated requests to Professor Brandwein's contacts to join LinkedIn.  Based on this statement, Professor Brandwein understood that if she inadvertently agreed to allow an

12

invitation email to be sent, nevertheless, she did not grant LinkedIn the right to send multiple follow-up emails.

### Erin Eggers

32.     Plaintiff Erin Eggers is a citizen and resident of the City of Los Angeles in Los Angeles County, California.  Ms. Eggers is a Partner at Penchant Entertainment and former Vice-President of Production at Morgan Creek Productions in Los Angeles.  Ms. Eggers has been, and still is, a registered LinkedIn member since before May 13, 2013.  LinkedIn on one or more occasions during the class period gained access to Ms. Eggers's Gmail account without her authorization.  LinkedIn, on one or more occasions during the class period, sent invitations to join LinkedIn to email addresses harvested from Ms. Eggers's Gmail account.  Moreover, without Ms. Eggers's consent, additional second and third reminder endorsement emails were sent by LinkedIn to email addresses harvested from her account.  These reminder emails were sent without the consent of Ms. Eggers and contained Ms. Eggers's name endorsing and advertising LinkedIn's service.  The reminder endorsement emails requested that the recipients join LinkedIn.  LinkedIn sent these reminder endorsement emails to email recipients within and outside of California.

33.     Ms. Eggers joined LinkedIn because it is a website for professionals. As a professional, Ms. Eggers was concerned about her reputation.  LinkedIn's unconsented-to sending of reminder emails to Ms. Eggers's contacts caused Ms. Eggers worry, concern, embarrassment, frustration and/or injury to the feelings. The sending of repeated reminder emails endorsing LinkedIn caused Ms. Eggers concern about her reputation because, as a professional, she was not the sort of person to send unsolicited commercial emails.  Moreover, Ms. Eggers was concerned and her peace of mind disturbed because LinkedIn used her name and/or likeness without her consent to advertise LinkedIn.

13

RUSS, AUGUST & KABAT

34.    Ms. Eggers reviewed the statements that LinkedIn made on its signup screens when she joined LinkedIn and at the time her external email account address book was imported.  The screens that Ms. Eggers reviewed and relied on included the screens shown below at Figures 1, 2, 3, 8 and 9.  Ms. Eggers was concerned about the privacy of her contacts and did not want them to be repeatedly emailed by LinkedIn.  Based on what was stated within LinkedIn's signup process, Ms. Eggers did not believe that LinkedIn would send repeated follow-up emails endorsing LinkedIn to her contacts.  Having now reviewed LinkedIn's "User Agreement" and "Privacy Policy," Ms. Eggers had no idea that LinkedIn would send repeated follow-up emails to Ms. Eggers' contacts.  Based on the statements made on LinkedIn's signup screens and in its "User Agreement" and "Privacy Policy" Ms. Eggers believed that LinkedIn would request authorization from Ms. Eggers before LinkedIn sent any email to a contact of Ms. Eggers.  Further, Ms. Eggers read and relied on LinkedIn's statement that "[w]e will not store your password or email anyone without your permission."  (LinkedIn Login Screen Step 2).  Based on this statement, Ms. Eggers did not believe that she was authorizing LinkedIn to send repeated requests to Ms. Eggers's contacts to join LinkedIn. Based on this statement, Ms. Eggers understood that if she inadvertently agreed to allow an invitation email to be sent, nevertheless, she did not grant LinkedIn the right to send multiple follow-up emails.

### Clare Connaughton

35.    Plaintiff Clare Connaughton is a citizen and resident of Suffolk County, New York.  Ms. Connaughton is an attorney specializing in mediation, civil litigation, and negotiation.  Since 1997, Ms. Connaughton has been a consultant to the United States Agency for International Development (USAID). She has taught at New York University, Columbia University and Touro Law School.  In addition, Ms. Connaughton is a member of the mediation panel for the Federal District for the Eastern District of New York.  Ms. Connaughton has been,

14

and still is, a registered LinkedIn member since before May 13, 2013.  LinkedIn on one or more occasions during the class period gained access to Ms. Connaughton's AOL email account without her authorization.  LinkedIn, on one or more occasions during the class period, sent invitations to join LinkedIn to email addresses harvested from Ms. Connaughton's external AOL email account.  Moreover, without Ms. Connaughton's consent, additional second and third reminder endorsement emails were sent by LinkedIn to email addresses harvested from her external email account.  These emails were sent without the consent of Ms. Connaughton and contained Ms. Connaughton's name endorsing and advertising LinkedIn's service.  The reminder endorsement emails requested that the recipients join LinkedIn.  LinkedIn sent reminder endorsement emails purportedly on Ms. Connaughton's behalf to opposing counsel in active litigation and to the clients of opposing counsel.  LinkedIn sent these reminder endorsement emails to email recipients within and outside of California.

36.     Ms. Connaughton joined LinkedIn because it is a website for professionals.   As a professional, Ms. Connaughton was concerned about her reputation.  LinkedIn's unconsented-to sending of reminder emails to Ms. Connaughton's contacts caused Ms. Connaughton worry, concern, embarrassment, frustration and/or injury to the feelings.  The sending of repeated reminder emails endorsing LinkedIn caused Ms. Connaughton concern about her reputation because, as a professional, she was not the sort of person to send unsolicited commercial emails.  Moreover, Ms. Connaughton was annoyed and her peace of mind disturbed because LinkedIn used her name and/or likeness without her consent to advertise LinkedIn.

37.     Ms. Connaughton reviewed the statements that LinkedIn made on its signup screens when she joined LinkedIn and at the time her external email account address book was imported.  The screens that Ms. Connaughton reviewed and relied on included the screens shown below at Figures 1, 2, 3, 7, 8 and 9.  Ms.

RUSS, AUGUST & KABAT

15

1   Connaughton was concerned about the privacy of her contacts and did not want
2   them to be repeatedly emailed by LinkedIn.  Based on what was stated within
3   LinkedIn's signup process, Ms. Connaughton did not believe that LinkedIn would
4   send repeated follow-up emails endorsing LinkedIn to her contacts.  Having now
5   reviewed LinkedIn's "User Agreement" and "Privacy Policy," Ms. Connaughton
6   had no idea that LinkedIn would send repeated follow-up emails to Ms.
7   Connaughton's contacts.  Based on the statements made on LinkedIn's signup
8   screens and in its "User Agreement" and "Privacy Policy" Ms. Connaughton
9   believed that LinkedIn would request authorization from Ms. Connaughton before
10  LinkedIn sent any email to a contact of Ms. Connaughton.  Further, Ms.
11  Connaughton read and relied on LinkedIn's statement that "[w]e will not store
12  your password or email anyone without your permission."  (LinkedIn Login Screen
13  Step 2).  Based on this statement, Ms. Connaughton did not believe that she was
14  authorizing LinkedIn to send repeated requests to Ms. Connaughton's contacts to
15  join LinkedIn.  Based on this statement, Ms. Connaughton understood that if she
16  inadvertently agreed to allow an invitation email to be sent, nevertheless, she did
17  not grant LinkedIn the right to send multiple follow-up emails.

### Nicole Crosby

38.   Plaintiff Nicole Crosby is a citizen and resident of St. Johns County,
Florida.  Ms. Crosby is the co-owner of Texas Fireframe Company.  Texas
Fireframe Company, which was started in 1975 by Ms. Crosby's father in Austin,
Texas, manufactures and sells fire grates that direct more heat into a room and less
up a chimney.  Ms. Crosby is also an advertising professional of 30 years who was
named outstanding copywriter by ADWEEK and has won numerous awards in her
field.  Ms. Crosby left a New York advertising agency work to begin her own
advertising business in 1993.  Ms. Crosby has been, and still is, a registered
LinkedIn member since before May 13, 2013.  LinkedIn on one or more occasions

16

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

1  during the class period gained access to Ms. Crosby's external AOL email account

2  without her authorization.  LinkedIn, on one or more occasions during the class

3  period, sent invitations to join LinkedIn to email addresses harvested from Ms.

4  Crosby's external AOL email account.  Moreover, without Ms. Crosby's consent,

5  additional second and third reminder endorsement emails were sent by LinkedIn to

6  email addresses harvested from her external email account.  These reminder

7  endorsement emails were sent without the consent of Ms. Crosby and contained

8  Ms. Crosby's name endorsing and advertising LinkedIn's service.  The reminder

9  endorsement emails requested that the recipients join LinkedIn.  These reminder

10  endorsement emails were sent to hundreds of Ms. Crosby's contacts, including her

11  advertising clients, potential clients, colleagues, suppliers, and other business

12  contacts and professional contacts in her fireplace grate business.  LinkedIn

13  harvested numerous email addresses from Ms. Crosby's external AOL account as

14  she had been using the same email account for approximately 18 years.  Ms.

15  Crosby never consented to have LinkedIn market its service to Ms. Crosby's

16  advertising clients, potential clients, colleagues, suppliers and other business

17  contacts and professional contacts in her fireplace grate business.  In addition Ms.

18  Crosby manages various business projects on the website BaseCamp.com.

19  BaseCamp.com is a project management website allowing businesses to

20  collaborate on projects, manage task lists and scheduling.  LinkedIn sent repeated

21  reminder endorsement emails to addresses relating to two of Ms. Crosby's

22  BaseCamp.com accounts.  LinkedIn's sending repeated reminder endorsement

23  emails caused a key advertising client of Ms. Crosby to remove Ms. Crosby from

24  the BaseCamp.com account, which contained many documents that she required

25  for her work.  The other BaseCamp.com account, on which Ms. Crosby did pro

26  bono advocacy work, was also sent repeat reminder endorsement emails, and the

27  person managing that BaseCamp.com account informed Ms. Crosby that

28  LinkedIn's repeated emailing led to Ms. Crosby's removal from that

17

1    account.  When LinkedIn harvested email accounts from Ms. Crosby, it was able to

2    gather not only the addresses of users but also additional information contained in

3    the addresses themselves.  Many addresses contained the company or institution

4    that the user was associated with.  Harvesting email addresses allowed LinkedIn to

5    find out information relating to many of the email addresses that were harvested

6    and the employers of people that had emailed or been emailed by Ms.

7    Crosby.  Information relating to who Ms. Crosby emailed and was emailed by was

8    confidential– it included customer email addresses, phone numbers, business titles,

9    employment information and even the birthdates of individuals associated with Ms.

10   Crosby.  After harvesting email addresses and data from Ms. Crosby's external

11   AOL account, LinkedIn sent reminder endorsement emails to email recipients

12   within and outside of California.

13          39.     Ms. Crosby joined LinkedIn because it is a website for professionals.

14   As a professional, Ms. Crosby was concerned about her reputation.  LinkedIn's

15   unconsented-to sending of reminder emails to Ms. Crosby's contacts caused Ms.

16   Crosby worry, concern, embarrassment, frustration and/or injury to the feelings.

17   The sending of repeated reminder emails endorsing LinkedIn caused Ms. Crosby

18   concern about her reputation because, as a professional, she was not the sort of

19   person to send unsolicited commercial emails.  Moreover, Ms. Crosby was

20   concerned and her peace of mind disturbed because LinkedIn used her name and/or

21   likeness without her consent to advertise LinkedIn.

22          40.     Ms. Crosby reviewed the statements that LinkedIn made on its signup

23   screens when she joined LinkedIn and at the time her external email account

24   address book was imported.  The screens that Ms. Crosby reviewed and relied on

25   included the screens shown below at Figures 1, 2, 3, 7, 8 and 9.  Ms. Crosby was

26   concerned about the privacy of her contacts and did not want them to be repeatedly

27   emailed by LinkedIn.  Based on what was stated within LinkedIn's signup process,

28   Ms. Crosby did not believe that LinkedIn would send repeated follow-up emails

18

RUSS, AUGUST & KABAT

1    endorsing LinkedIn to her contacts.  Having now reviewed LinkedIn's "User

2    Agreement" and "Privacy Policy," Ms. Crosby had no idea that LinkedIn would

3    send repeated follow-up emails to Ms. Crosby's contacts.  Based on the statements

4    made on LinkedIn's signup screens and in its "User Agreement" and "Privacy

5    Policy" Ms. Crosby believed that LinkedIn would request authorization from Ms.

6    Crosby before LinkedIn sent any email to a contact of Ms. Crosby.  Further, Ms.

7    Crosby read and relied on LinkedIn's statement that "[w]e will not store your

8    password or email anyone without your permission."  (LinkedIn Login Screen Step

9    2).  Based on this statement, Ms. Crosby did not believe that she was authorizing

10   LinkedIn to send repeated requests to Ms. Crosby's contacts to join LinkedIn.

11   Based on this statement, Ms. Crosby understood that if she inadvertently agreed to

12   allow an invitation email to be sent, nevertheless, she did not grant LinkedIn the

13   right to send multiple follow-up emails.

### Dr. Jake Kushner

15       41.    Plaintiff Jake Kushner, M.D. is a citizen and resident of Harris

16   County, Texas.  Dr. Kushner is a tenured Associate Professor of Pediatrics and

17   Molecular and Cellular Biology, a McNair Scholar, and Section Head of Pediatric

18   Diabetes at Baylor College of Medicine.  Dr. Kushner is also the Chief of Service

19   for the Texas Children's Hospital Diabetes and Endocrinology Center.  Dr.

20   Kushner is a nationally renowned expert in type 1 diabetes research and a member

21   of the Pediatric Endocrine Society and the Society for Pediatric Research.  Dr.

22   Kushner has been, and still is, a registered LinkedIn member since before May 13,

23   2013.  LinkedIn on one or more occasions during the class period gained access to

24   Dr. Kushner's external Apple Mail without his authorization.  Further, LinkedIn,

25   on one or more occasions during the class period, sent invitations to join LinkedIn

26   to email addresses harvested from Dr. Kushner's external Apple Mail account.

27   Moreover, without Dr. Kushner's consent, additional second and third reminder

28   endorsement emails were sent by LinkedIn to email addresses harvested from Dr.

RUSS, AUGUST & KABAT

19

1    Kushner's external email account.  These reminder endorsement emails were sent

2    without the consent of Dr. Kushner and contained Dr. Kushner's name endorsing

3    and advertising LinkedIn's service.  The reminder endorsement emails requested

4    that the recipients join LinkedIn.  These reminder endorsement emails were sent to

5    hundreds of Dr. Kushner's colleagues, students, and casual acquaintances.  Dr.

6    Kushner never consented to have LinkedIn market its services to Dr. Kushner's

7    colleagues, students, and casual acquaintances.  When LinkedIn harvested email

8    addresses and data from Dr. Kushner's external accounts, it was able to gather not

9    only the addresses of users but also additional information contained in the

10   addresses themselves along with information associated with the harvested email

11   accounts including physical addresses, phone numbers, business titles, employer

12   information, and birthdates.  Many of the harvested addresses contained

13   information identifying the company, school, or hospital that the user was

14   associated with.  Harvesting email addresses and data allowed LinkedIn to obtain

15   additional information that was then used to market LinkedIn's services and create

16   links between users and LinkedIn's advertisers.  LinkedIn sent these reminder

17   endorsement emails to email recipients within and outside of California.

18       42.    Dr. Kushner joined LinkedIn because it is a website for professionals.

19   As a professional, Dr. Kushner was concerned about his reputation.  LinkedIn's

20   unconsented-to sending of reminder emails to Dr. Kushner's contacts caused Dr.

21   Kushner worry, concern, embarrassment, frustration and/or injury to the feelings.

22   The sending of repeated reminder emails endorsing LinkedIn caused Dr. Kushner

23   concern about his reputation because, as a professional, he was not the sort of

24   person to send unsolicited commercial emails.  Moreover, Dr. Kushner was

25   concerned and his peace of mind disturbed because LinkedIn used his name and/or

26   likeness without his consent to advertise LinkedIn.

27       43.    Dr. Kushner reviewed the statements that LinkedIn made on its signup

28   screens when he joined LinkedIn and at the time his external email account address

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT

book was imported.  The screens that Dr. Kushner reviewed and relied on included the screens shown below at Figures 1, 2, 3, 8 and 9.  Dr. Kushner was concerned about the privacy of his contacts and did not want them to be repeatedly emailed by LinkedIn.  Based on what was stated within LinkedIn's signup process, Dr. Kushner did not believe that LinkedIn would send repeated follow-up emails endorsing LinkedIn to his contacts.  Having now reviewed LinkedIn's "User Agreement" and "Privacy Policy," Dr. Kushner had no idea that LinkedIn would send repeated follow-up emails to Dr. Kushner's contacts.  Based on the statements made on LinkedIn's signup screens and in its "User Agreement" and "Privacy Policy" Dr. Kushner believed that LinkedIn would request authorization from Dr. Kushner before LinkedIn sent any email to a contact of Dr. Kushner.  Dr. Kushner read and relied on LinkedIn's statement that "[w]e will not store your password or email anyone without your permission."  (LinkedIn Login Screen Step 2).  Based on this statement, Dr. Kushner did not believe that he was authorizing LinkedIn to send repeated requests to Dr. Kushner's contacts to join LinkedIn.  Based on this statement, Dr. Kushner understood that if he inadvertently agreed to allow an invitation email to be sent, nevertheless, he did not grant LinkedIn the right to send multiple follow-up emails.

## **Natalie Richstone**

44.    Plaintiff Natalie Richstone is a citizen and resident of New York City, New York in Queens County.  Ms. Richstone is a statistical researcher.  Ms. Richstone most recently worked as a statistical researcher in research relating to hemophilia at the Weill Cornell Medical College in New York City.  Ms. Richstone has been, and still is, a registered LinkedIn member since before May 13, 2013.  LinkedIn on one or more occasions during the class period gained access to Ms. Richstone's external AOL email account without her authorization.  LinkedIn, on one or more occasions during the class period, sent invitations to join

21

LinkedIn to email addresses harvested from Ms. Richstone's external AOL email account.  Moreover, without Ms. Richstone's consent, additional second and third reminder endorsement emails were sent by LinkedIn to email addresses harvested from her external email account.  These reminder endorsement emails were sent without the consent of Ms. Richstone and contained Ms. Richstone's name endorsing and advertising LinkedIn's service.  The reminder endorsement emails requested that the recipients join LinkedIn.  LinkedIn sent these reminder endorsement emails to email recipients within and outside of California.

45.    Ms. Richstone joined LinkedIn because it is a website for professionals.   As a professional, Ms. Richstone was concerned about her reputation.  LinkedIn's unconsented-to sending of reminder emails to Ms. Richstone's contacts caused Ms. Richstone worry, concern, embarrassment, frustration and/or injury to the feelings.  The sending of repeated reminder emails endorsing LinkedIn caused Ms. Richstone concern about her reputation because, as a professional, she was not the sort of person to send unsolicited commercial emails.  Moreover, Ms. Richstone was concerned and her peace of mind disturbed because LinkedIn used her name and/or likeness without her consent to advertise LinkedIn.

46.    Ms. Richstone reviewed the statements that LinkedIn made on its signup screens when she joined LinkedIn and at the time her external email account address book was imported.  The screens that Ms. Richstone reviewed and relied on included the screens shown below at Figures 1, 2, 3, 7, 8 and 9.  Ms. Richstone was concerned about the privacy of her contacts and did not want them to be repeatedly emailed by LinkedIn.  Based on what was stated within LinkedIn's signup process, Ms. Richstone did not believe that LinkedIn would send repeated follow-up emails endorsing LinkedIn to her contacts.  Having now reviewed LinkedIn's "User Agreement" and "Privacy Policy," Ms. Richstone had no idea that LinkedIn would send repeated follow-up emails to Ms. Richstone's

22

contacts.  Based on the statements made on LinkedIn's signup screens and in its "User Agreement" and "Privacy Policy" Ms. Richstone believed that LinkedIn would request authorization from Ms. Richstone before LinkedIn sent any email to a contact of Ms. Richstone.  Further, Ms. Richstone read and relied on LinkedIn's statement that "[w]e will not store your password or email anyone without your permission."  (LinkedIn Login Screen Step 2).  Based on this statement, Ms. Richstone did not believe that she was authorizing LinkedIn to send repeated requests to Ms. Richstone's contacts to join LinkedIn.  Based on this statement, Ms. Richstone understood that if she inadvertently agreed to allow an invitation email to be sent, nevertheless, she did not grant LinkedIn the right to send multiple follow-up emails.

## **Leslie Wall**

47.     Plaintiff Leslie Wall is a citizen and resident of Westchester County, New York.  Ms. Wall is an Associate Creative Director at a major advertising firm in New York City.  Ms. Wall has been, and still is, a registered LinkedIn member since before May 13, 2013.  LinkedIn on one or more occasions during the class period gained access to Ms. Wall's external Yahoo! email account without her authorization.  LinkedIn, on one or more occasions during the class period, sent invitations to join LinkedIn to email addresses harvested from Ms. Wall's external Yahoo! email account.  Moreover, without Ms. Wall's consent, additional second and third reminder endorsement emails were sent by LinkedIn to email addresses harvested from Ms. Wall's account.  These reminder endorsement emails were sent without the consent of Ms. Wall and contained Ms. Wall's name endorsing and advertising LinkedIn's service.  The reminder endorsement emails requested that the recipients join LinkedIn.  LinkedIn sent emails purportedly on Ms. Wall's behalf to over eight hundred email addresses.  These reminder endorsement emails were sent to Ms. Wall's business contacts at magazines, eBay sellers and people she had not contacted in years.  LinkedIn's harvesting of email addresses and data

23

RUSS, AUGUST & KABAT

provided LinkedIn with not only the email address of, but also information about, individuals who had been emailed by or sent an email to Ms. Wall.  The information intercepted from Ms. Wall's external email account included physical addresses, phone numbers, business titles, employer information, and birthdates associated with the harvested email addresses.  LinkedIn is able to use harvested email addresses and data to suggest additional people for users to connect to.  LinkedIn sent these reminder endorsement emails to email recipients within and outside of California.

48.     Ms. Wall joined LinkedIn because it is a website for professionals. As a professional, Ms. Wall was concerned about her reputation.  LinkedIn's unconsented-to sending of reminder emails to Ms. Wall's contacts caused Ms. Wall worry, concern, embarrassment, frustration and/or injury to the feelings.  The sending of repeated reminder emails endorsing LinkedIn caused Ms. Wall concern about her reputation because, as a professional, she was not the sort of person to send unsolicited commercial emails.  Moreover, Ms. Wall was concerned and her peace of mind disturbed because LinkedIn used her name and/or likeness without her consent to advertise LinkedIn.

49.     Ms. Wall reviewed the statements that LinkedIn made on its signup screens when she joined LinkedIn and at the time her external email account address book was imported.  The screens that Ms. Wall reviewed and relied on included the screens shown below at Figures 1, 2, 3, 5, 8 and 9.  Ms. Wall was concerned about the privacy of her contacts and did not want them to be repeatedly emailed by LinkedIn.  Based on what was stated within LinkedIn's signup process, Ms. Wall did not believe that LinkedIn would send repeated follow-up emails endorsing LinkedIn to her contacts.  Having now reviewed LinkedIn's "User Agreement" and "Privacy Policy," Ms. Wall had no idea that LinkedIn would send repeated follow-up emails to Ms. Wall's contacts.  Based on the statements made on LinkedIn's signup screens and in its "User Agreement" and "Privacy Policy"

24

RUSS, AUGUST & KABAT

1   Ms. Wall believed that LinkedIn would request authorization from Ms. Wall before

2   LinkedIn sent any email to a contact of Ms. Wall.  Further, Ms. Wall read and

3   relied on LinkedIn's statement that "[w]e will not store your password or email

4   anyone without your permission."  (LinkedIn Login Screen Step 2).  Based on this

5   statement, Ms. Wall did not believe that she was authorizing LinkedIn to send

6   repeated requests to Ms. Wall's contacts to join LinkedIn.  Based on this statement,

7   Ms. Wall understood that if she inadvertently agreed to allow an invitation email to

8   be sent, nevertheless, she did not grant LinkedIn the right to send multiple follow-

9   up emails.

10                                    **LinkedIn**

11          50.     Defendant LinkedIn Corporation is a corporation existing under the

12   laws of the State of Delaware, with its principal place of business at 2029 Stierlin

13   Court, Mountain View, California 94043.  LinkedIn does business throughout the

14   State of California and the United States.

15                           **FACTUAL ALLEGATIONS**

16          51.     LinkedIn is a social networking company that directs its products and

17   services to people whom it describes as "people in professional occupations."  As

18   of the second quarter of 2013, LinkedIn had at least 238 million members.

19   LinkedIn's purpose as a business entity is to generate revenue, which is achieved

20   through three main avenues: Talent Solutions, Marketing Solutions, and the sale of

21   Premium Subscriptions.  Talent Solutions offers a variety of products aimed at

22   companies and recruiters to allow them to quickly search for and contact

23   prospective employees.  Marketing Solutions consists of advertising to LinkedIn

24   members by placing ads on the LinkedIn website.  Premium Subscriptions are sold

25   directly to individuals and small businesses who want to conduct advanced

26   searching on LinkedIn's website, enhance their professional identities, and contact

27   other members.  The size and growth of the number of LinkedIn users is directly

28   correlated to the success of each of LinkedIn's three main sources of revenue.

RUSS, AUGUST & KABAT

LinkedIn touts itself as "The World's Largest Professional Network."  *See, e.g.*,

The Global LinkedIn Audience,

<http://marketing.linkedin.com/sites/default/files/pdfs/

Infographic_LinkedIn_Audience_Global_2012.pdf> (last visited, May 22, 2013).

52.     LinkedIn harvests the email addresses that are associated with the

external email accounts of its members.  These email accounts include AOL,

Yahoo! Mail, Microsoft Mail, Apple Mail, Google Gmail, and any number of other

email service providers.

53.     During the class period, when a new member signed up for LinkedIn,

LinkedIn asked for that new user's external email address.  This request was made

without any warning of what the email address would be used for.  A new

LinkedIn user was then asked to provide a password for his or her LinkedIn

account.  Figure 1, below, shows the prompt on the LinkedIn website requesting a

user's external email address and a "new password."



**Figure 1: LinkedIn Sign-Up Prompt (last visited May 2, 2013)**

54.     In Figure 1, there is a small asterisk next to the green "Join LinkedIn"

button (shown above in Figure 1).  If a user had scrolled down, they would have

found that in small grey print the site reads, "[b]y joining LinkedIn, you agree to

LinkedIn's User Agreement, Privacy Policy and Cookie Policy."  LinkedIn,

THIRD AMENDED CLASS ACTION COMPLAINT

1   contrary to industry practice, does not require members to view its Terms

2   documents nor does did it display its Terms documents in such a way that a reader

3   would have sufficient notice of their contents.  The terms of service are only

4   available via a link on a separate screen below the "Join LinkedIn" button, and this

5   link is only provided if a user scrolls down to the bottom of the screen. LinkedIn

6   places a link to the terms of service on a submerged screen.  Plaintiffs were not put

7   on notice of LinkedIn's terms of service.

8       55.   LinkedIn's User Agreement, Privacy Policy and Cookie Policy assure

9   LinkedIn users that LinkedIn will request their permission before sending any

10  emails.  These statements from LinkedIn include:

11      • "[T]he amount and type of information you decide to share, and with

12         whom you share it, is up to you."  LinkedIn Privacy Policy,

13         Introduction.

14      • "**You decide how much or how little you wish to communicate to**

15         **individuals or groups**."  *Id*. (bolding in original).

16      56.   After a new user enters his or her first and last name, external email

17  address, and a password for his or her LinkedIn Account (Figure 1), the user is

18  asked to start a professional profile.

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

THIRD AMENDED CLASS ACTION COMPLAINT



**Figure 2: LinkedIn's "Profession Profile Page" (last visited May 2, 2013)**

57.     After filling out the information requested by LinkedIn to create a professional profile, the user clicks a button entitled, "Create My Profile."

58.     Instead of being greeted by a draft profile, users are greeted with LinkedIn's "Grow your network on LinkedIn" screen, which is prepopulated with the user's external email account address. *See* Figure 3, below.



**Figure 3: LinkedIn's "Grow your network on LinkedIn" Screen (last visited May 2, 2013)**

59.     The "Grow your network on LinkedIn" screen includes the external email address provided by the new user in the sign-up screen.  If a LinkedIn user leaves an external email account open, LinkedIn pretends to be that user and downloads the email addresses contained anywhere in that account to LinkedIn servers.  LinkedIn is able to download these addresses without requesting the password for the external email accounts or obtaining consent.  If a LinkedIn user has logged out of all their email applications, LinkedIn requests the username and password of an external email account to ostensibly verify the identity of the user.  However, LinkedIn then takes the password and login information provided and, without providing notice or obtaining consent from the user, attempts to access the user's external email account to download email addresses from the user's external email account.  If LinkedIn is able to break into the user's external email account using this information, LinkedIn downloads the email addresses of each and every person ever emailed by that user.

RUSS, AUGUST & KABAT

It searched my email addresses for names and email addresses of people on LinkedIn. It is deceptive, misleading and purposely vague. Larry Bailey, April 10, 2013.[1]

I'm not the only one being hacked by linkedin, but extremely upset at the repercussions. one of the people on my contact list is mentally ill and the last thing I wanted was to invite her to be my connection on linkedin. not to mention all the other people I don't want contact with who remain on my contact list. Robin Epstein, April 21, 2013.[2]

They are certainly NOT in my address book. They perhaps tangentially related to my industry. Embarrassing. Mike Reno, March 1, 2013.[3]

60.     The hacking of the users' email accounts and downloading of all email addresses associated with users' accounts is done without clearly notifying the users or obtaining their consent.  In cases where a user's external email account is a Gmail account, a Google screen pops up stating, "LinkedIn is asking for some information from your Google Account."  *See* Figure 4, below.  The Google notification screen, however, does not indicate that LinkedIn will download and store up to thousands of contacts to LinkedIn servers.  Rather, this notification screen misleadingly states that LinkedIn is asking for "some information."  The Google Notification screen does not provide notice or obtain the consent for LinkedIn to send multiple reminder endorsement emails to the addresses harvested from the external email account.  LinkedIn does not provide this notification to its users; it is Google that provides this screen.

---

[1] LinkedIn Help Center, http://community.linkedin.com/questions/3666/linkedin-please-stop-hacking-and-spamming.html?sort=newest (last visited September 16, 2013).
[2] *Id.*
[3] LinkedIn Help Center, http://community.linkedin.com/questions/3666/linkedin-please-stop-hacking-and-spamming.html?page=3&pageSize=10&sort=newest (last visited September 16, 2013).

RUSS, AUGUST & KABAT



**Figure 4: Google Notification re: LinkedIn's Request for Information (last visited May 2, 2013)**

61.     Where the user's external email account is a Yahoo! email account, a Yahoo! screen pops up stating, "You are authorizing access to: Yahoo! Contacts." *See* Figure 5, below.  The Yahoo! notification screen, however, does not indicate that LinkedIn will download and store thousands of contacts and significant amounts of data to LinkedIn servers.  Rather, this notification screen misleadingly states that LinkedIn is asking to "authorize access to: Yahoo! Contacts."  The Yahoo! Notification screen does not provide notice to LinkedIn members that LinkedIn will be sending multiple reminder endorsement emails to the addresses harvested from the external email account.  LinkedIn does not provide this notification to its users; it is Yahoo! that provides this screen.





**Figure 5: Yahoo! Notification re: LinkedIn's Request for Information**

62.     Where the user's external email account is a Microsoft email account (*i.e.*, @outlook.com, @hotmail.com, @live.com, @msn.com), a screen pops up stating, "LinkedIn needs your permission to: Access email addresses: LinkedIn will have access to your and your contacts' email addresses."  *See* Figure 6, below. The Microsoft Notification screen does not provide notice to LinkedIn users that LinkedIn will be sending multiple reminder endorsement emails to the addresses harvested from the external email account.  Further, LinkedIn does not provide this notification to its users; it is Microsoft that provides this screen.

1

2

3

4

5

6

7

8

9

10

11

12

13



14

**Figure 6: Microsoft Notification re: LinkedIn's Request for Information**

15   63.   Where the LinkedIn user's external email account is an AOL email

16   account, an AOL screen pops up stating, "You are currently signed in as [Member

17   Name]"  *See* Figure 7, below.  The AOL screen does not indicate that LinkedIn

18   will be accessing a user's contacts and related data.  The screen does not indicate

19   that LinkedIn will download and store thousands of contacts and significant

20   amounts of data to LinkedIn servers.  The AOL Notification screen does not

21   provide notice to LinkedIn users that LinkedIn will be sending multiple reminder

22   endorsement emails to the addresses harvested from the user's external email

23   account.

24

25

26

27

28

33

Russ, August & Kabat

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT



**Figure 7: AOL Screen Prior To LinkedIn Intercepting And Downloading External Contacts And Data**

64.     In cases where the user's external email account is an Apple Mail account (*i.e.*, @mac, @icloud.com, @me.com), no popup screen from Apple appears that might indicate that LinkedIn would download and store thousands of contacts and significant quantities of data to LinkedIn servers and send repeated endorsement emails to the harvested email addresses.

65.     LinkedIn downloads not only the contact lists from users' external email accounts, but also the email addresses of every person who had ever communicated by email with users unfortunate enough to sign up for LinkedIn. LinkedIn's harvesting from email accounts far exceeds the scope of any notice it provided.  Complaints on LinkedIn's own website attest to LinkedIn's failure to provide sufficient notice.  Indeed, LinkedIn's disclosures on its website are designed to deceive its users.

34

66.     LinkedIn was aware of the harm that sending repeated endorsement emails was causing its members.

> How come I'm getting unauthorized invites from people NOT in my address book? The last 10 invitations I received I asked all 10 if they sent it or not... Out of the 10 - 8 said they had sent no such thing... So how do we get invitations from people who don't send them and they are not people I know and their emails are NOT in my address book??
> John Weaver, July 9, 2013.[4]

> I implemented the fixes against gmail and hotmail(outlook) intrusion. I AM STILL RECEIVING NOTICES OF NEW CONTACTS THAT I DID NOT REQUEST, THESE ARE NOW OF THE DISTANT COUSIN CATEGORY, I.E. NOT DIRECT CONTACTS OF MINE.
> Peter Bondy, May 8, 2013.[5]

> MAKE IT STOP. How can I stop them...they're ruining my relationships....STOP Karen Price If anyone knows what to do with this company please notify me [email redacted].
> Karen Price, June 20, 2013.[6]

67.     Despite knowing the harm its practices were causing users, LinkedIn repeatedly sent reminder endorsement emails without the consent of its members. Reid Hoffman, LinkedIn's Co-Founder remarked, "[a]ll these concerns about privacy tend to be old people issues."  Reid Hoffman, Executive Chairman and Co-Founder of LinkedIn, Davos Annual Meeting 2010.

68.     After obtaining a user's email addresses, LinkedIn displays a screen that states, "Why not invite some people?"  The screen lists only 10 individuals from the list of email addresses taken from that user's external email account. Since LinkedIn routinely takes well over 1,000 email addresses from a user's external email account, it displays only a very small fraction of those email addresses on the "Why not invite some people?" screen.  Although a user can scroll down to view additional email addresses that might be contacted, the screen greys

---

[4] LinkedIn Help Center,  http://community.linkedin.com/questions/19313/how-do-i-stop-linkedin-sending-out-invitation-emai.html (last visited July 9, 2013).
[5] *Id.*
[6] *Id.*

RUSS, AUGUST & KABAT

out this scroll bar.  *See*, Figure 8 below.  The design, layout, and format of the page is aimed to deceive LinkedIn's users.  Instead of clearly stating that LinkedIn will be emailing thousands of users repeatedly, LinkedIn states that it will allow you to "stay in touch with your contacts who aren't on LinkedIn yet."



**Figure 8: Why Not Invite Some People (last visited May 2, 2013)**

69.    LinkedIn downloads and stores contacts and data from external email accounts prior to displaying a portion of the data for users (as shown in Figure 8). If a user selects "Skip this step" (as shown on Figure 8) LinkedIn retains the data and contacts it has downloaded from a user's external email account.

70.    LinkedIn does not inform its users that each email address appropriated from a user's external email account will be sent multiple emails inviting the recipient to join LinkedIn with the user's endorsement.  Nowhere does LinkedIn disclose that two additional "reminder" emails containing the user's

endorsement will be sent.  By making it functionally impossible for a user to stop subsequent emails from being sent while claiming elsewhere on the site that LinkedIn will never send emails "without your permission," LinkedIn is deceiving its users and lacks their consent.

71.    LinkedIn is aware that its web pages are deceptive and users have not consented to sending multiple endorsement emails to each appropriated email address.  Users have complained to LinkedIn about its unethical harvesting of email addresses and repeated spamming of those addresses.

> When I added my secondary gmail account I absolutely did not give them permission to send email invitations to every address in my contacts. when I went into the settings I realized that all the addresses had been selected automatically and I would have had to anticipate that and deselect them PRIOR to adding my email address. That's hacking, plain and simple.
> Robin Epstein, April 21, 2013.[7]

> What's more the invitations are NOT people in my address book. They are people I don't know. I find this entire issue extremely unprofessional on LI's part. You would think with all these members with the same problem LI would respond with a fix.
> Geri Spieler, May 1, 2013.[8]

> There is a specific group of people whom I absolutely must avoid for ethical reasons. This feature has sent out invitations on its own initiative twice, and my first notice each time was that one of these people "accepted" my invitations. Terrible.
> Wilson Zildjian, April 9, 2013.[9]

72.    The "Why not invite some users" screen misleads LinkedIn users because it states, "Stay in touch with your contacts who aren't on LinkedIn yet. Invite them to connect with you."  By using the phrase, "your contacts," LinkedIn

---

[7] LinkedIn Help Center,  http://community.linkedin.com/questions/3666/linkedin-please-stop-hacking-and-spamming.html?sort=newest (last visited September 16, 2013).
[8] LinkedIn Help Center,  http://community.linkedin.com/questions/12199/stop-linked-in-from-sending-automated-invites-to-a-1.html?page=2&pageSize=10&sort=newest (last visited September 16, 2013).
[9] LinkedIn Help Center,  http://community.linkedin.com/questions/19313/how-do-i-stop-linkedin-sending-out-invitation-emai.html?page=1&pageSize=10&sort=votes (last visited September 16, 2013).

RUSS, AUGUST & KABAT

is intentionally misleading its users regarding the volume of email addresses it is collecting.  Referring to "your contacts" harkens a thought of those people the user intended to save to an electronic address book as a "contact," not every person who has either emailed the user, been emailed by the user, or who has been carbon copied to an email to or from that user.

73.     LinkedIn misleads its users with respect to the implications of the "Why not invite some users?" screen by captioning a large button on the screen, "Add to Network."  The LinkedIn user is not told that clicking "Add to Network" will cause LinkedIn to send multiple emails (into the thousands) containing the user's endorsement to each of the email addresses harvested from that user's external email account.

74.     Plaintiffs did not receive notice, by reviewing the "Add to Network" screen, that multiple emails would be sent out on their behalf with their endorsement advertising LinkedIn.  The button on the page merely reads, "Add to Network."

75.     Statements elsewhere on the LinkedIn site misleadingly imply that LinkedIn will not be sending "endorsement emails."  LinkedIn states in its publicity materials and terms of use that one should only invite close business contacts to join LinkedIn and that LinkedIn will never send emails "without your permission."

76.     There is no warning that LinkedIn will be sending additional repetitious emails to each email recipient.  Nothing in the sign-up process discloses to the LinkedIn member that two additional reminder emails will be sent to the email addresses harvested from that user's external email account.  Each of the reminder emails contain the LinkedIn member's name and likeness so as to give the recipient the impression that the LinkedIn member is endorsing LinkedIn and asking the recipient to join LinkedIn's social network.

Hey how do I get these reminder invitations to stop. I deleted all of them, but they're still going out to some people.
James Fouche, March 18, 2013.[10]

This makes me very upset and embarrassed! One of the contacts was a woman I haven't touched base with for 10 years, and her husband just died - very awkward.
Meg Linker-Estes, July 1, 2013.[11]

I feel the need to apologize to all the people that Linkedin has been spamming with invites in my name. This is a TERRIBLE business practice.
Scott Hobbs, April 7, 2013.[12]

Does anyone know how to send a letter of apology to everyone who got these invitations AND how to make LinkedIn stop doing it? I want to withdraw from this horrible thing, but I need to minimize the damage.
Andrea Freud Lowenstein, May 2, 2013.[13]

I am just gonna go ahead and repeat what everyone else here has already said. LinkedIn should stop the spammy practices of sending out invitations to people's address book without their explicit request to do so!
Konrad Szpirak, May 13, 2013.[14]

[I]t's too bad this company opts to be no good crappy spammers with a terrible interface and zero transparency. . . . How they don't even offer a the option to select all and then withdraw all is an example of a company that places it's own needs above the customer.
Nathan Kroop, July 15, 2013.[15]

[C]ustomers are calling me and asking me to stop these emails. I am now withdrawing the invitations which I have to do 1 at a time. This will take me weeks!!!! I'll express how disappointed i am with linked in for this major inconvenience.
Sean Deady, June 2, 2013.[16]

77.     LinkedIn's deceptive practices are not limited to new users.  Existing

LinkedIn users are greeted with a home page that ostensibly requests that users

---

[10] LinkedIn Help Center,  http://community.linkedin.com/questions/13871/reminder-invitations-are-spamming-my-clients.html (last visited September 16, 2013).
[11] LinkedIn Help Center,  http://community.linkedin.com/questions/3666/linkedin-please-stop-hacking-and-spamming.html (last visited September 16, 2013).
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

RUSS, AUGUST & KABAT

1   identify existing users of LinkedIn; however, LinkedIn's undisclosed objective in

2   making this request is to recruit new members.   The heading of LinkedIn's home

3   page states, "See Who You Already Know on LinkedIn," and requests the user's

4   external email address and contains a button that simply states, "Continue."   *See*,

5   Figure 9, below.



**Figure 9: LinkedIn Home Page "See Who You Already Know on LinkedIn" (last visited May 2, 2013)**

78.     Once users input their email addresses, LinkedIn attempts to hack into

their email accounts by tunneling through any email program they have open.

Even if a user had never provided a password to LinkedIn, LinkedIn would use an

open connection to an email service to download the user's data.   Like with a new

user, LinkedIn also seeks to force users who visit the "See Who You Already

Know" page to provide verification of an external email address.   It then uses that

verification data to download the email addresses associated in any way with that

user's account.

RUSS, AUGUST & KABAT

40

79.     After LinkedIn accesses the user's external email account, LinkedIn performs the process of downloading up to thousands of email addresses from the user, in the same way described above with respect to new users.  At this point, existing users are taken to the "Why Not Invite Some People?" page, which displays only up to ten names while not clearly revealing the fact that LinkedIn has obtained up to 2,000 or more email addresses.  Although a user is provided a screen that allows a user to scroll down and view the total list of email addresses downloaded, LinkedIn does not disclose that it will be sending up to three emails to each of the email addresses surreptitiously obtained that contain the user's endorsement of LinkedIn.

80.     The endorsement email messages sent by LinkedIn after obtaining the list of email addresses despite users' intentions clearly and unmistakably use the names of users from whom the email addresses were appropriated.  Furthermore, LinkedIn words the endorsement emails in the first person, as though the users composed the emails themselves.  For example, some messages sent by LinkedIn to the email addresses harvested from users' external email accounts state, "I'd like to add you to my professional network."  They then place the name of the LinkedIn user below the text with a dash, as commonly done to sign a personal email.  *See* Figure 7, below.  Despite the appearance of the endorsement emails, the users do not compose the message***, they do not consent to LinkedIn sending multiple messages on their behalf***, and they are not compensated for the use of their name or likeness in the advertising or promotion of LinkedIn.

RUSS, AUGUST & KABAT



**Figure 10: Image of An Endorsement Email Sent By LinkedIn (last visited May 2, 2013)**

81.     If, after one week, the recipient of the first endorsement email has not joined LinkedIn, LinkedIn sends another email.  If, after two weeks, the recipient of an endorsement email still has not joined LinkedIn, LinkedIn sends a third email requesting that the recipient sign up for LinkedIn.  Each of these two subsequent emails also contains the endorsement of LinkedIn from the LinkedIn user from which the recipient's email address was harvested.

82.     LinkedIn makes numerous deceptive and misleading statements in connection with its endorsement emails.  LinkedIn expressly states that it will not email any of the contacts associated with a user's email address without obtaining permission.  "We will not store your password or email anyone without your permission."  (LinkedIn Login Screen Step 2).  Nowhere does LinkedIn inform users that it will be sending *multiple* emails on their behalf.  On LinkedIn's official blog, LinkedIn claims "we are committed to putting our members first. This means being open about how we use and protect the data that you entrust with us as a LinkedIn member."  LinkedIn Official Blog, August 19, 2013, http://blog.linkedin.com/page/4/ (last visited September 16, 2013); *Id*., June 1, 2013 ("Ensuring more privacy and control over your personal data remains our

42

highest priority."); *Id.*, May 10, 2013 (Ensuring you more clarity, consistency and control over your personal data continues to be our highest priority."); *Id.*, October 10, 2010 ("We take spam very seriously."); *Id.*, March 27, 2009 ("This . . . abusive behavior violates our Terms of Service.  This includes examples such as . . . massively inviting people they don't know.  This behavior, though infrequent, strikes at the very root of a trusted professional network.  We take these violations very seriously and will not tolerate this behavior.").  Because LinkedIn is not, in fact, open about how it uses people's data, does not ensure user control over data, treats spam as an acceptable advertising tool, and invites people who users do not necessarily know to join LinkedIn on a massive scale, these statements from LinkedIn are false, deceptive and misleading.

83.    In addition, LinkedIn states throughout its website that it will not send unsolicited emails, store user data, or provide personally identifiable information to third parties.

> We will not store your password or email anyone without your permission.
> *See* Figure 3, above.

> You decide how much or how little you wish to communicate
> to individuals or groups.
> LinkedIn Privacy Policy, May 12, 1013 Introduction.

> We do not rent, sell, or otherwise provide your personally
> identifiable information to third parties without your consent,
> unless compelled by law.
> LinkedIn Privacy Policy, May 12, 2103 Introduction.

84.    If a LinkedIn user should discover that emails have been sent to thousands of people under their name before the second and third reminders go out, there is no practical way to prevent the future spamming.

RUSS, AUGUST & KABAT

43

I have now sent 800 invitations or so and it's very emabarrassing (*sic*). It is a huge problem to go through every single invitation to withdraw, and it seems that once you withdraw a recipient, the follow up email is not automically (*sic*) withdrawn, meaning that I have to withdraw the same person twice. That seems unnecessarily difficult with the wealth of technology available to you. Please consider changing this system, its (*sic*) actually hurting my professional reputation which is NOT the idea behind linkedin.
Carolina Franco, March 22, 2013.[17]

The a$$holes at LinkedIn sent out invitations to everyone on my email list. Everyone that I have evr (*sic*) had an email from.
Jack White, April 17, 2013.[18]

85.    The only way LinkedIn users could stop the two follow-up endorsement emails (assuming the user found out about the initial emails in the first place) from going out would be to individually open up each invitation from within his or her LinkedIn account (which LinkedIn has intentionally made difficult to find within the user's account) and click a button that allows the user to withdraw that single invitation.  Assuming reasonable internet speed, this process takes approximately 20 seconds for each invitation.  For a user who had two thousand invitations go out, it would take roughly 11 hours of constant clicking, with reliable internet service, to prevent the reminder emails from being sent.  For the user quoted above from the LinkedIn community message boards who complained that LinkedIn sent 800 invitations, it would take that user over four hours of continuous clicking to prevent recipients from receiving the subsequent reminder emails.

86.    No functionality on the LinkedIn website allows a user to withdraw all invitations at once.  Furthermore, contacting LinkedIn does not lead to reminder emails being stopped.  Weeks after being contacted by a user, and only after the reminder emails have been delivered, LinkedIn responds to users' contact by

---

[17] LinkedIn Help Center,  http://community.linkedin.com/questions/12199/stop-linked-in-from-sending-automated-invites-to-a-1.html (last visited September 16, 2013).
[18] LinkedIn Help Center,  http://community.linkedin.com/questions/13871/reminder-invitations-are-spamming-my-clients.html (last visited September 16, 2013).

writing, "Thanks for your email and I would first like to apologize for the delay in responding to your inquiry. This is certainly not the customary wait time for a reply from LinkedIn Customer Support. We have been experiencing higher than expected volumes, and your patience is greatly appreciated." The frustration and harm suffered by LinkedIn users is described below:

> I discovered that yesterday LinkedIn sent out automated invitations to more than 1,300 people--most of whom I don't know. I'm being bombarded with replies and people complaining. I cannot manually withdraw over a thousand invitations. What to do?!
> Absolutely awful, I purposefully avoided this feature for years and then it tricks you into doing it, I can't believe I've spammed everyone I've ever met on here, so unnecessary and unethical!
> Matt Hines, April 11, 2013.[19]

> And sent an email to LinkedIn 3 days ago.... Got a prompt reply: "Thanks for contacting us. Someone from our support team will get back to you as soon as possible." And of course since then nothing....
> Raibourn Leila, April 21, 2013.[20]

> LinkedIn should stop the spammy practices of sending out invitations to people's address book without their explicit request to do so!
> Konrad Spzirak, May 13, 2013.[21]

> Frankly...at this point I'm finding LinkedIn more of a problem in terms of hurting my reputation rather than helping it. What's more the invitations are NOT people in my address book. They are people I don't know. I find this entire issue extremely unprofessional on LI's part. You would think with all these members with the same problem LI would respond with a fix.
> Geri Spieler, May 1, 2013.[22]

---

[19] LinkedIn Help Center, http://community.linkedin.com/questions/19313/how-do-i-stop-linkedin-sending-out-invitation-emai.html?page=3&pageSize=10&sort=votes (last visited September 16, 2013).
[20] *Id.*
[21] *Id.*
[22] LinkedIn Help Center, http://community.linkedin.com/questions/12199/stop-linked-in-from-sending-automated-invites-to-a-1.html?page=2&pageSize=10&sort=newest (last visited September 16, 2013).

RUSS, AUGUST & KABAT

They're not contacting me back. I have yet to receive a response from anybody at LinkedIn. This is getting a little ridiculous. Margaret A. Ost, March 18, 2013.[23]

LinkedIn keeps doing that, hacking into people's private emails and posting spam invitations, without permission. Allegedly, we've given permission. I have not. Absolutely not. I've seen this happening with other people, so I avoided joining LinkedIn for a long time. When I finally joined, I made sure I did not tick anything that could be construed as permission to send invitation spam in my name. Yet now it's happening. Accessing people's email address lists without their permission, and sending spam in their name without asking, is not acceptable. It's disgusting. Rayne Hall, February 19, 2013.[24]

87.    LinkedIn's "Add Connections" screens do not disclose that LinkedIn sends out repeated reminder endorsement members using LinkedIn member names and likenesses.

88.    During the class period, the disclosures on LinkedIn's webpages remained substantially the same. The changes that were made were minor changes that did not provide LinkedIn members with notice that LinkedIn would send multiple reminder endorsement emails that appeared to come from LinkedIn users. LinkedIn's minor changes to web pages relating to the harvesting of email addresses and sending of endorsement emails are discussed below.

89.    In May 2012, LinkedIn slightly modified the wording of the "Grow Your Network on LinkedIn" page. Before May 2012, the "Grow Your Network on LinkedIn" page (Figure 10) read, "See Who You Already Know on LinkedIn" and "Searching your email contacts is the easiest way to find people you already know on LinkedIn." After May 2012, it (Figure 11) read, "Grow your network on LinkedIn" and "Get started by adding your email address." The modification to the wording on the "Grow Your Network on LinkedIn" page did not put LinkedIn's members on notice that LinkedIn would be sending repeated reminder

---

[23] LinkedIn Help Center,  http://community.linkedin.com/questions/13871/reminder-invitations-are-spamming-my-clients.html?sort=newest (last visited September 16, 2013).
[24] LinkedIn Help Center,  http://community.linkedin.com/questions/3666/linkedin-please-stop-hacking-and-spamming.html (last visited September 16, 2013).

1    endorsement emails.  Before and after May 2012, the "Grow Your Network on

2    LinkedIn" page assured LinkedIn users that LinkedIn would not send emails

3    without the permission of the LinkedIn Member.  *See* Figure 10 ("We won't

4    contact anyone without your permission."); Figure 11 ("We will not store your

5    password or email anyone without your permission.").



**Figure 10: Pre May 2012, "Grow Your Network On LinkedIn" page**



**Figure 11: Post May 2012, "Grow Your Network On LinkedIn" page**

90.    In June 2012, LinkedIn modified the wording of the "Why Not

Invite Some People" page.  Before June 2012, the button on the bottom of the "Why Not

Russ, August & Kabat

Invite Some People" page (Figure 12) read, "invite to connect."  After June 2012, the button on the bottom of the "Why Not Invite Some People" page (Figure 13) read, "Add to Network."  The modification to the wording on the button at the bottom of the "Why Not Invite Some People?" page did not put LinkedIn's members on notice that LinkedIn would be sending repeated reminder endorsement emails.



**Figure 12: Pre June 2012, "Why Not Invite Some People?" page**



**Figure 13: Post June 2012, "Why Not Invite Some People?" page**

91.    In July 2012, on the page presented to existing LinkedIn members who access the Add Connections feature, LinkedIn changed the language "Searching your email contacts is the easiest way to find people you already know on LinkedIn" to "Get started by using your email address."  The modification to the wording on the page did not put LinkedIn's members on notice that LinkedIn

48

1   would be sending repeated reminder endorsement emails.  Before and after July

2   2012, the page assured LinkedIn users that LinkedIn would not send emails

3   without the permission of the LinkedIn Member.  *See* Figure 14 ("We will not

4   store your password or email anyone without your permission.").



**Figure 14: The Existing User Landing Page (The red box contains LinkedIn's assurance to its users that LinkedIn "won't store your password or email anyone without your permission.").**

92.     Recruiting new members is critical to LinkedIn's business model.

LinkedIn's financial reports are filled with references to the importance of

attracting new members using the email addresses taken from external accounts of

existing users.  "To date, our member base has grown virally based on members

inviting other members to join our network."  LinkedIn 2012 10-K at 10, March 2,

2012.  In other words, hijacking users' email accounts, harvesting data, and

spamming everyone with whom a user ever communicated is central to LinkedIn's

financial success.  LinkedIn expressly recognizes that member growth is directly

correlated to the success of its business: "actions could negatively impact our

member growth and engagement and our brand, which would harm our business."

*Id*. at 25.  Moreover, in order to sustain its growth, LinkedIn must continually

attract new members: "In order to grow our business, we must continually attract

new customers."  *Id*.  Further, LinkedIn identifies that its key strategy is to "foster

viral growth of our member base."  LinkedIn 2013 Proxy Statement, at 25.

49

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

93.    LinkedIn executives recognize that endorsement emails are crucial to LinkedIn's growth and profits.  Growth is linked to using recommendations from existing members: "it's that connection with the individual that I think leads to growth rate."  Interview with Reid Hoffman, The CEO Show, January 1, 2010, http://troyanosgroup.com/inside-the-brand/the-ceo-show/interview-archives/reid-hoffman-transcript/ (last visited September 16, 2013).

94.    LinkedIn monetizes new members by selling services directly attributable to its membership size.  For example, LinkedIn markets itself to large corporations to purchase advertising or to search through LinkedIn profiles based on the number of LinkedIn members.  "LinkedIn Recruiter gives corporate businesses unprecedented access to LinkedIn's database of over 40 million members.  With one new member joining every second, *LinkedIn's membership grows larger and more valuable by the day*, increasing the odds that recruiters will find that exceptional passive candidate they're looking for."  LinkedIn Allstate Case Study: Finding Highly Specialized Talent In Vast Numbers, http://business.linkedin.com/content/dam/li-external-web-assets/websites/business.linkedin.com/en_US/resources/pdf/case-studies/allstate_case_study_20130220_us_en.pdf (last visited May 20, 2013) (emphasis added).  Indeed, in selling LinkedIn products and services to large corporations, LinkedIn's ability to make such sales is directly attributable to LinkedIn recruitment of new members. "With regard to recruitment, specifically by virtue of the size of the network, we were able to do something that's really never been possible before, and that's passive candidate recruiting at scale."  Jeff Weiner, Interview on Worldmakers, Innovating From Within, June 24, 2013, http://www.linkedin.com/today/post/article/20130624191834-25153523-innovating-from-within-linkedin-s-jeff-weiner-on-worldmakers (last visited September 16, 2013).  LinkedIn's endorsement emails are valuable to LinkedIn.

Individualized personalized endorsement of LinkedIn to Plaintiffs' friends and acquaintances has concrete demonstrable value in the economy at large.

95.     LinkedIn is able to save money by appropriating the email addresses and "endorsements" of its users.  In its 2012 10-K, LinkedIn attributed its profitability to this strategy.  "[O]ur member base has grown virally . . . we have been able to build our brand with relatively low marketing costs."  LinkedIn 2012 10-K at 12.

96.     The email addresses that LinkedIn takes from its users and uses to promote its service (using the names of the LinkedIn users) have value to users, as well.  LinkedIn charges its own users ten dollars to send an email to another LinkedIn user if they are not already directly connected.  LinkedIn's InMail product is available for sale to users, and states that because InMail contains "information about you" such as your name and profession, sending emails that utilize this information is "better than an email or cold call."  Linked InMail Purchasing Page, https://www.linkedin.com/secure/inmail_v4?displayProducts= (last visited May 20, 2013).  Like the reminder emails that LinkedIn sends to the email addresses that it harvests from its members, LinkedIn allows members to re-send reminder emails if a response is not received in seven days.  LinkedIn acknowledges the value of sending multiple reminder emails by offering just one free reminder InMail message if the recipient does not respond within seven days.  If the LinkedIn member wants to remind the recipient before the seven-day window expires, or if the member wants to send a second reminder email, the member must pay an additional ten dollars.  InMail Expiration and Renewal Process,  http://help.linkedin.com/app/answers/detail/a_id/75 (last visited May 20, 2013).

97.     Each new member that LinkedIn attracts has monetary value.  When LinkedIn attracts new members, it attempts to sell them premium accounts.  These accounts cost $39.95 per month (when purchasing a full year) and $49.95 per

RUSS, AUGUST & KABAT

month when purchasing a month-to-month plan.  LinkedIn is not only advertising joining its network, but also directly selling a product with a price tag of $480 per year to the owners of the email addresses harvested from users.  *See* LinkedIn Premium Page,  http://www.linkedin.com/mnyfe/subscriptionv2?trk=mny-subs-spewc-logout-upgrade (last visited May 20, 2013).  In 2012, Premium Subscriptions accounted for $190 million in revenue and grew by 81% over the prior year.  *See* LinkedIn 2012 10-K Introduction.

98.    If LinkedIn were not able to send endorsement emails using email addresses that its users never intended to provide, LinkedIn would be forced to pay for the contact information of people to whom to advertise and promote its service.

99.    LinkedIn is growing its network by using its members to endorse LinkedIn, repeatedly, without their consent.  This growth of LinkedIn's network increases LinkedIn's direct revenue through sales of products to new members, and increases its indirect revenue through sales to growing numbers of recruiters and large corporations.  The value of each endorsement email sent by LinkedIn on behalf of members is a concrete, measureable dollar amount.  LinkedIn members did not intend to benefit LinkedIn in this way, and they are directly harmed by LinkedIn's appropriation of their names, as they have stated on LinkedIn's Web site.

> It searched my email addresses for names and email addresses of people on LinkedIn. It is deceptive, misleading and purposely vague.
> Larry Bailey, April 10, 2013.[25]
>
> I am so sorry Linkedin stole my identity to spam all my google contacts with invitations to join "my linkedin network". Since I use gmail from day 1 linkedin harrasses people in my name I was acquainted to a hundred years ago which causes very unwanted, painfull and embarrasing situations. Linkedin won't

---

[25] LinkedIn Help Center,  http://community.linkedin.com/questions/3666/linkedin-please-stop-hacking-and-spamming.html?sort=newest (September 16, 2013).

RUSS, AUGUST & KABAT

stop bothering my google contacts list even though I asked politely.
Ron Hol, March 27, 2013.[26]

Agree. I believe I've been hacked.
Cameron Strrachan, March 24, 2013.[27]

I'm also getting responses from people I don't know AND there is no record in my Sent folder that I ever sent them an invitation.
Diane P. Barber, March 15, 2013.[28]

Accessing my contacts so that I can see who I'd like to connect with is one thing. Spamming my entire contact database of everyone I've ever emailed is definitely black hat tactics at growing users. This included people I know, don't know, email addresses from people off Craigslist, even mailing lists received an "invite to connect" from me today.  I did not click on "invite all." In fact, I clicked on "skip this step." Very disappointing.
Desmond Liao, March 12, 2013.[29]

LinkedIn is not just accessing my address book, it is accessing the history of everyone I have ever sent emails to. I have about 50 people in my address book (who I also did not want invitations sent to) and I have 280 pending invitations to withdraw.
Ben Kirwood, March 1, 2013.[30]

I have the same problem and none of these people are in any of my address books. They were all sent yesterday and I have not logged into linked in for several days. I am withdrawing the invitations but I have 168 that all have to be done individually. How was my account hacked?
Linda Peterson, April 20, 2013.[31]

There is *absolutely* no way to "withdraw" invitations in bulk, and simply deleting the invitations will not stop the reminders from going out to each invitation recipient.
Charles Caro, February 18, 2013.[32]

## Facts Common to Plaintiffs' Actions

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] LinkedIn Help Center,  http://community.linkedin.com/questions/12168/why-am-i-getting-connections-i-have-not-requested.html (last visited September 16, 2013).
[32] LinkedIn Help Center,  http://community.linkedin.com/questions/3423/unable-to-remove-pending-invitations.html?page=2&pageSize=10&sort=votes (last visited September 16, 2013).

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

100.   Plaintiffs each registered for a LinkedIn account prior to May 13, 2013.

101.   Plaintiffs did not agree to allow LinkedIn to send multiple reminder endorsement emails to the owners of email addresses associated with Plaintiffs' external email accounts.

102.   Plaintiffs are professionals and as professionals are concerned about their reputations.

103.   Plaintiffs are professionals and as professionals are concerned about the use of their name and/or likeness, particularly where their name and/or likeness is used to endorse a commercial product or service.

104.   Plaintiffs further did not consent to allow LinkedIn to use their names, photographs, or likenesses as an endorsement of LinkedIn, or its products or services in LinkedIn's reminder endorsement emails.

105.   Plaintiffs did not have, and could not have been expected to have, any exposure to LinkedIn's unique and misleading advertising practice of sending emails that falsely appear to be endorsed by Plaintiffs.  Plaintiffs reasonably had no expectation that by signing up for a LinkedIn account, their names, photographs, or likenesses would be used to endorse any products, services, or brands.

106.   LinkedIn used each Plaintiff's name, photograph, and/or likeness without consent in emails endorsing LinkedIn.

107.   Each Plaintiff's name and photograph was provided to LinkedIn for purposes unrelated to the advertisements at issue here, as required or requested by LinkedIn during the account sign-up process.

108.   Each endorsement email described herein used the LinkedIn name and LinkedIn's trademarked images.

109.   Each endorsement email described herein combined all of the respective elements described, heretofore unrelated to one another, into new

content appearing in the endorsement emails sent to email addresses obtained from Plaintiffs.

110.   LinkedIn was solely responsible for the creation and development of each endorsement email, the content, and the advertisement scheme by which each endorsement email was created.

111.   Each endorsement email was new, original, and unique content created and developed in whole or in part by LinkedIn.

112.   In each endorsement email, the respective Plaintiff appears to be endorsing LinkedIn when, if fact, he or she does not.

113.   No Plaintiff knew that providing his or her external email account address would result in the harvesting of the email addresses of individuals from his or her external email account.

114.   No Plaintiff knew that LinkedIn's harvesting of email addresses from his or her external email account would result in the appearance of him or her endorsing LinkedIn in a commercial advertisement.

115.   Each Plaintiff was deprived of the monetary value of having his or her endorsement appear in the endorsement emails, and therefore was deprived of money to which he or she was entitled.

116.   As a professional, each Plaintiff was concerned about his or her reputation.

117.   Each Plaintiff has been personally injured by this loss of money.  The injury to Plaintiffs is not outweighed by any countervailing benefits to them or other consumers.

## **CLASS ACTION ALLEGATIONS**

118.   Plaintiffs bring this action pursuant to Rules 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following Class:

All natural-person LinkedIn users located within the United States who had an account registered on www.linkedin.com on or before May 13, 2013, and had their name, photograph, likenesses, or identity used in a second and/or third endorsement email sent to one or more third parties by LinkedIn between September 17, 2011 and May 13, 2013.

119.   Excluded from the Class are the following individuals and/or entities: LinkedIn and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which LinkedIn has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

120.   Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

121.   The class is so numerous that joinder of all members is impracticable. On information and belief, there are more than 200 million LinkedIn members in the United States.  The number of separate individuals who have had second and third reminder endorsement emails sent without their consent, within two years before the filing of this action is likely in the millions, and is identifiable and ascertainable based on LinkedIn's records.

122.   There are questions of law or fact common to the Class that will drive the resolution of this case.  These questions include, but are not limited to, the following:

        a.   Whether Plaintiffs and the Class consented to the use of their names, photographs, likenesses, or identities in second and third reminder endorsement emails sent to third parties by LinkedIn;

56

RUSS, AUGUST & KABAT

b.  Whether LinkedIn gained a commercial benefit or some other advantage by using Plaintiffs' and the Class members' names, photographs, likenesses, or identities in reminder endorsement emails;

c.  Whether Plaintiffs and the Class were harmed by the nonconsensual use of their names, photographs, likenesses, or identities in reminder endorsement emails sent by LinkedIn to third parties, and whether LinkedIn's conduct was a substantial factor in causing that harm;

d.  Whether Class members are entitled to damages as a result of LinkedIn's conduct, and, if so, what is the measure of those damages;

e.  Whether LinkedIn's conduct violated California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et. seq.*);

f.  Whether LinkedIn was unjustly enriched as a result of its conduct;

g.  Whether LinkedIn violated California's Common Law Right of Publicity;

h.  Whether LinkedIn violated the California Statutory Right of Publicity, Cal. Civ. Code § 3344;

i.  What the value of an endorsement by a non-celebrity is in a social network endorsement email advertisement.

123.   LinkedIn engaged in a common course of conduct giving rise to violations the legal rights sought to be enforced uniformly by the Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved.  Therefore, individual questions, if any, pale in comparison to the numerous common questions presented.

57

124.   The injuries sustained by members of the Class flow, in each instance, from a common nucleus of operative fact.  In each case, LinkedIn caused or permitted the unauthorized appropriation of the Plaintiff and the Class members' names, photographs, likenesses, or identities without adequate or any notice, consent, or opportunity to withdraw from participation.

125.   The website that each member of the Class used contained substantially the same language, terms of use, and disclosures.

126.   Given the similar nature of the Class members' claims and the absence of material differences in the statutes and common laws upon which the Class members' claims are based, a nationwide class will be easily managed by the Court and the parties.

127.   The Class is comprised of professionals who joined LinkedIn to connect with other professionals and be more productive and successful.

128.   As professionals, Class members are concerned about their reputations and the use of their names and/or likenesses.

129.   As professionals, Class members are concerned about commercial endorsement emails being sent ostensibly on their behalf but without their consent.

130.   Because of the relatively small size of the individual Class members' claims, no Class member could afford to seek legal redress on an individual basis. A class action is superior to any alternative means of prosecution.

131.   The representative Plaintiffs' claims are typical of those of the Class, as all members of the Class are similarly affected by LinkedIn's uniform conduct as alleged.

132.   LinkedIn has acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Class, supporting the imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

58

133.   Plaintiffs will fairly and adequately protect the interests of the Class, and have retained counsel competent and experienced in class action litigation. The class representatives have no interests which conflict with or adverse to those of the other Class members.

134.   Plaintiffs reserve the right to revise the above class definition based on facts learned in discovery.

## FIRST COUNT

**Violation of California's Common Law Right of Publicity**

**(On behalf of all Plaintiffs and the Class)**

135.   Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

136.   California's Common Law Right of Publicity law protects persons from the unauthorized appropriation of the person's identity by another for commercial gain.

137.   During the class period, LinkedIn knowingly used Plaintiffs' names, photographs, or likenesses to directly advertise or sell a product or service.

138.   LinkedIn did not have Plaintiffs' consent to do so.

139.   Plaintiffs received no compensation or other consideration for LinkedIn's use thereof.

140.   Plaintiffs were harmed by LinkedIn's actions.

141.   Plaintiffs were deprived of the earnings to which they were entitled.

142.   Use of Plaintiffs' names, photographs, and likenesses was directly connected to LinkedIn's commercial use.

143.   LinkedIn's actions were a substantial factor in causing Plaintiffs' harm.

144.   The advertisements were not used in conjunction with news, public affairs, a sports broadcast or account, or a political campaign.

59

145.   Plaintiffs and members of the Class therefore seek injunctive relief, and other such preliminary and other equitable or declaratory relief as may be appropriate.

146.   Plaintiffs and members of the Class seek a remedy as provided for by the California Common Law Right of Publicity in an amount equal to the greater of, the amount that LinkedIn avoided paying to the members of the Class in marketing costs, the value that LinkedIn derives from use of its members' name and/or likeness, actual damages, any profits attributable to LinkedIn's illegal action before taking into account any actual damages, punitive damages, attorneys' fees and costs, and any other relief as may be appropriate.

## SECOND COUNT

**Violation of California's Statutory Right of Publicity Cal. Civ. Code § 3344**
**(On behalf of all Plaintiffs and the Class)**

147.   Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

148.   California's Right of Publicity Statute, Cal. Civ. Code § 3344, protects persons from the unauthorized appropriation of the person's identity by another for commercial gain.

149.   During the Class period, LinkedIn knowingly used Plaintiffs' names, photographs, or likenesses to directly advertise or sell a product or service.

150.   LinkedIn did not have Plaintiffs' consent to do so.

151.   Plaintiffs received no compensation or other consideration for LinkedIn's use thereof.

152.   Plaintiffs were harmed by LinkedIn's actions.

153.   Plaintiffs were deprived of the earnings they would otherwise be entitled to.

154.   Use of Plaintiffs' names, photographs, and likenesses were directly connected to LinkedIn's commercial use.

60

RUSS, AUGUST & KABAT

155.   LinkedIn's misappropriation of Plaintiffs' names and/or likeness for use in reminder emails caused Plaintiffs worry, concern, embarrassment, frustration and/or injury to the feelings.

156.   The unauthorized use of professionals' names or likenesses made in the connection with the professionals' profession, causes emotional harm, *per se*. As a result of LinkedIn's conduct alleged herein, Plaintiffs suffered emotional harm, *per se*.

157.   LinkedIn's actions were a substantial factor in causing Plaintiffs' harm.

158.   The advertisements were not used in conjunction with news, public affairs, a sports broadcast or account, or a political campaign.

159.   Plaintiffs and members of the Class therefore seek injunctive relief, and other such preliminary and other equitable or declaratory relief as may be appropriate.

160.   As a result of its unlawful use of Plaintiffs' names and/or likenesses, LinkedIn is liable for any damages sustained as a result thereof, in an amount equal to the greater of seven hundred fifty dollars ($750) per LinkedIn member, or the actual damages suffered by Plaintiffs as a result of the unauthorized use.

161.   Plaintiffs and members of the Class seek punitive damages, attorneys' fees and costs, and any other relief as may be appropriate.

### THIRD COUNT

### Violation of Cal. Bus. & Prof. Code § 17200

### (On behalf of all Plaintiffs and the Class against LinkedIn)

162.   Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.

163.   LinkedIn's conduct as alleged herein constitutes unfair, unlawful, or fraudulent business acts or practices as proscribed by Section 17200, *et seq.*, of the California Business & Professions Code ("UCL").

61

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

164.   LinkedIn's conduct constitutes "unlawful" business acts or practices by virtue of LinkedIn's violation of the California Common Law Right of Publicity and Cal. Civ. Code § 3344.

165.   Plaintiffs read and reasonably relied on LinkedIn's representations that LinkedIn "will never send emails without your permission."  LinkedIn failed to disclose to that it sends repeated reminder emails advertising LinkedIn to contacts harvested from a LinkedIn user's external email account.  Moreover, LinkedIn fails to disclose on its signup screens and screens relating to address book importation that it would be sending repeated reminder emails to a users' contacts.

166.   LinkedIn's "User Agreement" and "Privacy Policy" fails to disclose LinkedIn's acts or practices, and together with its statement, provided when LinkedIn requires or requests a user's email address, that LinkedIn "will never send emails without your permission," are likely to deceive members of the public. As a result, LinkedIn's conduct constitutes "fraudulent" business acts and/or practices.

167.   Plaintiffs have an interest in controlling the use of their names and likenesses.  Contrary to Plaintiffs' interests, LinkedIn exercised control over the use of Plaintiffs' names and likenesses, exploiting them for profit without Plaintiffs' consent. As a result, LinkedIn's conduct constitutes "unfair" business acts or practices.

168.   LinkedIn's unlawful, fraudulent, and unfair practices originated from and/or occurred primarily in California.  Decisions concerning the creation of the endorsement email advertising scheme were made in California.  LinkedIn maintains all or a substantial part of the computer systems that serve LinkedIn's website in California, and all or a substantial part of the code and content that create and/or comprise endorsement email advertisements is developed and deployed within and from California.

169.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order permanently enjoining LinkedIn from continuing to engage in the unlawful, unfair, and fraudulent conduct described here.  Plaintiffs seek an order requiring LinkedIn to (1) immediately cease the unlawful practices stated in this Complaint, and (2) award Plaintiff and the Class reasonable costs and attorneys' fees pursuant to Cal. Code of Civ. Proc. § 1021.5.

170.   Plaintiffs have a vested monetary interest in their appearance in LinkedIn's repeated advertisements, and LinkedIn has deprived them of that interest.

171.   Plaintiffs each lost money to which they were entitled in the form of compensation for the use of their images and names, and in which they had a vested interest, by virtue of LinkedIn's conduct.  Plaintiffs are entitled to restitution of such sums.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the Class, pray for the following relief:

1.   Certification of this case as a class action on behalf of the Class defined above, appointment of Plaintiffs Paul Perkins, Pennie Sempell, Ann Brandwein, Erin Eggers, Clare Connaughton, Jake Kushner, Natalie Richstone, Nicole Crosby, and Leslie Wall as class representatives, and appointment of their counsel as Class counsel;

2.   A declaration that LinkedIn's actions, as described herein, violate the claims outlined above;

3.   An award of injunctive and other equitable relief as is necessary to protect the interests of the Plaintiffs and the Class, including, *inter alia*, an order prohibiting LinkedIn from engaging in the wrongful and unlawful acts described herein;

63

RUSS, AUGUST & KABAT

4.      Disgorgement or restitution by LinkedIn of all revenue earned from the fraudulent and unlawful advertising practices described herein during the class period;

5.      An award of damages, including statutory damages where applicable, to Plaintiffs and the Class in an amount to be determined at trial;

6.      An award of all economic, monetary, actual, consequential, and compensatory damages caused by LinkedIn's conduct, and if its conduct is proved willful, award Plaintiffs and the Class exemplary damages;

7.      An award of restitution against LinkedIn for all money to which Plaintiffs and the Class are entitled in equity;

8.      An award to Plaintiffs and their Class Counsel of their reasonable litigation expenses and attorneys' fees;

9.      An award to Plaintiffs and the Class of pre- and post-judgment interest, to the extent allowable; and

10.     Any and all other relief as equity and justice requires.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all issues triable.

RUSS, AUGUST & KABAT

64

1

2    Dated:  December 15, 2014          Respectfully submitted,

3                                       **RUSS AUGUST & KABAT**

4

5                                       By:  /s/ Larry C. Russ
                                             Larry C. Russ

6                                       Larry C. Russ, Cal. Bar No. 82760
7                                       lruss@raklaw.com
                                        Dorian S. Berger, Cal. Bar No. 264424
8                                       dberger@raklaw.com
                                        Daniel P. Hipskind, Cal. Bar No. 266763
9                                       dhipskind@raklaw.com
                                        12424 Wilshire Boulevard, 12th Floor
10                                      Los Angeles, California 90025
                                        Tel:  310.826.7474
11                                      Fax:   310.826.6991

12
                                        **LIEFF, CABRASER, HEIMANN &**
13                                      **BERNSTEIN, LLP**

14

15                                      By:  /s/ Michael W. Sobol
                                             Michael W. Sobol

16
                                        Michael W. Sobol, Cal.  Bar No. 194857
17                                      msobol@lchb.com
                                        Nicholas R. Diamand, Pro Hac Vice
18                                      ndiamand@lchb.com
                                        Melissa Gardner, State Bar No. 289096
19                                      mgardner@lchb.com
                                        275 Battery Street, 29th Floor
20                                      San Francisco, CA 94111
                                        Tel:   415.956.1000
21                                      Fax:  415.956.1008

22

23                                      *Attorneys for Plaintiffs*

24

25

26

27

28

RUSS, AUGUST & KABAT

65