Steven F. Helfand, SBN 206667
HELFAND LAW OFFICES
1400 SW 137th Avenue, Unit F112
Hollywood, FL 33027

Telephone:  415.596.5611
Email:      sh4078@gmail.com

Attorney for absent class member Hannah Tanner

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| PAUL PERKINS, PENNIE SEMPELL, ANN BRANDWEIN, ERIN EGGERS, CLARE CONNAUGHTON, JAKE KUSHNER, NATALIE RICHSTONE, NICOLE CROSBY and LESLIE WALL; individually, and on behalf of all others similarly situated.<br><br>          Plaintiff,<br>          *vs*.<br><br>LINKEDIN CORPORATION,<br><br>          Defendant. | Case No.: 13-CV-04303 LHK<br><br>**OBJECTION AND NOTICE OF INTENT TO APPEAR**<br><br>Ctrm. 8<br>Hon.   Lucy H. Koh<br>Date: February 11, 2016<br>Time: 1:30 p.m. |

**COMES NOW**, absent class member, Hannah Tanner [hereafter "Tanner"] and objects to the proposed class action settlement [hereafter the "Settlement"] as

follows:

## I. OBJECTION

### A. Introduction

The Court should decline to grant final approval to this proposed class action settlement [hereafter "S.A"]. The settling parties ensnared class members with a convoluted claims process [seven pages to read, understand and complete to *possibly* receive just ten dollars] and misleading settlement notice, ensuring the real beneficiaries of this settlement are the three *cy pres* beneficiaries, along with Class counsel.

The *cy pres* beneficiaries are murky organizations that are nakedly political. These organizations are not shy about weighing in on controversial political matters.

The first organization is overseen by Defendant. This is not disclosed to the class.

The second organization is notable for spending less than two percent of its programming resources in the United States. This organization has a penchant for hosting conferences in exotic locations. This is not disclosed to the class.

The third organization is a repeat-player. It has been involved in countless privacy cases. It has received millions of dollars in *cy pres* grants and has nothing to show for it.

The three *cy pres* beneficiaries are as follows:

- Access Now, Inc. [hereafter "Access"]
- Electronic Privacy Information Center [hereafter "EPIC"].
- Network for Teaching Entrepreneurship [hereafter "NTFE"].

**B. The Claim Form is convoluted and needlessly lengthy. It serves only to increase the amount of money to be given to the *cy pres* beneficiaries.**

A class member must wade through a voluminous and wordy seven pages in order to be eligible to possibly receive just ten dollars. In the attestation, the class members must swear under penalty of perjury that he/she has been "injured" in some manner. The word "injury" is not explained. Does it mean emotional distress? Does it mean physical injury? Does it mean reputational harm? It is unknown how a class member would or could know whether or not an "injury" has taken place. The concerns are compounded by the fact the Notice states, "**No one knows in advance whether or in what amount payments will be made to claimants**." Email Notice, p. 1. If too many claimants file claims, it is possible no claimants will receive any money. All of it instead will be given to *cy pres* beneficiaries. Why bother?

**B. The *Cy Pres* Beneficiaries are Nakedly Political Organizations**

**1. Access**

Put simply, class money **should be inaccessible to Access**.

*First*, Access purports that it is "an international human rights organization premised on the belief that the realization of human rights and democracy in the twenty-first century is increasingly predicated on access to the internet and other forms of information technology." Exhibit A, p. 2.

*Second*, Access lobbies the federal government. See, Ex. A, p. 37, line 4.

*Third*, Access is overtly political: "**ACT NOW TO # STOPCISA The dangerous CISA cyber-surveillance bill is on the move AGAIN. Send U.S. Rep. Michael McCaul a tweet and ask him to stand strong for privacy …**" See, Exhibit A, p. 23.1 - 23.3. By way of further example, Access opposes French security measures implemented after the recent Paris terrorist assaults. Exhibit A, p. 23.4.

*Fourth*, Access is anti-American and supported by utopian leftists with a decidedly progressive agenda. Access asserts for example, "In enforcing the acts such as ACTA, PIPA or SOPA, the government [of the United States] is ruining our culture, our freedom, our lives."

*Fifth*, Access purportedly "defends and extends the digital rights of users at risk around the world." Virtually all of Access' programming is overseas. See, e.g., Exhibit A, p. 64 [reflecting expenditures for programming]. This is critical and underscores the disconnect between Access and the class. For instance,

Access' geographic funding for programming as per its most recent tax filing is as follows:

| Geographic Location | Amount of Expenditure |
|---|---|
| Europe | $131,000 |
| South America | $29,000 |
| East Asia & The Pacific | $7,000 |
| North America | $3,000 |
| Russia | $2,000 |
| Middle East & North Africa | $199,000 |
| TOTAL | $371,000 |
| **Percentage to North America** | **1.9 %** |

Of course, North America consists of more than twenty countries spanning from Canada to Panama. The amount of programming directed to the United States is not broken out but appears to be minimal, if any.

*Sixth*, one of the largest consumption of resources by Access is for travel expense, including to exotic locations such as Rio, Brazil for its executive director. See, Exhibit A, p. 79; Compare p. 69 ["Access held an educational conference, the Silicon Valley Human Rights Conference, on May 31st and June 1, in Rio De Janeiro, Brazil."] Why a Silicon Valley conference was venued in Brazil is not explained. Funding a frivolous organization run by jet-setting progressives is not a valid use of *cy pres* funds.

*Seventh*, as to advocacy, Access "teams with digital activists and civil society groups internationally to build their technical capacity and to help them advocate globally for their digital rights." Exhibit A, p. 13. Its blog weighs in on controversial subjects such as anti-terrorism monitoring by a variety of governments.

*Eigth*, Access implicitly supports a boycott against the United States of America while inconsistently seeking to profit from class proceeds originating from it. See, e.g., Exhibit A, p. 11 ["We call on you to stand up to governments who use your services for censorship, surveillance, and to otherwise violate the rights of their citizens. If the conditions in a country in which you operate make it impossible to respect human rights, it's time to end your operations there."]

*Ninth*, Access' does not promote democratic values; its mantra is "**Respect rights or get out!**" In other words, class members who disagree with Access should presumably get out too by seeking exclusion. As shall be shown, this contention is not persuasive.

*Finally*, most of the money it raised last year was devoted to salaries of its employees. See, e.g., Exhibit A, p. 44 [reporting salaries of $98, 886 plus other wages of $584,030]. When rent, management expenses, and ancillary services are included, the financial picture of Access becomes even more bleak.

Class funds should not be used as a bailout for a political organization and its bloated staff. Class counsel must explain the following:

- Why was this organization was selected?
- How shall class proceeds be used by Access?
- How are Access' activities to be monitored, if at all?
- Shall the class receive anything tangible for the grant?
- What value, if any, will the class realize for the money.

Class counsel should also disclose why this group was selected and whether any of the attorneys involved have connections to the organization, directly or indirectly. In fact, according the tax records, a major contributor to Access is another entity called Humanity United. Humanity United appears to have shadowy and undisclosed connections with Lieff Cabraser. Lieff Cabraser should acknowledge its connections, if any, however indirect, to Access or leading funders for Access, such as Humanity United. If confirmed, Class counsel has a disabling conflict of interest which precludes an award of fees in their favor. *Rodriguez v. West Publ'g. Corp*. (9th Cir. 2009) 563 F.3d 948.

Free speech is a wonderful thing. This objection does not take issue with Access' right, along with the two other beneficiaries, guaranteed by the Constitution, to pursue whatever political or social policies it finds appropriate. By the same token, class members have Constitutional rights as well; they may not be

compelled to fund political advocacy or a world wide policy agenda of any stripe. Put even more simply, free speech should not be underwritten by the class. Moreover, both parties have misled the class by failing to disclose their connections with the beneficiaries.

**2. EPIC**

The organization, EPIC, often appears in cases such as this one as a beneficiary of class settlement proceeds. Yet, in spite of it being a repeat-player, there is virtually nothing tangible to show for its activities. It's about time an organization that repeatedly utilizes *cy pres* funds make a proffer specifically demonstrating how it used prior *cy pres* awards.

**3. NTFE**

NTFE is affiliated with LinkedIn. LinkedIn is a member of its "Board of Overseers." See, Exhibit A, p. 162 [indicating Reid Hoffman]. This fact is not disclosed to the class. It also creates a conflict of interest.

**4. Miscellaneous concerns**

So as to defeat transparency:

- no web addresses are provided for the *cy pres* recipients; and
- no descriptions as to how funds are to be utilized [restricted or unrestricted] are set forth.

In short, there is no meaningful nexus between the claims here and the proposed *cy pres* beneficiaries in the Notice.

### C. Concluding introductory comments

The Court has a choice. It can, as urged by the settling parties, close its eyes to reality, defer to settling counsel and reflexively adopt the unsupportable notion that this settlement provides a benefit to class members. Or it can, as required by Fed. R. Civ. P. 23, scrutinize the facts, closely inspect the terms of settlement, and demand explanations and evidence from the settling parties, all to faithfully discharge its fiduciary duty to class members and ferret out the true state of affairs.

## II. DISCUSSION

### A. Notice is not adequate

A notice may not be misleading. The notice is misleading. It violates due process and Fed. R. Civ. Proc., Rule 23. *Molski v. Gleich* (9th Cir. 2003) 318 F.3d 937, 952 [Notice is not adequate if it misleads the class]; *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488, 504 (D. Kan. 2012) (denying approval where *cy pres* beneficiaries were not designated); see also, *In re Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1111 (D.N.M. 2012) (outlining *cy pres* defects).

### B. The S.A. Purports to Violate the First and Fifth Amendments

### 1. *Cy Pres* reversion to a third party, political advocacy group, is not appropriate

a. **What is *cy pres*?**

The term *cy pres* is derived from a French phrase meaning "as near as." In the class action context, the reason for appealing to *cy pres* is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement to the class. *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ["'[C]y pres' is the name of a doctrine of trust law that allows the funds in a charitable trust, if they can no longer be devoted to the purpose for which the trust was created, to be diverted to a related purpose; and, so, when the polio vaccine was developed the March of Dimes Foundation was permitted to redirect its resources from combating polio to combating other childhood diseases."]

When class actions are settled or tried, there are times that it's not possible to distribute all of the money recovered to some or all of the class members. They may be difficult to identify or find or it may not be economically feasible to distribute the funds to them. For example, the cost of distributing 50 cents to each of 6 million class members may preclude individual distribution, even though the defendant has been held accountable for cheating the class out of $3 million.

When that is so, the *cy pres* doctrine allows the funds to be distributed to a nonprofit charitable organization to support work that indirectly benefits the class and advances the public interest.

b. **What kinds of *cy pres* distributions are appropriate?**

Where it is not possible to directly distribute all of the money to the class members, a *cy pres* distribution to a non-profit organization may be appropriate. "The fairness of the settlement must be evaluated primarily based on how it compensates class members." *Pampers*, 724 F.3d at 720 (emphasis in original). Although this Court cannot compel the settling parties to employ a direct payment process, it can and should refuse to approve a settlement until the parties do so of their own accord. Another viable option for the parties is limiting the release to those class members who submit claims forms. See *Fraser v. Asus Computer Int'l*, No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 181315, at *7-*10 (N.D. Cal. Dec. 21, 2012) (release should be limited to those who submit claim forms), revised settlement granted preliminary approval at 2013 U.S. Dist. LEXIS 22338 (N.D. Cal. Feb. 19, 2013); *Ross v. Trex Co.*, No. C 09-00670 JSW, 2013 U.S. Dist. LEXIS 74720, at *5 (N.D. Cal. May 28, 2013) (same as Fraser).

The alternative, in some cases, is that parties may enter into settlements that allow all of the unclaimed money to go back to the defendant. This has the effects of enormously reducing the benefit the settlement confers on the class and letting the defendant keep the benefit of much (and sometimes nearly all) of the money it wrongfully took from the class. Courts generally have approved *cy pres* distributions in two circumstances. Am. Law Inst. ("ALI"), Principles of Law of

Aggregate Litig. § 3.07, comment a (2010) ["First, many courts allow a settlement that directs funds to a third party when funds are left over after all individual claims have been satisfied…. Second, some courts allow a settlement to require a payment only to a third party, that is, to provide no recovery at all directly to class members."] See, *e.g.*, *In re Lupron Marketing and Sales Prac. Litig.*, 677 F.3d 21, 25 (1st Cir. 2012) (involving settlement that allowed consumers to claim 30% of their total out-of-pocket payments or $100, whichever sum was greater).

Courts generally require that, if feasible. "unclaimed funds" should be distributed to class members first rather than to a third party. See *In re Bank of Am. Corp. Sec. Litig.*, 775 F.3d at 1064 (holding unclaimed funds should be distributed to the class "except where an additional distribution would provide a windfall to class members with liquidated damages claim that were 100 percent satisfied by the initial distribution"); *In re Lupron*, 677 F.3d at 32 (noting the ALI principles' policy that unclaimed funds be redistributed to ensure class members recover their full losses); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) (cautioning that direct distributions to the class are preferred to *cy pres* distributions but holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component); *Klier v. Elf Atochem North Am. Inc.*, 658 F.3d 468, 478–79 (5th Cir. 2011) (holding that district court abused its discretion by not redistributing funds left unclaimed by one segment of the class to another segment of the class).

Because the concept of a *cy pres* distribution is, that it should be, "as near as" giving the money to the class members, *cy pres* distributions should relate to the

purposes of the case. For instance, in a case that challenges predatory lending practices that, result in many people losing their homes, for example, it might be appropriate for residual funds to be distributed to organizations that address housing problems. In a class action involving overcharges for pharmaceutical products, however, it would make little sense to distribute funds to such organizations. The parties here have violated this rule.

### c. What kinds of *cy pres* distributions are inappropriate?

When possible, monies recovered in class actions should go directly to the class members themselves. It is inappropriate for a settlement to pay out all or nearly all of the money in *cy pres* distributions when it is possible to distribute significant sums to the class members themselves. It is also, not appropriate, for the settling parties to attempt to direct *cy pres* distributions to personal favorite charities (such as one's alma mater) or political advocacy organizations that have no relationship to the issues addressed by the underlying lawsuit.

## 2. The Cy Pres funds nakedly political organizations and this raises constitutional issues

Making a political contribution is First Amendment protected, expressive and associational activity. *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (per curiam). Concomitantly, individuals have a right to refrain from making such a donation, a right to not be compelled to engage in expressive and associational activity. See, e.g., *Knox v. Service Employees Int'l Union, Local 1000,* 132 S. Ct. 2277, 2288

(2012) (the government "may not…compel the endorsement of ideas it approves.").

"First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors." *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001); *Keller v. State Bar of California*, 496 U.S. 1 (1990) (attorney bar dues cannot be used for political or ideological purposes); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235 (1977) (teacher union dues cannot be used for ideological activities not "germane" to their bargaining representative duties); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (recognizing the right of an individual to reject a state measure that forces him "as a part of his daily life…to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable.").

In articulating this right, the Supreme Court has acknowledged Thomas Jefferson's view that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves[] is sinful and tyrannical." *Abood*, 431 U.S. at 234 n. 31, (quoting I. Brant, James Madison: The Nationalist 354 (1948)) (internal quotation marks omitted). *Abood* allowed room for charging dues for uses related to collective bargaining. *Id*. at 232. Recently, however, the Supreme Court cast doubt upon even this exception to the First Amendment right against compelled speech subsidy. *Harris v. Quinn*, 134 S. Ct. 2618, 2632 (2014) ("*Abood* failed to appreciate the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends").

*Harris* refused to extend *Abood* to regulated occupations that were not "full-fledged public employees." *Id*. at 2638.

"[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Id*. at 2644. These principles render class action, third-party awards (at least those awards like this one that will be reserved for lobbying, litigation, or other First Amendment political activity, whether termed "cy pres" or not) unconstitutional. Three premises support this conclusion.

The first premise is that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing ALI Principles of the Law of Aggregate Litigation § 3.07 cmt. (b)).

The second premise is that a third-party donation is an expression of support, association, and endorsement of the third-party's political agenda and activities. See, e.g., *Buckley, supra*; *In re Asbestos Sch. Litig*., 46 F.3d 1284, 1294 (3d Cir. 1994) (Alito, J.) ("Joining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection.").

And the third and final premise is that absent class members are being compelled into participating in the donations.

The S.A.'s "opt out" right is not an opportunity to merely abstain from the political donation, it is simply the right to exit the class action entirely. The settling

parties are conditioning class members' right to participate in the action on their acceptance of the compelled donation, tantamount to telling union members or regulated professionals that their dues are not mandatory because they are always free to quit and find a new profession. This is a *Hobson's choice*, not a true opt-out. See *Keller*, 496 U.S. at 10 ("Claimants cannot be required by government action to relinquish First Amendment rights as a condition of retaining employment."); *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 978 (1st Cir. 1993), superseded on other grounds by Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998) (where the burden to avoid is "more than an inconvenience" a rule requiring monetary contribution should be viewed as compulsory).

The above discussion presumes that a noncoercive opt-out scheme would satisfy the First Amendment concerns, but recent jurisprudence has suggested that even an actual opt-out scheme may be too burdensome and that an opt-in scheme may be required by the First Amendment. *Knox v. SEIU*, 132 S. Ct. 2277, 2290-96 (2012). Because silence does not equate to consent, "[a]n opt-out system creates a risk that the fees paid by nonmembers will be used to further political and ideological ends with which they do not agree." *Id*. at 2290; see generally Christopher R. Leslie, The Significance of Silence: Collective Action Problems and Class Action Settlements, 59 FLA. L. REV. 71, 73 (2007) ("Silence may be a function of ignorance about the settlement terms or may reflect an insufficient

amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low.").

### III. CONCLUSION

The Court should deny final approval to the S.A. Free expression of ideas is what this country is about. Ideas of all political stripes are welcome. However, the class should not have to pay for either left wing or right wing social theorists in their embrace of political frivolity, "real" or "imagined" issues or anything else. Class money cannot be misused in this fashion and the Court has a responsibility to prevent it.

Respectfully submitted,

Dated: December 11, 2015        _____/s/_____

                Steven Franklyn Helfand

                1400 SW 137th Avenue, Apt. F112
                Hollywood, FL 33027
                Telephone:  415.397.0007
                Email:       sh4078@gmail.com

Objection and Notice of Intent to Appear

17