LARRY C. RUSS (SBN 82760)
lruss@raklaw.com
NATHAN D. MEYER (SBN 239850)
nmeyer@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7424
Facsimile: (310) 826-6991

MICHAEL W. SOBOL (SBN 194857)
msobol@lchb.com
NICHOLAS R. DIAMAND (*Pro Hac Vice*)
ndiamand@lchb.com
MELISSA GARDNER (SBN 289096)
mgardner@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

DORIAN S. BERGER (SBN 264424)
dberger@olavidunne.com
DANIEL P. HIPSKIND (SBN 266763)
dhipskind@olavidunne.com
OLAVI DUNNE LLP
1880 Century Park East, Ste. 815
Los Angeles, California 90067
Telephone: (213) 516-7900
Facsimile: (213) 516-7910

*Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PAUL PERKINS, PENNIE SEMPELL, ANN BRANDWEIN, ERIN EGGERS, CLARE CONNAUGHTON, JAKE KUSHNER, NATALIE RICHSTONE, NICOLE CROSBY, and LESLIE WALL; individually and on behalf of all others similarly situated,<br><br>                  Plaintiffs<br><br>    v.<br><br>LINKEDIN CORPORATION,<br><br>          Defendant. | Case No. 13-CV-04303-LHK<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        February 11, 2016<br>Time:       1:30 pm<br>Courtroom:  Room 8, 4th Floor<br>Judge:     Honorable Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ............................................................................. vi

I. INTRODUCTION ............................................................................................ 1

II. FACTUAL AND PROCEDURAL BACKGROUND ......................................... 1

III. TERMS OF THE SETTLEMENT ..................................................................... 2

    A. The Class Definition ............................................................................ 2

    B. Benefits to the Settlement Class ......................................................... 3

        1. Prospective Relief for all United States LinkedIn Users ............... 3

        2. Monetary Relief, Claims Figures and Payments to Class Members .................................................................................. 4

    C. Release ................................................................................................. 5

IV. ARGUMENT .................................................................................................. 6

    A. The Class Action Settlement Approval Process ................................. 6

    B. The Court-Approved Notice Program Meets Applicable Standards and Has Been Fully Implemented. .................................... 6

    C. Significant Additional Notice was Achieved Through Media Coverage of the Settlement and Notice Program. ............................. 8

    D. Final Approval of the Settlement is Appropriate. .............................. 9

        1. The Settlement is the Product of Arm's-Length Negotiations and, Therefore, Presumptively Fair and Reasonable. .................. 10

        2. The Litigation Risks Favor Final Approval. ............................... 11

        3. The Recommendation of Experienced Counsel Favors Approval. ................................................................................. 12

        4. The Class Response Favors Final Approval. ............................... 12

            a. Objections to the Litigation Itself .................................. 14

            b. Objections to the Monetary Relief ................................. 14

            c. Objections to the Prospective Relief ............................... 16

            d. Objections to the Cy Pres Provisions .............................. 17

            e. Objections to the Notice ................................................. 20

            f. Objections to the Claims Process ................................... 22

            g. Objections to the Release ................................................ 24

        5. The Repeat Objectors are not Credible ....................................... 24

V. CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

Barnhill v Fla. Microsoft Anti-Trust Litig.,
  905 So.2d 195 (Fla. Dist. Ct. App. Apr. 6, 2005) ................................................... 25

Bayat v. Bank of the W.,
  No. 13-2376, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ................................. 22

Bellinghausen v. Tractor Supply Co.,
  306 F.R.D. 245 (N.D. Cal. 2015) ........................................................................ 12

Browne v. Am. Honda Motor Co.,
  No. 9-6750, 2010 WL 9499072 (C.D. Cal. July 29, 2010) ............................. 13, 16

Churchill Vill., LLC v. GE,
  361 F.3d 566 (9th Cir. 2004) ......................................................................... 13, 21

Class Plaintiffs v. City of Seattle,
  955 F.2d 1268 (9th Cir. 1992) .................................................................. 9, 10, 12

Custom LED, LLC v. eBay, Inc.,
  No. 12-350, 2013 WL 6114379 (N.D. Cal. Nov. 20, 2013) ................................. 24

Dennis v. Kellogg Co.,
  697 F.3d 858 (9th Cir. 2012) ............................................................................. 18

Dennis v. Kellogg Co.,
  No. 9-1786, 2013 WL 6055326 (S.D. Cal. Nov. 4, 2013) ................................... 25

Ellis v. Naval Air Rework Facility,
  87 F.R.D. 15 (N.D. Cal. 1980) ........................................................................... 12

Ficalora v. Lockheed Cal. Co.,
  751 F.2d 995 (9th Cir. 1985) ............................................................................. 10

Fraley v. Facebook, Inc.,
  966 F. Supp. 2d 939 (N.D. Cal. 2013) ......................................................... passim

Garner v. State Farm Mut. Auto Ins. Co.,
  2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ..................................................... 10

Hanlon v. Chrysler Corp.,
  150 F.3d 1011 (9th Cir. 1988) ....................................................................... 9, 17

Hesse v. Sprint Corp.,
  598 F.3d 581 (9th Cir. 2010) ............................................................................. 24

Horn v Bank of Am. NA,
  No. 12-1718, 2014 WL 1455917 (S.D. Cal. Apr. 14, 2014) ................................ 25

*In re Airline Ticket Comm'n Antitrust Litig.*,
953 F. Supp. 280 (D. Minn. 1997) ............................................................ 16

*In re CreditDebit Card Tying Cases*,
No. A-138984, 2014 WL 5488910 (Cal. Ct. App. Nov. 24, 2014) ....................... 25

*In re Google Buzz Privacy Litig.*,
No. 10-672, 2011 WL 7460099
(N.D. Cal. June 2, 2011) ......................................................................... 16

*In re Google Referrer Header Privacy Litig.*,
No. 10-4809, 2015 WL 1520475
(N.D. Cal. Mar. 31, 2015) ........................................................................ 16

*In re High-Tech Emp. Antitrust Litig.*,
No. 11-2509, 2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ......................... passim

*In re Indep. Energy Holdings PLC Sec. Litig.*,
No. 6689, 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) .................................. 10

*In re Netflix Privacy Litig.*,
No. 11-379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .............................. 9, 16

*In re NVIDIA GPU Litig.*,
539 Fed. App'x 822 (9th Cir. 2013) ............................................................ 25

*In re Uponor, Inc.*,
No. 11-MD-2247, 2012 WL 3984542 (D. Minn. Sept. 11, 2012) ....................... 25

*In re WorldCom Inc. Sec. Litig.*,
No. 2-3288, 2004 WL 2591402 (S.D.N.Y. 2004) ........................................... 25

*In re Yahoo! Litig. True Comm., Inc.!*,
No. 6-2737 (N.D. Cal. 2010) ................................................................... 25

*In re: Oil Spill*, MDL 2179,
2013 WL 144042 (E.D. La. Jan. 11, 2013) ................................................... 25

*Keller v. Nat'l Coll. Athletic Ass'n (NCAA)*,
No. 9-1967, 2015 WL 5005901 (N.D. Cal. Aug. 19, 2015) ......................... 21, 22

*Ko v. Natura Pet Products, Inc.*,
No. 9-2619, 2012 WL 3945541 (N.D. Cal. Sept. 10, 2012) ............................... 14

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) .................................................................... 19

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998) ......................................................... 10, 11, 15

*Marshall v. Holiday Magic, Inc.*,
  550 F.2d 1173 (9th Cir. 1977) .................................................................. 12

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) ................................................................. 18

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ............................................................ 12

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982) ......................................................... 9, 10, 15

*Parker v. Time Warner Entm't Co., L.P.*,
  331 F.3d 13 (2d Cir. 2003) ...................................................................... 15

*Ralston v Mortg. Inv'rs. Grp. Inc.*,
  No. 8-536, 2013 WL 5290240 (N.D. Cal. Sept. 19, 2013) ..................... 25

*Rodriguez v. West Pub. Corp.*,
  2007 WL 2827379 (C.D. Cal. Sept. 10, 2007) ....................................... 12

*Rose v Bank of Am. Corp.*,
  No. 11 -2390, 2015 WL 2379562 (ND Cal. May 18, 2015) ...................... 25

*Satchell v. Fed. Express Corp.*,
  Nos. 03-2659, 03-2878, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ............... 10

*Sugarman v. Ducati N. Am., Inc.*,
  No. 10-5246, 2012 WL 113361 (N.D. Cal. Jan. 12, 2012) ..................... 13

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) ..................................................................... 10

*Utility Reform Project v. Bonneville Power Admin.*,
  869 F.2d 437 (9th Cir. 1989) ..................................................................... 9

*Van Bronkhorst v. Safeco Corp.*,
  529 F.2d 943 (9th Cir. 1976) ..................................................................... 9

*Wakefield v. Wells Fargo & Co.*,
  No. 13-5053, 2015 WL 3430240 (N.D. Cal. May 28, 2015) ................... 10

*Wal-Mart Stores Inc v Buholzer*,
  156 Fed. App'x 347 (2d Cir. 2005) ........................................................ 25

*Wren v. RGIS Inventory Specialists*,
  No. 6-5778, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ...................... 14

1283489.8

# TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

Cal. Bus. and Prof. Code § 17206 ................................................................................. 20

Cal. Bus. and Prof. Code § 17206.1 .............................................................................. 20

Cal. Civ. Code § 3344 ...................................................................................... passim

**TREATISES**

4 NEWBERG ON CLASS ACTIONS,
    §§ 11.22, *et seq.* (4th ed. 2002) ................................................................. 6

MANUAL FOR COMPLEX LITIGATION (Fourth)
    §§ 21.632, *et seq.* (2004) ......................................................................... 6

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 11, 2016 at 1:30 p.m., or as soon as the matter may be heard in Courtroom 8 of the above-entitled court, Class Representatives Paul Perkins, Pennie Sempell, Ann Brandwein, Erin Eggers, Clare Connaughton, Jake Kushner, Natalie Richstone, Nicole Crosby, and Leslie Wall ("Plaintiffs") will and hereby do move, pursuant to Federal Rule of Civil Procedure 23(e), for entry of an order finally approving the Settlement with Defendant LinkedIn Corporation ("LinkedIn"), specifically:

1. finding that the Settlement is fair, reasonable, and adequate within the meaning of Rule 23(e) of the Federal Rules of Civil Procedure;

2. finding that the notice provided to the Class constitutes due, adequate, and sufficient notice, and meets the requirements of due process and applicable law;

3. approving the method for distributing monetary relief under the Settlement;

4. directing that this action be dismissed with prejudice as against Defendant;

5. approving the release of claims as specified in the Settlement as binding and effective;

6. reserving exclusive and continuing jurisdiction over the Settlement; and

7. directing that final judgment of dismissal be entered as between Plaintiffs and Defendant.

This motion is brought pursuant to Federal Rule of Civil Procedure 23(e) and is based upon the supporting Memorandum of Points and Authorities filed concurrently with this Notice; the supporting Declarations of Nathan Meyer ("Meyer Decl."), Nicholas Diamand ("Diamand Decl."), Dorian Berger ("Berger Decl."), Daniel Burke ("Burke Decl."), Kenneth Jue ("Jue Decl."), Adam Weinstein ("Weinstein Decl."), and Kurt Andersen ("Andersen Decl."), filed concurrently with this Notice; the records, pleadings, and papers filed in this action, and upon such argument as may be presented to the Court at the hearing on this motion.

1283489.8

# I. INTRODUCTION

Plaintiffs respectfully submit this Memorandum in support of final approval of the Class Action Settlement with LinkedIn. The Settlement is fair, reasonable, and adequate. This action challenges LinkedIn's Add Connections service which allows users to import contact information from their email accounts and invite contacts to join their LinkedIn network. Plaintiffs allege that LinkedIn improperly grew its member base through Add Connections, particularly through the use of invitation emails and up to two subsequent reminder emails sent by LinkedIn displaying the names and/or likenesses of Class Members. Pursuant to the terms of the Settlement, LinkedIn has made significant and meaningful changes to its disclosures and functionality for the use of its Add Connections service, which are designed to address, remedy, and prospectively prevent the fundamental harms that gave rise to this litigation. Additionally, LinkedIn has agreed to pay $13 million to establish a non-reversionary cash Settlement Fund from which Settlement Class Members who submit valid claims will be sent cash payments. The Court granted preliminary approval on September 15, 2015. (Dkt. No. 106, at 3).

The Notice Plan, which the Court found was "consistent with the requirements of Rule 23 and due process, and constitute[s] the best notice practicable under the circumstances," (*id.* at 4), has been fully implemented with a thoroughly positive result. Following direct email notice to the Class (of 20,890,903 members), 443,047 valid Claim Forms, 145 exclusion requests (0.0007%), 8 valid objections (0.00004%), and 85 total objections, inclusive (0.0004%), to the Settlement were received.

The Parties carried out the Court's Order and the Settlement should be finally approved.

# II. FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiffs are individuals who used LinkedIn's Add Connections service and initiated emails containing their names and/or likenesses, inviting others to join their professional networks on LinkedIn. Plaintiffs assert violations of California common law and statutory rights of publicity, and California's Unfair Competition Law (the "UCL"); and seek monetary, injunctive and other equitable

---

[1] Plaintiffs provide a brief overview here of the factual and procedural background for the Court's convenience. A more fulsome description was included in Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (Dkt. No. 95).

relief against LinkedIn, as well as statutory damages pursuant to California Civil Code § 3344. (Dkt. No. 70). LinkedIn answered the operative Complaint on January 9, 2015. (Dkt. No. 73).

On June 11, 2015, Plaintiffs moved for preliminary approval of the Settlement, and a hearing was held on August 27, 2015. (Dkt. Nos. 95, 102). On September 10, 2015, the Parties submitted additional materials and a Joint Statement regarding Plaintiffs' Motion for Preliminary Approval. (Dkt. Nos. 102, 105). On September 15, 2015, the Court granted the Motion for Preliminary Approval, appointed the undersigned as Class Counsel; appointed Gilardi & Co., LLC as Settlement Administrator; approved the form and manner of notice to the Class; and scheduled a Final Approval Hearing. (Dkt. No. 106).

Notice was disseminated on October 2, 2015, by direct email to the Settlement Class. (Burke Decl. ¶4). Claims were filed throughout the claims period up to the opt-out deadline of December 14, 2015. (*See* Dkt. No. 106, ¶27). Pursuant to the Settlement terms, shortly after that deadline, the Settlement Administrator initiated a procedure for claimants who had not established Class membership to cure deficient claim forms. (Burke Decl. ¶24). As discussed *infra*, that process concludes on January 20, 2016. On November 30, 2015, Class Counsel moved for attorneys' fees, litigation costs, and incentive awards for the Class Representatives. (Dkt. No. 116). By February 4, 2016, Class Counsel will respond to objections[2] to its fee petition and report final claims data, including figures from the ongoing process to cure deficient claim forms.

## III.   TERMS OF THE SETTLEMENT

The Settlement resolves all claims of Class Members against LinkedIn. The key terms of the Amended Class Action Settlement (Dkt. No. 105-2) are described below.

### A.   The Class Definition

The Court has certified a Settlement Class, defined as follows:

> All current and former LinkedIn members who used Add Connections to import information from external email accounts and to send emails to persons who were non-members in which the member's name, photograph, likeness and/or identity was displayed between September 17, 2011 and October 31, 2014.[3]

---

[2] LinkedIn, together with the Settlement Administrator, will also confirm according to its own records which objections have been submitted by verified Class Members. Diamand Decl. ¶28.

[3] Defendant, its subsidiaries, and affiliates and each of their respective officers, directors and

*Footnote continued on next page*

## B.    Benefits to the Settlement Class

### 1.    Prospective Relief for all United States LinkedIn Users

As a direct result of this Settlement, LinkedIn made significant practice changes to its operations designed to ensure that United States LinkedIn users are provided adequate notice and control over LinkedIn's use of their names and likenesses in Add Connections emails.  The disclosures on LinkedIn's website have been improved so that Class Members do not inadvertently upload their address books or initiate emails to their contacts.  (Declaration of Adam Kaplan In Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement; Dkt. No. 105-4). On the *Add Connections Import* screen, which users view before LinkedIn uploads contact information for potential invitation recipients, LinkedIn now expressly states that it will "import your address book to suggest connections." (*Id.*). When this suit was filed, LinkedIn made no such disclosures, and merely stated "[g]et started by adding your email address." (Dkt. No. 1, ¶¶9-15; 25). Additionally, pursuant to the Settlement, LinkedIn's *Add Connections Invitations* permission screen has been revised to state that "[i]f someone you invite doesn't respond right away, we'll send up to two reminders." (Settlement, § 2.2; Dkt. No. 105-4, at 12).  Plaintiffs alleged that LinkedIn previously did not disclose its practice of sending reminder emails following initial invitation emails (Dkt. No. 1, ¶18), and, once the Add Connections invitations process had been initiated, LinkedIn users had no practical way to stop reminder emails from being sent.  (Dkt. No. 1, ¶¶32-33).  Although the functionality was designed to facilitate hundreds or thousands of Add Connection invitations going out with modest effort – just a few clicks, undoing each invitation had to be done manually, one invitation at a time, which effectively limited users' ability to do so. (*Id.*) Now, pursuant to the Settlement, LinkedIn has implemented functionality allowing users who send an initial Add Connection invitation to withdraw those invitations *en masse*, preventing unwanted reminder emails from being sent.  (Berger Decl. ¶7; Dkt. No. 105-4, at 14). This relief is of significant value to the Class and achieves, prospectively, the key goals of this litigation.

---

*Footnote continued from previous page*
employees; Class Counsel and Defendant's Counsel; and any judicial officer to whom the Action is assigned benefits to the Settlement Class are all excluded from the Class. (Dkt. No. 106, at 2).

## 2. Monetary Relief, Claims Figures and Payments to Class Members

LinkedIn has also agreed to establish a Settlement Fund of $13 million to be used for: (a) providing compensation to Settlement Class Members; (b) payment of Settlement Administration and Notice Expenses; and (c) payment of any court-approved attorney Fee Award and Incentive Awards for the Class Representatives. (Settlement, §§ 2.1.1, 1.23, 8.1.1).

Settlement Administration expenses are capped at and are expected to be under $750,000. Plaintiffs seek Incentive Awards of $1,500 for each of the nine Named Plaintiffs for a total of $13,500 (Dkt. No. 116) and attorneys' fees (*inclusive* of all litigation costs) in the amount of 25% of the Settlement Fund, $3.25 million. (*Id.*). The portion of the Settlement Fund available for payments to Authorized Claimants thus totals approximately $9 million.[4] (Should the Court award less than the amounts sought in the petition for Incentive Awards and/or Attorneys' fees and costs, the difference between the amounts sought and awarded will remain in the Settlement Fund to pay Authorized Claimants. (Settlement, § 8.1.1)).

A total of 567,816 Claim Forms were submitted. (Burke Decl. ¶19). Of these, 377,104 claimants provided the Claim ID from their Email Notice and were thus counted as Valid Claimants. (*Id.* ¶17, Weinstein Decl. ¶12). 188,738 individuals submitted Claim Forms without providing their Claim ID, and instead submitted the email address they used to sign up for LinkedIn as a means of validating their Class membership. (Burke Decl. ¶17).[5] On December 15, 2015, after removing 6,637 exact duplicate claims, the Settlement Administrator provided to LinkedIn the names and email addresses submitted by the 182,101 such individuals. (*Id.* ¶¶19-20). Pursuant to the Settlement, LinkedIn checked that information against records of Add Connections users between September 17, 2011 and October 31, 2014, and identified 1,011 duplicate Claims, (Weinstein Decl. ¶13) and an additional 65,943 Authorized Claimants, (*Id.*) for a total of 443,047 valid Claims, to date.

---

[4] The Settlement provided for a Contingent Payment by LinkedIn of up to $750,000 if the Net Settlement Fund had been insufficient to allow for *pro rata* payments of at least $10 to each Authorized Claimant, with the payment equal to that amount necessary to increase the amount of such *pro rata* payments to Authorized Claimants to a maximum of $10. (Settlement, §2.1.2). Because the expected *pro rata* distribution is at least $16, LinkedIn's obligation to make the Contingent Payment will not be triggered.

[5] 1,974 claimants submitted claims by mail, email or fax. (Burke Decl. ¶18).

On January 6, 2016, in consultation with the Parties, the Settlement Administrator sent to the remaining 112,022 Claimants (to the current email address they provided) a Notice of Deficiency, which contained a hyperlink to a webpage created by the Settlement Administrator where claimants could re-submit the email address associated with their LinkedIn account, or their unique Claim ID, in order to validate their claim. (Burke Decl. ¶24, Weinstein Decl. ¶14). The deadline for claimants to respond to the Notice of Deficiency is January 20, 2016. Assuming that 100% of these claims are cured, the estimated total number of Authorized Claimants will be 556,469, resulting in an estimated *pro rata* payment to each Authorized Claimant of no less than $16.[6] Pursuant to the proposed Plan of Distribution (Settlement, § 3.1), the Authorized Claimants may, at their option, receive payments via either (1) a physical mailed check, valid for ninety days, or (2) direct ACH transfer to the financial institution identified on their Claim Forms. (Settlement, §§ 3.1.2(a)-(b).)

Any funds from checks not cashed within ninety days of issuance and funds from failed ACH transfers shall revert to the Settlement Fund. (Settlement, § 3.1.2(b).) If, in consultation with the Settlement Administrator, the Parties determine that such reverted funds can be distributed again *pro rata* to the Authorized Claimants in an economically feasible manner, the funds shall be distributed accordingly. (*Id.*) If not, upon Court approval, the Settlement Administrator will distribute the reverted funds *pro rata* to the three *Cy Pres* recipients: Access Now, Electronic Privacy Information Center ("EPIC"), and the Network for Teaching Entrepreneurship ("NFTE").[7] (*Id.*)

If the Settlement is approved, no portion of the Settlement Fund will revert to LinkedIn.

### C.  <u>Release</u>

In exchange for the benefits provided pursuant to the Settlement, Class Members will release LinkedIn and related persons and entities ("Released Parties") from all claims that were or could have been asserted arising from or related to allegations in the Action regarding the alleged use of Add Connections to grow LinkedIn's member base including, without limitation, (i) accessing, importing, storing and/or using information from LinkedIn users' external email accounts; (ii) using LinkedIn

---

[6] Plaintiffs intend to provide the final number of Valid Claims and proposed *pro rata* payment from the Settlement Fund in their Reply in support of Plaintiffs' Motion for Attorneys' Fees, Litigation Costs, and Incentive Awards, which will be filed on or before February 4, 2016.

[7] The *Cy Pres* recipients are described further below at IV.D.4.d.

users' names, photographs, likenesses, and/or identities in emails relating to Add Connections; or (iii)

related disclosures, representations, and omissions. (Settlement, §§ 1.29-1.31, 4.1).

## IV.    ARGUMENT

### A.    The Class Action Settlement Approval Process

Judicial proceedings under Federal Rule of Civil Procedure 23 have led to a defined three-step

procedure for the approval of class action settlements:

> (1)    Preliminary approval of the proposed settlement after submission to the
> court of a written motion for preliminary approval;
>
> (2)    Dissemination of notice of the proposed settlement to the class; and
>
> (3)    A formal fairness hearing, or final settlement approval hearing, at which
> class members may be heard regarding the settlement, and at which
> evidence and argument concerning the fairness, adequacy, and
> reasonableness of the settlement is presented.

*See* MANUAL FOR COMPLEX LITIGATION (Fourth) §§ 21.632, *et seq.* (2004).  This procedure

safeguards class members' procedural due process rights and enables courts to fulfill their roles as

guardians of class interests.  *See* 4 NEWBERG ON CLASS ACTIONS, §§ 11.22, *et seq.* (4th ed. 2002).

This Court completed the first step in the settlement approval process when it granted

preliminary approval to the Settlement. (Dkt. No. 106). The second step has been completed as well:

the Court-approved Notice Plan was fully implemented.  By this motion, Class Counsel request that

the Court take the third and final step, and grant final approval of the Settlement.

### B.    The Court-Approved Notice Program Meets Applicable Standards and Has Been Fully Implemented.

When a proposed class action settlement is presented for court approval, Rule 23(c)(2)(B) of

the Federal Rules of Civil Procedure requires:

> the best notice that is practicable under the circumstances, including individual
> notice to all members who can be identified through reasonable effort.  The notice
> must clearly and concisely state in plain, easily understood language:  (i) the
> nature of the action; (ii) the definition of the class certified; (iii) the class claims,
> issues, or defenses; (iv) that a class member may enter an appearance through an
> attorney if the member so desires; (v) that the court will exclude from the class any
> member who requests exclusion; (vi) the time and manner for requesting
> exclusion; and (vii) the binding effect of a class judgment on members under
> Rule 23(c)(3).

The Notice Plan approved by this Court, which included (i) direct Email Notice to Class

1  Members using their last-known contact information on file with LinkedIn; (ii) maintenance of a

2  Settlement Website which provided links to case documents and other information needed to evaluate

3  the Settlement; and (iii) several means for Class Members to inquire about the case, the Settlement,

4  and the claims process, provided valid, due, and sufficient notice to Class Members, and constitutes

5  the best notice practicable under the circumstances. The content of the notice complied with the

6  requirements of Rule 23(c)(2)(B). The notice provided a clear description of who is a member of the

7  Class and the binding effects of Class membership. (Dkt. No. 105-2, Ex. C (Website Notice)). The

8  notice explained how to receive money from the Settlement, how to opt out of the Settlement, how to

9  object to the Settlement, how to obtain copies of papers filed in the case, and how to contact Class

10  Counsel and the Settlement Administrator with any further questions or requests. (*Id.*) Each Email

11  Notice that was disseminated contained a unique Claim ID, which Class Members could use to

12  identify themselves as Authorized Claimants.

13  The Notice also explained that the Settlement itself was filed publicly with the Court and

14  available online by visiting the Settlement Website at www.addconnectionssettlement.com. As a

15  result, every provision of the Settlement was available to each Class Member. Other relevant case

16  and settlement documents were available at the same website.

17  The Court approved this notice plan. (Dkt. No. 106, at 4). LinkedIn thus sent or cause to be

18  sent the Email Notice to each Settlement Class Member, and attempted to re-send notices that were

19  returned undeliverable, or bounced back. (*Id.*, Andersen Decl. ¶¶5-6). The Court ordered the

20  Settlement Administrator, Gilardi & Co., LLC to publish the Website Notice through the Settlement

21  Website, and to develop, host, and maintain such Settlement Website. (Dkt. No 106). The Settlement

22  Administrator did so; as of January 13, 2016, 2,028,251 website visits had been recorded. (Burke

23  Decl. ¶3). The Court found that this notice was "consistent with the requirements of Rule 23 and due

24  process, and constitute[d] the best notice practicable under the circumstances." (Dkt. No. 106).

25  Class Members could submit a Claim Form either electronically, through the Settlement

26  Website, or by mail. The Claim Form requested, but did not require, that Class Members provide the

27  unique Claim ID included in each Email Notice to ensure that Class Members who, for whatever

28  reason, lacked access to the email address associated with their LinkedIn account were not improperly

excluded from filing a Claim. Such claimants were asked, instead, to provide the email address associated with their LinkedIn account for verification. Class Members also had a variety of methods by which to view relevant documents, contact the Settlement Administrator or Class Counsel, opt out of the Settlement, or object to the Settlement. These methods included mail, telephone, a case-specific website, and email. (Burke Decl. ¶2, Diamand Decl. ¶15, Meyer Decl. ¶4).[8]

For instance, the Settlement Administrator received 12,194 emails regarding the Settlement (Burke Decl. ¶7), and received 143 requests for mailed copies of the Notice over the phone, by email, and by mail. (*Id.* ¶12) The Settlement Administrator sent a copy of the Notice whenever one was requested. (*Id.*) Class Members also contacted Class Counsel, through both email and telephone, with questions and requests. (Diamand Decl. ¶¶15-19; Meyer Decl. ¶¶8-31). Class Counsel answered Class Member questions and responded to requests. (*Id.*)

## C.    Significant Additional Notice was Achieved Through Media Coverage of the Settlement and Notice Program.

In addition to the direct Notice program, broad nationwide notice of the settlement resulted from spontaneous coverage by hundreds of blogs and news outlets. (Diamand Decl. ¶¶ 11-13 (citing media coverage of the settlement during the Notice Period)). For example, Fortune.com's October 15, 2015 article: "LinkedIn Will Pay $13M For Sending Those Awful Emails," covered the Settlement and Class definition, and linked to the Settlement Website.[9] Additional notice garnered through accurate media coverage about the Settlement, a large proportion of which provided a link to the Settlement Website, further supports a finding that Class Members received adequate Notice of the Settlement.

Even those articles that misrepresented the scope of the Settlement Class or the terms of the Settlement alerted Class Members to the Settlement, provided a link to the Settlement Website and

---

[8] The initial response to Email Notice was thoroughly positive; so much so that it initially strained the Settlement Website prompting a slower than expected load and rendering it temporarily unavailable to some visitors after dissemination of the Email Notice. (Diamand Decl. ¶4; Meyer Decl. ¶ 11; Burke Decl. ¶5). Class Counsel responded to telephone and email inquiries regarding the Settlement Website throughout this period. For the remainder of and throughout the Notice Period, the Settlement Website and online Claim Form were accessible to Class Members.

[9] Jeff John Roberts, *LinkedIn will pay $13M for sending those awful emails*, Oct. 5, 2015, Fortune, available at http://fortune.com/2015/10/05/linkedin-class-action/ (last visited Jan. 6, 2016).

1   were frequently corrected following contact from Class Counsel. For example, the October 7, 2015

2   Los Angeles Times Business Section reported that Class Members were eligible to receive $1,500 if

3   they filed a claim,  (Diamond Decl. ¶13; Exs. 4-6), and an October 6, 2015 Inquisitr.com article stated

4   that the Settlement entitled *recipients* of LinkedIn's "spam" emails to payments of up to $1,500 each.

5   (*Id.*). These articles, like dozens of others, provided a link to the Settlement Website, where claims

6   could be submitted electronically whether or not someone had received the Email Notice or possessed

7   a unique Claim ID.  Class Counsel contacted these and other reporters who published inaccurate

8   information and obtained corrections. (*Id.* ¶13).  According to the Settlement Administrator, the

9   initially incorrect articles and those that were never corrected may explain the number of claims

10  submitted by claimants who may not be members of the Class. (Burke Decl. ¶22).

11          **D.      Final Approval of the Settlement is Appropriate.**

12          "The law favors the compromise and settlement of class action suits." *In re Netflix Privacy*

13  *Litig.*, No. 11-379, 2013 WL 1120801, at *3 (N.D. Cal. Mar. 18, 2013) (Davila, J.); *see also In re*

14  *High-Tech Emp. Antitrust Litig.*, No. 11-2509, 2015 WL 5159441, at *1 (N.D. Cal. Sept. 2, 2015)

15  (Koh, J.); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  "[T]he decision to

16  approve or reject a settlement is committed to the sound discretion of the trial judge because [she] is

17  'exposed to the litigants and their strategies, positions and proof.'" *Hanlon v. Chrysler Corp.*, 150

18  F.3d 1011, 1026 (9th Cir. 1988) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615,

19  626 (9th Cir. 1982)).  In exercising such discretion, courts should give "proper deference to the

20  private consensual decision of the parties. . . .  [T]he court's intrusion upon what is otherwise a private

21  consensual agreement negotiated between the parties to a lawsuit must be limited to the extent

22  necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching

23  by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair,

24  reasonable and adequate to all concerned." *Id.* at 1027 (citation and quotations omitted).  Here,

25  relevant factors support final approval of the Settlement.

26          "[T]here is an overriding public interest in settling and quieting litigation" and "[t]his is

27  particularly true in class action suits." *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir.

28  1976); *see also Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989).

In evaluating a proposed class action settlement, the Ninth Circuit has recognized that:

> [T]he universally applied standard is whether the settlement is fundamentally fair, adequate and reasonable. The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Officers for Justice*, 688 F.2d at 625 (citations omitted); *accord Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

### 1. The Settlement is the Product of Arm's-Length Negotiations and, Therefore, Presumptively Fair and Reasonable.

"'Before approving a class action settlement, the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties . . .'" *City of Seattle*, 955 F.2d at 1290 (quoting *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 997 (9th Cir. 1985)). "'Where a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable.'" *Wakefield v. Wells Fargo & Co.*, No. 13-5053, 2015 WL 3430240, at *4 (N.D. Cal. May 28, 2015) (Beeler, J.) (quoting *Garner v. State Farm Mut. Auto Ins. Co.*, 2010 WL 1687832, *13 (N.D. Cal. Apr. 22, 2010)); *Linney v. Cellular Alaska P'ship*, No. 96-3008, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997) (Jensen, J.), *aff'd*, 151 F.3d 1234 (9th Cir. 1998) ("The involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair."). The active participation of Antonio Piazza of Mediated Negotiations, a neutral mediator with extensive experience mediating complex litigation, further supports a finding of fairness. *See Satchell v. Fed. Express Corp.*, Nos. 03-2659, 03-2878, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive"); *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 6689, 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private

mediator experienced in complex litigation, is further proof that it is fair and reasonable.").

All Parties were represented throughout extensive arm's-length negotiations by counsel experienced in the prosecution, defense, and settlement of complex consumer and digital privacy cases and class actions. (*See* Dkt. Nos. 96-98 (Diamand, Russ, and Berger Declarations in support of Motion for Preliminary Approval). The Settlement is, therefore, presumptively fair.

## 2. The Litigation Risks Favor Final Approval.

The potential risks attendant on further litigation also support final approval. If this case continued to be litigated, the contested factual and legal issues of liability under the state right of publicity laws and the UCL, along with contested class certification issues, would be extensive. LinkedIn has vigorously contested its liability, arguing that its terms of service and privacy policies, as well as LinkedIn users' knowledge based upon receipt of Add Connections emails from other members and other potential forms of notice, would be sufficient for a jury to find that the proposed Class consented to the challenged conduct. LinkedIn also argues that the single publication rule may prevent Class Members from challenging reminder emails separately from initial invitation emails because the communications constituted a "single integrated publication." (Diamand Decl. ¶22). LinkedIn has also raised arguments under the First Amendment and Article III of the Constitution, the Communications Decency Act, and California's "Incidental Use" doctrine which, although rejected by this Court, were preserved for appeal. (Dkt. Nos. 47, 69 (Motions to Dismiss Orders)).

LinkedIn also vigorously would contest class certification claiming that injury and consent are inherently individualized issues. *See Fraley v. Facebook, Inc*., 966 F. Supp. 2d 939, 942-43 (N.D. Cal. 2013) (Seeborg, J.) (granting final approval of class-wide settlement of the UCL and Cal. Civ. Code § 3344 claims, recognizing "substantial burden" of quantifying class-wide injury, and "significant risk . . . that class certification would prove unwarranted in light of consent issues."). Class Counsel maintain that their claims are meritorious and could succeed at trial. Nonetheless, the value to the Class of a swift, certain recovery, plus the prospective relief obtained through this Settlement, balanced against the real risk of no recovery or one significantly delayed through litigation and appeals, weighs in favor of the Settlement.

### 3. The Recommendation of Experienced Counsel Favors Approval.

The judgment of experienced counsel regarding the Settlement also carries considerable weight. *See Linney*, 1997 WL 450064, at *5; *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 257 (N.D. Cal. 2015) (quoting *Rodriguez v. West Pub. Corp.*, 2007 WL 2827379, at *8 (C.D. Cal. Sept. 10, 2007) ("The trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.") "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979). Here, Plaintiffs' counsel endorse this Settlement as fair, adequate and reasonable. *See, e.g.*, Diamand Decl. ¶2; Meyer Decl. ¶2. This factor also weighs in favor of approval.

### 4. The Class Response Favors Final Approval.

A court may appropriately infer that a class settlement is fair, reasonable, and adequate when few Class members object to it. *See Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977); *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("the absence of a large number of objections to a proposed class settlement action raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members."). Indeed, a court can approve a class action settlement over the objections of a significant percentage of class members. *See Boyd v. Bechtel*, 485 F. Supp. at 624 ("A settlement is not unfair simply because a large number or a certain percentage of class members oppose it, as long as it is otherwise fair, adequate, and reasonable"); *City of Seattle*, 955 F.2d at 1291-96.

Class Counsel received a tremendous positive response to the Settlement; hundreds of thousands of Class Members filed Claims, evidencing their support of the Settlement, and many wrote to Class Counsel expressing their approval of the settlement, and their disapproval of LinkedIn's conduct prior to implementation of the prospective relief. For example, one Class Members wrote, "I did not agree to the two follow-up emails. That persistence was annoying." (Diamand Decl. ¶20). Out of more than 20.8 million Class Members, only 85 submitted documents that could be construed as objections (0.0004% of the Class). (Burke Decl. ¶29). Of these possible objectors, 19 supported the

goals of the litigation and objected to LinkedIn's conduct, rather than specifically to the Settlement.[10] The Settlement Administrator has reviewed these documents for compliance with the Court's Order (Dkt. No. 106) for submitting a valid objection: 8 of the filed objections were valid.[11] (Burke Decl. ¶ 27). 145 individuals have sought to opt out of the Settlement (0.0007% of the Class). (*Id.* ¶30).

The "low rates of objections and opt-outs are indicia of approval of the class." *High-Tech*, 2015 WL 5159441, at *3 (quotation and citation marks omitted) (finding indicia of approval where 11 class members out of 64,466, or about 0.017% submitted objections, and "less than 0.9%" opted out); *Fraley*, 966 F. Supp. 2d at 947 (approving settlement where 29 of 150 million Class Members filed valid objections, and 6,825 opted out); *Sugarman v. Ducati N. Am., Inc.*, No. 10-5246, 2012 WL 113361, at *3 (N.D. Cal. Jan. 12, 2012) (objections from 42 of 38,774 class members—more than 0.1 %,—is a "positive response"); *Churchill Vill., LLC v. GE*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming district court's approval of settlement where 45 of 90,000 class members objected to the settlement (.05 %), and 500 class members opted out (0.56%)).

The objections and letters stating concerns about the Settlement fall into eight categories: Objections to (a) the litigation itself; (b) the monetary relief; (c) the *cy pres* provisions; (d) the prospective relief; (e) the Notice; (f) the claims process; (g) the Release; and (h) the requested attorneys' fees and incentive awards.[12] None raises meritorious concerns. *See Browne v. Am. Honda Motor Co.*, No. 9-6750, 2010 WL 9499072, at *15 (C.D. Cal. July 29, 2010) ("[O]pposition does not necessitate disapproval of the settlement. Instead, the court must independently evaluate whether the

---

[10] For instance, objector Gerald Monge wrote, "Numerous acquaintances of mine were offended that I released their names to LinkedIn (Jue Decl., Ex. 49); " Lindsay Finnie wrote, "I agree with the terms of the lawsuit and expect reimbursement" (*Id.*, Ex. 19); Rustin Coburn wrote "I . . . seriously do not like that LinkedIn used the 'Add Connections' service to import contacts. . . This is unethical and hopefully illegal (*Id.*, Ex. 12);" Diane Kushmer wrote "I see this as an invasion to my privacy and to the privacy of the people in my contacts (*Id.*, Ex. 40). Additional objectors who appear to support the litigation and/or the Settlement are June Barrett, Anne Butman, Shataia Denise Blocker, Antuan Booker, Nora Cordero, Elizabeth Garcia, Julius Gonzala, Christopher H. Peters, Donata Ray, Youssef Rifai, Carol Stocks, Scott L. Teague, Efrain Valdez, Melanie Wobig, Quintena Woodward. (*Id*, Exs. 2, 10, 6-7, 13, 22, 24, 53, 57, 60, 68, 71, 75, 81-82)).

[11] Such procedurally deficient objections should be overruled on that basis alone. Should the Court wish to consider their substance, however, they are addressed herein.

[12] Objections to Class Counsel's request for Attorneys' Fees and Incentive Awards will be addressed in the Reply in support of Class Counsel's fee petition, to be filed on or before February 4, 2016.

objections being raised suggest serious reasons why the proposal might be unfair.") (citation

omitted)).  This positive response from the Class strongly favors Settlement approval.

### a.      Objections to the Litigation Itself

The majority of objectors[13] objected to the case having been brought in the first place.  These

objections do not comment on any aspect of the Settlement, but rather oppose the claims alleged as

being frivolous, and in large part challenge the propriety of any monetary recovery for violation of

digital privacy rights.  Because such objections appear to support no recovery for the Class, these

objectors' interests apparently are adverse to the Class, and the objections should be overruled.  *See*

*Ko v. Natura Pet Prods., Inc.*, No. 9-2619, 2012 WL 3945541, at *6 (N.D. Cal. Sept. 10, 2012)

(Armstrong, J.) ("[A]n objection based on a concern for the Defendants and an apparent non-

substantive assessment of the frivolity of the action are not germane to the issue of whether the

settlement is fair."); *Wren v. RGIS Inventory Specialists*, No. 6-5778, 2011 WL 1230826, at *13 (N.D.

Cal. Apr. 1, 2011) (Spero, J.) (overruling objections submitted that "do not go to the fairness of the

settlement").

### b.      Objections to the Monetary Relief

Eleven individuals objected on the basis (in whole or in part) that the Settlement should be

rejected because it should be larger: Gregory Paul Berning, Daniel Brown/Jenny Hill, Susan Entin,

Johnnie Graham, Dylan Jacobs, Mary Means, Darline S. Spencer, Gessica Still, Olen York, and

Farage Yuzupov.[14] (Jue Decl., Exs. 5,  9, 18, 26, 33, 47, 66-67, 84-85).

However, none of these Class Members adequately account for the risks and delays involved

---

[13] These 45 objections were filed by Jamie Anderson-Stewart, Claude Baudoin, Erich Berg, Boyan Boyanov, William Calderwood, Ian Cornell, BC Crothers, Mary C. Don, Stephen Foerster, Melodie Kate Ford, Gary Gill, Julie Gordon, Kevin Grell, Kira Harris, Ashley Houston, Mark Howard, Michael Hughes, Cassandra Jones, Roland Klose, Chinmay Kommuru, Anthony Lee Krauch, August E. Lasseter, Timothy Lezon, Tom Lucas, Timothy McDonald, William F. McNamara, Keith Miller, Donald G. Muldoon, Caleb T. Nelson, Robert Petersen, Lyle Polyak, Philip Reinemann, Karrie Reuter, John Rollinson, Doug Smith, Gabriel L. Smith, Ken Stuczynski, Jeanine Thompson, Nozima Tojimatova, Carol A. Tomczyk, K. Weeks, Frederick Wells, Steven White, Daniel Whitinger, and Philip Wrona. (Jue Decl., Exs. 1, 3, 4, 8, 11, 14-15, 17, 20-21, 23, 25, 27-28, 30-32, 34-35, 37-38, 42, 46, 48, 50-51, 54 55, 58-59, 62, 64-65, 69, 72-74, 77-80, 93).

[14] Of these objectors, Yuzupov alone stated that the actual harm he suffered exceeded the amount of the expected *pro rata* payment. (Jue Decl., Ex. 85).  Gloria Larravide (*Id.*, Ex. 41), objected that too much money was recovered for the Class.

in proceeding to trial.  They ignore that the Settlement provides the Class with a timely, and certain

cash recovery, plus meaningful, tailored, long-term prospective relief, while a trial—and any

subsequent appeal—is highly uncertain, would entail significant additional costs, and indubitably

would substantially delay any recovery achieved.  "'[T]he very essence of a settlement is

compromise, a yielding of absolutes and an abandoning of highest hopes.'"  *Linney v. Cellular Alaska*

*P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *Officers for Justice*, 688 F.2d at 624) (affirming

settlement approval).  "Estimates of what constitutes a fair settlement figure are tempered by factors

such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery

(often measured in years)."  *High-Tech*, 2015 WL 5159441, at *4 (citation and quotation marks

omitted).  Thus, "[t]he fact that a proposed settlement may only amount to a fraction of the potential

recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should

be disapproved."  *Id.*

A number of objectors (Brown/Hill, House, Jacobs, and Means. (Jue Decl., Exs. 9, 29, 33,

47)), contend that the result here is unfair and inadequate because California's statutory right of

publicity, Cal. Civ. Code § 3344, provides for $750 in statutory damages, much more than the

minimum $16 *pro rata* payment available through this Settlement.  Objector Mary Means, for

example, argues that the statutory penalty alone would have resulted in a recovery of $1.56 billion for

the 20.8 million members of the class.  (Jue Decl., Ex. 47, at 4).  Such a class-wide recovery is highly

unlikely.  Indeed, in overruling similar objections regarding the settlement of class-wide claims under

Cal. Civil Code § 3344, Judge Seeborg of this District explained that "[g]iven the class size, it is not

plausible that class members could recover the full amount of the statutory penalties . . . as such a

judgment would pose due process concerns and threaten [the defendant's] existence."  *Fraley*, 966 F.

Supp. 2d at 944; *see also Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003)

("[T]he potential for a devastatingly large damages award, out of all reasonable proportion to the

actual harm suffered by members of the plaintiff class, may raise due process issues.").  The

Settlement also obviates the risk that any individual plaintiff must take in pursuing a claim under Cal.

Civ. Code § 3344, which contains a fee-shifting provision.

This result is particularly impressive in light of other recent class action settlements in the area

of digital privacy, which have achieved lesser monetary relief when measured against the size of the settlement class. *See Fraley*, 966 F. Supp. 2d at 949 (granting final approval of $20 million to 124 million member class); *In re Google Referrer Header Privacy Litig.*, No. 10-4809, 2015 WL 1520475 (N.D. Cal. Mar. 31, 2015) (Davila, J.) (granting final approval of $8.5 million to 129 million member class); *In re Netflix Privacy Litig.*, No. 11-379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) (Davila, J.) (granting final approval of $9 million to 62 million member class); *In re Google Buzz Privacy Litig.*, No. 10-672, 2011 WL 7460099 (N.D. Cal. June 2, 2011) (Ware, J.) (granting final approval of $8.5 million to 37 million member class).

In addition, pursuant to the Settlement, the monetary relief will be allocated *pro rata* based upon the number of valid claims that are submitted. Such *pro rata* distributions are "cost-effective, simple, and fundamentally fair." *High-Tech*, 2015 WL 5159441, at *8 (quoting *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 285 (D. Minn. 1997).

That certain Class Members evaluate the risks and potential benefits differently, or would prefer to go to trial despite the risks, does not prevent the Court from granting final approval. *See Browne*, 2010 WL 9499072, at *15. The objections to the monetary relief should be overruled.

### c. Objections to the Prospective Relief

Class members Mary Means and Olen York object that the Settlement's prospective relief provisions are insufficient. (Jue Decl., Exs. 47, 84). Specifically, Means claims that "[t]he [p]rospective [r]elief is a [s]cam" because:

- LinkedIn's disclosure that "We'll import your address book to suggest connections and help you manage your contacts" does not disclose that data will be "used by LinkedIn for hundreds of millions of dollars in profits;"

- "LinkedIn fails to inform the consumer they intend to sell the data collected on the open market for profit;"

- LinkedIn "fails to inform class members LinkedIn will collect the data of the people in the class member's email contact list and LinkedIn will sell it for profit and/or expose it to a security lapse;" and

- The newly-implemented feature allowing members who invite contacts to connect through add connections to withdraw invitations, thereby stopping reminder emails from being sent "pre-existed the settlement."

(Jue Decl., Ex. 47, at 5-6).

The majority of Means' objections relating to the injunctive provisions are premised on misunderstandings of the allegations at issue here. LinkedIn's profits through the alleged violation of Plaintiffs' rights of publicity are unrelated to Ms. Means' claims of LinkedIn's "sell[ing of] data collected on the open market for profit" and none of the allegations or claims relate to any actual or perceived likelihood of a "security lapse" on the part of LinkedIn.

Finally, Means claims that the LinkedIn feature allowing users to withdraw invitations and stop reminder emails "pre-existed the settlement." The pre-existing functionality may have allowed a user to open each individual invitation and withdraw it to stop reminder emails from being sent, (*see* Dkt. No. 70, ¶85), but this process needed to be repeated for each individual invitation and could take a LinkedIn user hours to stop reminders from being sent in the event the member inadvertently sent hundreds of connection invitations. (*Id.*) "No functionality on the LinkedIn website allows a user to withdraw all invitations at once." (*Id.* at ¶86.) This is the functionality that the Settlement Agreement requires of LinkedIn; functionality that was not available until recently. (*See* Settlement, § 2.2.4; Dkt. No. 105-4.)

York objects that "LinkedIn should discontinue the 'Add Connections' tool from the members' package and send apologies to those contacted." (Jue Decl. Ex. 84). While it is undoubtedly true that discontinuing "Add Connections" would eliminate "any concern of misappropriation, or lack of consent, or commercial exploitation, . . . 'the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.'" *Fraley*, 996 F. Supp. 2d at 944-45 (quoting *Hanlon*, 150 F.3d at 1027).

These objections should be disregarded by the Court.

### d. Objections to the Cy Pres Provisions

Objections to the *cy pres* provisions of the settlement fall into two categories: to the Parties' selection of *Cy Pres* Recipients (brought by objectors Susan House, Dylan Jacobs, Daniel Pratt, and Hannah Tanner); and to a provision for a *cy pres* distribution at all (raised by Dylan Jacobs, Daniel Pratt, and Mary Means). The objections lack merit and should be overruled.[15]

---

[15] (Jue Decl., Exs. 29, 33, 47, 56, 70). The proposed *Cy Pres* Recipients were identified in both the Settlement (Settlement § 1.12), and the Website Notice. The objection of Dylan Jacobs stating the
*Footnote continued on next page*

The *Cy Pres* Recipients were selected based upon the alignment of their missions to the digital privacy and career-related reputational issues at stake in this case.  *See Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (approval of *cy pres* distribution requires "a driving nexus between the plaintiff class and the *cy pres* beneficiaries.").  As discussed above, the *Cy Pres* Recipients are Access Now, which "defends . . . digital rights,"[16] EPIC, which focuses on "protect[ing] privacy, freedom of expression, and democratic values,"[17] and NFTE, which "inspire[s] young people from low-income communities to stay in school, to recognize business opportunities and to plan for successful futures."[18]  *C.f. Nachshin v. AOL, LLC*, 663 F.3d 1034, 1041 (9th Cir. 2011) (observing, in connection with litigation over "unlawful advertising campaign that exploited users' outgoing e-mail messages" that "non-profit organizations that work to protect internet users from fraud, predation, and other forms of online malfeasance" would be appropriate *cy pres* beneficiaries).

**Access Now.**  Tanner and House incorrectly object that Access Now is not aligned with the interests of this Class because it devotes only 2% of its program expenses to activities within the United States.  (Jue Decl., Ex. 29, at 5; Ex. 70, at 5).  In fact, Access Now devotes more than 70% of its expenditures to activities in the US.[19]

**EPIC.**  Tanner and House object to EPIC's selection by the Parties on the grounds that EPIC is a "repeat player" which should be required to account for its use of previous *cy pres* awards before gaining entitlement to another.  (*Id.*).  Prior receipt of *cy pres* awards is no bar to EPIC's selection here.  Indeed, that history only serves to reinforce EPIC's suitability:  "EPIC has demonstrated that it is a well-established and respected organization within the field of internet

---

*Footnote continued from previous page*

contrary (Jue Decl., Ex. 33, at 3) should be overruled.

[16] *See* Access Now, *About Us*, https://www.accessnow.org/ (last visited Dec. 30, 2015).

[17] *See* Electronic Privacy Information Center, *About EPIC*, https://epic.org/epic/about.html (last visited Dec. 30, 2015).

[18] *See* Network for Teaching Entrepreneurship, *Mission*, http://www.nfte.com/what/mission (last visited Dec. 30, 2015).

[19] Access's total program expenditures for tax year 2014 were $2,892,307.  Deducting the $806,801 spent outside of the US, approximately $2,085,509, or 72% of Access's expenditures were in the US.  Further, Tanner's conclusory assertion that Class Counsel has a "shadowy" connection to Access (Jue Decl., Ex. 70) is unfounded, and should be disregarded by the Court.

privacy." *Google Buzz*, 2011 WL 7460099, at *1. Further, EPIC regularly posts updates regarding its activities, such as providing research and expert commentary (including at Congressional hearings) on emerging privacy issues, submitting comments on behalf of the public in regulatory proceedings, and filing *amicus curiae* briefs in appellate courts, including the U.S. Supreme Court, in support of policies favorable to consumer privacy.[20] As a national organization focused on precisely the kinds of privacy issues involved in this litigation, EPIC is an eminently suitable recipient for any *cy pres* distribution resulting from this Settlement. The objections lack merit.

**NFTE.** Tanner and House also specifically object to the Parties' selection of NFTE on the grounds that LinkedIn's founder, Reid Hoffman, is a member of NFTE's Board of Overseers. The Board of Overseers is a 25-person group, separate from NFTE's 18-person Board of Directors, is composed "of business, academic and community leaders committed to helping NFTE through their unique expertise and their vast networks."[21] Class Counsel have investigated and found no evidence that either Mr. Hoffman or LinkedIn have any pecuniary interest in funds provided to NFTE. Mr. Hoffman's role as a source of expertise and access to the field of internet technology does not create a conflict of interest that required disclosure. *C.f. Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012) (overruling objections based upon appointment of defendant's employee to Board of Directors of non-profit created to distribute *cy pres* funds from settlement).

Indeed, because the interests of the Class are directly aligned, both geographically and substantively, with the missions of these *Cy Pres* Recipients, a *cy pres* distribution of the Net Settlement Fund would be appropriate and provide the "next-best" recovery for the Class. *See Lane*, 696 F.3d at 819-20, quoting *Nachshin*, 663 F.3d at 1036 (affirming approval of exclusively *cy pres* settlement; holding that to find settlement fair, reasonable, and adequate requires that *cy pres* recipients "account[] for the nature of the plaintiffs' lawsuit, the objectives of the underlying

---

[20] *See generally* https://www.epic.org/.

[21] NFTE, *In Memoriam, John C. Whitehead*, founder of NFTE's Board of Overseers, available at https://nfte.com/in-memoriam-john-c-whitehead (last visited Jan. 8, 2016).

statutes, and the interests of the silent class members . . . .").  Nevertheless, in an effort to achieve

the *best* practicable distribution, the Settlement incorporates meaningful safeguards to prevent

funds from being distributed through *cy pres*. It imposes strict prerequisites that the Parties, the

Settlement Administrator, and the mediator, first, must determine that a *pro rata* distribution to

Authorized Claimants is not economically feasible, and, second, that Court approval be obtained,

before the Net Settlement Fund may be distributed through *cy pres*.  (Settlement, § 3.1.3).

Similarly, funds unclaimed by such Authorized Claimants (from checks not cashed or failed ACH

deposits) may be distributed through *cy pres*, only if the Settlement Administrator determines that

a secondary distribution of such funds *pro rata* to Authorized Claimants is not economically

feasible. (Settlement, § 3.1.2(b)).  Because the *cy pres* provisions of the Settlement are

fundamentally fair, reasonable, and adequate, these objections should be overruled.

### e. Objections to the Notice

Six objectors: Brown/Hill, House, Means, Jorge Pardo, and Tanner, submitted objections to

the content of the Notice disseminated to the Class.  (Jue Decl., Exs. 9, 29, 47, 52, 70).

House, Means, Brown, and Hill object that the Notice was inadequate because the text of the

Website Notice failed to state that Class Members could potentially recover $750 in statutory

damages for LinkedIn's alleged violation of Cal. Civ. Code § 3344.  House adds that a potential

recovery of punitive damages, attorneys' fees, and statutory penalties under the UCL[22] should all have

been described, as well.  Means speculates that Class Counsel purposefully omitted reference to Cal.

Civ. Code § 3344 in the Email and Website Notice in order to prevent Class Members from realizing

the value of their claims.  (Jue Decl., Ex. 47, at 10).[23]

---

[22] In fact, the UCL provides for recovery of such damages only in circumstances not applicable here, such as in an action by certain governmental entities, or to challenge conduct directed to one or more senior citizens or disabled persons. *See* Cal. Bus. and Prof. Code §§ 17206; 17206.1.

[23] Pardo objects that the Notice failed to state how compensation to Class Members would be calculated or the criteria for accepting claims. (Jue Decl., Ex. 52).  In fact, the Notice stated that funds would be distributed *pro rata* based on the number of approved claims, and that to be approved, the claim need only be submitted, timely, by a Class Member.  (Dkt. No. 105-2, Ex. C §§ 6, 8).  Brown and Hill also object that Class Members could not estimate their *pro rata* share of the Settlement because the Class size was not disclosed in the Notice. This information was contained in the Preliminary Approval Order, posted to the Settlement Website (Dkt. No. 106, at 2; Burke Decl. ¶2).  Even so, such estimates were not possible until the Settlement Administrator calculated the final number of Authorized Claimants.

House and Means also argue that the Settlement Website is deficient, asserting that it fails to comply with the Procedural Guidance for Class Action Settlements ("Guidance"). The Guidance states that a Settlement Website should provide links to "motions for approval and for attorneys' fees and any other important documents in the case," with instructions how to access such documents via PACER or by visiting the Court.[24] House argues that the Final Approval motion should have been posted during the Notice Period. (*Id.*, Ex. 29, at 4).[25] Means argues that the Preliminary Approval Motion should have been posted. (*Id.*, Ex. 47, at 10). Neither contends that the Notice otherwise failed to comply with the Guidance. Each objection lacks merit and should be overruled.

Rule 23 requires that Notice of a settlement describe "(i) the nature of the action;" (ii) "the definition of the class certified;" (iii) "the class claims, issues, or defenses;" (iv) "that a class member may enter an appearance through an attorney if the member so desires;" (v) "that the court will exclude from the class any member who requests exclusion;" (vi) "the time and manner for requesting exclusion;" and (vii) "the binding effect of a class judgment on members" Fed. R. Civ. P. 23(c)(2)(B). Generally, notice of a settlement is adequate if it "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., L.L.C*, 361 F.3d at 575 (quotations and citation omitted). It is unsurprising, therefore, that courts in this District have routinely approved class action settlements where claims for statutory damages were alleged, but specific notice of potentially recoverable statutory penalties was nowhere posted to the settlement website. *See e.g., Keller v. Nat'l Coll. Athletic Ass'n (NCAA)*, No. 9-1967, 2015 WL 5005901, at *7 (N.D. Cal. Aug. 19, 2015) (Wilken, J.) (granting final approval to class action asserting Cal. Civ. Code § 3344 claims where notice[26] did not identify statute or potential statutory penalties); *Arendas v. Citibank*, No. 11-6462 (Breyer, J.), at Dkt. No. 41 (granting final approval where notice[27] did not specify statutory cause of action or statutory penalties recoverable under Consumer Legal Remedies Act); *Bayat v. Bank of the W.*, No. 13-2376, 2015 WL 1744342, at

---

[24] *See* http://www.cand.uscourts.gov/ClassActionSettlementGuidance
[25] Pursuant to this Court's Order, Dkt. No. 106, it shall be posted on the day that it is filed.
[26] Available at http://www.ncaa-ea-likeness-settlement.com/.
[27] *See also* settlement website, available at http://www.arendasoverdraftfeesettlement.com/ (omitting motion for preliminary approval from case documents).

1283489.8

\*2 (N.D. Cal. Apr. 15, 2015) (Chen, J.) (granting final approval where statutory penalties recoverable under Telephone Consumer Protection Act not specified in notice[28]); (Diamand Decl. Exs. 7-9).[29]

The content of the Notice, including the list of documents provided on the Settlement Website, was approved by the Court, and met the requirements of Rule 23. Indeed, although not required by the Federal Rules, the Guidance, or independently in this Court's Order approving the Notice plan, information regarding statutory penalties and other recoverable damages in this action *was* available on the Settlement Website. For example, the Court's Order on LinkedIn's Second Motion to Dismiss, which was posted to the Settlement Website throughout the Notice Period (Burke Decl. ¶2) discussed the statutory damages available under Cal. Civ. Code § 3344 at length, and referred explicitly to the $750 minimum statutory damages in a section entitled "Minimum Statutory Damages Under Section 3344." (Dkt. No. 69, at 21-27). Likewise, the operative complaint which was posted to the Website (Burke Decl. ¶2) stated that this action seeks recovery of $750 in statutory penalties on behalf of each Class Member. (Dkt. No. 70, ¶161). Thus, the objections based on the purported failure to disclose the value of Class Members' claims lack a factual or legal basis.

Nor does an adequate Notice program require posting motions for preliminary approval to the settlement website. Websites for class settlements recently approved in this District have not done so. *Keller*, 2015 WL 5005901, at \*7; *Arendas*, No. 11-6462, at Dkt. No. 41; *Bayat*, 2015 WL 1744342, at \*2; (Diamand Decl. ¶¶ 23-25; Exs. 7-9).[30] Because the Notice here was implemented in full compliance with this Court's Order (Dkt. No. 106), these objections should be disregarded.

#### f.    Objections to the Claims Process

Three objectors: House, Means, and Kin Wah Kung contend, without merit, that the Claims Process was unfair. (Jue Decl., Exs. 29, 47, 39). Kung and House object that claimants did not know, in advance of filing a Claim, whether or in what amount they would receive a payment. Kung describes the situation as a "Catch-22," in which Class Members were asked to sign away their rights

---

[28] Available at http://www.bayattcpasettlement.com/.

[29] For the same reasons, Means' objection that the Notice is deficient because it does not expressly state that the Court cannot change the terms of the Settlement should be rejected.

[30] Although not required by Court Order or the mandates of Rule 23, the Motion for Preliminary Approval was posted to the Settlement Website on January 6, 2016. (Burke Decl. ¶ 31).

without knowing whether they would "be entitled to anything at all." (Jue Decl., Ex. 39, at 2). These objections lack merit for several reasons.

Since the Settlement provides for *pro rata* payments based on the *final* number of Authorized Claimants, the distribution amount was not calculable during the Notice Period. This, however, does not make the Court-approved Notice inadequate. *See, e.g., High-Tech*, 2015 WL 5159441, at *7 ("The Notice's failure to include the allocation formula's denominator, which could not have been calculated with precision at the time the Notice was approved, was therefore not error."); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 637 (N.D. Cal. 1978) *aff'd*, 645 F.2d 699 (9th Cir. 1981) ("The aggregate amount available to all claimants was specified and the formula for determining one's recovery was given. Nothing more specific is needed."). This objection should be disregarded.

House, Means, and Tanner object that the Claim Form, in conjunction with the Notice, was designed to deter Class Members from filing claims. They assert that claimants were required to make the following attestation under penalty of perjury in order to submit a claim: "I believe I was injured by [LinkedIn's] use of my name or profile picture [in reminder emails]." House specifically objects that Class Members were exposed to possible perjury charges without the advice of counsel, while Means and Tanner object that the term "injured" was not defined in the Notice. These objections lack merit. Class Members had a variety of mechanisms for obtaining advice regarding the attestations on the Claim Form. Indeed, Class Counsel were prepared to, and did, provide clarification of the meaning of this and any term whenever such information was requested. (Meyer Decl. ¶21). Further, information regarding the types of "injury" at issue in this litigation was readily available on the Settlement Website. For example, the Court's Order on LinkedIn's First Motion to Dismiss, which was posted to the Settlement Website throughout the Notice Period (Burke Decl. ¶2) discussed injury to Plaintiffs resulting from the challenged conduct in significant detail in connection with a challenge to Plaintiffs' Article III standing. (Dkt. No. 47, at 16-23). Likewise, the operative Complaint, which was posted to the Website (Burke Decl. ¶2) stated with respect to each of the nine Named Plaintiffs that LinkedIn's conduct caused the Plaintiff "worry, concern, embarrassment, frustration and/or injury to the feelings." (Dkt. No. 70, ¶¶24, 27). This objection lacks merit.

Means further objects that the Claim Form intentionally deters claims by requesting bank

account information, which, Means contends, jeopardizes Class Members' privacy interests. (Jue Decl., Ex.47, at 7). In fact, Class Members were not required to provide this information and were given the clear option to bypass that section of the Claim Form by instead checking a box to select payment by personal check. (Dkt. No. 105-5, at 5 (Claim Form)). Further, the Claims process and the Settlement Website meet industry standards for protection of personally identifiable information (Burke Decl. ¶16); at no point was such information placed in jeopardy. The claims process was straightforward, accessible, and clear to Class Members and the public, as evidenced by the 567,816 claims that were submitted. Objections based upon the claims process should be overruled.

### g. Objections to the Release

Objector Means claims that the release is too broad, specifically that it "goes too far by releasing all related claims including future claims," and would operate to allow LinkedIn to use consumers' names and likenesses in the future without restraint. (Jue Decl., Ex. 47, at 4-5). This objection misunderstands the scope of the Release, and should be overruled.

The Release applies to claims "that ***were*** asserted or ***could have*** been asserted arising from or related to allegations in the Action regarding the alleged use of Add Connections to grow LinkedIn's member base." (Settlement, § 1.29). Claims based upon LinkedIn's theoretical future conduct were not, and could not, have been asserted in this action and, thus, are outside the scope of the Release. Further, in releasing claims "arising from or related to" the allegations in the Action, the Release is well-within the bounds set by precedent in this District. *See Custom LED, LLC v. eBay, Inc.*, No. 12-350, 2013 WL 6114379 (N.D. Cal. Nov. 20, 2013) (Tigar, J.) (approving class settlement release of claims "arising out of or relating in any way to any of the legal, factual, or other allegations made in the Action, or any legal theories that could have been raised on the allegations of the Action."); *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (claims appropriately included in scope of release can include any claim "based on the identical factual predicate as that underlying the claims in the settled class action."). Because they lack merit, objections to the Release should be overruled.

### 5. The Repeat Objectors are not Credible

Objectors House, Tanner, and, jointly, Daniel Brown and Jenny Hill are represented by attorneys Joseph Darrell Palmer, Steven F. Helfand, and Alan J. Sherwood, respectively – known

repeat objectors.[31]  Indeed, numerous courts have labeled Mr. Palmer[32] as "vexatious," and a "serial"

objector.  Objector House has also appeared, represented by Mr. Palmer, as an objector to several

other class action settlements.[33]  Mr. Helfand appears to have a similar history of filing meritless

objections, appealing when they are overruled[34] and, at least once, appealing his fee award where an

objection was sustained.[35]  Sherwood represented an objector to the *Fraley* settlement, whose

objections were overruled by the Court, and filed an appeal, which was dismissed voluntarily.

(Diamond Decl., Ex. 11).  There is no merit to the substance of these objectors' arguments.

## V.    CONCLUSION

Class Counsel respectfully request that the Court approve the Notice as being in compliance

with Federal Rule of Civil Procedure 23 and due process; approve the proposed Plan of Distribution

as fair, reasonable, and adequate; and grant final approval to the Settlement.

---

[31] *See* https://www.serialobjector.com/persons/21 (Palmer); https://www.serialobjector.com/persons/302 (Helfand); https://www.serialobjector.com/persons/316 (Sherwood).

[32] *See, e.g., Dennis v. Kellogg Co.*, No. 9-1786, 2013 WL 6055326, at *4 n. 2 (S.D. Cal. Nov. 4, 2013) ("Palmer has been widely and repeatedly criticized as a serial, professional, or otherwise vexatious objector") (and citations); *In re: Oil Spill*, No. MDL 2179, 2013 WL 144042, at *48 n.40 (E.D. La. Jan. 11, 2013) (same); *In re Uponor, Inc.*, No. 11-MD-2247, 2012 WL 3984542, at *3 (D. Minn. Sept. 11, 2012) (noting "the Palmer Objectors appear to be represented by an attorney … who is believed to be a serial objector to other class-action settlements . . .").

[33] *See* https://www.serialobjector.com/persons/47 (House); *see also, e.g., Rose v Bank of Am. Corp.*, No. 11-2390, 2015 WL 2379562 (ND Cal. May 18, 2015) (identifying objection by House, represented by Palmer) (Davila, J.); *Horn v Bank of Am. NA*, No. 12-1718, 2014 WL 1455917 (S.D. Cal. Apr. 14, 2014) (same); *Ralston v Mortg. Inv'rs. Grp. Inc.*, No. 8-536, 2013 WL 5290240 (N.D. Cal. Sept. 19, 2013) (Fogel, J.) (same).

[34] For example, Helfand represented an objector to the settlement in *In re Yahoo! Litig. True Comm., Inc.!*, No. 6-2737 (N.D. Cal. 2010) (Snyder, J.); the objections were overruled; Helfand also filed an appeal (2010 WL 6020601) which was subsequently dismissed by stipulation.  (Diamond Decl. Ex. 10). *See also In re NVIDIA GPU Litig.*, 539 Fed. App'x 822 (9th Cir. 2013) (denying appeal by Helfand to approval of settlement); *Barnhill v Fla. Microsoft Anti-Trust Litig.*, 905 So.2d 195 (Fla. Dist. Ct. App. Apr. 6, 2005) (dismissing appeal by Helfand to settlement approval); *In re WorldCom Inc. Sec. Litig.*, No. 2-3288, 2004 WL 2591402, at *9 (S.D.N.Y. 2004) (overruling objection by Helfand); *In re CreditDebit Card Tying Cases*, No. A-138984, 2014 WL 5488910 (Cal. Ct. App. Nov. 24, 2014) (overruling objections by both Palmer and Helfand).

[35] *Wal-Mart Stores Inc. v Buholzer*, 156 Fed. App'x 347-48 (2d Cir. 2005) ("Not satisfied with the district court's award, Davis, Helfand, and Schonbrun have appealed the decision, insisting that the court erred in its calculation. We affirm the judgment of the court below.")

| | |
|---|---|
| 1 | Respectfully submitted, |
| 2 | Dated:  January 14, 2016     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP |
| 3 | By:    */s/ Nicholas Diamand* |
| |              Nicholas Diamand |
| 4 | |
| 5 | Michael W. Sobol |
| | Nicholas Diamand |
| | Melissa Gardner |
| 6 | 275 Battery Street, 29th Floor |
| | San Francisco, CA 94111 |
| 7 | Telephone: (415) 956-1000 |
| | Facsimile: (415) 956-1008 |
| 8 | msobol@lchb.com |
| | ndiamand@lchb.com |
| 9 | mgardner@lchb.com |

1   Respectfully submitted,

2   Dated:  January 14, 2016        LIEFF, CABRASER, HEIMANN  & BERNSTEIN, LLP

3                                  By:   */s/ Nicholas Diamand*
                                            Nicholas Diamand
4
5                                  Michael W. Sobol
                                   Nicholas Diamand
                                   Melissa Gardner
6                                  275 Battery Street, 29th Floor
                                   San Francisco, CA 94111
7                                  Telephone: (415) 956-1000
                                   Facsimile: (415) 956-1008
8                                  msobol@lchb.com
                                   ndiamand@lchb.com
9                                  mgardner@lchb.com

10  Dated:  January 14, 2016        RUSS AUGUST & KABAT

11                                 By:   */s/ Larry C. Russ*
                                            Larry C. Russ
12
13                                 Larry C. Russ
                                   Nathan D. Meyer
                                   12424 Wilshire Boulevard, 12th Floor
14                                 Los Angeles, California 90025
                                   Telephone: (310) 826-7424
15                                 Facsimile: (310) 826-6991
                                   lruss@raklaw.com
16                                 nmeyer@raklaw.com

17

18  Dated:  January 14, 2016        OLAVI DUNNE LLP

19                                 By:   */s/ Dorian S. Berger*
                                            Dorian S. Berger
20
21                                 Dorian S. Berger
                                   Daniel P. Hipskind
22                                 1880 Century Park East, Ste. 1880
                                   Los Angeles, California 90067
23                                 Telephone: (213) 516-7900
                                   Facsimile: (213) 516-7910
24                                 dberger@olavidunne.com
                                   dhipskind@olavidunne.com
25
                                   *Class Counsel*
26

27

28